UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 4:11-cr-00003-RRB |
| ) | |
| Plaintiff, ) | Fairbanks, Alaska |
| ) | Wednesday, January 25, 2012 |
| vs. ) | 8:31 o'clock a.m. |
| ) | |
| WILLIS SCOTT MAXON, ) | **TRIAL BY JURY – DAY 1** |
| ) | |
| Defendant. ) | |
| _____ ) | |

VOLUME I
**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE RALPH R. BEISTLINE
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          STEPHEN COOPER, ESQ.
                            Assistant U.S. Attorney
                            U.S. Attorney's Office
                            101 12th Avenue, Room 310
                            Fairbanks, Alaska   99701
                            (907) 456-0245

For the Defendant:          F. RICHARD CURTNER, ESQ.
                            Federal Public Defender Agency
                            601 West 5th Avenue, Suite 800
                            Anchorage, Alaska   99501
                            (907) 646-3400

Court Recorder:             JODY EVANS
                            U.S. District Court
                            101 12th Avenue, Room 332
                            Fairbanks, Alaska   99701
                            (907) 451-5792

🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹
**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota 58501-1272*
*(701) 255-1054 ❧ nodak@centurylink.net*

```
 1   Transcription Service:          NODAK ROSE TRANSCRIPTS
                                     721 North 19th Street
 2                                   Bismarck, North Dakota   58501
                                     (701) 255-1054
 3
     Proceedings recorded by electronic sound recording.
 4   Transcript produced by transcription service.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    FAIRBANKS, ALASKA - WEDNESDAY, JANUARY 25, 2012

2        (Call to Order of the Court at 8:31 a.m.)

3        (All parties present; defendant present)

4        (Prospective jurors not present)

5            THE CLERK:  All rise.  His Honor the Court, the

6    United States District Court for the District of Alaska is now

7    in session, the Honorable Ralph R. Beistline presiding.

8    Please be seated.

9            THE COURT:  Okay.  Good morning.

10            MR. COOPER:  Morning, Your Honor.

11            MR. CURTNER:  Morning, Your Honor.

12            THE COURT:  Everybody ready to go?

13            MR. CURTNER:  Yes.

14            THE COURT:  Mr. Cooper?

15            MR. COOPER:  Yes, yes, we are, Your Honor.

16            THE COURT:  Just about?

17            MR. COOPER:  Yes, we are.

18            THE COURT:  Oh, okay.  All right.  All right.  Well,

19    let's go over a few things here.  Got the jury instructions

20    pretty well squared away.  I have to just see how things

21    develop there.  We have -- forty jurors have checked in.

22    Something about fifteen below makes that a little slow, but I

23    think we can do it with forty.  Hopefully a few more will come

24    in, in the next thirty minutes.  Any issues from the

25    Government at all?

1          MR. COOPER:  I don't believe so, Your Honor.  I

2    don't think I have anything that needs to come up.

3          MR. CURTNER:  I can't anticipate any issues right

4    now, Judge.

5          THE COURT:  What about -- didn't -- were you going

6    to have an agent sit with you?

7          MR. COOPER:  Yes, Your Honor.

8          THE COURT:  Who is that going to be?

9          MR. COOPER:  It's David Rippeto.

10         THE COURT:  Who?

11         MR. COOPER:  David Rippeto.  He's a --

12         THE CLERK:  I put -- I wrote that --

13         THE COURT:  Oh, it's -- oh, here it is.

14         THE CLERK:  -- (indiscernible - simultaneous

15   speakers) for you.

16         THE COURT:  Okay.  David Rippeto.

17         MR. COOPER:  He's a fish and wildlife specialist.

18         THE COURT:  Well, you've got two names here.  You

19   going to have two agents in?

20         MR. COOPER:  Well, Mac Whisler is actually his

21   supervisor.  He's the one that will be handling the computer

22   for --

23         THE COURT:  I'll just have you introduce the case

24   agent, whoever happens to be sitting there at the time.

25         MR. COOPER:  Fine.  That -- that'll be all right.

1     THE COURT:  And then -- let me see here.  We've got

2  -- Mr. Curtner, I'll just have you introduce Mr. Johnson so

3  everything is fair, okay?

4     MR. CURTNER:  That would be fine.

5     THE COURT:  And you're -- all right.  So, just so

6  there's no surprises, basically we'll -- we'll call the jurors

7  in, they'll fill up the -- they won't fill up the first row,

8  and we'll get right into it.  I'll use the stand -- the

9  language I have been using for a number of years, I'll

10 introduce the parties, I'll introduce the defendant when I

11 introduce counsel, I'll explain to the jury what we're dealing

12 with, I'll read the Indictment, give them the trial day -- you

13 want to have the trial day starting at 8:30 or nine?

14     MR. CURTNER:  Eight-thirty.

15     THE COURT:  Eight-thirty?  Okay.

16     MR. COOPER:  All right.  Sure.

17     THE COURT:  Is that okay?

18     MR. COOPER:  I believe -- yeah, that'll work, Your

19 Honor.

20     THE COURT:  Okay.  Take luncheon break around noon,

21 about an hour and fifteen minutes, and then we go to 4:30 or

22 five.  Generally, we go to at least 4:30 and no later than

23 five is what I usually say, and somewhere in that range we

24 break, and counsel can kind of tell me where they think we

25 should break as we approach the ending hour so it's a

1    convenient time witness-wise.

2              General rules, I've gone over the proposed questions

3    that -- they're pretty much what I usually ask and this -- the

4    only real difference I think is that this one involves the

5    Lacey Act, so I'll ask them if they have any strong feelings

6    one way or the other with regard to the federal fish and

7    wildlife laws.  Anything more specific in that regard?  I

8    mean, you'll be able to tell where they work or -- I mean, you

9    know, what their hobbies are if you -- if that's an issue for

10   you, but --

11             MR. COOPER:  I think -- right, I think that's fine.

12             MR. CURTNER:  Judge, this -- there may be some

13   issues about subsistence.  That's always sort of a sensitive

14   issues with some jurors.  You might just raise the general

15   topic of subsistence and subsistence fishing and see if it's a

16   sensitive issue for anybody.

17             THE COURT:  I'll just say if any of you have any

18   strong -- strong feelings with regard to -- or to the

19   subsistence laws or --

20             MR. CURTNER:  Yeah, that would be fine.

21             THE COURT:  You know, the ones that do will know

22   what we're talking about, the ones that don't won't have a

23   clue what I'm talking about.

24             MR. CURTNER:  Right.

25             THE COURT:  Should -- should I say with regard to

1  the subsistence fishery?

2          MR. CURTNER:  Yes.

3          THE COURT:  Okay.  Then we'll -- if we -- if we go

4  with the two alternates, then we'll have -- we'll work with --

5  from thirty-two jurors; if we go with one alternate, we'll go

6  with a lesser number.  And that just depends on how many

7  jurors we have.  We're going to aim for two alternates.  With

8  the -- with the weather, you never know what's going to

9  happen.

10          Let's see here.  That's all pretty straightforward.

11  Then -- you know, I don't -- we should go pretty quick,

12  frankly today.  I mean, it's not drugs, it's not guns, it's

13  not sex; it's fish.

14          MR. CURTNER:  Exactly.

15          THE COURT:  So, we -- we should be able to have few

16  -- well, there -- you know, people will come back when I ask

17  if you've ever been victims of crimes.  We'll have to go

18  through that process.

19          MR. CURTNER:  I doubt if they've ever been a victim

20  of a fish crime.

21          THE COURT:  I know, but I won't -- but they

22  generally have -- and I go through that pretty quick.  If it's

23  a real issue, you can tell by their face, you don't have to

24  even ask them anything.  When they get back here and -- and

25  you look at them, you can tell whether it's serious or not

1  just by their facial expression.

2         Okay.  Jody, do you want to call and see how we're

3  doing jurors-wise, see if we've gotten any more?

4         THE CLERK:  Sure.

5         THE COURT:  Do you know the number -- phone number?

6  See, the thing is we've -- we've -- the jurors have all

7  checked in, so we can even start early.  Do you need time to

8  do things or --

9         THE CLERK:  I believe they're still watching the

10 video right now.

11        THE COURT:  Oh, they're still watching the video?

12        THE CLERK:  Mm-hmm (affirmative).

13        THE COURT:  Okay.  So, we have --

14        MR. CURTNER:  Let's just take the first twelve.

15        THE COURT:  I've had -- I've had attorneys do that

16 in state court civil cases, just literally -- they don't care,

17 give me the first twelve, and in that particular case, it

18 didn't work out well for that particular -- it was a civil

19 case.  Great attorney.  The best -- one of the best attorneys

20 in town, but didn't work out well for him.

21                        (Pause)

22        THE COURT:  She may be busy.

23        THE CLERK:  She's not answering.

24        THE COURT:  Well, she's busy.  That's probably it.

25                        (Pause)

1    THE COURT:  Okay.  Well, we're still on the record,

2 so we'll go off the record in a second and -- Mr. Maxon, do

3 you have any questions?  Let me ask -- do you have any

4 questions about what's going to happen here this morning?

5    THE CLERK:  Can you pull that microphone over in

6 front of you, please?

7    THE COURT:  If you do -- I think I told you

8 everything.  If you're going to testify, it's your decision,

9 remember I told you all that?

10    THE DEFENDANT:  (No audible reply.)

11    THE COURT:  Can't think of anything else.  He's not

12 in custody, so we don't have to worry about -- he can come

13 back in if there's any -- so, there's none of the traditional

14 issues.  Okay?

15    THE DEFENDANT:  Okay.

16    THE COURT:  All right.  We'll let's stand in recess.

17 When the jury's ready, just let us know.  Probably -- probably

18 be another ten or fifteen minutes, right?

19    MR. CURTNER:  And do you have a list of the jurors?

20    THE COURT:  We will.

21    THE CLERK:  We will soon.

22    THE COURT:  And you'll get that first.  (Sound.)

23 That means you're getting a phone call?

24    THE CLERK:  Yes.

25    THE COURT:  Or -- okay, or is it a fire alarm?

1    THE CLERK:  (On the telephone.)  Hello?  Yes.  We

2    were just wondering if any more jurors had showed up?  Okay.

3    Okay.  And about how much longer?  Little bit yet?

4    THE COURT:  No rush.

5    THE CLERK:  Okay, great.  Thank you.  Okay, bye.

6    (End of telephone call.)  She'll have them ready at nine

7    o'clock.

8    THE COURT:  Okay.  Okay.  All right.  No early.  All

9    right.  But no -- she -- has any more shown up?

10    THE CLERK:  No.

11    THE COURT:  Counsel, do you want to go -- should she

12    be calling more jurors or do you think we can do it with

13    forty?

14    MR. CURTNER:  I think probably forty is --

15    THE COURT:  I think we can, but, you know --

16    MR. CURTNER:  Let's start with forty and --

17    THE COURT:  And if we don't get --

18    MR. CURTNER:  -- if somehow we end up short, we

19    can --

20    THE COURT:  Okay.  All right.  We'll see everybody

21    at nine o'clock then.

22    THE CLERK:  All rise.  Court stands in recess until

23    9:00 a.m.

24    (Recess at 8:40 a.m., until 9:11 a.m.)

25    (Prospective jurors not present)

1      THE CLERK:  All rise.  His Honor the Court, the

2  United States District Court for the District of Alaska is

3  again in session, the Honorable Ralph R. Beistline presiding.

4  Please be seated.

5      THE COURT:  Okay.  Now we're ready to go.  We've

6  distributed the list.  Do you have the list?

7      MR. CURTNER:  Yes, Your Honor.

8      THE COURT:  Okay.  Let me go through that real quick

9  to see if any names stand out.  And what about counsel,

10  anything -- as you go through the list, anything that --

11  anyone you're concerned about?

12      MR. CURTNER:  No.

13      THE COURT:  (States name of Prospective Juror No.

14  34) is a local attorney in town.  Looks like he's tried at

15  least one case in federal court, and he was a law clerk of

16  mine about fifteen years ago, and he does know about

17  subsistence fisheries; he's a -- he's a guide -- a fishing

18  guide.  That's all I can tell you there, but I don't know if

19  he knows about subsistence fishery.

20          (States name of Prospective Juror No. 39) is a

21  judicial assistant in state court.

22      MR. COOPER:  What was that name again, Your Honor?

23      THE COURT:  (States name of Prospective Juror No.

24  39).  I see we've got a fisheries biologist there.

25      MR. CURTNER:  Who?

1    THE COURT:  I've heard the name before.  You see

2  that?  (States first name of Prospective Juror No. 15)?

3    MR. COOPER:  Yes.

4    THE COURT:  Okay.  (States name of Prospective Juror

5  No. 25).  There may be other names I'm familiar with, but none

6  stand out as significant here for our purposes.  Okay.  Can we

7  go ahead and bring them in?

8    MR. COOPER:  Yes, Your Honor.

9    MR. CURTNER:  Yes.

10    THE COURT:  All right.  Let's do it.

11    THE CLERK:  (On the telephone.)  Can you bring the

12  jury in, please?  Thank you.  (End of telephone call.)

13                    (Pause)

14      (Prospective jurors in at 9:14 a.m.)

15    THE COURT:  Do you want them in the first row?

16    THE CLERK:  Oh --

17    THE COURT:  Everything -- everything but the first

18  row.  Any -- you can have any seat in the place except for the

19  first row.  Now, you can take any seat in the courtroom except

20  -- we're going to keep the first row open.

21                    (Pause)

22    THE COURT:  First row we want to keep open.  Any --

23  all the other rows are free.

24                    (Pause)

25    THE COURT:  Okay.  Counsel, can I just talk to you

1    real quickly -- just real -- up here real quick?

2         (Indiscernible side bar)

3              THE COURT:  All right.  Well, good morning.  How you

4    doing?  You look great.  I mean, you look fantastic.  The

5    weather must be warming up.  Well, listen, where else would

6    you want to be on a -- on a crispy Fairbanks morning?

7              My name is Judge Beistline.  You've been summoned

8    here as prospective jurors in a criminal case.  It's entitled

9    United States of America v. Willis Scott Maxon, and the Clerk

10   has already taken a role, so we've got -- we know who you are,

11   we know everyone that's here, and we're going to go ahead and

12   pick the jury.

13             Now, listen, before we even get started, I want to

14   thank you for coming.  I -- I know what it's like to be busy

15   and then to be called out of your life and thrown into

16   something like this.  Happened to me recently.  I was called

17   -- I was called for state jury duty, I spent days going back

18   and forth and doing all this stuff, so I know what it's like.

19             Let me tell you, I -- I've -- I've worked in the

20   state system, and we're not going to take two or three days to

21   pick a jury.  We're going to pick a jury this morning, and in

22   two or three days we'll be done and have you out of here.  So,

23   that's the good news.  And -- but I do want to thank you and

24   let you know we do really appreciate you taking the time to

25   come.  It's critical for our system of justice that we have

1  citizen jurors help us in this process.

2      So, this -- as I said before, it's a criminal case.

3  It involves charges of false identification of wildlife,

4  that's the charge.  The trial is expected to take just two or

5  three days.  So, by the weekend you'll be done and you won't

6  have to worry about jury duty for what, a couple of years?  I

7  don't know what the rules are in that regard.  So, this is not

8  going to be one of those two or three-week or two or three-

9  month trials, it's going to be a two or three-day trial.  So,

10  that's the good news.

11      Trial -- we -- we start at 8:30 in the morning

12  typically, we run to about noon, take a brief -- about an hour

13  -- hour-and-fifteen-minute lunch break, then come back right

14  after lunch and go to 4:30 or five, and that's basically the

15  process that we follow.

16      Let me introduce to you briefly the parties.  For

17  the Government, we have Mr. Cooper, and if you would introduce

18  the case agent, Mr. Cooper, please?

19      MR. COOPER:  Yes, thank you, Your Honor.  David

20  Rippeto, case agent on this case.

21      THE COURT:  Okay.  Very well.  And then for the

22  defendant, we have Mr. Curtner, that's the attorney, and the

23  defendant is the fellow, Mr. Maxon, on the far right.  And Mr.

24  Curtner, do you want to introduce your investigator, please?

25      MR. CURTNER:  Good morning, ladies and gentlemen.

1    I'm Rich Curtner.  I'm representing Scott Maxon, and this is

2    Bruce Johnson, he's my investigator.  He's smarter than me, so

3    he's going to help me out (indiscernible - away from

4    microphone).

5            THE COURT:  Okay.  So, those are the parties that

6    are -- are going to be involved in this process.  We do trials

7    all over the state.  We do them in Fairbanks, we do them in

8    Anchorage, we do them in Juneau, Ketchikan, once every twenty

9    years we do them in Nome, and we do them the same way, and so

10   I read from a script, and you'll notice I'm reading things and

11   that's and that's because we pick jurors the same way in

12   whatever the trial is, wherever we might be.  And so I'm going

13   to turn to the script right now.

14           It's trial rules.  Now, the trial in this case will

15   be conducted in accordance with established rules.  The judge

16   is like a referee and enforces the rules and determines what

17   law is to be applied to the case and what evidence may be

18   admitted.  The respective attorneys present the evidence

19   according to these rules.  It is the function of the jury to

20   decide the facts, the credibility of the witnesses, and the

21   weight to be given to witness testimony, and to render a just

22   verdict if you are able.

23           It will be the jury's sworn duty to accept the law

24   as given to you by the judge and to apply the law to the facts

25   as you find them to be.  As the trial proceeds, I will explain

1    this in more detail, as well as explain more fully the

2    procedure that will be followed during the trial.

3            Now, in this case, the United States has charged the

4    defendant by way of an Indictment.  So, I'll just read the

5    major portion of that.  The introductory allegation says:

6            "The Lacey Act, Title 16, United States Code, makes

7            it unlawful, among other things, to make any false

8            record, account or label or any false identification

9            of any fish or wildlife which has been or is

10           intended to be transported in interstate commerce."

11   Now, there are two counts.  Court one reads:

12           "On or about January 2nd, 2010, in the District

13           of Alaska and elsewhere, the defendant, Willis Scott

14           Maxon, did knowingly make a false identification,

15           record, account or label concerning the species of

16           fish intended to be transported in interstate

17           commerce for sale, to wit:

18           "Fifty pounds of smoked salmon strips falsely

19           identified, labeled and accounted for as twenty-five

20           pounds King salmon" --

21   -- then they have the -- the scientific name for it --

22           -- "Class A, and twenty-five pounds, which were sold

23           for one thousand three hundred and seventy-eight

24           dollars, when in truth and in fact the fifty pounds

25           of King salmon strips were Chum salmon strips."

1    And then count two says that:

2                    "From or on or about January 2nd, 2010, and

3             continuing up and to about August 23rd, 2010, in the

4             District of Alaska and elsewhere, the defendant,

5             Willis Maxon, did knowingly make a false

6             identification and account concerning the species of

7             fish intended to be and transported in interstate

8             commerce for sale, to wit:

9                    "Forty-eight pounds of smoke salmon strips

10            falsely identified and accounted for as King salmon

11            which were sold for one thousand three hundred and

12            forty-seven dollars, when in truth and fact the

13            forty-eight pounds of King salmon were Chum salmon

14            strips."

15   So, that's the Indictment.  Those are the two counts.

16           You need to understand that an indictment is only a

17   formal method of accusing a defendant of a crime.  It is not

18   evidence of any kind against the accused, and does not create

19   any presumption or permit any inference of guilt.  It is

20   merely an allegation of the charge or charges against the

21   defendant, and informs the defendant of the specific crime or

22   crimes with which he is charged.

23           The fact that an indictment has been filed against

24   the defendant may not be considered by you for any purpose,

25   and is not evidence in the case and should not be considered

1    as such by you.

2          To the charge contained in the Indictment, the

3    defendant has pled not guilty.  This plea of not guilty places

4    upon the Government the burden of proving beyond a reasonable

5    doubt all of the material allegations and essential elements

6    of the crime charged.

7          So, we're now going to proceed to the selection of

8    the trial jury.  This is an important part of the case because

9    both sides expect jurors to be fair and impartial.  Both the

10   Government and the defendant are entitled to jurors who

11   approach this case with open minds and agree to keep their

12   minds open until a verdict is reached.  Jurors must be as free

13   as humanly possible from bias or prejudice or sympathy, and

14   must not be influenced by preconceived ideas as to the facts

15   or as to the law.

16         Now in this case, the jury will be composed of

17   twelve persons and one or two alternates.  Before we call some

18   of you forward though and -- with some more specific

19   questions, we need to ask you a few questions to determine

20   whether or not this is an appropriate case for you to serve.

21         So, what we're going to do is administer -- have you

22   stand and administer the juror's oath and then ask some

23   questions.  So, if you'll please stand, my Clerk will take

24   care of the oath.

25         THE CLERK:  Please stand and raise your right hand.

1    (Oath administered to the prospective jurors.)

2              THE CLERK:  Please be seated.

3              THE COURT:  Okay.  Thank you very much.  Can

4    everybody hear me?  I'm speaking pretty loudly.  I hope you

5    can all hear.  Can you?

6              THE PROSPECTIVE JURORS:  (No audible reply.)

7              THE COURT:  Okay.  Good.  All right.  I have some

8    questions for you.  This is the time when you all get

9    stressed, I know that because I went through this, but they're

10   easy questions, okay?  And it's -- I'm going to ask you some

11   of these questions, then we'll have some more specific later

12   on.

13             Some of the questions when we get down the line, you

14   might feel, well, it's -- I'd like to just answer that

15   privately, so we just step outside, grab the microphone and we

16   do it privately.  I guarantee you we're going to do that, so

17   don't -- don't be afraid to be the first one to say can I

18   answer that up front, okay?  We'll just -- you know, don't --

19   don't be afraid to do that because we're going to do it, and

20   that always happens, but the questions are pretty

21   straightforward.  Here's the first one.  You ready?

22             Is there anyone here who is not a United States

23   citizen?

24             Second one.  Is there anyone here who is not

25   eighteen years of age or older?

1     Third one.  Now, you're all under oath, okay?  Is

2 there anyone here who is not in possession of a sound mind?

3 Good.  It's -- you look good, too.

4     Number four.  Is there anyone here who is not in

5 possession of all your natural faculties?  That is, the

6 ability to see, hear, smell, taste, and touch.  Anyone have

7 any trouble in any of those areas?  If you do, let me know.

8 We have hearing devices.  Okay.

9     Five.  Is there anyone who is unable to either read

10 or speak the English language?

11     Six.  Is there anyone who is currently on probation

12 either in state court or federal court?

13     Seven.  Is there anyone who currently has criminal

14 charges pending against you or is in a dispute with the

15 federal government?

16     Okay.  Now, come on.  We're going to -- now we're

17 getting to some where you're going to raise your hands, okay?

18     Eight.  Have you or anyone close to you ever been a

19 party in a lawsuit or court proceeding, not counting divorce,

20 not counting child custody, and not counting traffic-related

21 matters?  So, here's the question.  Have you or anyone close

22 to you ever been a party, a participant, in a lawsuit or court

23 proceeding other than divorce, child custody, or related

24 matters.  And I'll first ask the group on my right, just raise

25 your hand.  Come on.  Okay.

1          So, we've got a microphone here -- oh, you're going

2     to use the traveling mic?  Okay.  That's fine.

3          THE CLERK:  Would you rather them come up?

4          THE COURT:  No, you -- you're the boss.  You -- all

5     you do is state your -- stand and state your name, and I think

6     you have to do it when she's at the typewriter because she --

7     do they call them typewriters now?

8          THE CLERK:  Keyboard.

9          THE COURT:  Keyboard.  Okay.  All right.

10          PROSPECTIVE JUROR NO. 26:  My name is (states first

11     name) and I've been in bankruptcy.

12          THE CLERK:  I'm sorry.  I need your last name,

13     please.

14          PROSPECTIVE JUROR NO. 26:  Oh, (states last name).

15          THE COURT:  Okay.  Well, that's fine.  Your name is

16     (states first name) who?

17          PROSPECTIVE JUROR NO. 26:  (States last name.)

18          THE COURT:  Okay.  Anything about that fact affect

19     your ability to be a fair juror in this case?

20          PROSPECTIVE JUROR NO. 26:  No.

21          THE COURT:  Okay.  Thank you.  See how easy that

22     was?  Yes, sir.  Yes?

23          UNIDENTIFIED PROSPECTIVE JUROR:  I'm sorry.  Could

24     you define court proceeding?  I'm a witness all the time.  I

25     work at the (indiscernible - away from microphone).

1          THE COURT:  Well, that's good.  We'll put -- I can

2    tell you you've got a nice uniform on.  Yeah, we'll just get

3    your name and -- right now we've got the microphone here,

4    we'll get the -- yes, sir.

5          PROSPECTIVE JUROR NO. 23:  My name is (states name)

6    and years ago -- I don't know, I'm going to say maybe twenty

7    years ago, I had a misdemeanor conviction on game violation.

8          THE COURT:  Okay.  Okay.  That was here in Alaska?

9          PROSPECTIVE JUROR NO. 23:  Yes.  Uh-huh

10   (affirmative).

11         THE COURT:  So, tell me this because this case

12   involves fish and game, fish issues.  The fact that that's

13   your experience in your life experience, does that affect your

14   ability to be a fair juror in this case?

15         PROSPECTIVE JUROR NO. 23:  No.

16         THE COURT:  And -- and -- okay.  Let me just tell

17   people what a fair juror is because everyone says what the

18   heck is a fair juror?  A fair juror -- in -- in a case like

19   this, the Government has an obligation to prove the charges

20   against the defendant beyond a reasonable doubt.  That's the

21   job.  Now, the job of the juror is to decide whether or not

22   the Government did so.  Did the Government do that?  I think

23   they did, I think they didn't.  That's the job.  We want fair

24   jurors who can listen to the evidence and just decide fairly

25   whether or not the Government has proven the allegations.  Can

1  you do that, sir?

2         PROSPECTIVE JUROR NO. 23:  Yes.

3         THE COURT:  Despite the fact that twenty years ago

4  you yourself had a fish and game issue.

5         PROSPECTIVE JUROR NO. 23:  Yes.

6         THE COURT:  Okay.  Good.  Thank you.  All right.

7  Next -- oh, we have the gentlemen up front in the blue?  And

8  if you can just give us your name, sir, and --

9         PROSPECTIVE JUROR NO. 2:  (States name), sir.

10         THE COURT:  Okay.  And -- and -- and you work for --

11  do what?

12         PROSPECTIVE JUROR NO. 2:  I'm a Sergeant at

13  Fairbanks Correctional Center.

14         THE COURT:  Okay.  Tell me -- so that means you're

15  -- you're familiar with the criminal justice system somewhat

16  and deal with people involved in it.  Can you, in a situation

17  like this, be a fair juror --

18         PROSPECTIVE JUROR NO. 2:  Yes.

19         THE COURT:  -- as I described -- I mean, listen to

20  the facts, if the Government proves the facts, say guilty, and

21  if the Government doesn't prove the facts, say not guilty?

22         PROSPECTIVE JUROR NO. 2:  Yes.

23         THE COURT:  Okay.  Good.  Thank you.  Anyone else --

24  okay.  Let's pass the microphone on back.  Yes?

25         PROSPECTIVE JUROR NO. 33:  Yeah, my name is (states

1  name).  I'm a manager for a retail corporation.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR NO. 33:  I've had numerous

4  dealings involving assault down to misdemeanor theft, so --

5          THE COURT:  Okay.  Involving your business?

6          PROSPECTIVE JUROR NO. 33:  Yes.

7          THE COURT:  Anything about that affect your ability

8  to be a fair juror in this case?

9          PROSPECTIVE JUROR NO. 33:  No.

10          THE COURT:  I mean, would you hold that against the

11  defendant in any way?

12          PROSPECTIVE JUROR NO. 33:  No.

13          THE COURT:  And would you hold that against the

14  Government in any way?

15          PROSPECTIVE JUROR NO. 33:  No.

16          THE COURT:  So, you'll just listen to the evidence

17  and if the Government proves him guilty, say so, and if the

18  Government doesn't, say so, right?

19          PROSPECTIVE JUROR NO. 33:  Correct.

20          THE COURT:  Good.  Okay.  That's what we're looking

21  for.  Anyone else?  Okay.  On the left.  Let's see if we can

22  pass the microphone over to this gentleman.  Yes, sir.

23          PROSPECTIVE JUROR NO. 32:  Four years ago, a DUI.

24          THE COURT:  Okay.

25          THE CLERK:  Your name, sir?

1        PROSPECTIVE JUROR NO. 32:  (States name.)

2        THE COURT:  Anything -- was that in -- in Fairbanks?

3        PROSPECTIVE JUROR NO. 32:  Yes.

4        THE COURT:  Okay.  That's a good example -- by the

5    way, a good example of why a lot of people say can I come

6    forward and say this, okay?  But that's fine.  Anything about

7    that experience affect your ability to be a fair juror in this

8    case?

9        PROSPECTIVE JUROR NO. 32:  No.

10       THE COURT:  I mean, you would -- would you hold that

11   against the Government in this case?

12       PROSPECTIVE JUROR NO. 32:  No.

13       THE COURT:  Would you hold it against the defendant?

14       PROSPECTIVE JUROR NO. 32:  No.

15       THE COURT:  So, you'd be fair to both sides.

16       PROSPECTIVE JUROR NO. 32:  Yes.

17       THE COURT:  Okay.  All right, good.  Thank you, sir.

18   Anyone else over here?  Been a party to a lawsuit.  Okay.

19   Yes.

20       PROSPECTIVE JUROR NO. 40:  (States name.)  DUI five

21   years ago.

22       THE COURT:  I didn't catch your last name.

23       PROSPECTIVE JUROR NO. 40:  (States name.)

24       THE COURT:  Okay.

25       PROSPECTIVE JUROR NO. 40:  DUI five years ago.

1       THE COURT:  Anything about -- in Fairbanks?

2       PROSPECTIVE JUROR NO. 40:  No, in Anchorage.

3       THE COURT:  In Anchorage.  Okay.  Anything about

4  that -- you don't have to tell us those details, you can come

5  up here and say can I tell you -- but that's fine.  I mean,

6  everybody's got problems.

7       PROSPECTIVE JUROR NO. 40:  It happens.

8       THE COURT:  Everybody's had a history.  That's not a

9  problem.  But the question is would that affect your ability

10  to be a fair juror in this case?

11       PROSPECTIVE JUROR NO. 40:  No, I don't --

12       THE COURT:  I mean, if the Government proves the

13  allegations against the defendant, can you say guilty?

14       PROSPECTIVE JUROR NO. 40:  Yeah.

15       THE COURT:  And if they don't, can you say not

16  guilty?

17       PROSPECTIVE JUROR NO. 40:  Yes.

18       THE COURT:  That's the job of the juror.

19       PROSPECTIVE JUROR NO. 40:  Yes.

20       THE COURT:  Okay.  Good.  Thank you, sir.  We have a

21  gentleman up here in the far -- this way.

22       PROSPECTIVE JUROR NO. 37:  I'm (states name).  I --

23       THE COURT:  Okay.  I don't know if we got the name.

24  I'm getting old, I can't hear anymore.

25       PROSPECTIVE JUROR NO. 37:  (States name.)

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR NO. 37:  I sue a lot of people in

3    small claims court.

4          THE COURT:  You sue a lot of people.

5          PROSPECTIVE JUROR NO. 37:  In small claims court --

6          THE COURT:  In small claims?

7          PROSPECTIVE JUROR NO. 37:  -- in the business I'm

8    involved in.

9          THE COURT:  Is it any -- just anybody you sue or do

10   you have some relation --

11         PROSPECTIVE JUROR NO. 37:  People that owe money.

12         THE COURT:  People that owe you money.

13         PROSPECTIVE JUROR NO. 37:  Yeah.

14         THE COURT:  Do you have a business?

15         PROSPECTIVE JUROR NO. 37:  Yes, Banker's Collection.

16         THE COURT:  Okay.  Okay.  That's what you do then.

17         PROSPECTIVE JUROR NO. 37:  Yes.

18         THE COURT:  You're a collection agency.  Oh, okay.

19   Anything about that experience affect your ability to be a

20   fair juror in this case?

21         PROSPECTIVE JUROR NO. 37:  I don't believe so.

22         THE COURT:  I mean -- I don't believe so.  What does

23   that mean?

24         PROSPECTIVE JUROR NO. 37:  (Indiscernible -

25   mumbling.)

1          THE COURT:  It has nothing to do with this case,

2     does it?

3          PROSPECTIVE JUROR NO. 37:  No.

4          THE COURT:  Okay.  So, you can be fair to both --

5          PROSPECTIVE JUROR NO. 37:  Other business contract

6     lawsuits (indiscernible - simultaneous speakers).

7          THE COURT:  Yeah.  Business matters and that's your

8     job.  Okay.  But you can be fair to the defendant in this

9     case, can't you?

10          PROSPECTIVE JUROR NO. 37:  Yes.

11          THE COURT:  And you can be fair to the Government,

12     right?

13          PROSPECTIVE JUROR NO. 37:  Yes.

14          THE COURT:  Okay.  Good.  Thank you, sir.  Okay.

15     There have got to be more than that.  Oh, okay.

16          PROSPECTIVE JUROR NO. 1:  Hi.  (States name.)

17          THE COURT:  Okay.

18          PROSPECTIVE JUROR NO. 1:  I work for the FAA to do

19     enforcements on civil aviators.

20          THE COURT:  Okay.  Anything about that affect your

21     ability to be a fair juror?

22          PROSPECTIVE JUROR NO. 1:  No, sir.

23          THE COURT:  Now, you work for the FAA, that's

24     federal government, right?

25          PROSPECTIVE JUROR NO. 1:  Yes, sir.

1          THE COURT:  Can you be fair to the defendant in this

2    case?

3          PROSPECTIVE JUROR NO. 1:  Yes, sir.

4          THE COURT:  I mean, he's being charged by the

5    federal government with a crime --

6          PROSPECTIVE JUROR NO. 1:  Yes, sir.

7          THE COURT:  -- and that still means the federal

8    government has to prove each of the elements of the crime.

9          PROSPECTIVE JUROR NO. 1:  Yes, sir.

10         THE COURT:  And you could make them do that even

11   though you work for the federal government, can't you?

12         PROSPECTIVE JUROR NO. 1:  (No audible reply.)

13         THE COURT:  Okay.  But you -- so you'd be fair --

14   but you'll be fair to the federal government, too, won't you?

15         PROSPECTIVE JUROR NO. 1:  Yes, sir.

16         THE COURT:  Okay.  Good.  All right.  Any more

17   hands?  I've got more questions, so don't feel left out.

18   We've got a chance for everybody.

19         Next question.  Have you or anyone close to you ever

20   worked as a law enforcement officer which would include

21   probation officer or correction officer, or ever worked for a

22   defense law firm as an investigator?  We'll start on my right.

23   I know we have a gentle -- you don't have to say it again.

24   All right.  So, first row.  Yes, ma'am.  Where's that

25   microphone?  We've got to get it all the way back here.  Okay.

1    If we were in state court, this would now be after lunch,

2    okay?  All right.  Keep going.

3                PROSPECTIVE JUROR NO. 8:  My son-in-law is a State

4    Trooper with the --

5                THE CLERK:  Your name, ma'am.

6                THE COURT:  You name?

7                PROSPECTIVE JUROR NO. 8:  Oh, (states name).

8                THE COURT:  Okay.  (States name.)

9                PROSPECTIVE JUROR NO. 8:  My son-in-law is a State

10   Trooper with the Northern Team, the highway patrol.

11               THE COURT:  Northern Team.  What does that mean?

12   I --

13               PROSPECTIVE JUROR NO. 8:  That's just this region,

14   the whole northern region.

15               THE COURT:  Oh, up here.  So, your son-in-law is a

16   State Trooper.

17               PROSPECTIVE JUROR NO. 8:  Yes.

18               THE COURT:  Okay.  Does that affect your ability to

19   be a fair juror?

20               PROSPECTIVE JUROR NO. 8:  Probably not in this case,

21   no, no.  He doesn't --

22               THE COURT:  Well, this -- you know, I told -- this

23   is what they call a Lacey Act case, deals with fish and game

24   issues.

25               PROSPECTIVE JUROR NO. 8:  Yeah.

1        THE COURT:  The Government has to prove the case

2    beyond a reasonable doubt.

3        PROSPECTIVE JUROR NO. 8:  Mm-hmm (affirmative).

4        THE COURT:  We need people to say, hmm, they did or

5    they didn't.

6        PROSPECTIVE JUROR NO. 8:  Right.

7        THE COURT:  Can you do that?

8        PROSPECTIVE JUROR NO. 8:  I think I can do that.

9        THE COURT:  Well, what do you mean you think you

10   can?

11       PROSPECTIVE JUROR NO. 8:  Well, I -- I know I can do

12   that.

13       THE COURT:  Oh, you are.  And the fact -- despite

14   the fact that your son-in-law is a State Trooper, you can be

15   fair to this defendant and to this federal government, true?

16       PROSPECTIVE JUROR NO. 8:  I can be fair, yes.

17       THE COURT:  Good.  Thank you.

18       PROSPECTIVE JUROR NO. 8:  Yes.

19       THE COURT:  All right.  Let's go back.  Let's move

20   on back.

21       PROSPECTIVE JUROR NO. 15:  (States name.)  Work for

22   the Alaska Department of Fish and Game.

23       THE COURT:  Okay.  So, what do you do -- what do you

24   do with them?

25       PROSPECTIVE JUROR NO. 15:  Sport fish.  I put the

1   fish in the lakes.

2           THE COURT:  So, your job is to go fishing?

3           PROSPECTIVE JUROR NO. 15:  No, it's to make it --

4   make you able to go fishing.

5           THE COURT:  You -- you stock the --

6           PROSPECTIVE JUROR NO. 15:  You got it, yes.

7           THE COURT:  You stock the lake.

8           PROSPECTIVE JUROR NO. 15:  Correct.

9           THE COURT:  So, you work for the State Fish and

10  Game.  So, you --

11          PROSPECTIVE JUROR NO. 15:  Correct.  We've got

12  badges, we enforce the regulations.

13          THE COURT:  Okay.  So, here you've got a gentleman

14  who's accused of violating the fish -- a federal fish and game

15  issue.  Can you be fair to him?

16          PROSPECTIVE JUROR NO. 15:  Yes, I can.

17          THE COURT:  In other words, you -- you'll -- you'll

18  make the Government prove the elements of the charges beyond a

19  reasonable doubt.

20          PROSPECTIVE JUROR NO. 15:  Correct.

21          THE COURT:  And the fact that you -- you -- you have

22  some experience in this area wouldn't affect you one way or

23  the other; you wouldn't be biased, you wouldn't be prejudiced,

24  you'd just be fair, right?

25          PROSPECTIVE JUROR NO. 15:  We listen to the facts

1  and we're fair.

2  THE COURT: Okay. Good. All right. Thank you.

3  All right. Up -- front row again. I know we've got the back

4  row. Yes, ma'am.

5  PROSPECTIVE JUROR NO. 35: I also work for the

6  Alaska Department of Fish and Game.

7  THE COURT: Okay.

8  PROSPECTIVE JUROR NO. 35: I have a --

9  THE CLERK: Can I get your name, please?

10  PROSPECTIVE JUROR NO. 35: Oh, (states name).

11  THE COURT: Okay. Anything -- what -- what do you

12  do?

13  PROSPECTIVE JUROR NO. 35: I'm a research biologist.

14  THE COURT: What do you do for them?

15  PROSPECTIVE JUROR NO. 35: I'm a research

16  biologist --

17  THE COURT: Okay.

18  PROSPECTIVE JUROR NO. 35: -- and I'm conducting

19  mark recapture experiments and lately a -- I'm looking at the

20  basic biological information on Sheefish on the Kuskokwim

21  River drainage.

22  THE COURT: Okay. That sounds fascinating. You get

23  paid to do that? Wow. And that's -- so -- so you're based

24  out of Fairbanks then?

25  PROSPECTIVE JUROR NO. 35: Yes. And I have also had

1   the enforcement training and have a badge, although I've never

2   written a ticket.

3            THE COURT:  Okay.  Now, you see you're in a unique

4   situation because this is kind of a related kind of a case in

5   a way.  Can you be fair to the defendant?

6            PROSPECTIVE JUROR NO. 35:  Yes, sir.

7            THE COURT:  In other words, you just have to listen

8   to the evidence and if the Government proves the case, you

9   have to say guilty, but if the Government doesn't prove the

10  case, you have to say not guilty.  Can you do that?

11           PROSPECTIVE JUROR NO. 35:  Yes, sir.

12           THE COURT:  Okay.  All right.

13           PROSPECTIVE JUROR NO. 34:  My name is (states name),

14  and from 1970 to 1990, I was a sport fish biologist with the

15  Fish and Game Department --

16           THE COURT:  Okay.

17           PROSPECTIVE JUROR NO. 34:  -- also deputized like

18  these two --

19           THE COURT:  Okay.

20           PROSPECTIVE JUROR NO. 34:  -- and -- but not

21  strictly a law enforcement officer, but --

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR NO. 34:  -- we did attend trooper

24  school for a week in Sitka.

25           THE COURT:  Okay.  And then you retired in 1990?

1          PROSPECTIVE JUROR NO. 34:  Yes.

2          THE COURT:  And now you're -- you're not affiliated

3     with that at all anymore?

4          PROSPECTIVE JUROR NO. 34:  That's correct.

5          THE COURT:  Okay.  Now, you've heard the questions.

6     Can you be fair to the defendant in this case?

7          PROSPECTIVE JUROR NO. 34:  Yes.

8          THE COURT:  And -- and it's important when you have,

9     you know, this background that these last two or three people

10    have said, that you -- that you understand your job is not to

11    enforce the law, now your job is to determine whether or not

12    the Government has proven its case beyond a reasonable doubt,

13    and if they do, you have to say guilty, but if they don't, you

14    have to say not guilty.  Can you do that, sir?

15         PROSPECTIVE JUROR NO. 34:  I've been directly away

16    from it from so long that I believe --

17         THE COURT:  Twenty-one years.

18         PROSPECTIVE JUROR NO. 34:  -- that I can be fair,

19    yes.

20         THE COURT:  Yeah, okay.  Very good.  All right.

21    We've covered everyone on my right, I think.  Let's go back.

22    Did I -- back to the left.  Okay.  Same question and just give

23    us your name, please.

24         PROSPECTIVE JUROR NO. 11:  My name is (states name).

25         THE COURT:  Okay.

1        PROSPECTIVE JUROR NO. 11:  And my wife is a retired

2   airport police lieutenant for -- she was an officer for twenty

3   years.

4        THE COURT:  Okay.  Is that the airport here in

5   Fairbanks?

6        PROSPECTIVE JUROR NO. 11:  Yes.  Correct.

7        THE COURT:  Okay.  And when did she retire?

8        PROSPECTIVE JUROR NO. 11:  Four years ago, five

9   years ago.

10       THE COURT:  Okay.  And so she doesn't do that

11  anymore?

12       PROSPECTIVE JUROR NO. 11:  No.

13       THE COURT:  Okay.  Anything about that affect your

14  ability to be a fair juror in this case?

15       PROSPECTIVE JUROR NO. 11:  No.

16       THE COURT:  Okay.  So, you can be fair to the

17  defendant and to the Government, true?

18       PROSPECTIVE JUROR NO. 11:  Yes.

19       THE COURT:  Okay.  All right, good.  Thank you.

20       PROSPECTIVE JUROR NO. 29:  My name's (states name),

21  and I have a brother who's a police officer.

22       THE COURT:  In Fairbanks?

23       PROSPECTIVE JUROR NO. 29:  Seattle.

24       THE COURT:  In Seattle.  Okay.  Anything about that

25  affect your ability to be a fair juror in this case?

1          PROSPECTIVE JUROR NO. 29:  No.

2          THE COURT:  I mean, you can be fair to the

3    Government and you can be fair to the defendant?

4          PROSPECTIVE JUROR NO. 29:  Yes.

5          THE COURT:  Okay.  Because what your brother does --

6    it's a long ways away and not -- not involved with you at all,

7    right?

8          PROSPECTIVE JUROR NO. 29:  Yeah, yeah.

9          THE COURT:  Okay.  All right, thanks.  Anyone else

10   -- okay.  Yes, sir.

11         PROSPECTIVE JUROR NO. 1:  (States name.)  My wife is

12   the nursing supervisor at Fairbanks Correctional Center.

13         THE COURT:  Nursing supervisor at Fairbanks

14   Correctional Center.  Okay.  That's your wife.

15         PROSPECTIVE JUROR NO. 1:  Yes, sir.

16         THE COURT:  Anything about that affect your ability

17   -- your ability to be a fair juror in this case?

18         PROSPECTIVE JUROR NO. 1:  No, sir.

19         THE COURT:  Okay.  Good, thanks.  Okay.  We've got

20   more hands.  Yes.

21         PROSPECTIVE JUROR NO. 31:  My name is (states name),

22   and my father was a game warden for the State of Arizona.

23   He's retired.

24         THE COURT:  Okay.  And that's in Arizona, too,

25   right?

1    PROSPECTIVE JUROR NO. 31:  Correct.

2    THE COURT:  Anything about that affect your ability

3    to be a fair juror?

4    PROSPECTIVE JUROR NO. 31:  No, sir.

5    THE COURT:  Okay.  All right, good.  People behind

6    you there, I see.

7    PROSPECTIVE JUROR NO. 4:  (States name.)

8    THE COURT:  Okay.  I didn't catch your last name.

9    PROSPECTIVE JUROR NO. 4:  (States last name.)

10   THE COURT:  Okay.

11   PROSPECTIVE JUROR NO. 4:  My -- my father was the

12   LEO in Oregon.  Before that he was Master at Arms before

13   coming to Alaska, serving as a park ranger.

14   THE COURT:  Okay.  LEO you say?

15   PROSPECTIVE JUROR NO. 4:  Law enforcement officer.

16   THE COURT:  Okay.  All right.

17   PROSPECTIVE JUROR NO. 4:  Sorry, slang.

18   THE COURT:  Okay.

19   PROSPECTIVE JUROR NO. 4:  My brother worked for the

20   Department of Fish and Game, Fisheries Enforcement, for

21   approximately five years during the nineties.

22   THE COURT:  Where?

23   PROSPECTIVE JUROR NO. 4:  Kenai District.

24   THE COURT:  Okay.

25   PROSPECTIVE JUROR NO. 4:  He currently works for the

1    Department of Natural Resources and is out of enforcement

2    work.

3            THE COURT:  In -- where's that?

4            PROSPECTIVE JUROR NO. 44:  Out of Anchorage office.

5            THE COURT:  Anchorage.  Okay.  Anything about any of

6    that affect your ability to be a fair juror in this case?

7            PROSPECTIVE JUROR NO. 4:  No, sir.

8            THE COURT:  You can be fair to both sides.

9            PROSPECTIVE JUROR NO. 4:  Yes, sir.

10           THE COURT:  Okay.  Good.

11           PROSPECTIVE JUROR NO. 4:  And I have participated

12   with the Alaska State Troopers as an assistant for arson

13   investigation.

14           THE COURT:  Okay.  What -- what is your expertise

15   that would allow you to do that?

16           PROSPECTIVE JUROR NO. 4:  I was a firefighter.

17           THE COURT:  Oh, you're a firefighter.

18           PROSPECTIVE JUROR NO. 4:  Was a firefighter.

19           THE COURT:  Was a firefighter.

20           PROSPECTIVE JUROR NO. 4:  They -- was a firefighter.

21   They found out I could write reports, so they moved me into

22   code enforcement at the university.

23           THE COURT:  Okay.  So, now you do code enforcement.

24           PROSPECTIVE JUROR NO. 4:  Yes.  I've lost twenty

25   percent of my hair, gained twenty percent of my weight.

1          THE COURT:  Okay.  Good work.

2          PROSPECTIVE JUROR NO. 4:  And I've been begging to

3     be moved back to operations ever since.

4          THE COURT:  Okay.  But you -- the question is can

5     you be fair given all of that?

6          PROSPECTIVE JUROR NO. 4:  Yes, sir.

7          THE COURT:  Because you've got relatives, you've got

8     a history, but you can be fair to both sides?

9          PROSPECTIVE JUROR NO. 4:  Yes, sir.  I can be fair

10    and impartial.

11         THE COURT:  Anything else you want to add?

12         PROSPECTIVE JUROR NO. 4:  No, sir.

13         THE COURT:  Okay.  Good, thank you.

14         PROSPECTIVE JUROR NO. 4:  Next?  (Indiscernible -

15    away from microphone.)

16         PROSPECTIVE JUROR NO. 14:  My name is (states name),

17    and my mother is a clerk for the state court.

18         THE COURT:  Okay.  Anything -- that's your mother,

19    right?

20         PROSPECTIVE JUROR NO. 14:  Yes.

21         THE COURT:  Anything about that affect your ability

22    to be a fair juror?

23         PROSPECTIVE JUROR NO. 14:  No, sir.

24         THE COURT:  Okay.  Very good, thank you.  Anyone

25    else?  Okay.  I've got more questions, so don't worry if you

1  want to -- let's see.  This one -- okay.  Have you -- the

2  question is have you or anyone close to you been a victim of a

3  crime?  You don't have to blurt it out.  You can -- we just

4  put it -- we can put it here on the -- back here real quick,

5  okay?  So, some -- you know, many of us have had -- been --

6  houses burglarized or cars, so that's fine, but if there's

7  anything else, let's just talk about it back here.  But the

8  question is have you or anyone close to you been a victim of a

9  crime?  Let's go on the right.  All right.  You want to start

10  back here?  Okay.  See?  Come on, counsel.  We'll just come up

11  back here.

12           THE CLERK:  Can we please move the microphone over?

13           THE COURT:  No, I want to do it in the back -- back

14  here.  Oh, that microphone.  But these people are coming back

15  here.  Is there a mic back there?  I hope -- I didn't check

16  today.  All right, counsel, let's go.  Question is -- you can

17  all think about it -- have you or anyone close to you been a

18  victim of a crime?

19           THE CLERK:  Ma'am, if I can get your name.

20           PROSPECTIVE JUROR NO. 36:  I'm (states name).

21           THE CLERK:  I'm sorry?

22           PROSPECTIVE JUROR NO. 36:  (States name.)

23           THE CLERK:  All right.  If you just want to wait

24  here at the microphone, we'll do one at a time.

25           THE COURT:  You coming?  One at a time -- just one

1    at a time.  Okay.

2        (At side bar)

3            THE COURT:  We've got this right here.  You can

4    stand right here -- right here.  I'm going to close this so

5    we'll have a little privacy here.  Now, this is -- let me just

6    tell you, this is not being played out over the whatever,

7    okay?

8            PROSPECTIVE JUROR NO. 36:  Okay.

9            THE COURT:  What's your name, please?

10           PROSPECTIVE JUROR NO. 36:  (States name.)

11           THE COURT:  Okay.  And what's your concern?

12           PROSPECTIVE JUROR NO. 36:  Well, I don't know that

13   I'm concerned, but --

14           THE COURT:  Okay.  What's the --

15           PROSPECTIVE JUROR NO. 36:  So, let's see, 1980, I

16   believe, I was a convenience store clerk and got robbed.

17           THE COURT:  Okay.

18           PROSPECTIVE JUROR NO. 36:  And in like 1988, I had a

19   domestic violence case --

20           THE COURT:  Okay.  Okay.

21           PROSPECTIVE JUROR NO. 36:  -- that I was a victim.

22   That's it.

23           THE COURT:  Anything else?

24           PROSPECTIVE JUROR NO. 36:  No.

25           THE COURT:  Anything about any of that affect your

1    ability to be a fair juror?

2              PROSPECTIVE JUROR NO. 36:  No.

3              THE COURT:  You can be fair to both sides?

4              PROSPECTIVE JUROR NO. 36:  Yes.

5              THE COURT:  Counsel, any questions?

6              MR. CURTNER:  No.

7              THE COURT:  All right.

8              MR. COOPER:  No questions.

9              THE COURT:  You just go back where you're seated and

10   we'll take the next -- there's a whole line, counsel, you can

11   stay here.

12             MR. COOPER:  Oh, okay.

13        (End side bar)

14             THE COURT:  All right.  Next?

15             THE CLERK:  And if you could just state your name in

16   that microphone before you go back.

17             THE COURT:  That's a new system, but go ahead.

18   You're the boss.

19             PROSPECTIVE JUROR NO. 34:  This one?  My name is

20   (states name).

21        (At side bar)

22             THE COURT:  She's having them state their name out

23   there.

24             MR. COOPER:  Oh.

25             THE COURT:  All right.

1    PROSPECTIVE JUROR NO. 34:  I don't really need

2  privacy, but everybody was coming back, so I just got up.

3    THE COURT:  Well, I know.  Okay.  All right.  Mr.

4  (states last name).

5    PROSPECTIVE JUROR NO. 34:  Yes.

6    THE COURT:  What's the -- what's the -- what crime?

7    PROSPECTIVE JUROR NO. 34:  Yeah, someone stole my

8  truck years ago.

9    THE COURT:  And would that affect your ability --

10    PROSPECTIVE JUROR NO. 34:  No.

11    THE COURT:  -- to be a fair juror?

12    PROSPECTIVE JUROR NO. 34:  No.  Uhn-uh (negative).

13    THE COURT:  I've had trucks, cars, everything

14  stolen, I still can be fair.

15    PROSPECTIVE JUROR NO. 34:  But I had to answer the

16  question, right?

17    THE COURT:  Well, you did.  Thank you.

18    PROSPECTIVE JUROR NO. 34:  Okay.

19    THE COURT:  And counsel, you just speak up if you

20  have any questions.

21    MR. COOPER:  Sure.

22      (End side bar)

23    THE CLERK:  Sir, your name?

24    PROSPECTIVE JUROR NO. 9:  (States name.)

25    THE COURT:  All right.  This will just give us a

1    little exercise.  Doesn't take too long.

2        (At side bar)

3            THE COURT:  And you've already given your name, is

4    that right?

5            PROSPECTIVE JUROR NO. 9:  Yes, sir.

6            THE COURT:  That's what she's doing?  Okay.  Watch

7    these stairs, and --

8            PROSPECTIVE JUROR NO. 9:  Good morning to you.

9            THE COURT:  -- just give -- give --

10           PROSPECTIVE JUROR NO. 9:  Oh, sorry.

11           THE COURT:  Oh, you already gave your name, right?

12           PROSPECTIVE JUROR NO. 9:  I did.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR NO. 9:  (States name.)

15           THE COURT:  Okay.

16           PROSPECTIVE JUROR NO. 9:  And my house was --

17           MR. COOPER:  What was the name?

18           PROSPECTIVE JUROR NO. 9:  (States name.)

19           THE COURT:  Yeah.  Hey, you guys don't have the

20   names.

21           MR. COOPER:  That's right.

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR NO. 9:  My house was burglarized

24   by a meth addict --

25           THE COURT:  Okay.

1      PROSPECTIVE JUROR NO. 9:  -- and I'm pretty

2  passionate about it, you know, and ask (indiscernible - voice

3  too low), so --

4      THE COURT:  Yeah.  But this -- but this doesn't have

5  anything to do with drugs, you know that.

6      PROSPECTIVE JUROR NO. 9:  That's correct.

7      THE COURT:  Can you be fair in this case?

8      PROSPECTIVE JUROR NO. 9:  I can.

9      THE COURT:  Okay.

10      PROSPECTIVE JUROR NO. 9:  And I -- yeah, one quick

11  question.  I've (indiscernible) also a commercial fisherman.

12      THE COURT:  Okay.

13      PROSPECTIVE JUROR NO. 9:  If you can ask questions

14  about --

15      THE COURT:  No, no, tell me.

16      PROSPECTIVE JUROR NO. 9:  Okay.  You know,

17  commercial fisherman, we were -- we were at -- you know, prior

18  to what I do now --

19      THE COURT:  Yeah.

20      PROSPECTIVE JUROR NO. 9:  -- and I did that for

21  seven years.

22      THE COURT:  Where -- where?

23      PROSPECTIVE JUROR NO. 9:  Valdez --

24      THE COURT:  Valdez?

25      PROSPECTIVE JUROR NO. 9:  -- and Southwest.

1          THE COURT:  So, you've -- so you did the big stuff,

2    you didn't just go out and fish for (indiscernible -

3    simultaneous speakers).

4          PROSPECTIVE JUROR NO. 9:  Yeah, we did, and we had

5    to abide by all the laws and --

6          THE COURT:  Right.

7          PROSPECTIVE JUROR NO. 9:  -- permit issues and

8    stuff, so, again, pretty passionate about --

9          THE COURT:  Can you be fair though in this case?

10   Because the issue is whether or not the Government proves the

11   case beyond a reasonable doubt.  If they do, you have to say

12   guilty, but if they don't, you have to say not guilty.

13         PROSPECTIVE JUROR NO. 9:  I believe so.

14         THE COURT:  You can -- well --

15         PROSPECTIVE JUROR NO. 9:  Yes, I -- I will -- yes, I

16   will be fair to them, absolutely.

17         THE COURT:  Okay.  Okay.

18         MR. CURTNER:  You said you were passionate about --

19         PROSPECTIVE JUROR NO. 9:  About the -- you know, we

20   had to abide by all the permitting laws and all of that, it's

21   very tricky to -- there's lots involved in commercial fishing

22   and specific species and what you can and can't take, limits,

23   and that kind of thing, so --

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR NO. 9:  -- just want to be fair.

1    THE COURT:  No, you are being fair.

2        (Indiscernible - simultaneous speakers and away from

3    microphone.)

4        THE COURT:  Last one who did that was Magistrate

5    Judge Hall when he was an attorney.  Every time he'd come back

6    here, he'd have to go use the bathroom.  That was before he

7    became a magistrate.  Oh, should we take a -- I don't know how

8    long this is going to be.  Should we --

9        MR. COOPER:  Hopefully it won't be long.

10        THE COURT:  -- get the next person?

11        MR. CURTNER:  We'll honor their privacy.  So, Judge,

12    did you read that Supreme Court decision on GPS stuff?

13        THE COURT:  No.  I mean, I know enough about -- I

14    knew a little bit about it beforehand, so I understand what

15    it's all about.  You can -- you can't -- yeah, you have to

16    have a warrant (indiscernible - away from microphone).  I

17    don't know if that really surprised me.

18        MR. CURTNER:  No.

19        UNIDENTIFIED SPEAKER:  Thank you, guys.

20        THE COURT:  Okay.

21    (End side bar)

22        THE CLERK:  Your name, ma'am?

23        THE COURT:  Next?

24        PROSPECTIVE JUROR NO. 26:  (States name.)

25    (At side bar)

1          THE COURT:  Okay.  We've got two stairs here.  I

2   know you gave your name already, but we need to know your name

3   because they --

4          PROSPECTIVE JUROR NO. 26:  (States name.)

5          THE COURT:  Okay.  And what is the -- what was

6   the --

7          PROSPECTIVE JUROR NO. 26:  I had been involved in

8   molestation case --

9          THE COURT:  Okay.

10          PROSPECTIVE JUROR NO. 26:  -- physical.

11          THE COURT:  Here in Alaska?

12          PROSPECTIVE JUROR NO. 26:  No, that was in Montana.

13          MR. CURTNER:  How long ago?

14          PROSPECTIVE JUROR NO. 26:  In the eighty -- early

15   eighties.

16          THE COURT:  Anything about that affect your ability

17   to be a fair juror in this case?

18          PROSPECTIVE JUROR NO. 26:  No.

19          THE COURT:  You can be fair to both sides?

20          PROSPECTIVE JUROR NO. 26:  Yes.

21          THE COURT:  Doesn't have anything to do with this

22   case.

23          PROSPECTIVE JUROR NO. 26:  No.

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR NO. 26:  By no means.

1        THE COURT:  Okay.  Counsel want to follow up on

2   that?  I think it's pretty clear.

3        MR. COOPER:  No.

4        MR. CURTNER:  I'm sorry, what was -- victim of what?

5        THE COURT:  Molestation.

6        PROSPECTIVE JUROR NO. 26:  Molestation.  Arson was

7   also involved in that also.

8        THE COURT:  Okay.

9        MR. CURTNER:  (Indiscernible - away from

10  microphone.)

11        THE COURT:  Okay.

12        PROSPECTIVE JUROR NO. 26:  All right.  Thank you.

13        THE COURT:  Okay.  Thank you.

14     (End side bar)

15        THE CLERK:  Next?

16        PROSPECTIVE JUROR NO. 33:  (States name.)

17        THE COURT:  Next?

18     (At side bar)

19        THE COURT:  Okay.  We still need your name again

20  because --

21        PROSPECTIVE JUROR NO. 33:  (States name.)

22        THE COURT:  (States last name.)

23        PROSPECTIVE JUROR NO. 33:  (Spells last name.)

24        THE COURT:  Okay.

25        PROSPECTIVE JUROR NO. 33:  I've been a retail

1    manager for twenty-five years, so I've actually had robbery,

2    I've had assault against my person --

3              THE COURT:  Okay.

4              PROSPECTIVE JUROR NO. 33:  -- a lot of

5    shoplifting --

6              THE COURT:  Okay.

7              PROSPECTIVE JUROR NO. 33:  -- a couple of

8    embezzlements with --

9              THE COURT:  Employees?

10             PROSPECTIVE JUROR NO. 33:  Yes.  Typical retail --

11             THE COURT:  Yeah.  Okay.

12             PROSPECTIVE JUROR NO. 33:  -- unfortunately.

13             THE COURT:  Anything about that affect your ability

14   to be a fair juror in this case?

15             PROSPECTIVE JUROR NO. 33:  No.

16             THE COURT:  See, none of that -- that's -- this case

17   has nothing to do with those kind of things.

18             PROSPECTIVE JUROR NO. 33:  No.

19             THE COURT:  Okay.  All right.  Thank you.

20        (End side bar)

21             THE CLERK:  Next?

22             PROSPECTIVE JUROR NO. 11:  (States name.)

23        (At side bar)

24                  (Pause - side conversation)

25             THE COURT:  Okay.  Can we have your name, please?

1          PROSPECTIVE JUROR NO. 11:  (States name.)

2          THE COURT:  Okay.  And what was your --

3          PROSPECTIVE JUROR NO. 11:  When my daughter was in

4   high school, she was raped by a couple of guys, and --

5          THE COURT:  Any -- in Alaska?

6          PROSPECTIVE JUROR NO. 11:  In Alaska.

7          THE COURT:  In Fairbanks?

8          PROSPECTIVE JUROR NO. 11:  In North Pole.

9          THE COURT:  Okay.  Anything about that affect your

10  ability to be a fair juror in this case?

11         PROSPECTIVE JUROR NO. 11:  Well, only I didn't think

12  that the law enforcement did enough --

13         THE COURT:  Yeah.

14         PROSPECTIVE JUROR NO. 11:  -- to pursue the case.

15  In fact, we never got to court.

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR NO. 11:  There was an

18  investigation, never got to court, and I'm just, you know, mad

19  that they didn't (indiscernible - simultaneous speakers).

20         THE COURT:  But would that affect your ability to be

21  a fair juror in this case?  Would you hold it against the

22  Government in this case?

23         PROSPECTIVE JUROR NO. 11:  No.  There's other things

24  I hold against the Government in this case --

25         THE COURT:  What, what?

1    PROSPECTIVE JUROR NO. 11:  Well, you know, I got

2  ticketed for -- you know, I'm a sports fisherman.  I got

3  ticketed for fishing with one of those -- what do you call

4  those?  Casting bobbers.

5    THE COURT:  Yeah.

6    PROSPECTIVE JUROR NO. 11:  And I was just getting

7  (indiscernible) line went, and I got ticketed by the Fish and

8  Wildlife guy for a bobber that didn't have a hook on it, you

9  know?  And I thought really, dudes, you know?  And that -- I

10  have not -- and I paid the ticket, it was two hundred -- it

11  was a two-hundred-dollar bobber.  And since then, I've never

12  been really, you know, comfortable --

13    THE COURT:  Yeah.

14    PROSPECTIVE JUROR NO. 11:  -- you know, with -- with

15  the fishing and wildlife regulations over sports fishing

16  and --

17    THE COURT:  Yeah.

18    PROSPECTIVE JUROR NO. 11:  -- stuff like that.

19  There's certain things that I disagree with and certain things

20  that -- the enforcement I truly disagree with, but, you know,

21  it's something we've got to live with.

22    THE COURT:  Okay.

23    PROSPECTIVE JUROR NO. 11:  But -- but what really

24  ticked me off was, you know, the -- the ticket with the

25  bobber.

1              THE COURT:  Yeah, I can see --

2              PROSPECTIVE JUROR NO. 11:  You know, that -- that

3    was the -- just a -- a pure exercise in ridiculousness.

4              THE COURT:  So, can -- you can't be fair then in

5    this case?

6              PROSPECTIVE JUROR NO. 11:  You know?

7              THE COURT:  I don't know.  You know.  I mean, this

8    is not --

9              PROSPECTIVE JUROR NO. 11:  You know, I guess if I

10   were to hear it out -- you know, I don't know what the guy

11   did.  I mean, I really --

12             THE COURT:  I don't know either, but the Government

13   says that he broke the law.  My job is to tell you what the

14   law is, your job is to figure out if he broke the law.

15             PROSPECTIVE JUROR NO. 11:  I don't know.  I mean,

16   Chum salmon, King salmon -- I mean, either the guy's stupid

17   or trying to make a buck, I don't know.  I -- I -- I don't

18   know if it'll --

19             THE COURT:  How do you make a buck -- I don't know

20   if that --

21             PROSPECTIVE JUROR NO. 11:  Yeah.  You know, I don't

22   know what he's trying to do, but it's basically between chum

23   and -- and king.  Already I'm a -- you know, my mind set is,

24   dude, you know, that's stupid, and so my perception of what he

25   did, I'm -- I feel kind of biased in the fact that he -- if

1    you've been in Alaska for all this time, you know, you know

2    the difference between Chum salmon and King salmon.

3              THE COURT:  I'm just trying to figure out if you can

4    be fair because you said things pro for -- pro and against

5    both sides.

6              PROSPECTIVE JUROR NO. 11:  Right, right.  So, now

7    I'm some kind of -- I don't know.  I don't know if I can be

8    fair to be honest with you.  I don't know.

9              THE COURT:  But you don't know who you would be

10   leaning towards now.

11             PROSPECTIVE JUROR NO. 11:  Right, right.  And I --

12   it tend to (indiscernible) what I heard, you know.

13             THE COURT:  Well, why don't you think about it --

14             PROSPECTIVE JUROR NO. 11:  Sure.

15             THE COURT:  -- and if you can't be fair, you tell us

16   because if you can't be fair, then we -- then there's going to

17   be a different -- we could have a drug case next week you

18   could be on or something, but if this is a case you can't be

19   on because you have -- you can't be fair to one side or the

20   other, just tell us and we'll excuse you.  But right now,

21   you've told me you're kind of mad at the government because of

22   the bobber --

23             PROSPECTIVE JUROR NO. 11:  Yeah, well, my personal

24   experience, but, you know, it's my personal experience.  I

25   mean, I'm being honest with you.

1       THE COURT:  You're supposed to put that aside and

2   listen to the evidence and say did the Government prove it or

3   not.

4       PROSPECTIVE JUROR NO. 11:  Right.

5       THE COURT:  And you're supposed to follow the law

6   that I tell you.  You can't say that's a stupid law.

7       PROSPECTIVE JUROR NO. 11:  Well, I believe -- I

8   believe I can be fair.  I'm just telling you I don't know

9   through the course of listening to the case that I will be.

10      THE COURT:  Well, if you're affected by the facts of

11  the case, that's what you're supposed to be affected by --

12      PROSPECTIVE JUROR NO. 11:  Right.

13      THE COURT:  -- but you're supposed to be fair in the

14  process.  If you -- after you listen to the evidence and you

15  conclude he's guilty, then you have to say so, but if you

16  conclude he's not guilty or they didn't prove all the elements

17  -- he might be guilty, but they didn't prove it beyond a

18  reasonable doubt, then you have to say not guilty.

19      PROSPECTIVE JUROR NO. 11:  Sure.

20      THE COURT:  Can you do that?

21      PROSPECTIVE JUROR NO. 11:  Yeah, I think --

22      THE COURT:  Thank you.

23    (End side bar)

24      THE CLERK:  Next, sir.

25      PROSPECTIVE JUROR NO. 4:  (States name.)

1          THE COURT:  Next?

2      (At side bar)

3          THE COURT:  You guys are free to step in with

4  questions.  I tried --

5          MR. CURTNER:  Oh, no, no, you're doing a good job.

6              (Pause - side conversation)

7          THE COURT:  Well, what's your name?

8          PROSPECTIVE JUROR NO. 4:  My name is (states name).

9          THE COURT:  Okay.  And what's the --

10          PROSPECTIVE JUROR NO. 4:  Oh, I was assaulted in the

11  line of duty as a firefighter.

12          THE COURT:  Anything about that affect your ability

13  to be a fair juror?

14          PROSPECTIVE JUROR NO. 4:  No, sir.

15          THE COURT:  You wouldn't hold it against either

16  side?

17          PROSPECTIVE JUROR NO. 4:  No, sir.

18          THE COURT:  Anything else on your mind?

19          PROSPECTIVE JUROR NO. 4:  No, sir.

20          THE COURT:  Counsel?  How's that?  You -- you may

21  have broken the record.

22          PROSPECTIVE JUROR NO. 4:  (Indiscernible - away from

23  microphone.)

24      (End side bar)

25          THE CLERK:  Next?

1      PROSPECTIVE JUROR NO. 32:  (States name.)

2           THE COURT:  All right.

3      (At side bar)

4           THE COURT:  Okay.  Now, watch the stairs, and just

5  give us your name again.

6           PROSPECTIVE JUROR NO. 32:  (States name.)

7           THE COURT:  Okay.  And what was the concern?

8           PROSPECTIVE JUROR NO. 32:  In the -- back in the

9  early eighties, I ran a bar -- the Bullseye Bar, part owner.

10          THE COURT:  Where's the Bullseye?  Is that --

11          PROSPECTIVE JUROR NO. 32:  It was at 4 Mile, Chena

12 Hot Springs Road.

13          THE COURT:  That's gone now, isn't it?

14          PROSPECTIVE JUROR NO. 32:  Even the building is

15 gone.

16          THE COURT:  Yeah, I thought about that.  When did

17 you own that?

18          PROSPECTIVE JUROR NO. 32:  Eighty to '84.

19          THE COURT:  Okay.

20          PROSPECTIVE JUROR NO. 32:  Actually, we sold the

21 license and (indiscernible - voice too low).

22          THE COURT:  Okay.

23          PROSPECTIVE JUROR NO. 32:  I had a bartender there

24 who had -- with some kids that we trusted --

25          THE COURT:  Yeah.

1          PROSPECTIVE JUROR NO. 32:  -- but they ended up

2     breaking into the bar and stealing the till --

3          THE COURT:  Okay.  Okay.

4          PROSPECTIVE JUROR NO. 32:  -- and they even babysat

5     for me --

6          THE COURT:  Oh, boy.

7          PROSPECTIVE JUROR NO. 32:  -- and it turned out that

8     they (indiscernible) a lot of --

9          THE COURT:  Yeah.

10         PROSPECTIVE JUROR NO. 32:  -- hard stuff and the

11    little one in particular.  He also fondled my two-year-old

12    daughter at the time.

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR NO. 32:  So --

15         THE COURT:  So, you've got -- but you've been -- so,

16    you have been victimized in that -- in that regard.  Anything

17    else beside that?

18         PROSPECTIVE JUROR NO. 32:  Not --

19         THE COURT:  Nothing significant?

20         PROSPECTIVE JUROR NO. 32:  Nothing at --

21         THE COURT:  Yeah.  So, anything about that affect

22    your ability to be a fair juror in this case?

23         PROSPECTIVE JUROR NO. 32:  No.

24         THE COURT:  Okay.  What do you work for -- what kind

25    of work do you do now?

1          PROSPECTIVE JUROR NO. 32:  I'm now retired.

2          THE COURT:  Okay.  All right.  What did you do after

3   you sold the bar?

4          PROSPECTIVE JUROR NO. 32:  Oh, I (indiscernible) the

5   executive director of the Yukon Quest.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR NO. 32:  And I actually retired

8   from the --

9          THE COURT:  That's where I've heard your name

10  before.  It wasn't the Bullseye Bar then.

11         PROSPECTIVE JUROR NO. 32:  Yeah, I was with the

12  Yukon Quest for many years --

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR NO. 32:  -- and I retired from the

15  armed services, YMCA --

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR NO. 32:  -- that was my last

18  career job.

19         THE COURT:  Okay.  All right.  Anything else?

20         PROSPECTIVE JUROR NO. 32:  No.

21         THE COURT:  Can you be fair to both sides?

22         PROSPECTIVE JUROR NO. 32:  Yeah.  In this case, I --

23  I wouldn't want to sit on a trial with the young gentleman --

24         THE COURT:  Okay.  I can -- okay.

25         PROSPECTIVE JUROR NO. 32:  But other than that --

1       THE COURT:  Okay.  Good, thank you.

2   (End side bar)

3       THE CLERK:  Next?

4       PROSPECTIVE JUROR NO. 40:  (States name.)

5       THE COURT:  Okay.

6   (At side bar)

7           (Pause - side conversation)

8       THE COURT:  Okay.  Sir.  Can you give us your name

9   again, please?

10      PROSPECTIVE JUROR NO. 40:  (States name.)

11      THE COURT:  Okay.  And --

12      PROSPECTIVE JUROR NO. 40:  About ten years ago, got

13  home invasion --

14      THE COURT:  Here in Fairbanks?

15      PROSPECTIVE JUROR NO. 40:  In Anchorage.

16      THE COURT:  In Anchorage, okay.

17      PROSPECTIVE JUROR NO. 40:  And we got robbed at

18  gunpoint.

19      THE COURT:  Okay.  Anything else?

20      PROSPECTIVE JUROR NO. 40:  That's all I can think

21  of.

22      THE COURT:  Anything about that experience affect

23  your ability to be a fair juror in this case?

24      PROSPECTIVE JUROR NO. 40:  I don't think so.

25      THE COURT:  You can be fair to both sides?  You

1  won't hold that against any -- these people weren't in

2  Anchorage, you know that?

3            PROSPECTIVE JUROR NO. 40:  Yeah.

4            THE COURT:  Okay.  All right.  Good, thank you.

5       (End side bar)

6            THE CLERK:  Next?

7            PROSPECTIVE JUROR NO. 35:  (States name.)

8       (At side bar)

9            THE COURT:  Okay.

10            PROSPECTIVE JUROR NO. 35:  This wasn't anything

11  major, but I did have to call the police, so --

12            THE COURT:  Okay.

13            PROSPECTIVE JUROR NO. 35:  -- I figured I better

14  disclose it.

15            THE COURT:  Okay.  What is it?  Give us your name

16  just so we know who --

17            PROSPECTIVE JUROR NO. 35:  Oh, yeah, the court

18  recorder -- (states name).

19            THE COURT:  Okay.

20            PROSPECTIVE JUROR NO. 35:  In 2004, somebody -- I

21  was out doing field work and --

22            THE COURT:  Yeah.

23            PROSPECTIVE JUROR NO. 35:  -- somebody had kicked

24  the door of my cabin open --

25            THE COURT:  Yeah.

1    PROSPECTIVE JUROR NO. 35:  -- and pretty much busted

2  the door.

3    THE COURT:  Uh-huh (affirmative).

4    PROSPECTIVE JUROR NO. 35:  There was a giant foot

5  mark there.  I didn't notice until I got back from the field.

6  Nothing was stolen.  I was renting and -- the -- the -- the --

7  the police were telling me that there was kind of a rash of

8  (indiscernible) robberies --

9    THE COURT:  Yeah, yeah.

10    PROSPECTIVE JUROR NO. 35:  -- in the Goldstream

11  area --

12    THE COURT:  Yeah.

13    PROSPECTIVE JUROR NO. 35:  -- so -- and -- and --

14  and my landlord had an old piece of crap (indiscernible -

15  simultaneous speakers) --

16    THE COURT:  Yeah.

17    PROSPECTIVE JUROR NO. 35:  -- so that might have

18  been the case because nothing was stolen.

19    THE COURT:  But they didn't take the stove either?

20    PROSPECTIVE JUROR NO. 35:  They -- no, they didn't

21  take the stove, they didn't steal anything, they just --

22    THE COURT:  They just checked the stove out.

23    PROSPECTIVE JUROR NO. 35:  -- broke my -- broke --

24  broke the door and kicked the door of my cabin.

25    THE COURT:  You're telling me your stove wasn't even

1  worthy of being stolen.

2           PROSPECTIVE JUROR NO. 35:  It was running.

3           THE COURT:  I -- I -- I -- I -- I own a cabin now

4  and (indiscernible - simultaneous speakers).

5           PROSPECTIVE JUROR NO. 35:  You've got a good stove.

6           THE COURT:  Okay.  Yeah.  Anything about that affect

7  your ability to be a fair juror in this case?

8           PROSPECTIVE JUROR NO. 35:  No, no.

9           THE COURT:  You can be fair to both sides?

10          PROSPECTIVE JUROR NO. 35:  Yes.

11          THE COURT:  Okay.  Good.

12      (End side bar)

13          THE CLERK:  Is there anybody else?

14          THE COURT:  How we doing?  Anybody else want to come

15  back?  All right.  We're done.  Okay.  We've moving through

16  this fairly closely.  I have a few more questions.  Anything

17  questioned -- did those -- having thought about it, anybody

18  else have anything on your mind before I go to the next

19  question?  Okay.  Next question is -- we introduced the

20  parties -- yeah, yes.

21          THE CLERK:  There's a gentleman right there.

22          THE COURT:  Where?

23          PROSPECTIVE JUROR NO. 1:  (States name.)  We had a

24  four-wheeler stolen (indiscernible - away from microphone).

25          THE COURT:  Okay.  So, (states name of Prospective

1  Juror No. 1) had a four-wheeler stolen, and anything about

2  that affect your ability to be a fair juror in this case?

3      PROSPECTIVE JUROR NO. 1:  (Indiscernible - away from

4  microphone.)

5      THE COURT:  Okay.  All right.  So, here's the next

6  question:  We generally don't permit people to serve as jurors

7  if they are friends or relatives of any of the people in this

8  front row, either the defendant or the counsel or the

9  investigators.  Any of you know any of these people?  No hands

10 going up.  Okay.

11     Have any of you ever heard about this case before?

12 No hands going up.  Yes?  Did that --

13     PROSPECTIVE JUROR NO. 18:  (Indiscernible - away

14 from microphone.)

15     THE COURT:  You heard about it.  Okay.  I don't know

16 if you heard about this case, but you may have, I don't know.

17 Why don't you come tell us what you heard.

18     PROSPECTIVE JUROR NO. 18:  (Indiscernible - away

19 from microphone.)

20     THE COURT:  Yeah.  I think come up front would be

21 best.

22     PROSPECTIVE JUROR NO. 18:  (Indiscernible - away

23 from microphone.)

24     THE COURT:  See, we paid for this room, too.  We've

25 got to use it.

1          (At side bar)

2              THE COURT:  Okay.  You should go right -- or right

3    here's good.  Give us your name, please.

4              PROSPECTIVE JUROR NO. 18:  (States name.)

5              THE COURT:  And how -- what have you heard about it?

6              PROSPECTIVE JUROR NO. 18:  I saw it in the paper

7    last year.

8              THE COURT:  Do you remember what you saw?  I don't

9    -- I didn't even know it was in the paper.

10             PROSPECTIVE JUROR NO. 18:  That they were indicting

11   him and it talked about the case, about fish.

12             THE COURT:  Okay.

13             PROSPECTIVE JUROR NO. 18:  It was in the --

14   (indiscernible - voice too low) last February or something

15   like that.  It was in the newspaper.

16             THE COURT:  I don't know if it was or wasn't, so I

17   don't even know if that was this case or another -- I don't

18   know anything about it, but the question is --

19             PROSPECTIVE JUROR NO. 18:  The guy's from Nenana,

20   right?

21             THE COURT:  Yeah.

22        (Indiscernible - simultaneous speakers)

23             PROSPECTIVE JUROR NO. 18:  -- from Nenana

24   (indiscernible - voice too low).

25             THE COURT:  Okay.  So, can -- that's interesting

1    because I didn't know it was in the paper, so you know more

2    about it than I do.  Can -- you understand that what's in the

3    paper is in the paper and that's not evidence at all?

4              PROSPECTIVE JUROR NO. 18:  Right.

5              THE COURT:  That's just --

6              PROSPECTIVE JUROR NO. 18:  (Indiscernible -

7    simultaneous speakers.)

8              THE COURT:  And I also told you that an indictment

9    is only a charge, it's not --

10             PROSPECTIVE JUROR NO. 18:  Right.

11             THE COURT:  -- it doesn't -- it's not evidence,

12   can't be considered for any purpose.  You know, some people

13   are indicted and that's the end of it and -- and some people

14   go to trial and found not guilty, some go to trial and found

15   guilty.  So, you can't let that affect you, do you understand

16   that?

17             PROSPECTIVE JUROR NO. 18:  Right.

18             THE COURT:  Do you think you can keep that --

19             PROSPECTIVE JUROR NO. 18:  (Indiscernible -

20   simultaneous speakers.)

21             THE COURT:  -- just erase that and listen to the

22   evidence and if he's guilty, say so, and if he's not guilty,

23   say so?

24             PROSPECTIVE JUROR NO. 18:  Sure.

25             THE COURT:  And when I say guilty, the Government

1    has to prove the elements beyond a reasonable doubt.  That's

2    your job, to decide whether or not they've done that.  Can you

3    do that?

4              PROSPECTIVE JUROR NO. 18:  I can do that.

5              MR. CURTNER:  Um --

6              THE COURT:  Go ahead.

7              MR. CURTNER:  Do you remember what you read?  I

8    mean, I know it's a year ago, but do you remember what the

9    article was about or what you remember from the article?

10             PROSPECTIVE JUROR NO. 18:  Well, I just -- I live in

11   Healy --

12             MR. CURTNER:  Oh, okay.

13             PROSPECTIVE JUROR NO. 18:  -- so when you hear

14   something about Nenana or the lobe area, I read the article.

15   It was talking about some modification -- being charged with

16   mis-marking a fish package or something like that.  I couldn't

17   remember --

18             THE COURT:  But I've already told you that this

19   morning.

20             PROSPECTIVE JUROR NO. 18:  Right.  Be basically the

21   same thing.

22             THE COURT:  Okay.

23             MR. CURTNER:  Oh, okay.

24             PROSPECTIVE JUROR NO. 18:  I just -- when it said

25   Nenana, you know, (indiscernible - voice too low).

1          THE COURT:  Do you know anything about the case more

2   than what I've already told you?

3          PROSPECTIVE JUROR NO. 18:  No.

4          MR. COOPER:  (Indiscernible - microphone noise)

5   questions.

6          THE COURT:  So, you -- you're going to drive in

7   every morning?  Is that your plan?

8          PROSPECTIVE JUROR NO. 18:  Probably not.  Probably

9   going to stay in a hotel room (indiscernible - simultaneous

10  speakers).

11         THE COURT:  Okay.  All right.  Good.  Because the

12  roads are going to be kind of tough.

13         PROSPECTIVE JUROR NO. 18:  I know.  I left at four

14  o'clock this morning.

15         THE COURT:  Okay.  Well, you -- okay, well, you can

16  get a hotel.  They'll pay for it, won't they?

17         PROSPECTIVE JUROR NO. 18:  Well, I thought about it

18  last night.  Should I come in?  I was like, no, I'll just

19  drive in, in the morning.

20         THE COURT:  But I think the -- we'll pay for it.

21         PROSPECTIVE JUROR NO. 18:  Right.  They said that

22  you just go over there and --

23         THE COURT:  It's up to the judge.

24         PROSPECTIVE JUROR NO. 18:  Right.

25         THE COURT:  Yeah.  Okay.  Okay, good.  All right.

1    Thank you.  Let's go, unless counsel have more questions.

2              MR. COOPER:  I don't think so.

3         (End side bar)

4              THE COURT:  Okay.  Sometimes, just the charges in a

5    case prevent some people from serving as jurors.  And, you

6    know, you typically don't get in -- you get it in certain kind

7    of cases because it's -- involves guns or things of that

8    nature which we're not talking about here, but this case does

9    involve issues with regard to the federal fish and wildlife

10   laws.  Some people might say I just can't serve on a jury in

11   that -- anyone in that -- have concerns about serving on a

12   jury just given the nature of the charges?  Would that -- just

13   the nature of the charges affect your ability to be a fair

14   juror?  No -- no hand going up.

15             And, you know, I don't know if issues of -- of -- of

16   -- regarding the federal subsistence laws will come up or not.

17   Anyone have any issues with regard to the subsistence

18   fisheries that just makes it so you can't be a fair juror in

19   this case?  No hands going up.  Okay.

20             So, here's the deal.  My job -- everyone has a job

21   in this -- this process.  My job is to set forth the law that

22   applies, and I get that from the -- the statutes.  I read the

23   statutes, I look at other appellate court cases, and I -- and

24   I set forth what law applies in this case.  Is there anyone

25   that feels they just cannot follow the law because they just

1    don't believe in following the law?  Come on.  Okay.

2            Because you've got to be able to follow the law.  My

3    job -- my job is so minimal in this case, but one of the jobs

4    I have is to tell you what the law is, and your job is to

5    accept that; whether you agree with it or not, just to accept

6    it.  Can you do that?  Okay.  Everybody's -- no -- no hands

7    have gone up.  Okay.

8            So, I'm going to give you some written instructions

9    that you'll have and you're going to be obligated to follow

10   the instructions.  Let me give you kind of an example of what

11   -- when I say the law:

12           The law requires that a defendant is presumed

13   innocent and that the Government must prove the guilt beyond a

14   reasonable doubt.  That's the law.  Anybody have any problem

15   with following that law?  Okay.

16           The law requires that a defendant does not have to

17   testify at trial, and the jurors cannot consider that fact or

18   hold that fact against the defendant if the defendant does not

19   testify.  That's just the law.  Anyone have any difficulty

20   following that law?  Okay.

21           Okay.  I've gone through this pretty clearly.

22   Anything on your mind that I missed that you said I hope the

23   judge doesn't ask that question or I'm going to be out of

24   here?  Okay.  All right.  Okay.

25           Well, this case is going to be done by the end of

1    the week.  Anybody have any emergencies that -- that you know

2    -- that are going to prevent you from serving?  You're going

3    to elope -- you're going to elope?

4              PROSPECTIVE JUROR NO. 13:  No.

5              THE COURT:  Okay.

6              PROSPECTIVE JUROR NO. 13:  (Indiscernible -

7    laughter.)

8              THE COURT:  Okay.  Could you just give us your name

9    and then I'll have to make a note of it and see what we can

10   do?  And you have to go to a microphone so we can get your

11   name or -- yes.

12             PROSPECTIVE JUROR NO. 13:  (States name.)

13             THE COURT:  Okay.

14             PROSPECTIVE JUROR NO. 13:  My husband surprised me

15   with a short weekend trip, and we leave Friday evening, and I

16   don't come back until Monday evening.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR NO. 13:  I know that you said that

19   the possibility --

20             THE COURT:  I'm going to put that down, but I expect

21   this to be done before -- before you get on the airplane.

22             PROSPECTIVE JUROR NO. 13:  Okay.  Good.  Because my

23   husband said something about me being in contempt if we don't

24   go and, or if I do go or he's going to make me go --

25             THE COURT:  He will hold you in -- he will hold you

1   in contempt?

2           PROSPECTIVE JUROR NO. 13:  I'm like wait a minute.

3   It's not up to me.

4           THE COURT:  So, you're telling me that you can serve

5   today and you can serve tomorrow and you can serve all day

6   Friday.

7           PROSPECTIVE JUROR NO. 13:  Absolutely.

8           THE COURT:  But you have a commitment that will take

9   you out of town this weekend.

10          PROSPECTIVE JUROR NO. 13:  That will take me to the

11  valley, yes.

12          THE COURT:  Okay.  Counsel, make a note of that,

13  okay, and we'll keep that in mind.  When will you be back?

14          PROSPECTIVE JUROR NO. 13:  I will be back Monday

15  evening.

16          THE COURT:  So --

17          PROSPECTIVE JUROR NO. 13:  My flight comes in at

18  four.

19          THE COURT:  Okay.  All right, good.  All right.

20  Next?

21          PROSPECTIVE JUROR NO. 39:  (States name.)  And I'd

22  love to serve, but I have an emergency dentist appointment

23  Friday morning.

24          THE COURT:  You have a what?

25          PROSPECTIVE JUROR NO. 39:  Emergency dentist

1    appointment.

2          THE COURT:  Dentist appointment?  They have such

3    thing as emergency dentist appointments?

4          PROSPECTIVE JUROR NO. 39:  You can tell me I can't

5    go.  I'd rather be here.

6          THE COURT:  No.  Okay.  All right.  All right.

7    Well, why don't we just put that down.  Dentist appointment

8    Friday morning.  So, that's getting closer because that is --

9    okay, everyone get that?  All right.

10          PROSPECTIVE JUROR NO. 26:  (States name.)  I have an

11    appointment at my son's school tomorrow at 2:15.

12          THE COURT:  Is it -- how critical is it?

13          PROSPECTIVE JUROR NO. 26:  Well, it's to establish

14    his IET stuff (indiscernible - simultaneous speakers).

15          THE COURT:  Yeah, but won't they let you do it

16    Monday?

17          PROSPECTIVE JUROR NO. 26:  I can try to reschedule.

18    I won't know until (indiscernible - simultaneous speakers).

19          THE COURT:  If I gave you a letter, would it help?

20    I am sure for jury duty --

21          PROSPECTIVE JUROR NO. 26:  I don't have a problem

22    rescheduling it.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR NO. 26:  It's just a matter of --

25          THE COURT:  You're just telling us about it.

1    PROSPECTIVE JUROR NO. 26:  -- I have it and I

2 haven't been able to get a-hold of them because I didn't know

3 about (indiscernible - simultaneous speakers).

4    THE COURT:  Okay.  All right.  Well, I think that --

5 I'd be shocked if they -- if they held your son back a year

6 because you were on jury duty.

7    PROSPECTIVE JUROR NO. 26:  Oh, Lord no.  I guess

8 he's going to have to go through it.

9    THE COURT:  Okay.  Counsel, I don't -- I'm not good

10 at keeping all these notes.  I hope everybody -- but I think

11 that -- I think I'm following this.  Yes, sir.

12    PROSPECTIVE JUROR NO. 22:  My name's (states name).

13    THE COURT:  (States last name.)  Okay.

14    PROSPECTIVE JUROR NO. 22:  Yes.  My wife has surgery

15 on Friday morning.

16    THE COURT:  For -- okay.  Actual surgery where --

17    PROSPECTIVE JUROR NO. 22:  Yes.

18    THE COURT:  Is it in-patient surgery do you think?

19    PROSPECTIVE JUROR NO. 22:  In --

20    THE COURT:  In -- in the hospital type of --

21    PROSPECTIVE JUROR NO. 22:  Yes.

22    THE COURT:  Okay.  (States last name.)  Surgery.

23 Okay.  Anyone else?  I have -- I was trying a case in

24 Sacramento several years ago and I got to this stage of the

25 case and everyone said they could do -- the first guy that

1  stood up said I am a pediatric brain surgeon, I do brain

2  surgery on babies, and I have surgery scheduled for tomorrow

3  and the next day, but I'd be happy to reschedule, Judge, if

4  you would like.  And I said, no, go ahead.  So, that's an

5  excuse that worked real well.  Any pediatric brain surgeons

6  here?  That'll work.

7            Okay.  Counsel, it sounds like (states name of

8  Prospective Juror No. 39) has the -- the -- the emergency --

9  emergency -- it must not be much of an emergency if it's

10  Friday.  If I had needed a dentist, I'd want it today, but

11  anyhow, okay.  So, Friday, and then we have (states name of

12  Prospective Juror No. 22) wife has surgery Friday.  I think

13  that -- I think we can work with the school district to get

14  that --

15            PROSPECTIVE JUROR NO. 26:  I think (indiscernible -

16  simultaneous speakers).

17            THE COURT:  -- and I think the -- I really think

18  trial's going to be done by Friday evening.  What time's your

19  flight Friday, do you know?

20            PROSPECTIVE JUROR NO. 13:  I think -- my husband

21  said I needed to be at the airport like six.

22            THE COURT:  Okay.  All right.  Okay.  All right,

23  good.  I hope everybody made notes of that, and help me

24  remember when we get to that point.  All right.  I think we've

25  covered most of these things.  We do have a little bit --

1 things we still have to do.  Do you want to take a quick

2 restroom break?  Does anyone want to do that, take ten minutes

3 just to use the restroom, then come back?  And then we're

4 going to call twenty -- we're going to call some names

5 forward, then you have to read a list of questions, and -- I

6 think there will be thirty-two.  That'll take probably thirty

7 to forty-five minutes, maybe an hour, and then basically we

8 pick the jury.

9          So, we're still going to have the jury picked, it

10 looks like, by noon, but I don't want people to be

11 uncomfortable.  So, why don't we take fifteen minutes, go back

12 to the big room, reassemble in the big room, then you can do

13 whatever you need to do, and we'll come back and finish up,

14 okay?

15          And now let me tell you this.  You can't talk about

16 the case with anyone -- to anyone.  You can't -- people can't

17 talk to you about the case.  That's your job is to not -- not

18 consider anything outside the courtroom, and these people are

19 not allowed to talk to you.  So, they're not being rude to

20 you.  If you run into them and they ignore you, it's because

21 they don't want to get in trouble, okay?  It's not because

22 they're rude people, okay?

23          All right.  Thank you.  We'll stand in recess for

24 fifteen minutes.

25                    (Pause - side conversation)

1       (Prospective Jurors out at 10:10 a.m.)

2           THE CLERK:  We're going to go off record.

3       (Recess at 10:11 a.m., until 10:28 a.m.)

4       (Prospective jurors not present)

5           THE CLERK:  All rise.  His Honor the Court, the

6   United States District Court for the District of Alaska is

7   again in session, the Honorable Ralph R. Beistline presiding.

8   Please be seated.

9           THE COURT:  So, how's it going?

10          MR. COOPER:  So far, so good.

11          MR. CURTNER:  Great.

12          THE COURT:  Any complaints?

13          MR. CURTNER:  No.

14          THE COURT:  Good.  Let's bring the jurors back.

15  We'll continue this process.

16                      (Pause)

17          THE COURT:  My thinking is that those two gentlemen,

18  (states last name of Prospective Juror No. 22) and (states

19  last name of Prospective Juror No. 39) -- or the gentleman and

20  the lady should not be in the thirty-two.

21          THE CLERK:  (On the telephone.)  Hi.  We're ready.

22          MR. CURTNER:  That would be fine.  We haven't lost

23  anybody yet, so --

24          THE CLERK:  (On the telephone.)  Okay.  Thank you.

25  (End of telephone call.)

1          THE COURT:  Can you do that?

2          THE CLERK:  (No audible reply.)

3          THE COURT:  Okay.

4          THE CLERK:  I'm sorry?

5          THE COURT:  Can you take (states last name of

6  Prospective Juror No. 39) and (states last name of Prospective

7  Juror No. 22) out of the thirty-two and put them in the back

8  of the pack?

9          THE CLERK:  Yes.

10          THE COURT:  Okay.  That way we can still get them if

11  we need them.  Is that okay with the Government?

12          MR. COOPER:  So far, yes.

13          THE COURT:  Is that okay, Mr. Curtner?

14          MR. CURTNER:  There's (states last name of

15  Prospective Juror No. 22) and who was the other one?

16          THE CLERK:  (States last name of Prospective Juror

17  No. 39.)

18          THE COURT:  (States last name of Prospective Juror

19  No. 39.)

20          MR. CURTNER:  Oh, okay.

21          THE COURT:  She's got the emergency dental Friday

22  and (states last name of Prospective Juror No. 22) got the

23  wife in the hospital --

24          MR. CURTNER:  Mm-hmm (affirmative).

25          THE COURT:  -- Friday.  And then you've got the

1    other two to think about, the lady who's meeting with the

2    school tomorrow and the lady who's going to Anchorage Friday

3    night, but I think we can deal with them.  But if we take

4    (states last name of Prospective Juror No. 39) and (states

5    last name of Prospective Juror No. 22) out of the thirty --

6    out of the thirty-two, they can still be -- okay.

7                        (Pause)

8         (Prospective jurors in at 10:30 a.m.)

9              THE COURT:  Just anywhere you want to sit is fine,

10   although some people have their coats here still.

11                       (Pause)

12             THE COURT:  Okay.  Looks like we've got the whole

13   team back.  Is there anybody not here?  Raise your hand.

14   Okay.  Anyone have anything that came to mind while you were

15   -- while we were apart that is of concern for you that you

16   want to bring to my attention?  Yes, sir.

17             PROSPECTIVE JUROR NO. 34:  I don't know if it's

18   conflict of interest, but I just want to disclose it that I

19   believe my son, when he was becoming an attorney, clerked for

20   you.

21             THE COURT:  You don't know that?

22             PROSPECTIVE JUROR NO. 34:  Years ago.

23             THE COURT:  I already told them that.

24             PROSPECTIVE JUROR NO. 34:  Okay.

25             THE COURT:  In fact, we thought you were him.

1  You've got the same name.  You look the same.  Okay.  Thank

2  you.  Anything else?  All right, good.  So, what we're going

3  to do now is pick thirty-two names, and as your name is

4  called, you just -- the first fourteen will go in the jury

5  box, the next we'll just line up in this front row, and then

6  you're going to have you read twelve questions, I might have a

7  few follow-up questions for you, and then we're going to

8  separate again, counsel will pick the jury, and we'll come

9  back and read you some final instructions and get on with this

10  trial.  Okay.  Madam Clerk.

11          THE CLERK:  (States names of Prospective Juror No.

12  1.)  If you could please have a seat in the front row, right

13  in front of the microphone.

14          THE COURT:  So, it would be in the front row on the

15  far right, I guess.

16          THE CLERK:  (States name of Prospective Juror No.

17  2).  Number three, (states name of Prospective Juror No. 3).

18  Number four, (states name of Prospective Juror No. 4).  Number

19  five, (states name of Prospective Juror No. 5).  If you could

20  have a seat on the far right in the second row.  Number six,

21  (states name of Prospective Juror No. 6).

22          PROSPECTIVE JUROR NO. 6:  (States last name.)

23          THE CLERK:  Number seven, (states name of

24  Prospective Juror No. 7).  Number eight, (states name of

25  Prospective Juror No. 8).  Number nine, (states name of

1   Prospective Juror No. 9).  Ten, (states name of Prospective

2   Juror No. 10).  Eleven, (states name of Prospective Juror No.

3   11).  Number twelve, (states name of Prospective Juror No.

4   12).  Number thirteen, (states name of Prospective Juror No.

5   13).  Fourteen, (states name of Prospective Juror No. 14).

6   Fifteen, (states name of Prospective Juror No. 15).

7              PROSPECTIVE JUROR NO. 15:  (States last name.)

8              THE COURT:  You're in the front row somewhere.

9              THE CLERK:  You want to have a seat down here in the

10  first row.  (States name of Prospective Juror No. 16), (states

11  name of Prospective Juror No. 17).  Eighteen, (states name of

12  Prospective Juror No. 18).  Nineteen, (states name of

13  Prospective Juror No. 19).  Twenty, (states name of

14  Prospective Juror No. 20).  Twenty-one, (states name of

15  Prospective Juror No. 21).  Twenty-two, (states name of

16  Prospective Juror No. 23).  Twenty-three, (states name of

17  Prospective Juror No. 24).  (States name of Prospective Juror

18  No. 25).  Twenty-five, (states name of Prospective Juror No.

19  26).  Twenty-six, (states name of Prospective Juror No. 27).

20  Twenty-seven, (states name of Prospective Juror No. 28).

21  Twenty-eight, (states name of Prospective Juror No. 29).

22  Twenty-nine, (states name of Prospective Juror No. 31).

23  Thirty, (states name of Prospective Juror No. 32).  Thirty-

24  one, (states name of Prospective Juror No. 33).  Thirty-two,

25  (states name of Prospective Juror No. 34).

1       THE COURT:  Okay.  That's thirty-two.  Now, we've

2   got a -- you all have a piece of paper -- every one of you

3   should have a piece of paper, true?  And who's juror number

4   one?  That's you, sir.  You get to start us off.  If you can

5   just read the answers to those questions.

6       PROSPECTIVE JUROR NO. 1:  All right.  I live in

7   North Pole, Alaska.

8       THE COURT:  And I bet -- I bet your name is still as

9   it was before, (states name of Prospective Juror No. 1), is

10  that right?

11      PROSPECTIVE JUROR NO. 1:  Yes.

12      THE COURT:  Okay.

13      PROSPECTIVE JUROR NO. 1:  I've been here eleven

14  years.  I currently work for the Federal Aviation

15  Administration.  There, what we do is we assist the airmen in

16  getting mechanics equipped, get the pilots certificates, as

17  well as certify one thirty-five, one twenty-one operators, and

18  we also enforce the regulations when it looks like somebody is

19  -- has not followed them.  I've been there for four and a half

20  years.  Prior to that, I was with the United States Air Force.

21  In the Air Force, I was avionics.  I have two Associate's

22  Degrees, I'm four classes away from a Master's Degree.  I'm

23  married.  My wife is the nursing supervisor at the Fairbanks

24  Correctional Center.  I have three children; twenty-five,

25  twenty-one, and fourteen.  My hobbies are hunting and fishing,

gold mining, and we race four-wheelers. Clubs or

organizations I belong to is National (indiscernible)

Association and the Air Force Non-Commissioned Officers

Association. I served twenty-one years in the United States

Air Force. I retired as a Master Sergeant. And I've never

had any prior jury service.

THE COURT: So, you're a gold miner?

PROSPECTIVE JUROR NO. 1: Yes, sir.

THE COURT: You're rich then, right?

PROSPECTIVE JUROR NO. 1: No, sir. I'm like the

rest of them.

THE COURT: Okay. All right, thank you.

PROSPECTIVE JUROR NO. 2: Okay. I'm (states name).

I live in North Pole, Alaska. I've been there for nineteen

years. Work for the State of Alaska as a correctional

officer. I'm the compliance sergeant as well as the

disciplinary sergeant at Fairbanks Correctional Center. I

also own a small business, it's a security company that I've

owned for nine years now, just a mom and pop operation, just

two employees and myself. I am working on my Master's Degree.

I have a Bachelor's Degree in criminal justice. I am married.

My wife is the -- is the -- she works at Pike's and she

handles all the money for Jay Ramras. Two children, thirty-

three and thirty-five. My hobbies are chasing grandkids.

Military service, I did twenty-three years in the Army. I was

1    retired as a Chief Warrant Officer 4.  And as far as jury

2    service, every time I go to the state in this outfit, they

3    send me home, so --

4              THE COURT:  Good.

5              PROSPECTIVE JUROR NO. 3:  My name is (states name).

6    I live in Fairbanks, Alaska.  I've been here six years.  I

7    work for a gem company.  I'm an administrative assistant.

8    I've been there for six years.  I have a -- trade school is my

9    highest education.  I am married.  My husband works for West

10   Valley High School; he's a kitchen manager.  I have three

11   childrens -- three children; three -- two, four, and six.  I

12   like to go to church and our hobbies are spending time with

13   our kids and going to the park.  No military service.  I have

14   served in a civil and a criminal jury duty, and there was a

15   verdict reached.

16             PROSPECTIVE JUROR NO. 4:  (States name.)  Currently

17   reside in Fairbanks, Alaska, off Old Murphy Dome.  Resided in

18   Alaska, well, depending on when you believe life begins,

19   either 1970 or 1971.  My employer's name is the University of

20   Alaska Fairbanks where I am currently employed as a safety

21   officer, and have been for the last five years.  Highest level

22   of education attained, I completely some graduate work in

23   statistics, but did not grad -- or did not complete the

24   master's program.  I am currently married with three children.

25   My wife -- oh, they're ages six and a half, one is -- just

1    turned three today, and one will be turning one here in two

2    days.  My spouse is a computer -- computer security

3    specialist.  Hobbies are primarily fishing, camping, and

4    hiking, and I have never been seated formally for jury

5    service.

6            THE COURT:  I think we go down right -- get the mic

7    down at that end.

8            PROSPECTIVE JUROR NO. 5:  (States name.)  I live in

9    Fairbanks.  I've been here twenty-three years.  I work for

10   Fullford Electric, journeyman wireman.  Been with them for six

11   years.

12           THE COURT:  I didn't hear that.  What was for six

13   years?  You said something about six years.

14           PROSPECTIVE JUROR NO. 5:  Journeyman -- or I work

15   for Fullford for six years.

16           THE COURT:  Oh, you've worked for the Fullford for

17   six years.  Okay.

18           PROSPECTIVE JUROR NO. 5:  Highest level of education

19   is high school and four years of apprenticeship.  I'm single,

20   no kids.  Hunting, fishing, four-wheeling for hobbies.  I was

21   in the South Dakota National Guard for seven years, Spec-4 is

22   the highest rank, and no prior service.

23           PROSPECTIVE JUROR NO. 6:  My name is (states name).

24   I reside here in Fairbanks.  Been here for twenty-four years.

25   I am currently unemployed, full-time student at the

1    university.  For the last five years, I worked as a manager at

2    Chili's for two years and before that I was a leasing agent

3    for J.L. Properties.

4            THE COURT:  Did everybody hear where she's worked

5    for two years?  I didn't hear that.

6            PROSPECTIVE JUROR NO. 6:  Chili's -- as a manager --

7            THE COURT:  Chili's.  Okay.

8            PROSPECTIVE JUROR NO. 6:  -- at Chili's.  The

9    highest level of education, got my high school diploma,

10   currently going to school for nursing; got my EMT

11   certification.  I'm single.  I have one little boy, he's

12   three.  Hobbies would be singing and I'm an adult advisor for

13   International Order of the Rainbow for Girls.  And no military

14   service and no jury service.

15           PROSPECTIVE JUROR NO. 7:  Hi.  I'm (states name).  I

16   live in North Pole, Alaska.  I've been in Alaska for seventeen

17   years.  I work for the 354 Supply Spot down at nella (ph) --

18   or out at Eilson.  My occupation is a -- is a supply

19   technician.  Been there for the past five years.  Highest

20   formal education is high school diploma.  I'm married.  My

21   husband works out at Eilson at Transit Alert.  No children.

22   Hobbies, four-wheeling, snow machining.  Military service, I

23   spent nine and a half years in the United States Air Force,

24   retired as a sergeant.  Prior jury service is none.

25           PROSPECTIVE JUROR NO. 8:  My name is (states name)

1   and I live in Fairbanks, and I've been here for fifty-seven

2   years.  Employer, I work for Golden Valley, I'm their

3   switchboard operator.  And let's see.  High school diploma.  I

4   am single.  My daughter is twenty-nine and she's my only

5   child.  Hobbies, I enjoy singing and go to karaoke when I can,

6   and I've got two grandchildren that keep me very busy.  And I

7   was on a jury many, many years ago, I don't even remember what

8   year, as an alternate, and they didn't need me, so --

9           PROSPECTIVE JUROR NO. 9:  My name is (states name)

10  or (states first name) is probably how it's on there.  I live

11  in North Pole.  I was actually born here, so I've been here

12  forty-four years.  I currently work for the NAPA Auto Parts as

13  a commissioned salesman, and prior to that I was a -- a

14  commercial fisherman.  Graduated high school.  Have lots of

15  vocational training.  Actually sit on the board for a couple

16  of vocational advisory type things.  I'm happily married.  I

17  have four kids ages twenty-seven, twenty-six, sixteen, and

18  thirteen.  My wife works for one of the equipment companies in

19  town as an administrative assistant.  I -- hobbies, I like to

20  hunt, fish, camp, go to church, and, you know, try to be a

21  good Dad; that's it.  Never been in the military and this is

22  my tenth jury service.

23          PROSPECTIVE JUROR NO. 10:  So, I'm (states name).

24  I've been in -- I live in Fairbanks.  I've lived here

25  seventeen years.  I'm employed at University of Alaska

1   Fairbanks, I'm a professor of archeology.  I've done that for

2   the last six years.  Highest level of education, that's Ph.D.

3   I am married.  My wife is unemployed now.  She's a housewife,

4   but she was a civil engineer up until a year ago.  We have two

5   kids, two and a half and two months a few weeks ago.  Hobbies,

6   well, my kids and my work pretty much take up all my time.  No

7   military service, and jury service, I've been called many

8   times and never selected.

9           PROSPECTIVE JUROR NO. 11:  (States name.)  I live in

10  North Pole.  Lived there for fifteen years; in Alaska for

11  thirty.  I'm employed by AAFES on Fort Wainwright, Alaska, as

12  a labor management systems manager.  I've worked there for one

13  year.  My previous employment for the last fifteen years was

14  at University of Alaska Fairbanks, and the type of work was

15  executive business management.  Highest level of formal

16  education is a Bachelor's and Associate's.  Married, three

17  children ages twenty-six, twenty-one, and nineteen.  Hobbies

18  include sports fishing, camping, youth coaching.  No military

19  service, and prior jury service, I've been never selected for

20  jury service.

21          PROSPECTIVE JUROR NO. 12:  I'm (states name).  I'm

22  from North Pole, Alaska.  I've been here for fourteen years.

23  My employer is Fairbanks Native Association.  I'm an R.N. and

24  I'm the program coordinator for Gateway to Recovery, the

25  medically managed detox center.  I've also worked as a case

1  manager and as a floor nurse for them, and before that at

2  Denali Center at Fairbanks Memorial.  Highest level of

3  education, I have an Associate's in nursing.  I'm married.  My

4  spouse is a journeyman pressman for Fairbanks News-Miner.  I

5  have three children; twenty-three, nineteen, and seventeen.

6  And I enjoy fly fishing and taking my granddaughter camping.

7  I've never been in the military and I have not had any jury

8  service prior to that.

9       PROSPECTIVE JUROR NO. 13:  (States name.)

10  Fairbanks.  Lived in Fairbanks for eight years now in Alaska.

11  I work for the Fairbanks School District.  I am the materials

12  development specialist in the curriculum department.  I

13  started that position in July of last year.  Prior to that, I

14  was a counseling secretary at North Pole Middle.  Prior to

15  that, I was a business owner for two and a half years, Glow-

16  Putt Mini-Golf, and prior to that, I was manager at the Yukon

17  Quest International Sled Dog Race for three years.  I'm a high

18  school graduate with some college.  I am married.  My husband

19  also works for the school district.  He works as principal out

20  at Ben Eilson Junior-Senior High School.  We have four

21  children; twenty-five, thirteen, ten, and eight.  My hobbies

22  are genealogy, reading, movies.  No military service.  I have

23  served on a jury, criminal, and a verdict was reached.

24       PROSPECTIVE JUROR NO. 14:  I'm (states name).  I

25  live in Fairbanks, Alaska.  I have lived in Alaska for forty

1  years.  I work for the Fairbanks Concert Association as an

2  operations manager.  I've worked there for the past seven

3  years.  I have a Bachelor's Degree in music.  I am single.  No

4  children.  My hobbies are oddly enough music and reading.  No

5  military service.  I served on the state grand jury probably

6  ten years ago for a month.

7          PROSPECTIVE JUROR NO. 15:  (States name.)

8  Residence, Fairbanks.  Alaskan for thirty-six years.

9  Employer, State of Alaska, Department Fish and Game.  I'm the

10 guy that puts all the fish in the lakes.  I work a sport fish

11 position.  Well, that's what I've been doing for thirty-one

12 years.

13         THE COURT:  Now, when's this fish thing going to

14 open?

15         PROSPECTIVE JUROR NO. 15:  (No audible reply -

16 laughter.)  That's really personal.  Can we go in the back

17 room?  I've been saying it's going to open next year for the

18 last four years.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR NO. 15:  But we do have eggs in

21 the hatchery now --

22         THE COURT:  Good.

23         PROSPECTIVE JUROR NO. 15:  -- and we're bringing

24 fish up from Anchorage next month.

25         THE COURT:  Good.

1       PROSPECTIVE JUROR NO. 15:  So, this summer we'll be

2  getting fish out of the hatchery --

3       THE COURT:  Okay.

4       PROSPECTIVE JUROR NO. 15:  -- finally.

5       THE COURT:  You heard that first here.

6       PROSPECTIVE JUROR NO. 15:  I have a Master's of

7  Science.  Married.  No kids.  Spouse is retired, works on the

8  computer, and I'm not sure what she does.  Hobbies, skeet,

9  trap.  Member of the Chamber of Commerce, Natural Resources.

10 No military service.  Prior jury service, yes, Alaska,

11 criminal, verdict was reached.

12      PROSPECTIVE JUROR NO. 16:  I'm (states name).  I

13 live in North Pole.  I've been here for five years.  I work on

14 Eilson Air Force Base, the Civil Engineering Squadron.  I'm a

15 budget technician.  I was in the military for six years.  For

16 the past two years, like I said, I'm working at Eilson.  I

17 have an Associate's Degree.  I'm married.  My husband works

18 over at Fort Wainwright as a computer technician.  We have one

19 child, he's three years old.  I like spending time with my

20 family, we go four-wheeling and I like quilting.  And like I

21 said, I was in the military and I was -- I got out as a Senior

22 Airman, and I never did jury duty.

23      PROSPECTIVE JUROR NO. 17:  I'm (states name).  I

24 live in Fairbanks.  I've lived here for twenty-seven and a

25 half years.  I work for Tanana Valley Clinic.  I am a patient

1　financial services and contract coordinator. High school with

2　some trade. I'm married. My husband is retired, but also is

3　a small business owner. No children. I have a stepson; none

4　of my own. He's thirty-five. I like to read. No military

5　service. And yes, prior jury service, criminal I think, and

6　no verdict.

7　　　　　PROSPECTIVE JUROR NO. 18: (States name.) I've

8　lived in Healy, Alaska, for the last six years. I've been in

9　Alaska for six years. Worked for Samson Electric. I'm a

10　journeyman electrician. I've done that also for the last six

11　and a half years. I've got a high school diploma with four

12　years electrical trade service school. I'm married. My wife

13　is a postal clerk at the Healy Post Office. We have six kids;

14　thirty-two, thirty, three of them are twenty-five, and one's

15　fourteen. We like hunting, camping, and fishing. I was in

16　the U.S. Air Force, got out as a sergeant, and no jury

17　service.

18　　　　　PROSPECTIVE JUROR NO. 19: My name is (states name).

19　I live outside of Fox. I've been in Alaska about seven years.

20　I'm employed by BP. My occupation is a facility operator.

21　I've worked with BP for four years, and prior to that, went to

22　school at UAF for process technology. Highest level of

23　education is Master's. Not married. No children. Hobbies,

24　outside stuff. Haven't served in the military, and I was

25　called for jury service once but not selected.

1    THE COURT:  So, you -- you work for BP in Fairbanks

2  or do you work up at one --

3    PROSPECTIVE JUROR NO. 19:  On the North Slope.

4    THE COURT:  On the North Slope and you're in town

5  for a couple of weeks?

6    PROSPECTIVE JUROR NO. 19:  Yes.

7    THE COURT:  Okay.

8    PROSPECTIVE JUROR NO. 20:  (States name.)  Live in

9  North Pole.  Been here since 2001.  I work for FedEx Express.

10  Courier.  Work history, used to build houses for awhile.

11  Highest level, high school G.E.D.  Let's see, welder,

12  advocator, truck driver.  Married, three kids.  My wife is a

13  cashier.  Kids; two, seven, and eleven.  Hobbies, hunting,

14  fishing, four-wheeling, loading rounds.  Eight years active

15  duty, NCO.  Been called for duty many times, but never served.

16    PROSPECTIVE JUROR NO. 21:  My name is (states name).

17  I've lived in Fairbanks for thirty-four years.  I've worked

18  for Department of Natural Resources, State of Alaska.  I am a

19  land surveyor and have been for thirty years.  I have an

20  Associate's Degree and a Bachelor's Degree.  I am married.  My

21  wife works for the State of Alaska, Department of Public

22  Health, as a microbiologist.  I have two children, twenty and

23  twenty-three.  I'm a member of the Goldstream Valley Lions

24  Club.  I've never been in the military.  I have had prior jury

25  service.  It was a criminal trial, and a verdict was reached.

1     PROSPECTIVE JUROR NO. 23:  My name is (states name).

2  Live in North Pole.  Have lived in Alaska for forty-one years.

3  I am a retired teacher.  I've been doing carpentry work,

4  finish carpentry, for the last thirteen years.  Highest level

5  of education is a Bachelor's Degree in biology and chemistry.

6  Married.  Wife is a counselor at North Pole High School.  Two

7  children, twenty-one and twenty-five.  Hunting, fishing,

8  flying.  Member of the Alaska Guard for six years.  I don't

9  remember what my rank was when I got out.  Prior jury service,

10  I've been on numerous criminal juries over the years, and a

11  verdict was reached in all of them.

12     PROSPECTIVE JUROR NO. 24:  (States name.)  I live on

13  Fort Wainwright, and I've been in Alaska for just shy of two

14  years.  I'm currently a stay-at-home mom, and I sell

15  (indiscernible - background noise) on the side.  Before that,

16  I worked for the the Department of the Army as an executive

17  administrative assistant, and before that, I was active duty,

18  Russian linguist.  My highest level of education, I have an

19  Associate's in Russian and a Bachelor's in history.  I'm

20  married.  My spouse is active-duty Army.  He is a

21  (indiscernible) tech.  I have two daughters, six and three.

22  We do Girl Scouts, soccer.  Member of the NRA.  I did seven

23  and a half years as a Russian linguist, was discharged as a

24  Spec-4.  (Indiscernible -- voice too low) jury duty.

25     THE COURT:  So, you're -- you speak Russian then.

1      PROSPECTIVE JUROR NO. 24:  I do.

2          THE COURT:  Good.

3      PROSPECTIVE JUROR NO. 34:  Is (states name).  I live

4  off of Farmer's --

5          THE COURT:  Now, are we in the right order here?

6  Should we do -- he's number thir -- I'm just asking her if

7  she's -- if that's the right order.

8          THE CLERK:  Yeah.  If we could start at the other

9  end.

10         PROSPECTIVE JUROR NO. 34:  Okay.

11         THE CLERK:  Thank you.

12         PROSPECTIVE JUROR NO. 25:  I live in North Pole.

13  I've been here since 1974.  I'm retired, but I'm currently

14  working part-time at Fred Meyer's West as a clerk.  Before

15  that, I worked for the Olympics.  I did special events

16  transportation for Salt Lake, the Middle East, South Africa.

17  I have a Bachelor's (indiscernible) in education and short a

18  few hours on my Master's.  I'm married.  My wife is an R.N.

19  and director of risk management at Fairbanks Memorial.  We

20  have two sons, twenty-nine and thirty-four.  My hobbies are

21  camping and photography, gardening, and I've been a volunteer

22  at the emergency room for four years.  I was in the Navy at --

23  discharged at an E-4 as a hospital corpsman.  I was on a jury

24  last May on a civil case, and a jury was -- and a verdict was

25  reached.

1        THE COURT:  In federal court or state court?  Must

2  have been --

3        PROSPECTIVE JUROR NO. 25:  State court.

4        THE COURT:  How'd you get so lucky to get two juries

5  twice in -- you must be special.

6        PROSPECTIVE JUROR NO. 25:  It's probably because I'm

7  partly retired.

8        THE COURT:  Okay.  All right.

9        PROSPECTIVE JUROR NO. 26:  My name is (states name).

10  I've been in -- I live in Fairbanks.  I've been here since

11  '85.  I currently do not work, but I have worked as a dog

12  groomer in the past.  I have a G.E.D.  I've been married for

13  twenty-three years.  My husband works for Alaska Logistics.

14  He's a (indiscernible).  We've had four children; twenty-

15  three, twenty-four -- twenty-three, twenty-two, twenty, and

16  sixteen, sorry.  I enjoy hunting, hiking, camping, anything

17  outside.  Never served in the military, and I have served as a

18  juror, but they ended up taking a plea agreement instead.

19        THE COURT:  Okay.

20        PROSPECTIVE JUROR NO. 27:  I've lived in Fairbanks

21  for fifty-eight years.  I used to work for Houston

22  Contracting, construction work.

23        THE CLERK:  Sir, can you use the microphone, please?

24        PROSPECTIVE JUROR NO. 27:  Oh, sorry.  I went to

25  three years of college at U of A, and have an Associate's

1    Degree in commercial art.  I'm single.  I've got two kids,

2    twenty-seven and thirty.  And hunting and fishing and

3    shooting.  No military service.  I was on a jury for the state

4    and it was criminal and there was a verdict reached.

5          PROSPECTIVE JUROR NO. 28:  My name is (states name).

6    This is my third -- I live in North Pole, Alaska.  My third

7    year living here.  Work at Walmart, I'm a cashier.  I worked

8    at Target.  I was a cashier.  I worked there for three years.

9    High school is my highest education.  I'm married.  My husband

10   works for Slayden Plumbing and Heating, but he was laid off

11   the three months.  We have no kids.  My hobbies are three

12   Yorkies, three cats.  I crochet.  Play on games on Facebook.

13   We ride our Harley in the summertime.  I go to church.  No

14   military.  I did jury service three times and was never

15   selected.

16         PROSPECTIVE JUROR NO. 29:  My name is (states name).

17   I've lived in -- or I live in Fairbanks.  I've been here for

18   thirty years.  I work at Fairbanks Memorial Hospital in the

19   maintenance department.  I've been there for over ten years.

20   I have an Associate's Degree.  I'm married and my wife is an

21   R.N., also works at the hospital.  I have two children, twin

22   boys two years old.  My hobbies are changing diapers and

23   photography, not necessarily in that order.  Military, I was

24   in the Air Force, I was a staff sergeant, and I have served on

25   a jury before.  It was a criminal trial and a verdict was

1    reached.

2             PROSPECTIVE JUROR NO. 31:  I'm (states name).  I've

3    lived in Fairbanks for six years.  I currently work at UAF,

4    I'm a research technician.  Before that, I've done a variety

5    of -- of warehouse logistics, construction work.  I have a

6    Master's Degree.  I'm single.  No kids.  I enjoy skiing, snow

7    machining, hunting, fishing, all that good stuff.  No military

8    service and I got selected for jury duty last year, but I

9    didn't get picked.

10            PROSPECTIVE JUROR NO. 32:  (States name.)  Republic

11   of Ester.  I've been in -- I'm working on my forty-eighth year

12   here in Alaska.  I retired in 2008 from the Armed Services

13   YMCA where I was the deputy director.  I have several -- been

14   called back on a temporary basis in 2010, and I worked a few

15   months for the Census Bureau.  I have a Bachelor's Degree from

16   the University of Alaska.  I'm married.  My wife works for

17   BLM, she's a timekeeper for the smoke jumpers out at Fort

18   Wainwright.  I have two children ages thirty-five and thirty-

19   one.  I still enjoy golf and reading.  I'm a member of the

20   Golden Heart Dart Association, and volunteer for the Yukon

21   Quest.  I was a sergeant in the United States Army.  Served on

22   jury duty, a criminal trial, and a verdict was reached.

23            PROSPECTIVE JUROR NO. 33:  My name's (states name).

24   I've been in Fairbanks, Alaska, for the last twelve years.

25   I'm a manger trainer for Foot Locker.  I've been there for

twenty-three years.  I have a B -- B.A. in business

administration from Cal State Fullerton.  Single.  I like to

run, hike, and photography.  No military.  I've been on one

jury service which was criminal, and a verdict was reached.

PROSPECTIVE JUROR NO. 34:  (States name.)  I live

off of Farmer's Loop.  I've been in Alaska since 1970.

Currently, I'm self-employed, mostly retired.  The last five

years, I've worked as a financial advisor with a national

company, Valic, V-A-L-I-C; it's a financial services company.

Have a Bachelor's in biological sciences.  I'm single.  Two

children, both grown.  Hobbies are travel, hunting, and

fishing.  Clubs, NRA, National Wild Turkey Federation, and

locally on my parish council at church.  Military service,

U.S. Air Force, sergeant at discharge, honorable.  Prior jury

service, many years ago it was state and I believe it was

criminal and a verdict was reached.

THE COURT:  Okay.  All right.  Now, over the last

few minutes, have any of you had any -- any new thoughts that

I need to know about?  You all still feel like you're

qualified to serve as jurors in this case?  Mr. Cooper, did I

over -- did I miss something in terms of questions?  Anything

you want to bring up?

MR. COOPER:  I don't believe so, Your Honor.

THE COURT:  Counsel?

MR. CURTNER:  No, Your Honor.

1            THE COURT:  Okay.  All right.  So, I'll just tell

2    you this.  The chances of those people sitting in the back

3    getting on this jury are very slim, but not impossible, okay?

4    But what we're going to do now is we're going to stand in

5    recess, you get to go back to the big room for maybe fifteen

6    to twenty minutes, then we'll bring you back in and we'll

7    announced the jury.

8            And who -- and we're going to pick fourteen of -- of

9    you, but only twelve will actually serve as jurors, and we

10   aren't going to designate who the alternates are until the

11   very, very end, and then when it's all done, if all -- if

12   there's still fourteen healthy people, we'll put all your

13   names in our spindle, give it a crank of a yank, pull out two

14   names, and those will be the alternates.  If someone gets sick

15   or elopes or something happens, then they'll be the

16   alternates, okay?  That's basically the plan.  Any questions?

17   Okay.  We'll stand in recess for roughly fifteen minutes.

18           Now, remember, don't talk about the case, all that

19   stuff, and go to the big room and be ready to come back in

20   fifteen to twenty minutes.

21                         (Pause)

22        (Prospective Jurors out at 11:10 a.m.)

23           THE COURT:  Okay.  The jurors are gone.  Mr. Cooper,

24   any issues?

25           MR. COOPER:  I'm not -- I've got this lingering

1    problem regarding (states name of Prospective Juror No. 11).

2            THE COURT:  Well, why don't you bring it up to me

3    then.

4            MR. COOPER:  He was -- he actually said he couldn't

5    be fair --

6            THE COURT:  And then he said he could be fair at the

7    end.

8            MR. COOPER:  -- and then he waffled, and -- yeah, he

9    waffled on it, so --

10           THE COURT:  Why don't you -- why don't you use one

11   of your challenges then?

12           MR. COOPER:  Well --

13           THE COURT:  He's -- he could be fair -- first he

14   couldn't be fair to either side, then he could be fair to both

15   -- when he left -- he's just a human being.  He's bugged

16   because he got -- got cited for something he didn't think he

17   should be cited for --

18           MR. COOPER:  Mm-hmm (affirmative).

19           THE COURT:  -- and then on the other hand, what was

20   his -- what was his concern?  He didn't -- oh, yeah, he -- he

21   figured you should know the difference between Chum salmon and

22   King salmon.  Didn't he -- isn't that the same guy?

23           MR. COOPER:  Yeah, that's the guy.

24           THE COURT:  So, he had some solid -- he was on both

25   issues.  I think that if you want to challenge him, you're

1    free to do that.  I'm going to -- I think -- I think he can be

2    as fair as anybody, so any other problems?

3             MR. COOPER:  There was another person that had a

4    time issue and we left her in there.  That was --

5             THE COURT:  That was (states name of Prospective

6    Juror No. 13), but she's not leaving until six o'clock Friday,

7    and I figure that with two alternates, we probably had the

8    luxury, but if either one of you want to challenge her, that's

9    fine, too.

10            MR. COOPER:  Well, it's sort of like saying we

11   guarantee that probably if something goes wrong and we have to

12   go over to Monday or if the deliberations go over to Monday --

13            THE COURT:  Yeah.  Well, that's -- it can go either

14   way on that.  We've got plenty of jurors.  We've got some in

15   the back.

16            MR. COOPER:  I mean, otherwise she's no problem,

17   just the time problem, I guess.

18            THE COURT:  What do you think, Mr. Curtner, about

19   (states name of Prospective Juror No. 13)?

20            MR. CURTNER:  I don't have any problem either way,

21   Your Honor.  I did have a question.  Originally, there was a

22   (states name of Prospective Juror No. 30), who's number

23   thirty.

24            THE CLERK:  She was excused prior to them

25   bringing --

1          THE COURT:  She came to -- she came here with all

2    her kids.

3          MR. CURTNER:  Oh, okay.

4          THE COURT:  I think they may have -- her kids were

5    here in the hall and we figured, you know --

6          MR. CURTNER:  (Indiscernible - simultaneous

7    speakers.)

8          THE COURT:  She -- she was very unhappy and I

9    figured neither one of you wanted her as a juror, and I knew I

10   didn't.

11         MR. CURTNER:  I just wondered if she was --

12         THE COURT:  Okay.  So, does that answer that

13   question?

14         MR. CURTNER:  Yes.

15         THE COURT:  Okay.  She may still be lingering out

16   here because I think I still heard her kids.  I heard her kids

17   during -- but she wanted to --

18         THE CLERK:  They may be with Naturalization

19   Services.

20         THE COURT:  Okay.

21         THE CLERK:  They're conducting interviews today down

22   there.

23         THE COURT:  Oh, okay.  All right.  So, that's why

24   she was excused.  So, what do you want to -- I don't -- you

25   know, we've got plenty of jurors and I think you've got a good

1    -- everyone's got a good panel to work with.  How about this,

2    Mr. Cooper.  You look through it and if you feel you need an

3    additional challenge, you can bring that up in fifteen minutes

4    or so, okay?

5              MR. COOPER:  Yes, Your Honor.

6              THE COURT:  The same applies for Mr. Curtner, okay?

7    Okay.  So, what do you need, fifteen minutes or --

8              MR. CURTNER:  About fifteen minutes.

9              THE COURT:  Take whatever you need.  Okay.  Keep me

10   posted.

11             THE CLERK:  How many?

12             THE COURT:  How many what?  Challenges?  The

13   Government gets seven, the defense gets eleven at this point

14   in time.

15             THE CLERK:  All rise.  This Court stands in brief

16   recess.

17        (Recess at 11:14 a.m., until 11:45 a.m.)

18        (Prospective jurors not present)

19             THE CLERK:  All rise.  His Honor the Court, the

20   United States District Court for the District of Alaska is

21   again in session, the Honorable Ralph R. Beistline presiding.

22   Please be seated.

23             THE COURT:  Okay.  How'd that go?

24             MR. CURTNER:  Great.  We're done.

25             MR. COOPER:  Yeah.

1        THE COURT:  Do you have -- do you have the list

2   handy?

3        THE CLERK:  I do.

4        MR. COOPER:  Your Honor, there's -- there's still

5   the issue about that woman that's going to be rushing for a --

6        THE COURT:  Okay.

7        MR. COOPER:  -- six o'clock flight on Friday, which

8   is, I think, problematic.

9        THE COURT:  So, let me just see what we've got here.

10  Did we use all the jurors?

11       MR. CURTNER:  Thirty-one out of thirty-two.

12       THE COURT:  Did you want to -- do you want to let

13  her go and make thirty-two or --

14       MR. COOPER:  I think that would be wise because

15  she'll be pressed for time.  Suppose they're deliberating at

16  that point.

17       THE COURT:  What do you think?  Any objection?

18       MR. CURTNER:  Well, I think that's what we alter --

19  alternates are for, but I don't have any objection to that

20  if --

21       THE COURT:  I don't care, frankly, and if the

22  parties don't care --

23       MR. COOPER:  Well, it's an automatic problem --

24       MR. CURTNER:  We'll let's put number thirty-two --

25       THE COURT:  Is thirty-two okay with both of you?

1           MR. COOPER:  Yeah, sure.

2           THE COURT:  Who is -- that's Mr. --

3           MR. CURTNER:  (States name of Prospective Juror No.

4   34).

5           THE COURT:  -- (states name of Prospective Juror No.

6   34).  Is that okay with both --

7           MR. COOPER:  (States name of Prospective Juror No.

8   34) or (states name of Prospective Juror No. 33).

9           MR. CURTNER:  (States name of Prospective Juror No.

10  34) number thirty-two.

11          MR. COOPER:  Is that what it is?

12          MR. CURTNER:  Mm-hmm (affirmative).

13          THE CLERK:  (States name of Prospective Juror No.

14  33) would be next on the list.

15          MR. COOPER:  (States name of Prospective Juror No.

16  33) would be next.

17          THE COURT:  What about (states name of Prospective

18  Juror No. 34), I thought he was.  Well, I don't know, I

19  haven't looked --

20          THE CLERK:  She's thirty-one and (states name of

21  Prospective Juror No. 34) is thirty-two.

22          THE COURT:  So, there's two left.

23          THE CLERK:  There is two left.

24          THE COURT:  Not one left.

25          MR. CURTNER:  Oh, okay.  Sure, we can excuse her.

1    That's fine.

2              THE COURT:  Okay.  Do you agree?

3              MR. COOPER:  Yes, Your Honor.

4              THE COURT:  Mr. Maxon, do you agree?

5              THE DEFENDANT:  (No audible reply.)

6              THE COURT:  What?

7              THE DEFENDANT:  Yeah.

8              THE COURT:  You've got to say yes or no.

9              THE DEFENDANT:  Okay.  Yes, sir.

10             THE COURT:  Yes.  Because I -- you know, it doesn't

11   matter to me and if the parties all agree, I'm certainly not

12   going to interfere with it.  So, let's change it to ex -- to

13   excuse (states name of Prospective Juror No. 13); (states name

14   of Prospective Juror No. 33) will be on the jury.  Now, what

15   about the other issue, that other gentleman, is he gone?

16             MR. COOPER:  He's gone.

17             THE COURT:  I -- I was sitting back here thinking

18   now who would I want -- I can see how both sides could want

19   him gone.  I don't know who -- I don't know who perempted him,

20   but I think if I were sitting -- I could -- I could see how

21   you'd both be interested in getting rid of him the more I

22   thought about it.  But if he's gone and everybody's happy with

23   the jury, I'm not going to interfere anymore.  Are you happy,

24   Mr. Cooper, with the jury as it's currently made up?

25             MR. COOPER:  Yes, Your Honor.

1        THE COURT:  Mr. Curtner?

2        MR. CURTNER:  Yes, Your Honor.

3        THE COURT:  Okay.  Mr. Maxon?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  Yes.  You said yes.  You're so far from

6   the microphone, that's why I can't --

7        THE CLERK:  Yep.

8        THE DEFENDANT:  Yes, Your Honor.

9        THE COURT:  Okay.  All right.  So, Jody, you ready

10  to read the list when they come in?

11       THE CLERK:  I am.

12       THE COURT:  Okay.  Let's bring them in.  Do it then.

13                    (Pause)

14       THE CLERK:  (On the telephone.)  All right.  Can you

15  bring them in, please?  Thank you.  (End of telephone call.)

16                    (Pause)

17       THE COURT:  Are you ready to do opening statements

18  right after lunch?

19       MR. CURTNER:  Yes, Your Honor.

20       MR. COOPER:  Yes, Your Honor.

21       THE COURT:  I think I'll read some -- we'll have

22  time for me to read a few instructions before they leave for

23  lunch.

24                    (Pause)

25     (Prospective Jurors in at 11:49 a.m.)

1          THE COURT:  Okay.  Now, you can just sit anywhere

2    again, anywhere in the whole place including the front row.

3          UNIDENTIFIED JUROR:  Can we go back where we were?

4          THE COURT:  No.  Just anywhere in the place

5    including the front row, and we're going to --

6                    (Pause)

7    Okay.  Now, you can sit anywhere in the place, including the

8    front row.

9          UNIDENTIFIED JUROR:  Anywhere?

10         THE COURT:  Okay.  Anywhere, including the front row

11   this time, and this will only be here a couple minutes and

12   then we're -- then we're done.  Again, you can sit anywhere in

13   the place, including the front row.  Okay.  Good.  We got the

14   whole team back.  Okay.  Use the front row this time if you

15   want.  Nothing wrong with the front row.  We've got them

16   bolted down like with rest of it.  Okay.

17         All right.  So, thank you, ladies and gentlemen.

18   What we're going to do now is read the names of the fourteen

19   jurors, and they'll -- as your name is called, just come and

20   -- and take your spot in the -- in the jury box.  Madam Clerk?

21         THE CLERK:  Juror No. 1, (states name of Prospective

22   Juror No. 3).  If you could please sit in the front row to the

23   far right.  Juror No. 2, (states name of Prospective Juror No.

24   6).  Juror No. 3, (states name of Prospective Juror No. 8).

25   Juror No. 4, (states name of Prospective Juror No. 12).

1        THE COURT:  We must have some men in this thing.

2        THE CLERK:  Juror No. 5, (states name of Prospective

3   Juror No. 33).  Juror No. 6, (states name of Prospective Juror

4   No. 14).  Juror No. 7, (states name of Prospective Juror No.

5   18).

6        JUROR NO. 7:  I'm a male.

7        THE CLERK:  Juror No. 8, (states name of Prospective

8   Juror No. 21).  Juror No. 9, (states name of Prospective Juror

9   No. 24).  Juror No. 10, (states name of Prospective Juror No.

10  25).

11       JUROR NO. 10:  (Indiscernible - away from

12  microphone.)

13       THE CLERK:  Juror No. 11, (states name of

14  Prospective Juror No. 26).  Juror No. 12, (states name of

15  Prospective Juror No. 28).

16       JUROR NO. 12:  Very good.

17       THE CLERK:  Juror No. 13, (states name of

18  Prospective Juror No. 29).  And Juror No. 14, (states name of

19  Prospective Juror No. 31).

20       THE COURT:  Okay.  This is the jury.

21  Congratulations.  This is not the jury.  Congratulations.  And

22  (states name of Prospective Juror No. 39), if you would take

23  note, it is now 11:53, and we have picked the jury, okay?

24  Thank you all very much.  You're free to stay or you're free

25  to go, and you're not free to go.  Let me read some

1    instructions, and then we're going to break for lunch, okay?

2                                (Pause)

3         (Remaining prospective jurors excused.)

4              THE COURT:  Okay.  These are the instructions and

5    then we're going to swear you in, and then we'll break for

6    lunch.

7              Fourteen of you have been -- have been chosen as

8    jurors in this case.  Two of you will be selected randomly as

9    the alternates at the conclusion of the case.  The law only

10   permits only twelve jurors to decide this matter.

11             Before you take the juror's oath, I want to impress

12   upon you the seriousness and importance of being a member of

13   the jury.  Trial by jury is a fundamental right in the United

14   States of America.  It ensures that each case will be decided

15   by citizens who are fairly selected, who come to a case

16   without bias, and who will attempt to render a fair verdict

17   upon the evidence presented.

18             You took an oath before you were examined as to your

19   qualifications to be jurors.  Now you're called upon to take a

20   second oath.  By this oath, you will swear or affirm that you

21   will decide the case on the evidence presented according to

22   the law that I will give you.  When you take the oath, you

23   accept serious and important obligations.  The jury system

24   depends on the honesty and the integrity of individual jurors.

25   You affirm that you are truly impartial in this case.  You

1    affirm that there is nothing to your knowledge that the

2    parties or I should know about your ability to sit as jurors

3    in the case.

4            So, can you make those affirmations?  Then if you'll

5    please stand, I'll have my Clerk read the -- read the oath.

6            THE CLERK:  Please raise your right hand.

7        (Trial jury sworn)

8            THE CLERK:  Please be seated.

9            THE COURT:  All right, ladies and gentlemen.  You

10   are now the jury in this case.  I want to take a few minutes

11   to tell you something about your duties as jurors and to give

12   you some preliminary instructions.  At the end of the trial, I

13   will give you more detailed written instructions that will

14   control your deliberations.

15           When you deliberate, it will be your duty to weigh

16   and to evaluate all of the evidence received in the case, and

17   in that process, to decide the facts.  To the facts as you

18   find them, you will apply the law as I give it to you, whether

19   you agree with the law or not.  You must decide the case

20   solely on the evidence and the law before you, and must not be

21   influenced by any personal likes or dislikes, opinions,

22   prejudices, or sympathy.  Please do not take anything I say or

23   do during the trial as indicating that I think -- what I think

24   of the evidence or what your verdict should be.  That is

25   entirely up to you.

1      This is a criminal case brought by the United States

2 Government.  The Government charges the defendant with false

3 identification of wildlife.  The charges against the defendant

4 are contained in the Indictment.  The Indictment simply

5 describes the charges the Government brings against the

6 defendant.  The Indictment is not evidence and does not prove

7 anything.

8      The defendant has pled not guilty to the charges in

9 the Indictment and is presumed innocent unless you -- unless

10 and until the Government proves the defendant guilty beyond a

11 reasonable doubt.  In addition, the defendant has the right to

12 remain silent and never has to prove innocence or to present

13 any evidence.

14      You are here only to determine whether the defendant

15 is guilty or not guilty of the charges in the Indictment.  The

16 defendant is not on trial for any conduct or offense not

17 charged in the Indictment.

18      Now, proof beyond a reasonable doubt is proof that

19 leaves you firmly convinced the defendant is guilty.  It is

20 not required that the Government prove guilt beyond all

21 possible doubt.

22      A reasonable doubt is a doubt based upon reason and

23 common sense, and is not based purely on speculation.  It may

24 arise from a careful and impartial consideration of all the

25 evidence or from a lack of evidence.

1    If after a careful and impartial consideration of

2 all the evidence you are not convinced beyond a reasonable

3 doubt that the defendant is guilty, it is your duty to find

4 the defendant not guilty.  On the other hand, if after a

5 careful and impartial consideration of all the evidence you

6 are convinced beyond a reasonable doubt that the defendant is

7 guilty, it is your duty to find the defendant guilty.

8    The evidence you are to consider in deciding what

9 facts -- what the facts are consist of:

10    One, the sworn testimony of any witness; two, the

11 exhibits which are received in evidence; and three, any facts

12 to which the parties agree.

13    The following things are not evidence and you must

14 not consider them as evidence in deciding the facts of the

15 case:

16    Number one.  The statements and arguments of the

17 attorneys, not evidence; two, questions and objections of the

18 attorneys, not evidence; any testimony that I instruct you to

19 discharge -- disregard is not evidence; and anything you may

20 see or hear when the court is not in session, even if what you

21 see or hear is done or said by one of the parties or by one of

22 the witnesses is not evidence.

23    Evidence may be direct or circumstantial.  Direct

24 evidence is direct proof of a fact, such as testimony by a

25 witness about what the witness personally saw or heard or did.

1    Circumstantial evidence is indirect evidence; that is, it is

2    proof of one or more facts from which one can find another

3    fact.  Let me give you an example.

4         If before you go to bed on a winter night, you look

5    out your window and see it snowing and you reach out the

6    window and feel it on your hand, you have personal knowledge

7    that it is snowing.  This is direct evidence.  But if when you

8    go to sleep the sky and ground are clear and when you later

9    awaken the ground is white and covered with snow, you conclude

10   that it snowed even though you did not see the snow fall.

11   This is circumstantial evidence.

12        You are to consider both direct and circumstantial

13   evidence.  Either can be used to prove any fact.  The law

14   makes no distinction between the weight to be given to either

15   direct or circumstantial evidence.  It is for you to decide

16   how much weight to give to any evidence.

17        In deciding the facts in this case, you may have to

18   decide which testimony to believe and which testimony not to

19   believe.  You may believe everything a witness says or part of

20   it or none of it.

21        In considering the testimony of any witness, you may

22   take into account the witness' opportunity and ability to see

23   or hear or know the things testified to; the witness' memory;

24   the witness' manner while testifying; the witness' interest in

25   the outcome of the case, if any; the witness' bias or

prejudice, if any; whether other evidence contradicted the witness' testimony; the reasonableness of the witness' testimony in light of all the evidence; and any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

You may hear testimony from persons who, because of education or experience, are permitted to share opinions and the reasons for their opinions. Such opinion testimony should be judged just like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves considering the witness' education and experience, the reasons given for the opinion, and all of the other evidence in the case.

From time to time during the trial, it may become necessary for me to take up legal matters with the attorneys privately, either by having a conference at the bench or, when necessary, by calling a recess. We will do what we can to keep the number and length of these conferences to a minimum. I may not always grant an attorney's request for a conference.

There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers an exhibit in evidence and the lawyer on the other side thinks that it is not permitted by the rules, that lawyer may object.

1    If I overrule the objection, the question may be answered or

2    the exhibit received.  If I sustain the objection, the

3    question cannot be answered or the exhibit cannot be received.

4    Whenever I sustain an objection to a question, you must ignore

5    the question and must not guess what the answer would have

6    been.

7            Sometimes I may order that evidence be stricken from

8    the record and that you disregard or ignore the evidence.

9    That means that when you are deciding the case, you must not

10   consider the evidence that I told you to disregard.

11           At the end of the trial, you will have to make your

12   decision based on what you recall of the evidence.  You will

13   not have a written transcript of the trial.  I urge you to pay

14   close attention to the testimony as it is given.

15           If you wish, you may take notes to help you remember

16   the evidence.  If you take notes, please keep them to yourself

17   until you and other fellow jurors go to the jury room to

18   decide the case.  Do not let note-taking distract you from

19   being attentive.  When you leave your -- leave court for

20   recesses, your notes should be left in the jury box.  No one

21   will read your notes.

22           Whether or not you take notes, you should rely on

23   your own memory of the evidence.  Notes are only to assist

24   your memory.  You should not be overly influenced by your

25   notes or those of your fellow jurors.

1    I will now say a few words about your conduct as

2  jurors:

3    First, keep an open mind throughout the trial, and

4  do not decide what the verdict should be until you and your

5  fellow jurors have completed your deliberations at the end of

6  the case.

7    Second, because you must decide this case based only

8  on the evidence received in the case and on my instructions as

9  to the law that applies, you must not be exposed to any other

10  information about the case or -- or to the issues it involves

11  during the course of your jury duty.

12    Thus, until the end of the case or unless I tell you

13  otherwise, do not communicate with anyone in any way, and do

14  not let anyone else communicate with you in any way about the

15  merits of the case or anything to do with it.  This includes

16  discussing the case in person, in writing, or by phone, or

17  electronic means via e-mail, text messaging, or any Internet

18  chat room, blog, website, or other feature.

19    You got that part?  That's a new thing we've had to

20  add to our instructions.  No social media.  We've actually had

21  to redo trials because jurors were texting during their

22  deliberations.  Can you believe that?  And getting

23  information.  That's inappropriate.  The idea is to decide the

24  case based on the evidence here in the courtroom.  I don't

25  want to do trials again, okay?  All right.

1    This applies to communicating with your fellow

2  jurors -- well, let me start back.

3    This includes discussing the case in person, in

4  writing, by phone, or electronic means, be it e-mail, text

5  messaging, or any Internet chat room blog, website, or other

6  feature.  This applies also to communicating with your fellow

7  jurors until I give you the case for deliberation, and it

8  applies to communicating with everyone else, including your

9  family members, your employer, the media or press.

10    Someone here have a spouse that works at the

11  newspaper?  Okay.  I don't want this in the newspaper until

12  the trial's over.  It always scares me when I hear they work

13  at the newspaper.  Okay.  So, let me start that sentence over.

14    This applies also to communicating with your fellow

15  jurors until I give you the case for deliberation, and it

16  applies to communicating with everyone else, including your

17  family members, your employer, the media or press, and the

18  people involved in the trial, although you may notify your

19  family and your employer that you have been seated as a juror

20  in the case.

21    But if you are asked or approached in any way about

22  your jury service or anything about this case, you must

23  respond that you have been ordered not to discuss the matter,

24  and to report the contact to the Court.

25    Because you will receive all the evidence and legal

1    instruction you properly may consider to return a verdict --

2    in other words, because you receive it here in the

3    courtroom -- do not read, watch, or listen to any news or

4    media accounts or commentary about the case or anything to do

5    with it; do not do any research, such as consulting

6    dictionaries, searching the Internet, or using other reference

7    materials; and do not make any investigation or in any way try

8    to learn about the case on your own.

9         The law requires these restrictions to ensure that

10   the parties have a fair trial based on the same evidence that

11   each party has had an opportunity to address.  A juror who

12   violates these restrictions jeopardizes the fairness of these

13   proceedings and a mistrial could result that would require the

14   entire trial process to start over.  If any juror is exposed

15   to any outside information, please notify the Court

16   immediately.

17        Okay.  As soon as we get back from lunch, we will

18   begin the next phase of the trial.  First, each side will make

19   an opening statement.  An opening statement is not evidence.

20   It is simply an outline to help you understand what the party

21   expects the evidence will show.  A party is not required to

22   make an opening statement.

23        The Government will then present evidence and

24   counsel for the defendant may cross-examine.  Then, if

25   defendant chooses to offer evidence, counsel for the

1    Government may cross-examine.  After the evidence has been

2    presented, the attorneys will make closing arguments and I

3    will instruct you on the law that applies to the case.  After

4    that, you will go to the jury room to deliberate on your

5    verdict.

6         We are about to take our first break.  Remember,

7    until the trial is over, do not discuss this case with anyone,

8    including your fellow jurors, members of your family, people

9    involved in the trial, or anyone else, and do not allow others

10   to discuss the case with you.  This includes discussing the

11   case in Internet chat rooms or through Internet blogs,

12   Internet bulletin boards, e-mails, or text messaging.

13        If anyone tries to communicate with you about the

14   case, please let me know about it immediately.  Do not read,

15   watch, or listen to any news reports or other accounts about

16   the trial or anyone associated with it, including any on-line

17   information.  Do not do any research such as consulting

18   dictionaries, searching the Internet, or using other reference

19   materials, and do not make any investigation about the case on

20   your own.

21        Finally, keep an open mind until all the evidence

22   has been presented and you have heard the arguments of

23   counsel, my instructions on the law, and the views of your

24   fellow jurors.

25        If you need to speak with me about anything, simply

1   give a signed note to the bailiff to give to me.

2           Okay.  You ready for lunch?  Let's see.  What time

3   do you want to come back?  It's 1:10, 2:10, how about 2:20?

4   Give you an hour and ten -- hour and ten -- I don't know --

5   want an hour and ten minutes, hour and fifteen minutes, what's

6   reasonable, counsel, tell me?

7           MR. COOPER:  1:30?

8           THE COURT:  1:30.  It's an even number.  Okay.

9   We're going to start right at 1:30 with opening statements.

10  You need -- you're free to go -- no, let's see.  They're going

11  to come down and get you, right?  So, you're going to --

12  you're -- there's a little room back here where you'll --

13  where you'll meet from now on, but you go out this door and

14  then they're going to escort you back to the big room.  When

15  you come back from lunch, you go to the big room, which is the

16  room you started in, then they'll escort you back to the

17  little room where you'll sit until we start trial, okay?  So,

18  you can -- you can get someone to get them, or do you take

19  them?

20          THE CLERK:  I did.

21          THE COURT:  Oh, you're on top of this.  That's why

22  she's the boss.  Okay.  So, let's stand in recess and you just

23  go into that little room until someone gets you, okay, and

24  they should be right down.  Any questions, by the way?  Is it

25  pretty clear?

1    UNIDENTIFIED JUROR:  Still park out front or --

2    THE COURT:  I think for now park out front if that's

3    okay, or wherever you want, I don't know, and then we'll -- if

4    parking becomes a problem, tell me, and we'll do something

5    about it, maybe.

6                          (Pause)

7        (Jury out at 12:09 p.m.)

8    THE COURT:  Okay.  So, the jury's gone.  Mr. Cooper,

9    any issues or concerns?

10   MR. COOPER:  No, Your Honor.

11   THE COURT:  Mr. Curtner, anything?

12   MR. CURTNER:  Yes, Judge.  Can I just look at our

13   list of peremptory challenges real quick?

14   THE COURT:  Okay.  Why, do you want the -- don't

15   tell me you want to change it now.

16   MR. CURTNER:  I don't want to --

17   THE COURT:  Okay.

18   MR. CURTNER:  Just want to look at it.

19   THE CLERK:  I'm going to give you a final list here

20   in a moment.

21                  (Pause - side conversation)

22   THE CLERK:  It's on the bottom.  It's on the bottom.

23                  (Pause - side conversation)

24   THE COURT:  Are you happy still?

25   MR. CURTNER:  I'm very happy.

1           THE COURT:  Good.  Okay.  So, I guess we're done

2   until 1:30, and we'll do opening statements, then Mr. Cooper

3   you need to be ready to go with a --

4           MR. COOPER:  Yes, Your Honor.

5           THE COURT:  Okay.  Thank you.

6           THE CLERK:  All rise.  This Court stands in recess

7   until 1:30.

8       (Recess at 12:11 p.m., until 1:33 p.m.)

9       (Jury not present)

10          THE CLERK:  All rise.  His Honor the Court, the

11  United States District Court for the District of Alaska is

12  again in session, the Honorable Ralph R. Beistline presiding.

13  Please be seated.

14          THE COURT:  Okay.  Everybody ready?

15          MR. COOPER:  Yes, Your Honor.

16          MR. CURTNER:  Yeah, Judge.

17          THE COURT:  Okay.  We'll bring the jurors in and

18  then, Mr. Cooper, you'll just take right off, right?

19          MR. COOPER:  That's correct, Your Honor.

20          THE COURT:  Okay.

21                          (Pause)

22      (Jury in at 1:34 p.m.)

23          THE COURT:  Okay.  You know, by the end of the

24  trial, you'll know right where you sit.  Okay.  Everybody

25  happy now?  Everyone's got a seat.  Okay.  Are you ready to

1    go?  Did you have a decent lunch?  Okay.  Good.  All right.

2    We're going to start with -- I told you earlier the process is

3    we start with opening statements.  It's not evidence, but it's

4    what the counsel expect the evidence to show, and we'll get

5    right into it and start with Mr. Cooper.

6              MR. COOPER:  Soon as I get rigged here.

7              THE COURT:  Okay.  You -- uh-oh.  Looks like it's

8    not.

9                        (Pause)

10                   **GOVERNMENT'S OPENING STATEMENT**

11             MR. COOPER:  Good afternoon, ladies and gentlemen.

12   I'm Stephen Cooper, I represent the United States.  It's our

13   duty in this case to present evidence to you that will support

14   the charges that are in the Indictment.

15        The judge read those charges at the beginning of the

16   case, and I'll explain a little bit about what those charges

17   are and what the elements of them are that are necessary to be

18   supported by evidence, and then I'll explain to you what the

19   evidence is that supports those elements and proves that they

20   actually occurred as charged.

21        And then -- see, we won't be arguing now, I'll just

22   be explaining what the evidence is that we're going to

23   present, and then later on you'll hear that evidence and

24   you'll hear the arguments and what it means and how it

25   applies.  So, right now I'd like to -- let's go back to what

1   you heard in the beginning as to what this case was about.

2           This is a two-count Indictment that charges Mr.

3   Maxon, who is sitting over here at the defense table, with

4   making a false identification -- and there are several

5   elements here, so I'll write a short note on the -- on the

6   poster up there just to keep track of this -- made a false

7   identification or a record or an account or a label of certain

8   species of fish that were intended to be transported in

9   interstate commerce.  It says in the Indictment were intended

10  to be and were transported, but either one, intended or

11  transported, will do under the law.

12          And in this case, it was fifty pounds of smoked

13  salmon strips that were shipped as part of a sale from Mr.

14  Maxon to an individual in Arizona, and he set a price on it

15  and they did this over -- transaction over the telephone, and

16  this was for fifty pounds of what were said to be King salmon

17  -- smoked King salmon strips.

18          When -- it says here falsely identified as twenty-

19  five pounds of King salmon Class A and twenty-five pounds of

20  Kings, there are two boxes, the two of them being

21  approximately fifty pounds, when in truth and in fact, the

22  fifty pounds of Kind Salmon strips so-called were Chum salmon

23  strips, and Chum salmon is another breed of salmon in Alaska

24  which is a significantly lower value than Kings.

25          And so this is the essence of the case, that a

1  product was being sold in interstate commerce, this product is

2  fish or wildlife -- in this case fish -- having a value in

3  excess of three hundred and fifty dollars, being sold

4  interstate, and is falsely identified.  Let me write this down

5  for you.  The elements essentially are these.

6  I should tell you now that I'm being careful to say

7  it correctly, but the authoritative statement of the law and

8  what the elements of this offense are come from the judge,

9  from the Court, and he'll give you that at the end of the

10  case.  But for our information and edification as the case

11  goes along, the elements are:

12  First -- first element is false I.D. or

13  identification.  Just make it simple there.  The statute and

14  the elements that you'll be given will be that it can be a

15  false identification or a false label or a false record or a

16  false account.  Now, you can see that some of those would be

17  written, like a label or a record, and some of them may be

18  they're written or not written, which would be an account,

19  that would be a story, a set of facts, or an identification.

20  So, if you identify something and you say this is

21  Kind Salmon, you're identifying it as King salmon.  Whether

22  you write that down or not, if that's the basis of the sale

23  that's taking place, then -- and it's not true and proven in

24  fact to be not true, then you have the first element of false

25  identification.

The second element is that the fish were intended to be transported or were transported in interstate commerce, and I'll just abbreviate that, interstate commerce.  What that means in the law is that something moves across a state line. When an object in commerce like something being sold moves across a state line, that's interstate commerce.  Well, in this case, it would be from Alaska to Arizona.  That's clearly across a state line, therefore, it's interstate commerce.

And the third element is that the making of this false identification or record or label or account involved the sale or purchase of fish with a market value of three hundred and fifty dollars or greater.  So, now that's important to keep in mind.  Market value -- or greater.  So, there's your third element.  We have to prove that the fish were worth on a market value basis, not maybe what he asked for the fish, but what the market value was, was three hundred and fifty dollars or greater.

And what the facts basically to show this are -- this -- and this is alleged to have happened in two counts, one in January -- December or January 2009 to 10, and another one in August 2010.  And the basic facts are as follows:

There's -- there's concern -- there was concern in 2009 about the condition of the salmon population in the rivers in Alaska.  And there's two ways that you can lawfully obtain fish, one by commercial fishing at different times when

1    there's a commercial season, or another way is by subsistence

2    fishing.  And if there's not enough salmon for all the

3    subsistence users all the way up the Yukon River and into

4    Canada to use, then they will close down the commercial side

5    until there's enough escapement.  You've probably heard that.

6         If there's a problem with that, the amount of

7    escapement, then there will be little or no commercial fishing

8    until that treaty obligation for the subsistence quantities

9    are satisfied.  Because of the difficulty in that area, it

10   became a matter of interest when in late 2009, it was observed

11   that the Alaska Federation of Natives had a convention in

12   Anchorage, and outside of the front door of the convention

13   were people -- not just Mr. Maxon, but including Mr. Maxon --

14   various different people selling salmon.  Smoked salmon strips

15   is a popular item.

16        And so the question would be, well, where did all

17   this fish come from if -- especially if there's either not a

18   commercial opening or a very poor commercial season, the law

19   enforcement people wondered about it.  And so for this reason,

20   they assigned a couple of agents to go and see how many people

21   at the AFN Convention in October 2009 in Anchorage were

22   selling salmon and how much salmon was there and what it was

23   represented to be, and so forth and so on; to pick up some

24   data about this.

25        Well, two agents -- you'll hear from these people as

1    the first witnesses -- one was Agent Stark from the Fish and

2    Wildlife Service -- U.S. Fish and Wildlife Service, another

3    was Agent Andie Sears, and she's from the National Park

4    Service.  The two of these went together and -- not just to

5    see Mr. Maxon, but they did stop at Mr. Maxon's table where he

6    was outside the front of the convention, and they had a small

7    video recording device and also an audio recording device.

8    So, we have a video picture of Mr. Maxon and we have an audio

9    track of what it was that was being said.

10           And Mr. Maxon essentially said that he had King

11   salmon for sale, and that these King salmon came from either

12   of two places, either Saint Mary's on the Yukon River, which

13   we'll show is way down near the mouth of the river,

14   practically at the outlet, not quite, and from the Copper

15   River.  So, there were two sources for what he alleged were

16   King salmon.

17           He -- the agent, Agent Stark, wanted to know --

18   because there was quite a lot, there were boxes stacked up

19   there at Mr. Maxon's table where he was selling fish -- wanted

20   to know something about quantities.  So, Mr. Stark -- Agent

21   Stark asked Mr. Maxon -- he said I have a friend who's into

22   specialty sales who's in business in Arizona, and would it be

23   possible for you to ship some of the salmon to him, several

24   hundred pounds?  And Mr. Maxon -- the information he gave in

25   reply to that was essentially that, yes, he ships salmon out

1    of Alaska all the time.  In fact, he ships thousands of pounds

2    of salmon to Hawaii, to Arizona, and to Las Vegas were the

3    places that he mentioned.

4            And he also indicated that he wouldn't have any

5    trouble with supplies because he has on hand right now

6    thousands of pounds of salmon and he -- but he expects it's

7    going to take him until December to sell all of it, but he

8    thinks he'll buy -- before then, he'll have it all sold.  So,

9    as of that time, he figured he had plenty of salmon to send to

10   Arizona.

11           He indicated that he travels to Arizona or used to

12   travel to Arizona quite a lot and sold hundreds of pounds of

13   it -- of salmon in Arizona, but he doesn't travel there

14   anymore, but he does still ship there, as well as the other

15   places that he mentions, and he ships thousands of pounds.

16           So, he said, well, these are King salmon.  And they

17   said -- the agents asked him, well, where's this particular

18   salmon from?  And he said this one is from Saint Mary's.  They

19   said, well, how can you tell?  And he -- Mr. Maxon said, well,

20   I can -- I've been doing this for a long time.  I can tell

21   just by looking at them.  He says, I can tell you -- look at

22   that salmon strip, the smoked salmon strip, and that's a Saint

23   Mary's Yukon River King salmon.  And so, he said some of these

24   others were from the Copper River, so he indicated that he had

25   that ability to tell, but he wasn't talking about other

breeds, he was talking about King salmon; that's what he said he had.

So, they exchanged some further information and got it arranged so that Mr. Stark -- Agent Stark was going to pass this information on to his friend in Arizona who would be potentially contacting Mr. Maxon and seeing if he could make a purchase.

Well, while he was -- while this was happening, Mr. Maxon says why don't you try this sample, and he handed them a bag of salmon collars. That's the part of the salmon right behind the gill, and they were smoked, and he said these are King salmon -- smoked King salmon collars, and just gave that to them as a kind of a promotional item.

And shortly after this happened, another investigator came along who was working for the State -- and you'll hear from him, his name is Lindell -- Justin Lindell -- and he began asking Mr. Maxon about the salmon on the table and he was also told this is King salmon -- Yukon River King salmon and Copper River King salmon, and he then agreed to purchase and did purchase from Mr. Maxon, then and there on that same day that Stark and Andie Sears were there, a -- two pounds of what was described as King salmon. So, now we actually have the salmon collars in hand and the State investigator has two pounds of what is alleged to be King salmon smoked strips.

1      And these were sent to a laboratory which is a

2  forensic laboratory.  That means they engage in scientific

3  analysis for use in court cases, among other things, and this

4  forensic laboratory is operated by the U.S. Fish and Wildlife

5  Service in Oregon, and they're busy all the time with this

6  type of thing, and they did an analysis on the salmon that was

7  obtained, the salmon collars and the -- and the two-pound bag

8  that Mr. Lindell -- Agent Lindell for the State had purchased,

9  and they reported back that these were Chum salmon, not King.

10      Okay.  So, then shortly thereafter, Mr. -- Agent

11  Stark -- the person he had mentioned in Arizona got a-hold of

12  Mr. Maxon on the telephone and he says my name is Ed Lopez --

13  and it was an undercover name that he used.  You'll hear from

14  this person; his actual name is Frank Solis, and he is a Fish

15  and Wildlife agent from the Arizona -- southern Arizona area,

16  and so he recorded this telephone conversation, and you'll

17  hear that soundtrack.

18      And his conversation with Mr. Maxon was something to

19  the -- to the effect of I'm marketing down here, there's a lot

20  of people that I could probably sell that product to, friends

21  of mine came to the AFN Convention up there and saw you and

22  told me that you had this product and that I ought to contact

23  you about it, I'm interested in smoked King salmon strips.

24  And eventually they reached an agreement, that Mr. Maxon -- it

25  took several phone calls, probably three or four and then a

1   couple of misses and leaving message and all that sort of

2   thing, but eventually -- this was in December of 2009.  They

3   eventually reached an agreement, which you'll hear on the

4   tape-recorded conversations, that Mr. Maxon would send by

5   C.O.D. delivery, U.S. Postal Service, from Alaska to Nogales,

6   Arizona, to Ed Lopez, fifty pounds of smoked King salmon

7   strips, and that he made a price on it for Mr. Lopez of

8   twenty-five dollars a pound.

9        So, for fifty pounds, that would be twelve hundred

10  and fifty dollars.  That was the price.  Plus, there would be

11  the C.O.D. charges which eventually brought it up to thirteen

12  hundred and seventy-something total.  And he did that and sent

13  this package to -- two packages -- it was actually in two

14  boxes, twenty-five pounds each, and sent them to Ed Lopez in

15  Arizona, and they went through and were received in early

16  January in 2010 by Ed Lopez in Arizona by C.O.D., U.S. Mail,

17  and he paid the thirteen hundred and something for that and

18  picked it up.

19       And these salmon -- samples were taken randomly from

20  the -- from the shipment and were submitted to the laboratory,

21  and they also came back as Chum salmon.

22       And Lopez then got on the phone and later contacted

23  Mr. Maxon again and wanted to make another purchase, and this

24  took a couple of months and, of course, we were waiting for

25  the next salmon run which would be in June -- or July of 2010,

1    and so the phone calls went into that time frame.  And Agent

2    Frank Solis, going under the name of Lopez, contacted Mr.

3    Maxon again and they eventually another agreement, which

4    you'll also hear on tape.  It's spread out over two or three

5    phone calls, but the agreement is there that he's going to

6    send him another fifty pounds of King salmon smoked strips,

7    and the price would again be twelve hundred and fifty dollars.

8         So, the same thing was done.  Mr. Maxon sent these

9    in two boxes, twenty-five pounds roughly each.  They -- the

10   whole shipment weight was a little less than fifty.  But

11   anyway, he paid for -- twelve hundred and fifty for the fifty

12   pounds, plus the C.O.D. and so forth and so on.

13        On the first two boxes that went out in December and

14   were received in January, on each box, there's not only the

15   C.O. -- C.O.D. label and the addresses and the postage on it,

16   but there's also handwritten with one of these markers like I

17   was just using here, and this handwriting or printing on the

18   front of the box said twenty-five pounds, Kings, Class A.  So,

19   it's actually written -- it's quoted in the Indictment,

20   "Twenty-five pounds, King salmon, Class A."

21        And then the other of the two boxes in January --

22   December-January said "Twenty-five pound, Kings."  That was

23   just handwritten with a black Magic marker on these -- on

24   these two boxes.  So, we -- that situation would be an example

25   of two different ways of making the false identification; one

1    by a false label on each box and, two, by the false

2    identification in the communications that you'll hear on the

3    tape recordings regarding these being King salmon.

4         So, also during the same summer of 2010 and shortly

5    before Mr. Maxon sent the second shipment to Mr. Lopez -- in

6    other words, late July -- another agent actually went to a

7    place where Mr. Maxon was selling fish in public, and this was

8    in Fairbanks this time; it was at the World Eskimo Indian

9    Olympics, I think it's called, it's held over in the Carlson

10   Center.

11        And so they went there and found Mr. Maxon selling

12   fish at that time and place, and this was another agent with

13   the U.S. Fish and Wildlife who walked by and saw this and had

14   a recorder on his person, so we have a soundtrack for what

15   took place, and he spoke with both Mr. Maxon and his wife,

16   Evangeline, who was there -- and she was apparently there at

17   the AFN also in -- in Anchorage -- and was interested in what

18   they had for sale and purchased two pounds of what were

19   represented to him to be red salmon strips from the Copper

20   River, the Copper River red salmon as alleged.

21        He purchased that, it was thirty dollars bagged, and

22   so he spent sixty dollars obtaining that -- I believe that's

23   the right price at that time -- and obtained further

24   statements from Mr. Maxon about the fact that he was selling

25   either King salmon or red salmon, and he talked about the

1    different qualities of these two fish and what -- which one is

2    better for this, that or the other purpose when it becomes

3    smoked fish.

4         So, again, these two pounds of -- of alleged red

5    salmon were taken and were tested at the laboratory -- the

6    forensic laboratory of Fish and Wildlife, and found to be Chum

7    salmon.

8         Then in -- in October, I believe it was, that year,

9    2010, there was a search warrant issued for Mr. Maxon's

10   residence in the Nenana area because he apparently was

11   operating from that area in making up the packages and the

12   strips of smoked salmon and so forth.  So, they went to his

13   residence and found quite a lot of smoked salmon strips

14   hanging in his smokehouse, also a small amount of actual raw

15   fish that were in two large plastic tub-type totes, and took

16   samples of the various fish that were there, and spoke to Mr.

17   Maxon.

18        And the samples that they took were also sent to the

19   laboratory, and it turns out that -- that of those samples

20   that were taken, counting -- including the -- the two boxes to

21   Mr. Lopez, the -- the salmon that was obtained in October 2009

22   at the AFN Convention by Stark and also by Lindell, and also

23   the bag of alleged red salmon that was sold to the agent in

24   July of 2010, plus what was seized in the search at the Maxon

25   residence in October of 2010, there were forty-six samples in

1  all that were taken, and forty-four of those samples that were

2  randomly collected were Chum salmon; two of them were what's

3  called Coho Salmon, which is another name for silver salmon.

4  There were no King salmon or red salmon found in any of the

5  the forty-six random samples that were taken from those

6  sources.

7          Mr. Maxon was interviewed and -- and he indicated

8  that he doesn't -- he isn't the one that conducts the sales,

9  that his wife is the one.  He says -- specifically, he said I

10  don't sell fish, my wife does.  He said I don't process the

11  fish, my wife does.  And he said I don't deal with anything

12  except transporting.  I haul fish around and I take it to the

13  post office and I mail it for her, but it's her business.

14          He also made statements that were inconsistent with

15  that.  First of all, he was -- when he said that, he was not

16  aware that we knew and had a tape recording of his

17  conversation with Mr. Lopez about selling the two fifty-pound

18  shipments, and he said specifically I never spoke to Mr.

19  Lopez, my wife handled the transaction entirely.  Now, you'll

20  hear the tape recording and his wife answered the phone one

21  time and was -- and passed it off to Mr. Maxon, but the

22  transaction was entirely between Agent Solis, posing as Lopez,

23  and Mr. Maxon.  So, there's a -- plainly an untrue statement

24  by Mr. Maxon that he never spoke to Mr. Lopez and that his

25  wife handled the entire transaction.

He also said that he never sells salmon -- never did sell salmon of one kind represented as being another kind, he said, because what we sell is all mixed species, it's chum, silver and King, and if anybody asks, I tell them it's a mixture of chum, King and silver, and he says I do not tell people that what they're getting is all King salmon. Well, you can listen to the tapes and you'll hear the discrepancy between that and what the tapes indicate.

There was one King salmon found in Mr. Maxon's house in this search and one red salmon, and they asked Mr. Maxon what these were for, and he said they don't have anything to do with this. My daughter brought the -- the King and the red here for her upcoming wedding, and he said I don't eat chum. That was the only King or red salmon found on the premises and had nothing to do with his operation.

I think that when you hear all the evidence and compare it with the charges that are set forth in the Indictment, being these two counts, that you'll find beyond a reasonable doubt that each of the three elements are satisfied in each of the two counts that you will have under consideration. Thank you.

THE COURT: Mr. Curtner.

(Pause)

MR. CURTNER: Good afternoon, ladies and gentlemen. Let me tell you (indiscernible - microphone covered).

1    THE CLERK:  Mr. Curtner, can you put that microphone

2  up a little bit, please, sir?

3    MR. CURTNER:  (Indiscernible - microphone

4  interference).

5    THE COURT:  Higher.

6    MR. CURTNER:  Higher?

7    THE CLERK:  Thank you.

8    MR. CURTNER:  That better?

9    THE CLERK:  Yes.

10    **DEFENDANT'S OPENING STATEMENT**

11    MR. CURTNER:  Okay.  Scott Maxon did not commit a

12  crime.  And some of you may ask yourself how did Scott Maxon

13  get here today?  In thinking about this case, looking at this

14  investigation, I can't help but use, I guess, a fish analogy.

15  I see this as Mr. Maxon being by-catch of this large

16  investigation.  And by by-catch, you know, if there's out in

17  the fishery going for a certain species, (indiscernible) a

18  certain type of fish, and in that process they bring up a

19  little fish, it's not what they're fishing for, usually they

20  throw it away.

21    But I see Mr. Maxon -- I think the evidence will

22  show you Mr. Maxon was by-catch of this large investigation,

23  and it wasn't just a couple of agents, it -- if you may

24  recall, you maybe know, you may have read about in 2009, there

25  was a big controversy that Yukon King salmon are a valuable

1    resource, especially for people who subsistence fish, but

2    commercially and for all of the interior of Alaska.  And it

3    was -- as the number of fish were being diminished, it became

4    a controversy, there was competition for this fish, and it

5    became a real significant issue.

6           And that's what initiated Operation Yukon Kings, a

7    huge operation of federal agents trying to find out if people

8    were selling subsistence Yukon King salmon, which is illegal.

9    They were investigating the tribal corporations of the

10   interior, Tanana Chiefs, Doyon Corporation, this was -- they

11   were doing a lot of search warrants, questioning a lot of

12   people, and their purpose was to find out if somebody was

13   selling subsistence-caught Yukon Kings.  And somehow during

14   this process, Scott Maxon became a focus of this

15   investigation.

16          Well, let me tell you a little bit about Scott

17   Maxon.  He's lived in Nenana twenty-five, thirty years.  His

18   business is the restaurant business.  He's a hard-working

19   family guy, he and his wife have seven kids, he's working

20   managing restaurants for twenty-five or thirty years, he's

21   owned his own restaurants for the last fifteen years.  We all

22   know it's a busy business, that keeps you busy enough as it is

23   just to run a restaurant.

24          At the time of this in 2009, he was running,

25   managing, owning Frontier Pizza here in town.  Now he owns and

1   runs the Co-Op Diner right downtown Fairbanks.  So, this is

2   his business.  But his wife, Evangeline -- she goes by Vangie

3   -- has been in her -- in her family a tradition of processing

4   fish, for generations.  Her father, known as Herman the

5   German, was I think well known in the interior for processing

6   fish.  He brought these skills, gave it to his family members,

7   and Mr. Maxon's wife Vangie lived -- that was their business,

8   that was her business to supplement the income from the

9   restaurant business.  She would process fish with her parents,

10  with her daughter, with her friends, and -- and that was the

11  tradition that they knew.

12          They would -- she and her family and her friends

13  would go to public events like the AFN Convention here and in

14  Anchorage, different public events, they would set up a little

15  stand and they would sell the product, the fish that they had

16  processed.

17          Now, Vangie also is very quiet.  She does suffer

18  from anxiety, she's not comfortable in public, and Scott is

19  more gregarious, he's really affluent, and a lot of times she

20  might hand the phone to him, she might ask him to interact

21  with the public in helping her run her business, and might get

22  him involved in that end.  He might be at a table at the

23  convention while they take turns managing the table because

24  there may be a number of people at the table and they take

25  turns, you know, collecting money for each other, it's kind of

1    a cooperative affair where they help each other because nobody

2    wants to stand out in the cold the whole time, they take

3    turns.  And Scott would be out there sometimes as the front

4    man, and he was -- as you'll see in some of these videos at

5    the AFN Convention, he's out there at the front desk.

6         But one thing that's really -- Mr. Cooper said is

7    really important to remember is that whatever I tell you is

8    not evidence and what Mr. Cooper tells you is not the

9    evidence, you will decide the evidence, and the judge will

10   decide the law.  And for example, I think Mr. Cooper left out

11   something that's really critically important in these elements

12   that the judge will instruct you on, and that is knowingly as

13   an element.

14        Knowingly mislabeled, used false records to

15   misidentify fish.  Knowingly -- knowing that the fish was

16   mislabeled or misrepresented in some way, and that's what you

17   will not find in this case, and that is an element you have to

18   be convinced of beyond a reasonable doubt.

19        So, Mr. Maxon becomes a focus of this investigation

20   of illegal sale of subsistence-caught fish, and the agents --

21   a lot of agents, a lot of work, a lot of investigation, a lot

22   of surreptitious investigation as if this were, you know, one

23   of the big drug cases here in the interior of Alaska -- they

24   go through all this investigation and they are investigating

25   him to see if he violated any state laws or regulations about

selling subsistence fish -- subsistence-caught fish.

And they did that investigation, it was in their reports, that's what they were looking for, they did not charge him because he was not guilty of that. They did a -- the -- the target -- the purpose of their investigation is to investigation whether Scott Maxon had been commercially selling subsistence-caught Yukon Kings in a violation of federal law, and he was not charged with that because he was not guilty.

Now, what they have charged him -- and you are to -- you are the judge of what really happened. I don't agree with what -- the story that Mr. Cooper told you, and you don't have to accept my word for it either. You will hear the conversations, and when you hear the evidence and you take these knowingly -- and look at the falsification records, labels, there's no sign -- and remember when you're looking at this evidence, there's no signs that say these are King, Yukon King salmon strips or smoked salmon, there's no labels on them like if you go to any store here and it might say King salmon or Chum salmon or silver salmon.

You're not going to find any labels like that, and you -- I want you to carefully examine and listen to the evidence, and you will -- as they had decided on these other things that they were investigating, that Scott Maxon is not guilty of what they're trying to charge him with now. Thank

1  you.

2          THE COURT:  All right.  Thank you.  Mr. Cooper, you

3  ready with your first witness?

4          MR. COOPER:  Yes, Your Honor.  I'd like to call Rory

5  Stark.

6          THE COURT:  Okay.

7                          (Pause)

8          THE COURT:  Is that you?

9          THE WITNESS:  That's me.

10          THE COURT:  Come on forward -- come on down.

11          MR. COOPER:  Where are the copies of the exhibits?

12          THE COURT:  And if you'll just remain standing

13  there, sir, my Clerk will swear you in.

14          THE CLERK:  Please raise your right hand.

15          **RORY STARK, GOVERNMENT'S WITNESS, SWORN**

16          THE CLERK:  Okay.  Please be seated.  For the

17  record, can you please state and spell your full name?

18          THE WITNESS:  My name is Rory Stark, spelled --

19          THE COURT:  Go ahead, finish the sentence.  Go

20  ahead.

21          THE WITNESS:  -- R-O-R-Y  S-T-A-R-K.

22          THE COURT:  All right.  So, Mr. Cooper, can you move

23  the chart so that the -- it's not in the way?

24          MR. COOPER:  Yes, Your Honor.

25          THE COURT:  Just a little bit.  I think that would

1   be -- okay.  Sorry about that, but --

2           MR. COOPER:  That's okay.

3           THE COURT:  All right.  Mr. Cooper.

4           MR. COOPER:  Thank you, Your Honor.

5                    **DIRECT EXAMINATION**

6   BY MR. COOPER:

7   Q    Good afternoon.  Are you -- state your name and

8   occupation, please.

9   A    Sure.  Again, my name is Rory Stark.  I'm a Special Agent

10  with the United States Fish and Wildlife Service.

11  Q    And were you employed in that capacity in 2009 and 2010?

12  A    I was.

13  Q    During October 2009, where were you assigned?

14  A    I was assigned to the Anchorage Field Station, Anchorage,

15  Alaska.

16  Q    And in that connection, did you have an opportunity to

17  participate in an investigation involving Mr. Maxon -- Scott

18  Maxon?

19  A    I did.

20  Q    Do you see him in the courtroom today?

21  A    I do.

22  Q    Would you point out where he's seated?

23  A    That's Mr. Maxon there.

24  Q    Indicating the third person to your right on the defense

25  table?

1    A    That's correct.

2              MR. COOPER:  I'd like the record to show the

3    defendant's been identified, Your Honor.

4              THE COURT:  Yes, so noted.

5    BY MR. COOPER:

6    Q    And where was it that you saw Mr. Maxon at that time?

7    A    In -- in October of 2009, I saw Mr. Maxon at the AFN

8    gathering -- Alaska Federation of Natives gathering at the

9    Dena'ina Center in Anchorage, Alaska.

10   Q    And the Dena'ina Center is -- where is that located?

11   A    It's in downtown Anchorage.

12   Q    All right.  And do you have a date for us on that?

13   A    October 23rd.

14   Q    Okay.  And what was your purpose in being there at that

15   time and place?

16   A    We were looking into the sale of subsistence King salmon

17   from the Yukon River -- subsistence -- subsistence-caught King

18   salmon from the Yukon River.

19   Q    All right.  And so what was it you were supposed to be

20   doing in that regard?

21   A    We were supposed to be contacting fish sellers to

22   determine if they were selling subsistence-caught King salmon

23   from the Yukon River.

24   Q    And how were you going to do that?

25   A    In a covert capacity, we were going to go to the AFN

1  gathering and discuss fish sales with these fish sellers.

2  Q    Discuss the sales with them?

3  A    Yes.

4  Q    And how many fish sellers did you see there?

5  A    There were several fish sellers there.

6  Q    Do you have a rough idea how many we're talking about?

7  A    I believe somewhere in the neighborhood of five.  Some --

8  some much smaller and some larger, depending on the operation.

9  Q    Okay.  And were they, what, inside the convention center

10 or out front on the sidewalk or where were they located?

11 A    There were some that were inside and there were some that

12 were outside on the sidewalk.

13 Q    Okay.  So, did you talk to others besides Mr. Maxon that

14 day?

15 A    I did.

16 Q    And so also you contacted him at some time that day, I'm

17 assuming, is that correct?

18 A    Yes, we contacted Mr. Maxon at approximately 1:00 p.m.

19 Q    All right.  Was there anybody with you at that time?

20 A    Yeah.  I was working with Special Agent Andie Sears with

21 the National Park Service.

22 Q    All right.  And did you -- who else was at the location

23 with -- first of all, describe the location where it was where

24 you saw Mr. Maxon.

25 A    Sure.  By -- it was the main entrance to the Dena'ina

1   Center, and I -- I'm trying to remember if it's on 7th or -- I

2   think it -- actually it's on 8th, I believe, maybe 7th.

3   Anyway, on the -- the front entrance there -- right next to

4   the front entrance adjacent to the front door, there was --

5   Mr. Maxon was set up with a number of fish boxes, the wet

6   boxes -- cardboard boxes full of salmon strips in plastic

7   bags.

8   Q    And how big are these boxes?

9   A    Probably, you know, four feet by a foot or something like

10  that, by maybe -- I don't know, ten inches deep.

11  Q    And do you know roughly what capacity weight-wise that

12  they would hold in salmon strips?

13  A    In salmon strips -- salmon strips are lighter for volume,

14  so it would probably be approximately twenty-five pounds.

15  Q    And do you have a recollection of approximately how many

16  of these boxes you saw at his location?

17  A    You know, I couldn't say for sure, but it seemed like --

18  the way that they were set up, there were maybe five in a row

19  -- five to six in a row, with -- you know, facing long-ways

20  backwards, and then with -- stacked on top of one another, so

21  there's maybe four or five in a row and then stacked three or

22  four high, and the top boxes had their lids off of them and

23  were full of plastic bags full of smoke salmon.

24  Q    So --

25  A    So, there was quite a quantity of them.

1   Q    So, you're talking about maybe a dozen or more than a

2   dozen boxes?

3   A    I would say more than a dozen, yeah.  Probably maybe

4   twenty.  I'm not positive.  I can't --

5   Q    Twenty boxes?  Okay.

6   A    Yeah.

7   Q    All right.  And who else was there at his -- was it a

8   table or something he had set up?

9   A    To the best of my recollection, it was a stack of boxes.

10  Q    Oh, okay.  So, working off of the --

11  A    And then on top of the boxes, they had the open boxes

12  that were for sale, so the -- them -- you know, the boxes with

13  their covers made up the table basically.

14  Q    I see.

15  A    They were the table.

16  Q    Okay.  So, at his -- his -- his station there, who else

17  -- else was with him, if anyone?

18  A    We later determined that his wife, Evangeline Maxon, was

19  with him there at the --

20  Q    All right. And anyone else to the best of your knowledge?

21  A    There were other people, but I don't know how they were

22  related.  There was a number of people standing around and

23  buying fish, numerous, you know, fish buyers.

24  Q    Okay.  Okay.  Nobody else, I mean, evidently working for

25  him or that you knew --

1    A    Not that I could determine.

2    Q    Okay.  So, what was it that you tried to do at that

3    point?

4    A    So, we contacted Mr. Maxon and just asked how much he was

5    selling the fish for, and then what kind of fish they were,

6    that sort of thing, to determine if these were the

7    subsistence-caught Yukon King fish that we were looking into.

8    Q    And what did he tell you about the fish that he had?

9    A    He said they were Kings.  He said they were King salmon

10   from the Copper River and Saint Mary's.  So, first he said

11   Kings, then from the Copper River and Saint Mary's.

12   Q    All right.  And where is Saint Mary's?

13   A    Saint Mary's is on the Yukon River.  He told us that as

14   well.

15   Q    Okay.  Do you know where on the Yukon it is?

16   A    I'm not exactly familiar.

17   Q    Okay.  All right.  Well, we can look into that.  So, what

18   -- did you have a scenario or a plan of -- of what it was you

19   were going to propose to him to determine whether he could

20   supply fish for further sales in the future?

21   A    Yeah.  We -- the idea -- and again, going back to the

22   purpose of our trip, the idea was to determine whether or not

23   subsistence-caught King salmon from the Yukon River were being

24   sold, and the reason that was important to us is because the

25   commercial openings on the Yukon River had been closed that

1  year because of the limited number of fish getting up --

2  escapement coming up to up -- upper river users and to Canada.

3  So, there were -- weren't any commercial -- commercially

4  available King salmon on the Yukon River that year, so any

5  fish that we did find for sale would have been subsistence

6  fish, and the sale of subsistence fish is greatly restricted;

7  it's very restrictive on what you can sell and who can -- you

8  know, from what waters and that sort of thing, so there's --

9  there was an issue with that.

10      So, we went in to determine if these were subsistence-

11 caught fish from the Yukon River and then determine what we

12 would do after that, the idea being -- so our scenario was ask

13 if they're selling them, see if they're shipping them out of

14 state or if they're taking them, you know, out of Alaska or if

15 they're just sold in Alaska, what they're doing with them, and

16 then see what kind of volume we're looking at, and if the

17 operation is an ongoing and a significant commercial

18 enterprise type of thing.

19 Q    All right.  And when you say from the Yukon River, you

20 needed to know if they were caught in the Yukon River, is that

21 what you're saying?

22 A    Yes, caught in the Yukon River.

23 Q    Caught in the Yukon River.

24 A    Right.

25 Q    Not caught in some tributary of the Yukon --

1    A    Right.  In the Yukon River.

2    Q    -- but Yukon River.  Okay.  All right.  So, do you

3    believe you made that determination at least from what he told

4    you?

5    A    Certainly.  That's -- we made the determination -- he

6    told us on a number of occasions that these were King salmon

7    from Saint Mary's, which is on the Yukon River, and --

8    specifically said Saint Mary's was on the Yukon River, so we

9    determined that these were the subsistence-caught King salmon

10   we were looking -- looking at.

11   Q    Right.  Okay.  Did you try to explore the subject of

12   future availability of this same product from him?

13   A    We did.  As a part of our investigation, we wanted to

14   see, like I said, if these were being shipped out of state and

15   what kind of quantities were going out, so we asked if -- if

16   there was any possibility of getting some salmon down into the

17   Lower 48 and what kind of quantities were available.  Mr.

18   Maxon said he had thousands of pounds available and he had

19   shipped them to Arizona previously.

20   Q    Did he say how much he had shipped to Arizona previously?

21   A    He said he'd shipped a lot to Arizona previously.

22   Q    All right.  Did he talk about having shipped thousands of

23   pounds out of the State of Alaska?

24   A    He did.

25   Q    All right.  Did he say how much he had left available

1   there that he still had to sell?

2   A    He did.  He said he had thousands of pounds available for

3   sale.

4   Q    All right.  And what were you attempting or planning to

5   do, to try to set something up for a future buy or something?

6   A    Yes.  We had planned that if we found somebody selling

7   subsistence fish in interstate -- like to Arizona, that we

8   would try and set up a buy where somebody from our office

9   would buy fish from this individual and from -- from the Lower

10  48, not from within Alaska.

11  Q    So, if these were indeed Yukon River fish, I gather your

12  -- is it your position then that they would be -- they would

13  necessarily be subsistence fish because there was no

14  commercial fishing in the Yukon that year?

15  A    That's correct.

16  Q    And that they shouldn't be sold in interstate commerce.

17  Is that another thing you were looking for?

18  A    Yeah, that's correct.

19  Q    Okay.

20  A    They shouldn't be sold in interstate commerce.

21  Q    All right.  Now -- so, did he -- what did you suggest to

22  him that you might be interested in purchasing in that re --

23  in that regard in the future?

24  A    I told him that I had a friend who had a store down in

25  Arizona that was interested in buying several hundred pounds

1    or couple hundred to several hundred pounds of -- of smoke

2    salmon strips, Kings.

3    Q    And what was his response to that?

4    A    His response was that he could -- he could sell them to

5    us, he had thousands of pounds available and he could sell it

6    to us.  He gave us contact information and said to give he and

7    his wife a call --

8    Q    Okay.

9    A    -- concerning the purchase.

10   Q    All right.  And did you eventually pass on that contact

11   information to someone?

12   A    I did.  I passed it on to the case agent and then he

13   passed it on to an agent down in Arizona.

14   Q    Arizona?

15   A    Yes.

16   Q    Okay.  Now, did you have a recording device with you that

17   picked up any of this conversation you've just described?

18   A    I did.  I had a -- a digital recorder and S.A. Andie

19   Sears or Special Agent Andie Sears, she had a -- a pen camera

20   on her person as well; a camera and a recording device.

21   Q    All right.  And have you listened to the tape recording

22   that was made by the device that you had on you as a sound

23   recorder?

24   A    I have.

25   Q    Is that an accurate reproduction of the conversation that

1    you -- as you recall it taking place?

2    A    It is.

3    Q    And have you participated in the -- in the transcribing

4    of that and come up with a transcript to the best of your

5    ability, setting down in transcript form the recorded

6    conversation that's on that tape?

7    A    I have and I did, yes.

8              MR. COOPER:  Your Honor, at this time, I would like

9    to propose that we play the tape and have a transcript of it

10   provided to the jury.  I have copies for the Court and counsel

11   and for the jury.

12             THE COURT:  Okay.

13             MR. CURTNER:  Your Honor -- sorry.

14             THE COURT:  Yes?

15             MR. CURTNER:  I listened to the tape and seen the

16   video, but I have not seen any transcripts.

17             THE COURT:  Well, why don't you take a look at that

18   transcript and see if there's an issue.

19                       (Pause)

20             THE COURT:  We can go off the record while we're

21   doing that.  No rush.

22             MR. CURTNER:  Well, I -- yeah, we'd have to, I

23   think, watch the video while we're reviewing this if there's

24   -- and I'd like to reserve any objection until I can --

25             THE COURT:  Okay.  So, what are you proposing?  What

1    are you proposing?

2              MR. CURTNER:  Let's play it and if the transcript's

3    accurate, I won't oppose it going to the jury; if it's not

4    accurate --

5              THE COURT:  How long are we talking about?

6              MR. COOPER:  Oh, this is probably, what, ten

7    minutes.

8              MR. CURTNER:  Nine pages.

9              THE COURT:  So, we're going to have to play it twice

10   then.  Go ahead.  Play it once, you follow the transcript,

11   then we'll play it again and the jury can have the transcript

12   if they --

13             MR. COOPER:  We'll play it once without passing the

14   transcript out.

15             THE COURT:  Right, so that the -- counsel can have a

16   chance to -- although I have an instruction that the trans --

17   the video is what counts, not the transcript, so -- but I

18   think it's fair that counsel have -- have at least seen the

19   transcript before it's handed to the jury.

20             MR. COOPER:  So -- all right.  So -- so, we're going

21   to play it once --

22             THE COURT:  Right.

23             MR. COOPER:  All right.  What I'd like to do is

24   combine the video with the audio for this first time through

25   because you're not --

1          THE COURT:  Okay.

2          MR. COOPER:  -- having to look at two things at

3     once, so --

4          THE COURT:  That's a good idea.

5          MR. COOPER:  All right.  Then -- so, I'll need to

6     lay a foundation for the video as well.

7          THE COURT:  Okay.

8     BY MR. COOPER:

9     Q    Have you also seen a video recording of this conversation

10    that you have on your sound recorder?

11    A    Yes.

12    Q    And how -- how was that video made?

13    A    That video, as I said earlier, was made by Special Agent

14    Andie Sears, National Park Service.  I provided her a pen

15    camera, it's a little camera that's in the -- in the pen case,

16    provided her that camera for the contact.  She turned it on

17    and during the contact, it played and video recorded the

18    scene, and then when we got done with the contact, I got the

19    -- the -- the pen from Agent Sears and downloaded it and --

20    and -- back at -- back at our office.

21    Q    All right.  And did you review that to determine whether

22    it appears to be a good reproduction of the scenes as you

23    recall seeing them?

24    A    I did, and it was a good reproduction of the --

25    Q    All right.

1   A    -- scene.

2   Q    Can you say that the camera was always looking directly

3   at either Mr. Maxon or his wife?

4   A     No, not necessarily.  This is a -- it's a small camera

5   that -- in a pen, so it moves with the person's body, so it --

6   it -- it will be -- you know, certainly it's not going to be a

7   perfect frame and it will be looking different places

8   different times, but as good as can be expected, you know,

9   wearing a camera on your body like that without looking

10  through a viewfinder.

11  Q    Okay.  So, sometimes he's out of the picture, sometimes

12  he's in the picture, and so forth?

13  A     That's right.

14  Q    All right.  Otherwise, it -- does it depict Mr. Maxon and

15  his wife?

16  A     It does.

17  Q    And the -- and the scene that you described for us in

18  your testimony?

19  A     It does.

20          MR. COOPER:  Very well, Your Honor.  I'd offer that

21  -- do we have the combination of the video and audio together,

22  a side track?

23          THE SPECIAL AGENT:  Yes, sir.

24          MR. COOPER:  And so this would be -- Exhibit 1 is

25  the -- this is the video and audio.

1        THE SPECIAL AGENT:  That's correct.

2        MR. COOPER:  We'd offer Exhibit 1 then to be played

3   at this time, Your Honor.

4        THE COURT:  Okay.  I'm just curious.  Are you saying

5   pin or pen?

6        THE WITNESS:  It's a pen, a writing pen.

7        THE COURT:  P-E-N.  Okay.

8        MR. COOPER:  P-E-N.  Correct.

9        THE COURT:  I've got it.  My wife's the same way,

10  she says pin when she means pen, but that's okay.  It's P-E-N,

11  it's pen like you write with, right?

12       THE WITNESS:  Right.  A pen like you write with.

13       THE COURT:  Okay.

14       MR. COOPER:  All right.  So -- and we have the

15  speakers, I think, set where we believe the jury can hear it

16  all right?

17       THE SPECIAL AGENT:  Yes, sir.

18       MR. COOPER:  We'd like to start that now, Your

19  Honor.

20     (Exhibit 1 audio and video played for the jury)

21       THE COURT:  Okay.  Mr. Curtner.

22       MR. CURTNER:  Your Honor, I think you're correct,

23  the evidence is the tape itself.

24       THE COURT:  Right.

25       MR. CURTNER:  I -- just looking at this real

1  quickly, it's not of the quality that I can absolutely agree

2  that this is the correct transcript of it as a translation,

3  and I would object to the jury getting this because the real

4  evidence is just what they saw.

5            THE COURT:  Okay.  Mr. Cooper?

6            MR. COOPER:  Your Honor, the -- the witness who's on

7  the stand now was there and he has already testified that this

8  is an accurate statement of what the tape has on it.

9            THE COURT:  Okay.  Excuse me.  Did he testify that

10  the transcript was accurate?

11            MR. COOPER:  Yes.

12            THE COURT:  Okay.

13            MR. COOPER:  And I -- and -- and if we need to

14  repeat that, we can do it.

15            THE COURT:  Well, why don't you ask him that because

16  I -- I wasn't --

17            MR. COOPER:  I'd like it to be in his words, so --

18            THE COURT:  Okay.

19  BY MR. COOPER:

20  Q    But you -- did you prepare this transcript or participate

21  in its final edition?

22  A    I did that transcript, yes.

23  Q    And did you do it by just your memory or interpretation

24  or did you do it by hearing words on the tape and putting down

25  what you heard on the tape?

1   A    I did it by hearing the words.  I -- I reviewed the

2   recording many times.  I actually used a -- a program where I

3   filtered out some of the background noise and I listened to it

4   multiple times and using my memory and the audio, I came up

5   with that transcript, and that's -- to the best of my

6   knowledge, that's what was on the tape what's on the

7   transcript.

8   Q    So, you -- have you altered it, edited it in accordance

9   with what you think you recall being there or is this just a

10  transcript of what you hear on the tape?

11  A    It's a transcript of what I hear on the tape, coupled

12  with what I remember from the contact.

13  Q    But I mean is there anything on here that you don't hear

14  on the tape but you know was there, that you put it down

15  because you know it --

16  A    There's nothing.  That is just a transcript of the tape

17  itself.

18            MR. COOPER:  Offer the transcript to be read by the

19  jury.

20            THE COURT:  Very well.  It can be provided to the

21  jury.  Play the tape and I'll read the appropriate cautionary

22  instruction.

23            MR. COOPER:  Pass these out for --

24            THE COURT:  Yes.

25            MR. COOPER:  (Indiscernible - away from microphone.)

1      THE CLERK:  Mr. Curtner, can you adjust that

2  microphone a little closer to you?  Thank you.

3      MR. COOPER:  (Indiscernible - away from microphone.)

4          (Pause - side conversation)

5      MR. COOPER:  This will be just the audio track, Your

6  Honor.

7      THE COURT:  You're not going -- okay.  Is that all

8  you're going to play is the audio?

9      MR. COOPER:  That's correct.

10      THE COURT:  Okay.

11      (Audio begins playing.)

12      THE COURT:  Wait, wait, wait.  Wait, wait.  Wait.

13  Still passing out and I have to read my instruction.  Okay.

14  You know the law anticipates almost every eventuality.  I've

15  got a whole book full of instructions, and now I have to read

16  a cautionary instruction to you.  Are you ready?

17      You're about to hear a recording that has been

18  received in evidence.  A transcript of the recording is being

19  provided to you to help you identify speakers and help you

20  decide what the speakers say.  Remember that the recording is

21  the evidence, not the transcript.  If you hear something

22  different from what appears in the transcript, what you heard

23  is controlling.  Listen carefully.  The transcript will not be

24  available during your deliberations.

25      Want me to say that again?  Did you hear --

1  understand what I said?  We're just giving it to help, but

2  it's what you hear that's the evidence, okay?  All right.  Go

3  ahead.

4      (Government's Exhibit 1 admitted)

5      (Exhibit 1 audio replayed for the jury)

6          THE COURT:  Okay.  If you can just pass those down

7  to the front, we'll collect those.

8          MR. COOPER:  Do we need to mark them for the record,

9  Your Honor, as anything in particular?

10          THE COURT:  I don't think so, but we'll -- we'll

11  keep -- we'll keep one for the record --

12          MR. COOPER:  Sure.

13          THE COURT:  -- so it's clear that it's available.

14  You can mark one, not as an exhibit, but as a -- what do you

15  call it?  It won't be admitted, but it will be available as a

16  -- can't think of the word I want.

17          MR. COOPER:  Very well.

18          THE COURT:  Okay.

19          MR. COOPER:  Now --

20              (Pause - side conversation)

21          MR. COOPER:  I'd like to hand some exhibits to the

22  witness, Your Honor.

23          THE COURT:  Very well.

24              (Pause)

25  BY MR. COOPER:

1    Q    Agent Stark, I've handed you what are marked Exhibits 2,

2    3, 4, and 5.  Do you see those there?

3    A    I do.

4    Q    And what is two?

5    A    Exhibit 2 is a picture with the bag of fish gill collars

6    that Mr. Maxon gave to myself and Agent Sears, and also in the

7    photograph is the handwritten note with the contact

8    information for Mr. Maxon and his wife.

9    Q    Okay.  And is that handwritten note also in front of you

10   as Exhibit 3?

11   A    It is.  The original is in front of me as Exhibit 3.

12   Q    And you obtained these from Mr. Maxon then, is that

13   right, two and three?

14   A    That's correct.

15   Q    Has this -- two, the bag out of which it appears that

16   either you or Agent Sears might have been eating a sample

17   while you were there?

18   A    Yes.

19   Q    And is this a bag out of which a sample was taken for

20   testing?

21   A    That's correct.  It was tested by our laboratory.

22        MR. COOPER:  Your Honor, I'd offer two and three in

23   evidence.

24        THE COURT:  Any objection?

25        MR. CURTNER:  No objection.

1          THE COURT:  Two and three will be accepted.

2      (Government's Exhibits 2 and 3 admitted)

3          MR. COOPER:  And is there an overhead projector that

4    I can show these to the jury on?

5          THE COURT:  So, if that question was directed to me,

6    the answer is yes.

7          MR. COOPER:  I see it now.

8                              (Pause)

9    BY MR. COOPER:

10   Q    Is that the bag that you had in your picture?  I'm just

11   putting that up on the screen.

12   A    That is the bag.

13          THE SPECIAL AGENT:  (Indiscernible - away from

14   microphone.)

15          MR. COOPER:  Oh, we have one on the computer, too.

16   That might be a better way to go.

17          THE SPECIAL AGENT:  (Indiscernible - away from

18   microphone.)

19          MR. COOPER:  Oh, can we switch to the computer?

20          THE SPECIAL AGENT:  (Indiscernible - away from

21   microphone.)

22          MR. COOPER:  There it is.

23   BY MR. COOPER:

24   Q    Is that a picture of number two, just the --

25   A    That is a picture of Exhibit Number 2, which is the bag

1  of collars that --

2  Q    So, that's the bag of salmon collars?

3  A    That's correct.

4            MR. COOPER:  And then three -- if we can put up

5  three then.  That's the note.

6            THE SPECIAL AGENT:  We don't have (indiscernible -

7  background noise) picture of the note.

8            MR. COOPER:  You don't have it?  Can you blow up

9  that --

10           THE SPECIAL AGENT:  That's it.

11           MR. COOPER:  -- portion of -- of Exhibit 2 to show

12  the note a little larger?

13  BY MR. COOPER:

14  Q    Okay.  Is this the handwritten note?  What does it say on

15  there, Mr. Stark?

16  A    It says Vangie and Scott, P.O. -- Maxon, P.O. Box 21,

17  Nenana, Alaska, 99760, and then it has two numbers --

18  Q    Two phone --

19  A    -- 832-1003 and 460-1162.

20  Q    Very well.  And is this the information you passed on to

21  the agent -- or to the agent here in Fairbanks for use by the

22  agent in Arizona?

23  A    It is.

24  Q    Very well.  That's all I have on those.  Now, you have

25  four and five in front of you also, don't you?

1   A    That's correct.

2   Q    And are these data compilations that are made available

3   to the public by the Alaska Department of Fish and Game?

4   A    They are.

5   Q    And do they relate to the prices actually paid for salmon

6   by species in 2009 and 10 commercially?

7   A    They do.  These are the prices that were paid to the

8   fishermen, so the X vessel values for price per pound for

9   salmon for the year 2009 and 2010 respectively.

10  Q    And rather -- there are a lot of numbers on these two

11  documents, right?

12  A    That's correct.

13  Q    One is for the year 2009 salmon season, the other is for

14  the year 2010, Exhibit 4 and 5 respectively, is that correct?

15  A    That's right.

16  Q    Can you tell us what the data show for the overall

17  average for Alaska without going into every particular area of

18  the state, but just for the Alaska --

19  A    Sure.  On --

20  Q    -- total --

21  A    This is Exhibit 4.  If you go -- if you go to page four

22  on Exhibit 4, there's a subheading called Alaska totals, and

23  that tells you the total average price per pound for the whole

24  State of Alaska for the different species of salmon in Alaska.

25  Q    All right.  And so what is the average price for King

1  salmon -- that's -- King salmon is also know as what?

2  A    Chinook.

3  Q    So, what is the average price per pound -- was the

4  average price per pound in 2009 statewide for Chinook salmon

5  or King salmon?

6  A    Two dollars and seventy-six cents [$2.76] a pound.

7  Q    A pound.  And that's raw from the fishing boat.

8  A    That is whole fish from the fisherman.

9  Q    And then for Chum, the same statewide number for 2009.

10  A    For 2009, it's forty-nine cents [$.49] for Chum.

11  Q    A pound.

12  A    A pound.

13  Q    Okay.  And then for -- for 2010 for that same category,

14  what are the figures for Chinook salmon and for Chum salmon?

15  A    For Chinook salmon, it's three dollars and sixty cents

16  [$3.60] a pound, and for Chum salmon, it's seventy cents

17  [$.70] a pound.

18  Q    Very well.  And do you know what the ratio is between

19  those two for 2009 and for 2010?

20  A    I do.  It's -- both of them are -- in both of those

21  situations, the price for Chinook is over five times what the

22  price for Chum salmon is.

23            MR. COOPER:  Very well.  I'd offer four and five,

24  Your Honor.

25            THE COURT:  Any objection?

1          MR. CURTNER:  No objection.

2          THE COURT:  It'll be received -- or they will be

3   received.

4        (Government's Exhibits 4 and 5 admitted)

5          MR. COOPER:  Now, I think this might be the time to

6   offer a stipulation the parties have reached regarding certain

7   evidence since we've already taken advantage of that, and --

8          THE COURT:  Okay.

9          MR. COOPER:  -- in part by admitting some of this

10  evidence.

11         THE COURT:  Okay.  Is this a stipulation as to what

12  a witness would say or what -- what --

13         MR. COOPER:  This is a stipulation regarding chain

14  of custody in general and is regarding -- it's got about four

15  or five categories.  What we'd like to do is perhaps we could

16  read it off to the jury at this time.  I -- I think all of it

17  would be applicable, and so I think it should be read to the

18  jury --

19         THE COURT:  Okay.

20         MR. COOPER:  -- and into the record at this time.

21  Both parties have --

22         THE COURT:  So --

23         MR. COOPER:  -- executed it.

24         THE COURT:  -- Mr. Curtner, this is a stipulation

25  the two of you have entered into?

1        MR. CURTNER:  Yes.  Mm-hmm (affirmative).

2        THE COURT:  Let me read Instruction 2.4.

3        MR. CURTNER:  Thank you.

4        MR. COOPER:  Very well.

5        THE COURT:  The parties have agreed to certain facts

6    that have been stated to -- that will be stated to you.  You

7    should, therefore, treat these facts as having been proven.

8    Okay?  All right.  Mr. Cooper, go ahead.

9        MR. COOPER:  Very well.  I don't have (indiscernible

10   - away from microphone).  This stipulation reads -- has the

11   name of this case and the case number and it's entitled

12   Stipulation:

13            "The United States and defendant Willis Scott

14            Maxon, through counsel, stipulate:

15            "One.  All items of physical, photographic, and

16            documentary evidence in this case have remained at

17            all times in official custody, unaltered except for

18            scientific testing.

19            "Two.  True copies of documents, photographs,

20            and audio and video tapes are admissible to the same

21            extent as the originals.

22            "Three.  The documents offered in evidence as

23            records of the United States Post Office or of

24            sales, purchases, or other transactions in issue in

25            this case are authentic records of the regularly

1          conducted business of the Post Office or other

2          entity involved.

3               "Four.  Qualified analysts of the United States

4          Fish and Wildlife Service and the State of Alaska

5          Department of Fish and Game" --

6    -- I'd like to make a correction there by deleting reference

7    to State of Alaska Department of Fish and Game because I don't

8    think that we rely on -- on evidence from that entity for

9    what's in part four of this stipulation.  So, it would read:

10         "Qualified analysts of the U.S. Fish and Wildlife

11         Service if called as expert witnesses, would testify

12         that they scientifically analyzed all the forty-six

13         samples submitted to them of fish originally

14         obtained from W. Scott Maxon by purchase and/or by

15         seizure under search warrant, and that forty-four of

16         these samples were Chum salmon, _oncorynchus keta_,

17         and two were Coho, silver, salmon."

18   And this bears today's date, January 25th, 2012, and it's

19   signed by myself and by Mr. Curtner for the defense.

20         THE COURT:  Okay.  Ladies and gentlemen, you're --

21   you're to accept those facts as true.

22         MR. COOPER:  Thank you, Your Honor.  That's all the

23   questions I have of this witness.

24         THE COURT:  Cross-examination?

25         MR. CURTNER:  Yes, Your Honor.

1                        **CROSS-EXAMINATION**

2    BY MR. CURTNER:

3    Q    Agent Stark, what was the name of this investigation you

4    were involved in?

5    A    Operation Yukon Kings.

6    Q    And how many agents were involved in that investigation

7    to the best of your knowledge?

8    A    Honestly, there's a -- there were a large number of

9    agents, especially for the take-down phase.  I couldn't tell

10   you exactly.

11   Q    Could you give me a guess about what a large number of

12   agents means to you?

13   A    You know, at the time we did the take-down, we probably

14   had thirty agents and then State Troopers as well, so actual

15   agents maybe thirty and then probably another -- you know, at

16   least probably fifty personnel working on it.

17   Q    Fifty personnel total?

18   A    I would say, yeah.

19   Q    And what do you mean by take-down operation?

20   A    That's when we go and do search warrants and -- and do

21   interviews of the subjects.

22   Q    And how many --

23   A    But in -- in addition to that, first, you'd have the

24   undercover operation and then the investigation and then you'd

25   have the -- the take-down.

1    Q    Okay.  And so how many search warrants and how many

2    interviews do you think were a part --

3    A    And honestly, you're asking the wrong person these

4    questions because I'm not the case agent.  I just did a small

5    portion of undercover work on this and -- but go ahead.

6    Q    Oh, no.  Just tell me what you know.

7         THE COURT:  Just tell him what you know.  If you

8    don't know it, you don't know it.

9    A    Right.  And you know, I -- I can't tell you for sure how

10   many -- I can't recall how many --

11   BY MR. CURTNER:

12   Q    Okay.  Well, let's (indiscernible) with fifty agents

13   altogether state and federal.

14   A    Right.

15   Q    Now, so when you -- on October 2009 in this video here,

16   you -- you were led to believe that Scott Maxon was selling

17   Yukon Kings subsistence fish?

18   A    From what he said, yes.

19   Q    Well, no.  Before you went to see him, isn't that why you

20   went to talk to him?

21   A    No.  We went to check to see who was selling subsistence

22   King salmon.

23   Q    And that's what you were investigating.  That's what you

24   were looking for, people selling subsistence Yukon Kings.

25   A    Yeah, and there had been -- like the State Troopers sent

1  an e-mail saying that there were some people they had heard

2  were selling Yukon Kings at the AFN and that sort of thing.

3  Q     Now, you -- you never bought any fish from Scott Maxon,

4  is that correct?

5  A     I did not.

6  Q     And you said his location -- were there a number of

7  people at that location?

8  A     I number of sellers?

9  Q     Yeah.

10  A     There was, I think, another seller adjacent to him, a

11  much smaller -- smaller volume seller.

12  Q     How many different people were involved with that one

13  table you talked about?

14  A     The one -- Mr. Maxon's --

15  Q     Mm-hmm (affirmative).

16  A     -- operation?  As far as I could see, there was only Mr.

17  Maxon and his wife.  I mean, he was talking to other people,

18  but I couldn't tell that anybody else was actually involved in

19  the sale at that -- at that operation.

20  Q     Now -- so how long were you at that location where fish

21  were being sold at that convention?

22  A     During the contact, eight minutes.

23  Q     Eight minutes.

24  A     Eight, nine minutes.

25  Q     Okay.  And then -- now how many days is the convention

1   typically?

2   A    I think three, four, something like that.  It runs sort

3   of over a weekend I --

4   Q    And were there vendors -- were there fish vendor sellers

5   there most of that time?

6   A    I believe so.  I wasn't there every day.

7   Q    Were there other people at that table selling processed

8   fish?

9   A    At Mr. Maxon's table, I didn't notice any other --

10  Q    Well, not the -- not during the eight minutes you were

11  there.  How about the rest of the three or four days?

12  A    I'm not sure.

13  Q    You wouldn't know because you weren't there.

14  A    I wasn't there.

15  Q    You were there eight minutes.

16  A    I mean, I -- I walked by previously.  I'd seen his

17  operation like the day before, but I'd just gone by, I hadn't

18  spent any time there.

19  Q    Okay.  Thank you for that.  Now, he gave you these

20  collars, right?

21  A    That's right.

22  Q    And did he ever say those collars were King salmon

23  collars?

24  A    He didn't.

25  Q    No, that's not anywhere in that tape, right?

1  A    Not in the transcript, no.  We were led to believe they

2  were because he said -- when asked what are you selling?

3  Kings.

4  Q    Did he ever tell you here's some King salmon collars, try

5  these?

6  A    He didn't, but we were -- he did say, when we asked what

7  are you selling, Kings.  He didn't say any other fish, he just

8  said he was selling Kings.

9  Q    You assumed that he was trying to convince you that they

10  were Kings.  That was your assumption.

11  A    I didn't assume anything.  He said he was selling Kings.

12  Q    He didn't say those collars were Kings, right?

13  A    He didn't, but he said he was selling Kings, nothing

14  else, so of course I would assume, but I didn't need to

15  because he said they were Kings.

16  Q    What other things were there on those tables?

17  A    There were a variety of bags of smoked salmon strips and

18  then there were the smoked salmon collars, and all of them

19  were referred when we asked what the fish were as Kings, and

20  they all looked --

21  Q    Okay.  Like on that tape, Mr. Maxon says all this whole

22  table here with all these people that are a cooperative

23  effort, they're all King salmon.

24  A    As far as I understood it, he was there and his wife were

25  there and they had their operation with their multiple boxes

1  of salmon, and S.A. Sears asked him what are they, and he said

2  Kings.

3  Q    And when she said that, I didn't see what was there.  I

4  didn't see --

5  A    She wasn't -- she wasn't pointing to any specific bag,

6  she said what kind of fish are they?  Kings.  'Cause he said

7  -- the way it started, I said how much are they?  And he said

8  thirty, thirty, fifteen, and five, and then she said what kind

9  of fish are they?  He said Kings.

10 Q    Now, there's nowhere in that video that shows what --

11 what's on that table, right?

12 A    Not -- no, you can't see -- the pen camera was focused

13 primarily on him.

14 Q    There -- there's some pickled salmon in jars?

15 A    I didn't notice that -- I can't recall that.

16 Q    There's different sizes of bags, different types of

17 salmon?

18 A    I recall different sizes of bags and I recall him saying

19 they were King salmon from Saint Mary's, which is on the

20 Yukon, and from Copper River.

21 Q    Now -- okay.  So, we saw that, the video and the audio.

22 A    Right.

23 Q    Now, there was two separate audios that you had to put

24 together though?

25 A    There was -- I was running an audio on my person and S.A.

1    Sears had a camera which also had an audio component, but she

2    also had an audio tape.  Her audio didn't come out well

3    because it was in a pocket and you couldn't hear it.  My audio

4    was the best for the conversation.  The pen camera doesn't

5    have great sound quality.

6    Q    And so when we heard audio on this video, whose audio is

7    that?

8    A    And I believe -- I -- I'd have to ask the folks at -- at

9    the table here, but I believe that one was a compilation of

10   the two where we -- we spliced my audio over the video just so

11   you -- so you could hear it, I believe.

12   Q    Okay.  Now -- and you made the transcript of this?

13   A    I did.

14   Q    Now, you could have hired a professional transcriber,

15   right?

16   A    I could have.

17   Q    A neutral professional transcriber who could listen to

18   it.  But this is your interpretation of it, is that right?

19   A    I'm the one who transcribed it.

20   Q    Yeah.  And -- and there are some things that are

21   unintelligible.

22   A    There are, and I marked that.  When I could not figure

23   out what it said, I marked it as unintelligible.  I listened

24   to it multiple times.

25   Q    And I did, too, but I think that what we saw here wasn't

1   everything that you gave us.  Was it -- was there some things

2   cut out?  Is it shorter than the -- the versions you provided

3   in discovery?

4   A    There was a lot background noise.  We might have

5   transcribed some things that -- that weren't relevant or was

6   somebody else talking instead of Mr. Maxon.  And I'm not a

7   professional transcriptionist.  I did the best I could.

8   Q    Now -- so, you had this discussion with Mr. Maxon about

9   sending fish Outside.  Did you ask him for a card?

10  A    I did.  Twice.

11  Q    And did he have like a business card that said Maxon

12  smoked salmon products?

13  A    No, he didn't.  He actually told me he didn't bring his

14  business cards with him because this was an Indian gathering

15  and he doesn't do commercial type stuff here.

16  Q    He didn't have any brochures or anything in writing.  The

17  only thing --

18  A    Nothing like that.

19  Q    The only thing you got -- the only thing you got from him

20  in writing was this little scrap of paper?

21  A    Right.  Because he said he didn't bring his business

22  cards to this gathering because it was an Indian gathering.

23  Q    Is that on the tape, too?

24  A    It is.  It's on the transcript.

25  Q    Saying that he didn't bring his cards because this is an

1   Indian gathering.

2   A     Yes.

3   Q     And on that scrap of paper, doesn't it have Vangie first

4   then had the --

5   A     It does have Vangie first, yes.

6   Q     -- address of Vangie and Scott in Nenana, right?

7   A     Right.

8           MR. CURTNER:  Just a minute, Your Honor.  No further

9   questions.

10          THE COURT:  Redirect?

11          MR. COOPER:  No, I don't believe so, Your Honor.

12          THE COURT:  Thank you, sir.  You're excused.

13          THE WITNESS:  Thank you.

14          THE COURT:  What's your plan, Mr. Cooper?

15          MR. COOPER:  Andie Sears.

16          THE COURT:  So, ladies and gentlemen, you okay to go

17  with another witness before our break or do you need a break

18  now?  Tell me what you think.  You okay?  Anyone want -- okay.

19  We usually take a break about 3:15 to 3:30, so we're right in

20  the break -- breaking time.  All right.  You're going to head

21  on down this way.  Just while she's coming up, if anybody's

22  uncomfortable for any reason, just raise your hand and we'll

23  take a break, okay?  This is not to make anybody miserable,

24  okay?

25          All right.  We've got a seat for you up here, and if

1  you'll just remain standing, my Clerk will swear you in.

2          THE CLERK:  Please raise your right hand.

3          **ANDREA SEARS, GOVERNMENT'S WITNESS, SWORN**

4          THE CLERK:  Okay.  Please be seated.  And for the

5  record, can you please state and spell your full name?

6          THE WITNESS:  Andrea Sears.  A-N-D-R-E-A.  Sears,

7  S-E-A-R-S.

8          THE CLERK:  Thank you.

9          THE COURT:  Mr. Cooper.

10          MR. COOPER:  Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12  BY MR. COOPER:

13  Q    And Mrs. Sears, what's your occupation, please?

14  A    I'm a law enforcement officer with the National Park

15  Service.

16  Q    And were you a Special Agent with the Park Service last

17  -- in October 2009?

18  A    Yes, I was.

19  Q    At that time, did you have occasion to be on an operation

20  in which you were co-acting with a Fish and Wildlife agent

21  named Rory Stark at a convention in Anchorage?

22  A    Yes, I was.

23  Q    And would that have been the 23rd of October of 2009?

24  A    I don't recall the exact date.  That sounds right.

25  Q    Okay.  And tell us, was that the occasion you were

1   wearing some sort of a recording device?

2   A    Yes, I was.

3   Q    What recording devices did you have on that day?

4   A    I had a digital recorder in a pocket and I also had a --

5   a camera that was on a pen.

6   Q    On a pen, like -- like a writing pen.

7   A    Like a writing pen.

8   Q    With a clip that -- what you put in your pocket, you

9   mean?

10  A    That's correct.

11  Q    And so we saw -- a little bit ago, we saw a video that

12  was a little off -- off -- off target sometimes, but showed

13  Mr. Maxon and -- is that the one that you took?

14  A    Yes, it is.

15  Q    Okay.  We hear a voice in there also asking at times like

16  what kind of salmon is it.  Was that you?

17  A    Yes, that was me.

18  Q    And can you recall what it was you asked Mr. Maxon -- was

19  it Mr. Maxon you were addressing when you asked what kind of

20  salmon it was?

21  A    Yes, it was this individual.

22  Q    All right.  Now -- so like -- do you recall Mr. Maxon

23  being asked how much they are per bag before you asked him

24  this -- what kind of salmon it is?

25  A    Yes, I do recall that.

1  Q    And who was it that asked him that?

2  A    Agent Stark.

3  Q    And do you recall Mr. Maxon's answer giving prices for

4  those bags?

5  A    Yes, I do.

6  Q    And then -- so, right after that price discussion, was

7  that when you asked him about what kind of salmon it was?

8  A    That's correct.

9  Q    And what did he say?

10 A    Kings.

11 Q    And so then did you ask him from where those Kings were

12 caught?

13 A    Yes, I did.

14 Q    What did he tell you?

15 A    He said from Saint Mary's and from the Copper River.

16 Q    All right.  And did you ask him anything further about

17 that?

18 A    I asked how he could tell the difference, what was from

19 Saint Mary's and what was from the Copper River.

20 Q    What did he tell you?

21 A    He said that the ones from Saint Mary's had black on the

22 back.

23 Q    And so did he then tell you what -- which was the Saint

24 Mary's salmon and which was Copper River salmon?

25 A    Yes, he did.

1    Q    Now, the ones that were -- was he talking about fish that

2    were right in front of you at that time?

3    A    Yes.  He had picked up a bag.

4    Q    He picked up a bag from in front.  Where was this?  On

5    top of one of the boxes there?

6    A    Yeah.  He picked up one of the bags of smoked salmon

7    strips and -- and said it's got black on its back.

8    Q    And so that makes it what?

9    A    Saint Mary's.

10   Q    Okay.  All right.  So, do you recall asking him anything

11   further about where he was selling these and who was buying

12   them?

13   A    Yes.  And I asked where he was selling them and he said

14   that he sells them in -- in Hawaii, Arizona, and Las Vegas.

15   Q    Mm-hmm (affirmative).  And did you ask him -- did he

16   indicate how much, to the best of your recollection, that he

17   was selling in those places?

18   A    With respect to Arizona, he said thousands -- thousands

19   of pounds.

20   Q    And did he indicate who it was that was buying those --

21   that salmon the best that you -- you can recall?

22   A    With respect to Arizona, he said that the Casa Grande

23   Indian Reservation -- he said that the -- that the casinos --

24   they -- I think it was they put them up or they cut them up.

25   Q    Okay.  And now do you recall receiving from him or seeing

1  Rory Stark receive from him a bag of salmon collars?

2  A     Yes, I do.

3  Q     Where did -- where did he produce those from?  Where did

4  you see him pick those up from?

5  A     One of the areas in front of him.  I don't recall

6  specifically beyond that.

7  Q     Would they have been among the ones he was referring to

8  in the beginning when he said the prices?

9  A     Yes.

10  Q     And what -- what price of a bag would this have been that

11  he handed you or to -- handed to Agent Stark?

12  A     Five dollars.

13  Q     So, did he require any price to be paid for that or was

14  he just giving that away?

15  A     Gave it away.

16  Q     Okay.  Did you ask him about if he still goes to Arizona?

17  A     Yes, I did.

18  Q     And what was his answer there to the best of your

19  recollection?

20  A     The answer I recall it being a bit ambiguous.  He made a

21  comment that he goes down there in the present tense, but then

22  later on in the conversation, he said that he used to go down

23  there, that his dad died.  So, I -- I wasn't quite certain if

24  he was still actively going down there.

25  Q     Mm-hmm (affirmative).  Now, did you -- have you -- did

1   you take a look at the transcript of the recording of the

2   conversation that took place that day and hear it on the tape

3   that was made by Agent Stark?

4   A    Yes, I have.

5   Q    And what you saw there, does that agree with your

6   recollection of the events that took place?

7   A    Yes, it does.

8   Q    And do you have a present recollection of those events?

9   A    Yes.

10  Q    And what you've told us, is that from your recollection?

11  A    Yes.

12           MR. COOPER:  That's all I have, Your Honor.

13           THE COURT:  Cross-examination.

14                    **CROSS-EXAMINATION**

15  BY MR. CURTNER:

16  Q    Is it Ranger Sears, Agent Sears, what's the proper way to

17  address you?

18  A    Currently Ranger Sears.

19  Q    Ranger Sears, could you describe the table that you

20  filmed this -- this video?

21  A    There were -- there were boxes that were open.  I can't

22  recall exactly how many boxes were there, and I don't have a

23  better re -- recollection than that.  There was -- there were

24  several boxes in front that were stacked up about to the --

25  you know, kind of like a -- a counter or table height.

1   Q    And what was on the boxes?  What kind of different fish

2   products or whatever?  What -- what -- what was on those boxes

3   that you could see?

4   A    Well, there were -- there were a lot of bags of smoked

5   salmon.  There were different kinds of bags.  You know, you

6   pointed out the tall -- the longer bags with smoked salmon

7   strips, and then there was some shorter bags, and then the

8   smaller bags.  And I don't have a more specific recollection

9   of -- of what was there.

10  Q    Were there also jars or were they just small bags?

11  A    I don't recall.

12  Q    Okay.  And this is the only time that you were involved

13  in this investigation?

14  A    That's accurate.

15  Q    Now, when these collars were given to you and Agent

16  Stark, did -- did Mr. Maxon ever say these were King salmon

17  collars?

18  A    I don't recall that.

19  Q    And did he ever tell you that these were five dollars a

20  bag?

21  A    He referred to the smaller bags that had the collars as

22  being five dollars, but that's -- that's the only -- that's as

23  specific as I can recall.

24          MR. CURTNER:  Okay.  No further questions.

25          THE COURT:  Redirect?

1        MR. COOPER:  No, Your Honor.

2        THE COURT:  Thank you, ma'am.  You're excused.  And

3   ladies and gentlemen, we'll take a fifteen-minute recess now,

4   and Mr. Cooper, if you can be ready with your next witness

5   when we get back.

6        MR. COOPER:  Yes, Your Honor.

7        THE COURT:  All right.  Thank you.  And those -- you

8   leave -- you leave your note pads right on your chair and the

9   other documents we'll pick up during the break, the

10  transcripts.

11                      (Pause)

12     (Jury out at 3:23 p.m.)

13       THE COURT:  So, Mr. Cooper, maybe you could have

14  somebody pick up those transcripts and retrieve -- or do you

15  have them already?

16       MR. COOPER:  We have them.

17       THE COURT:  Oh, you've already got them?  Good.

18  Okay.

19              (Pause - side conversation)

20       THE COURT:  But we need -- we need one copy of the

21  transcript to make -- and you've got that, that's part of the

22  -- it's not an exhibit -- what do you call it?  It's a -- it's

23  marked --

24       MR. COOPER:  It's an identification.

25       THE COURT:  Yeah, it's marked for identification,

1    but not a -- not for exhibit.

2            MR. COOPER:  Well, if we give it an identification

3    number like --

4            THE COURT:  Yes.

5            MR. COOPER:  -- something -- I would say call it 1-A

6    because one is the -- is the actual disk that has that

7    recording.

8            THE COURT:  Okay.

9            MR. COOPER:  So, if we call it 1-A, that would be a

10   good identification.

11           THE COURT:  1-A for identification purposes so it's

12   part of the record.

13       (Government's Exhibit 1-A marked for identification)

14           MR. COOPER:  That's right.

15           THE COURT:  At this point, it has not been admitted.

16           MR. COOPER:  That's right.

17           THE COURT:  Whether it will be later, I don't know.

18           MR. COOPER:  Right.

19           THE COURT:  Okay.  All right, thank you.

20           THE CLERK:  All rise.  This Court stands in recess

21   for fifteen minutes.

22       (Recess at 3:24 p.m., until 3:42 p.m.)

23       (Jury not present)

24           THE CLERK:  All rise.  His Honor the Court, the

25   United States District Court for the District of Alaska is

1    again in session, the Honorable Ralph R. Beistline presiding.

2    Please be seated.

3              THE COURT:  All right.  Mr. Cooper?

4              MR. COOPER:  Yes, Your Honor.  We'll call Justin

5    Lindell.

6              THE COURT:  Okay.

7              MR. COOPER:  Actually, I guess we need a jury.

8              THE COURT:  I know, but I mean I wanted to make sure

9    you had a witness.

10             MR. COOPER:  We do, yes, yes.  Thank you.

11             THE COURT:  Okay.  All right.  Well, you get the

12   witness, we'll get the jury.  I thought you might say you

13   rested, so I wanted to make sure.

14                        (Pause)

15             THE COURT:  Sir, you can just kind of make your way

16   up to this chair and then when we get the jury seated, we'll

17   swear you in and go from there.  You can remain -- remain

18   standing.  She's going to swear you in as soon as they get

19   here.

20        (Jury in at 3:42 p.m.)

21             THE COURT:  Okay.  Mr. Cooper, your next witness is?

22             MR. COOPER:  Justin Lindell.

23             THE COURT:  Okay.  All right.  Swear him in.

24             THE CLERK:  Please raise your right hand.

25        **JUSTIN LINDELL, GOVERNMENT'S WITNESS, SWORN**

1        THE CLERK:  Okay.  Please be seated.  For the

2   record, can you please state and spell your full name?

3        THE WITNESS:  Justin Clyde Lindell.  J-U-S-T-I-N

4   C-L-Y-D-E  L-I-N-D-E-L-L.

5        THE CLERK:  Thank you.

6        THE COURT:  Mr. Cooper.

7        MR. COOPER:  Thank you, Your Honor.

8                    **DIRECT EXAMINATION**

9   BY MR. COOPER:

10  Q    Mr. Lindell, what's your occupation?

11  A    I'm an Alaska State Trooper.

12  Q    And are you assigned to a particular division or activity

13  within the troopers?

14  A    I'm assigned to the Wildlife Investigations Unit.

15       THE COURT:  Okay.  Can you pull yourself up close to

16  the mic or back or something?  All right, good.

17       THE WITNESS:  Sorry.

18  BY MR. COOPER:

19  Q    What --

20  A    I'm assigned to the Wildlife Investigations Unit in

21  Anchorage.

22  Q    In Anchorage?  Okay.  And were you assigned to that unit

23  in 2009?

24  A    Yes, sir.

25  Q    And on or about the 23rd of October, 2009, did you have

1    occasion to participate in a contact of a Willis Scott Maxon

2    at a -- at a convention that was going on in Anchorage?

3    A    Yes, sir.  I didn't know his name at the time.

4    Q    Okay.  Do you see the person in the courtroom that you

5    dealt with at that time?

6    A    I do.

7    Q    And would you indicate where he is?

8    A    He's sitting right there.

9    Q    At defense table, far -- on the far end of the table?

10   A    Yes, sir.

11        MR. COOPER:  I'd like the record to show he's been

12   -- identified the defendant.

13        THE COURT:  The record will so note.

14        MR. COOPER:  Thank you.

15   BY MR. COOPER:

16   Q    And so what was the purpose of the contact at that time

17   that you had with Mr. Maxon?

18   A    I was asked to buy some fish from him.

19   Q    Who asked you to do that?

20   A    The U.S. Fish and Wildlife Service.

21   Q    And so, what preparation was made for that, if any, or

22   did you just walk in there and do it, or how did it go?

23   A    No, we'd been there earlier, walking around the -- the

24   AFN conference, and I had observed Agent Stark and Agent Sears

25   talking to the individual, so I'd seen them talking to him

1  earlier, and then we got together after we got done walking

2  around, and it was decided that I should go buy some fish from

3  him.

4  Q    When you say we, you're speaking of somebody with U.S.

5  Fish and Wildlife?

6  A    The agents that were there.

7  Q    All right.  So -- so, what did you do then after you made

8  that decision?

9  A    I walked back there and purchased fish.

10 Q    And did you speak with Mr. Maxon?

11 A    I did.

12 Q    Did you speak with anybody else at that location?

13 A    I don't recall.  There was a -- there was quite a few

14 people that were standing around that were also buying fish --

15 Q    Mm-hmm (affirmative).

16 A    -- and so I was pretty much kind of waiting in a line to

17 -- to -- to buy the fish.

18 Q    I see.  And did you have any kind of a recording device?

19 A    I did.

20 Q    And what did you have?

21 A    I had a digital recorder.

22 Q    Okay.  Just sound recording?

23 A    Yes.

24 Q    And you had that on when you made the contact with Mr.

25 Maxon at the ta -- at the -- not a -- not a table, but I mean

1  was -- was at his location where he was selling from?

2  A    Yes.

3  Q    Do you recall what physically he had set up there at that

4  place?

5  A    I can't remember everything that he had set up.  I

6  remember that there was boxes and -- and the fish, but I don't

7  remember every little --

8  Q    Boxes and fish.  Okay.  All right.  And so -- so, you had

9  the recording on -- and have you heard the recording that was

10 made by that digital recorder at that time?

11 A    Yes.

12 Q    Does that sound like an accurate reproduction of the

13 events that you recall that took place then?

14 A    I went over it and reviewed what -- what I had said and

15 what was said.

16 Q    And have you since seen a transcript of that -- the

17 contents of that tape?

18 A    Yes, sir.

19 Q    And how -- tell us if that transcript reflects what you

20 believe you hear on the tape.

21 A    I believe it does.  I mean, there's a lot of -- there's a

22 lot of background noise and there's a lot of people talking,

23 but as far as the stuff that I said, it's -- it's -- it's

24 accurate to the best of my knowledge.

25          MR. COOPER:  Very well.  Your Honor, I'd like to

1   offer number six and the transcript of it is six -- we'll mark

2   as 6-A.

3              THE COURT:  Okay.

4              MR. COOPER:  We haven't done that yet.

5              THE COURT:  So, you're offering six which is the --

6              MR. COOPER:  The audio of this --

7              THE COURT:  -- audio.

8              MR. COOPER:  -- contact.  Yes.

9              THE COURT:  Okay.  All right.  Any objection to the

10  audio?

11             MR. CURTNER:  No, Your Honor.

12             THE COURT:  It'll be received.  Now, what about 6-A,

13  the transcript?

14       (Government's Exhibit 6 admitted)

15             MR. COOPER:  6-A is the transcript.  I just had him

16  authenticate that as an accurate reproduction of the audio

17  track that we're going to hear, and so I'd like to mark that.

18  I don't have it marked yet, but I'm going to provide that to

19  the Court and the Clerk --

20             THE COURT:  Okay.

21             MR. COOPER:  -- and have that marked as 6-A.

22       (Government's Exhibit 6-A marked for identification)

23             THE COURT:  And what's -- what's -- Mr. Curtner,

24  what's your view on that?

25             MR. CURTNER:  Same as before, Your Honor.  I haven't

1   had a chance to actually listen to the tape --

2           THE COURT:  Let's do the same thing we did before

3   then.

4           MR. CURTNER:  Yes.

5           MR. COOPER:  Very well.  So, we'll -- we'll play

6   that recording then without the transcript in front of the

7   jury and then we'll play it with the transcript in front of

8   the jury.

9           THE COURT:  So that Mr. Curtner can get a chance to

10  compare it, and I'll give the same cautionary instruction.

11      (Exhibit 6 played for the jury)

12  BY MR. COOPER:

13  Q    Is that the extent of the recording you made there then,

14  Mr. Lindell?

15  A    That's -- that's the portion that dealt with the contact

16  there at AFN.

17          MR. COOPER:  I see.  Very well.  We'll offer 6-A

18  then for -- for the jury, Your Honor.

19          THE COURT:  Okay.  Same objection?

20          MR. CURTNER:  Yes.

21          THE COURT:  All right, very well.  Ladies and

22  gentlemen, same book.  You're about to hear a recording that

23  has been received in evidence.  The transcript of the

24  recording is being provided to you to help you identify

25  speakers and help you decide what the speakers say.  Remember

1  that the recording is the evidence, not the transcript.  If

2  you hear something different from what appears in the

3  transcript, what you heard is controlling.  Listen carefully.

4  The transcript will not be available during your

5  deliberations.

6           Okay.  If you can distribute the transcript then,

7  and --

8           MR. COOPER:  Very well.

9           THE COURT:  -- replay it.

10                          (Pause)

11           THE COURT:  Okay.  I think everybody has it.  Do

12  they?  Okay.  Go ahead with the recording then.

13      (Exhibit 6 replayed for the jury)

14           THE COURT:  Okay.  That's it.  So, you can just pass

15  them back down again, please, and then we'll continue with the

16  examination.

17                          (Pause)

18  BY MR. COOPER:

19  Q    Now, Mr. Lindell, that's the conversation you just

20  testified about, isn't it, that we just heard?

21  A    Yes, sir.

22  Q    Did you hear Mr. Maxon indicate that the place where

23  these were made?  Is he talking -- were -- you were there.

24  You saw -- what -- what are they talking about that was made

25  in Saint Mary's and some were made in Copper River.

1  A    I believe he was referring to the salmon strips.

2  Q    All right.  And on the next -- the last part of it there,

3  you said I'll take two.  Two bags is what Mr. Maxon answers,

4  two bags.  Two bags of what was it that you were referring to

5  when you told him you'd take two?

6  A    Two bags of the King strips.

7  Q    And is that what he gave you?

8  A    Yes.

9  Q    Or ones that he had indicated were King strips?

10  A    To -- that's what I understood they were.

11  Q    And is that the ones that he called the long ones?

12  A    Yes, sir.

13  Q    Do you have a copy of an exhibit in front of you that's

14  got an exhibit sticker number seven on it?

15  A    I do.

16  Q    And does that appear to identify or depict rather

17  something that you recognize?

18  A    Yes, sir.

19  Q    And what is that?

20  A    The two bags of salmon strips that I purchased.

21  Q    All right.  And these are the long ones that he talked

22  about?

23  A    Yes, sir.

24       MR. COOPER:  Your Honor, I'd offer seven in

25  evidence.

1          THE COURT:  Any objection?

2          MR. CURTNER:  No, Your Honor.

3          THE COURT:  It'll be received without objection.

4      (Government's Exhibit 7 admitted)

5          MR. COOPER:  And if I haven't offered it, I'd offer

6  6-A then as the transcript of what we were just talking about

7  here.

8          THE COURT:  The transcript will be received not as

9  -- not as an exhibit, but --

10         MR. COOPER:  But identification only --

11         THE COURT:  -- for identity as -- identification,

12 yes.

13         MR. COOPER:  -- at this time?  All right.  That's

14 all the questions I have of Mr. Lindell.

15         THE COURT:  Thank you.  Cross-examination?

16         MR. CURTNER:  Trooper Lindell, what was -- what was

17 the name of the --

18         MR. COOPER:  (Indiscernible - away from microphone.)

19         MR. CURTNER:  I'm sorry?

20         MR. COOPER:  Excuse me (indiscernible - away from

21 microphone).  Oh, that's right.  (Indiscernible - away from

22 microphone.)

23         THE COURT:  Well, did you -- are you done?

24         MR. CURTNER:  Are you done?

25         THE COURT:  If you're not done, I'm sure he will --

1          MR. COOPER:  Well, it's just that I wanted the jury

2     to see the picture that he was talking about, number seven.  I

3     didn't display it.

4          THE COURT:  Well, go do it.

5          MR. COOPER:  If we can put that up, it'll just take

6     a second.

7     BY MR. COOPER:

8     Q    Is that one, number seven, that you just talked about?

9     A    Yes, sir.

10         MR. COOPER:  Very well.  I think that's all I have,

11    Your Honor.

12         THE COURT:  Okay.  All right, thanks.  Cross-

13    examine.

14                     **CROSS-EXAMINATION**

15    BY MR. CURTNER:

16    Q    So, Trooper Lindell, you were involved in Operation Yukon

17    Kings as well, is that correct?

18    A    I -- I believe that's what it's called.

19    Q    Now, when you first encountered Mr. Maxon, was that

20    shortly after trooper -- or Agent Stark and Ranger Sears were

21    there?

22    A    When you say encountered --

23    Q    Well, okay.  This audio, like you went up to him and you

24    recorded him --

25    A    Uh-huh (affirmative).

1   Q    -- was that right after --

2   A    It wasn't immediately right after that.

3   Q    Few minutes, half an hour?

4   A    I -- I don't remember the exact time, sir.

5   Q    Okay.  Now, in the transcript, it talks about -- and I

6   heard a lot of voices that weren't you and weren't Mr. Maxon.

7   Who were those other folks?

8   A    Other people that were buying fish.

9   Q    Were there other people there who were selling fish, too?

10  A    There was.

11  Q    Okay.  So, some of the voices were just -- were they just

12  the buyers or the sellers or both?

13  A    The people that were around my immediate area were other

14  people that were looking at the fish strips that were for

15  sale.

16  Q    Okay.  But no -- there were -- how many other people were

17  around selling fish?

18  A    I don't recall the exact number, sir.

19  Q    Quite a few?

20  A    Again, I can't -- there wasn't like a hundred, but there

21  -- I don't remember -- I didn't count them.  I don't know an

22  exact number.

23  Q    A dozen, two dozen --

24  A    I don't think it was that many.

25  Q    Okay.  So, you don't know who said pinks in that con --

1  A    I don't, sir.

2  Q    Now, Mr. Maxon told you on that tape that he was selling

3  for the group.

4  A    That's what it says.  That's what he said, but I --

5  Q    What was he referring to?

6  A    I don't know.

7  Q    Other people who had processed fish on that -- in those

8  boxes?

9  A    I don't know.  I don't know what he was referring to.

10 Q    Now, there were other people selling fish.  Were they

11 also people from Anchorage?

12 A    I don't know.

13 Q    Were they from --

14 A    I didn't -- I didn't ask them where they were from.

15 Q    Were they from Fairbanks?  Oh, you don't know where they

16 were from.  Could they have been from villages around Alaska?

17 A    I don't know, sir.  I never asked them.  I don't know

18 where they're from.

19 Q    This transcript of this conversation, do you -- is that

20 something you prepared or do you know who prepared that

21 transcript?

22 A    I believe it was originally prepared by Agent Rippeto,

23 and then I reviewed it yesterday when I came to Fairbanks.

24 Q    So, he listened to the tape and he made his translation

25 of it, then you listened to it.

1    A    Yes.

2    Q    Now, in this one exhibit, Exhibit 7 we saw up there, it's

3    got an evidence tag on it, right?

4    A    Yes, sir.

5    Q    And the evidence tag, was that prepared by you?

6    A    It doesn't look like my handwriting.

7    Q    It's referenced to your evidence that you took, right?

8    A    Yes, sir.

9    Q    It says two pounds, quote, King salmon strips.  Who wrote

10   that?

11   A    I don't know who wrote that, but I was -- I was in the

12   office 'cause I delivered it to the office after I got done

13   buying it, but I can't remember who exactly wrote that down.

14   Q    There wasn't any labels or anything on these packages at

15   all, right?

16   A    Not to my knowledge, sir.

17   Q    Okay.  There's nothing on the package that said King

18   salmon strips.

19   A    Not to my knowledge, sir.

20   Q    Just this evidence tag that somebody else wrote out.

21   A    Yes, sir.

22            MR. CURTNER:  That's all I have.  Thank you.

23            THE COURT:  Redirect?

24            MR. COOPER:  No, Your Honor.

25            THE COURT:  All right.  Thank you, sir.  You're

1  excused.  Government's next witness.

2          MR. COOPER:  Yes.  We'd call Eric Marek.

3          UNIDENTIFIED SPEAKER:  (Indiscernible - away from

4  microphone.)

5          MR. COOPER:  Oh, sorry.  Correction.  Frank Solis.

6  Frank --

7          THE CLERK:  Mr. Cooper, can you pull that microphone

8  up?

9          MR. COOPER:  Say that again?

10         THE CLERK:  I'm not picking you up over there.

11         THE COURT:  In other words, pull the microphone

12  closer.

13         MR. COOPER:  Okay.  Fine.

14         THE COURT:  Okay.  I didn't hear -- hear who you

15  were calling.

16         MR. COOPER:  It's Frank Solis.

17         THE COURT:  Okay.

18         MR. COOPER:  S-O-L-I-S.

19         THE COURT:  Okay.

20                     (Pause)

21         THE COURT:  Okay, sir.  We're -- got a chair for you

22  right up in front.  And if you'd just remain standing for a

23  second, she'll swear you in.

24         THE CLERK:  Please raise your right hand.

25     **FRANCISCO SOLIS, JR., GOVERNMENT'S WITNESS, SWORN**

1       THE CLERK:  Okay.  Please be seated.  For the

2  record, can you please state and spell your full name?

3       THE WITNESS:  My name is Francisco Solis, Junior.

4  F-R-A-N-C-I-S-C-O  S-O-L-I-S,  J-R.

5       THE CLERK:  Thank you.

6       THE COURT:  Mr. Cooper.

7                    **DIRECT EXAMINATION**

8  BY MR. COOPER:

9  Q    Mr. Solis, what is your occupation?

10 A    Special Agent with U.S. Fish and Wildlife Service.

11 Q    And where are you stationed in that capacity?

12 A    San Antonio, Texas.

13 Q    And in 2009 and 10, where were you located on duty?

14 A    Nogales, Arizona.

15 Q    Is that right down in the southern part of the state near

16 the border?

17 A    Yes, sir.  Right on the border.

18 Q    And in that connection, did you have any contact with

19 Fish and Wildlife agents in Alaska relating to the possibility

20 of your making an undercover -- what you call an undercover

21 purchase of some fish?

22 A    Yes, that's correct.

23 Q    And who was it you had contact with in that regard?

24 A    Special Agent Dave Rippeto.

25 Q    And where was he from?

1   A    Fairbanks, Alaska.

2   Q    And what was the arrangement?  What were you to do?

3   A    I -- I was to contact Scott Maxon of Nenana, Alaska, with

4   the -- the goal to obtain some salmon from him from -- I

5   understood was being sold from the Yukon River, which was

6   specifically King salmon.

7   Q    All right.  And so when did you start making the contact

8   to accomplish that?

9   A    December 8th, 2009.

10  Q    And from where did you make the contact and how?

11  A    I called from Nogales, Arizona, using a cell phone.

12  Q    All right.  Did you make contact with Mr. Maxon?

13  A    I sure did.

14  Q    And what did you accomplish in that phone call?

15  A    In that phone call, I -- I explained to him that I

16  received his contact information, name and so forth, from a

17  friend of mine from Anchorage, Alaska, indicating that he had

18  met Maxon or met him at the -- you know, at the AFN who was --

19  well, he was selling fresh salmon, and I mentioned to him that

20  my friend was -- thought that the wild -- that the King salmon

21  from the Yukon River, the smoked salmon strips were -- were --

22  were pretty good and I -- I asked him if he had any of that,

23  which he indicated that he did, and I -- I indicated that I

24  would purchase at least a hundred pounds.

25  Q    Okay.  So, did you reach agreement?

1  A    He said he was going to go ahead and -- for -- for me to

2  call back and he'd check to see how much he had, but he said

3  he could -- he could provide some.

4  Q    Okay.  Now, at the time you made that call, did you have

5  any kind of recording device to record the call?

6  A    I did, yes.

7  Q    And what was that -- what kind of device was that?

8  A    It was a -- a digital recording device.

9  Q    All right.  And have you since listened to the recording

10 of the phone call -- this first phone call?

11 A    I sure did, yes.

12 Q    And does the recording sound to you like an accurate

13 reproduction of the call that you remember you made?

14 A    It did, however, it just captured my side of the

15 conversation.

16 Q    Ah.  So, that -- so, the other side then is totally

17 missing from this first recording?

18 A    On the first recording, yes.

19 Q    Okay.  So, what Mr. Maxon says, you can't hear at all, is

20 that it?

21 A    That's correct.

22 Q    Okay.  So, then -- now, did you have another call with

23 him shortly after that?

24 A    I did, on the next day, December 9th.

25 Q    So, on the first call, you spoke about making a purchase

1   of King salmon, is that right?

2   A    That's correct.

3   Q    And the second call, did you reach agreement for a

4   specific bargain of how much and when and where and so forth?

5   A    Yes, we did.  Yes.  In --

6   Q    Again, was it for King salmon.

7   A    Yes, it was.

8   Q    What was the bargain you reached in that second call?

9   A    He indicated he had at least fifty pounds of the smoked

10  King salmon strips.

11  Q    And what was he going to charge you per pound or for the

12  total?

13  A    It came up to roughly one thousand two hundred and fifty

14  dollars plus shipping.

15  Q    Plus the shipping.  How was he going to ship it to you?

16  A    He was going to ship it C.O.D. via the U.S. Postal

17  Service.

18  Q    All right.  So, was that agreement reached in the second

19  phone call?

20  A    The December 9th, there were another -- there was another

21  phone call, and the -- the second phone call that day we

22  reached the -- that agreement of the price and -- and the --

23  how I would be paying C.O.D. or paying the cash on delivery.

24  Q    Okay.  All right.  So -- and then is your -- a transcript

25  of either one of these first two calls in existence that you

1   know of?

2   A     Yes, I do.

3   Q     And have you looked at this transcript -- which one or

4   both of these calls are transcribed?

5   A     The December 8th was not, but the ones on September 9th

6   were.

7   Q     December 8th and -- you mean December 9th?

8   A     December 9th, those were transcribed.

9   Q     December 8th, is that the one where -- the first call,

10  it's only one side of it recorded and the other side wasn't?

11  A     That's correct.

12  Q     Okay.  So, no transcript of that.

13  A     That's correct.

14  Q     But there is one of the 9th?

15  A     There is.

16  Q     And have you gone over that transcript thoroughly?

17  A     I have.

18  Q     Does it appear to you to accurately reflect what is on

19  the recording itself?

20  A     It does.

21  Q     So, it's -- it doesn't have anything extra in there

22  that's not on the recording?

23  A     No, sir.  It does not.

24  Q     Okay.  And what is on the recording is accurately copied

25  onto the transcript, is that your testimony?

1   A    Yes, to the best of my knowledge.

2            MR. COOPER:  Okay.  Your Honor, I'm going to offer

3   the recording -- actually, this -- this disk has several

4   subsequent phone calls on it as well --

5            THE COURT:  Okay.

6            MR. COOPER:  -- and I'll ask the same questions

7   about that, but it's going to be Exhibit 8, and the transcript

8   is going to be Exhibit 8-A.  Do we have a separate series for

9   the rest of the transcripts, so it's 8-A, B, C, D or E?

10           THE SPECIAL AGENT:  (Indiscernible - away from

11  microphone.)

12                    (Pause - side conversation)

13           MR. COOPER:  All right.  We could -- what we have is

14  there's -- it looks like there's one, two, three -- five

15  recorded phone calls.  They're not extremely long.  And we can

16  go through this identification process on each one separately

17  or we can do all of them and -- and get the authentication and

18  make the offer.

19           THE COURT:  Why don't you do them all, get them

20  done, and -- and if Mr. --

21           MR. COOPER:  Very -- very well.

22           THE COURT:  -- Curtner has an objection, he'll say

23  so.  Right?

24           MR. COOPER:  Great.

25           MR. CURTNER:  Yeah, same objection.  I just got

1    these, but as far as the --

2              THE COURT:  I understand.

3              MR. CURTNER:  -- as far as the tapes, no.

4              THE COURT:  Do you want -- do you -- would you like

5    to hear him first be -- the same procedure we used in the

6    other ones?

7              MR. CURTNER:  Yes.

8              THE COURT:  Okay.  So, we'll just follow the same

9    procedure.  I'll read the same blue book and we'll get it

10   done.

11             MR. COOPER:  Very well.

12   BY MR. COOPER:

13   Q    So, then with regard to subsequent calls, let me ask you

14   the same questions, Mr. Solis.  Have you heard tape recordings

15   of four more phone calls that you had with him?

16   A    Yes, I did.

17   Q    And have you seen the transcripts of these additional

18   phone calls as well as the first one that I just asked you

19   about, which was actually call number two?

20   A    Yes, I have.

21   Q    And do the transcripts accurately reflect what's actually

22   on the tape, not something in addition to that or anything

23   inaccurate?

24   A    Yes, that's correct.

25   Q    And were each of these subsequent tapes -- you're either

1  speaking with Mr. Maxon or leaving a message for Mr. Maxon or

2  Mr. Maxon leaving a message for you?

3  A    That's correct.

4  Q    One of those.

5  A    Right.

6        MR. COOPER:  Okay.  So, I would make that offer

7  then, Your Honor, with regard to Exhibit 8, which is the disk

8  that has all these five phone calls on it, and -- and we'd

9  mark the series of transcripts of the five calls as Exhibits

10 8 -- there's six -- wait a second.  Six?

11        THE SPECIAL AGENT:  (Indiscernible - away from

12 microphone.)

13        MR. COOPER:  Make sure.

14              (Pause - side conversation)

15 BY MR. COOPER:

16 Q    So, my questions -- now I'll revise the questions I just

17 asked you.  Instead of five, there are six of these

18 transcripts, one of them is just one page and I overlooked

19 that.  So, is that true of all six of these transcripts, that

20 they are accurately -- they accurately reflect the contents of

21 the tapes of the phone calls from those six instances?

22 A    Yes, they do.

23        MR. COOPER:  Very well.  So, that will be the offer,

24 Your Honor.  These would be eight -- the transcript will be

25 marked for identification as 8-A, 8-B, 8-C, 8-D, 8-E, and 8-F.

1     (Government's Exhibits 8-A through 8-F marked for

2        identification)

3          THE COURT:  Okay.  Are you going to -- I don't have

4     an objection, unless Mr. Curtner does, to you just simply

5     playing all six calls.

6          MR. COOPER:  Well, we're going to -- after each one,

7     I'm going to have Mr. Solis fill in the gaps and answer any --

8          THE COURT:  Okay.

9          MR. COOPER:  -- introductory questions --

10          THE COURT:  But then --

11          MR. COOPER:  -- about the next tape.

12          THE COURT:  Okay.  But then -- and then we'll do it

13     again with the transcripts --

14          MR. COOPER:  That's correct.

15          THE COURT:  -- so just want to give Mr. Curtner a

16     chance to --

17          MR. COOPER:  That's correct.

18          THE COURT:  Okay.  Go ahead.  Take --

19          MR. COOPER:  All right.  Then read -- play what's

20     going to be marked as 8-A, which is a conversation that he

21     described as taking place on December 9th, 2009.

22     (Exhibit 8 played for the jury)

23          MR. COOPER:  All right.  We should probably do these

24     one at a time.

25          THE COURT:  Okay.  Do it one at a time.  You're --

1          MR. COOPER:  Okay.  So --

2          THE COURT:  So, now you're going to pass out the

3    transcripts?

4          MR. COOPER:  Pardon?

5          THE COURT:  Are you going to pass the transcripts

6    out now?

7          MR. COOPER:  That's -- that's what I believe we

8    should do.

9          THE COURT:  Okay.  I'm not going to read this six

10   times, but I'll read it one more time, okay?  And it applies

11   to the next six:

12          You're about to hear a recording that has been

13   received in evidence.  The transcript of the recording is

14   being provided to you to help you identify speakers and help

15   you decide what the speakers say.  Remember that the recording

16   is the evidence, not the transcript.  If you hear something

17   different from what appears in the transcript, what you heard

18   is controlling.  Listen carefully.  The transcript will not be

19   available during your deliberations.

20          Now, here's what this note says.  It says:

21          "This may not be repeated if more than one recording

22          is played."

23   Footnote.

24          "However, the judge can remind the jury that the

25          recording and not the transcript is the evidence."

1   Have I done that?  So, I've done my job, right?  Okay, good.

2          (Government's Exhibit 8 admitted)

3                  (Pause - side conversation)

4          (Exhibit 8 continuation played for the jury)

5                          (Pause)

6   BY MR. COOPER:

7   Q    So, Mr. Solis, what happened after that?  Did you talk to

8   him again?

9   A    Yeah, I -- I called him back to give him the address for

10  the local Nogales post office.

11  Q    And was the -- was it arranged that -- how that would go

12  through?  What did you -- what did you discuss on this second

13  phone call -- or the next phone call rather?

14  A    Right.  The second phone call is where I asked how much

15  was it going to cost to -- to ship it up here -- or to

16  Nogales.

17  Q    He gave you a price?

18  A    He gave me a price.

19  Q    For the fish --

20  A    For the -- for the smoked --

21  Q    -- and the shipping?

22  A    And the shipping.  Well, the shipping was an estimate.

23          MR. COOPER:  Okay.  And you've authenticated all

24  these transcripts on the same terms already, so at this time,

25  I'd like to have 8-B then played, or the tape that relates to

1  8-B, and then -- first, and then we'll play the trans -- or

2  with the transcript.  (Indiscernible - away from microphone.)

3       (Exhibit 8 continuation played for the jury)

4       MR. COOPER:  Very well.

5  BY MR. COOPER:

6  Q    Now, with regard to this one, Mr. Solis, there's a couple

7  of places where there was a break in the conversation -- in

8  the recording.  What's the reason for that?

9  A    It was just to get to more pertinent information.  A lot

10  of it was just other chit-chat on other things that didn't

11  apply.

12  Q    Okay.  All right.  Then after he had this conversation

13  with you about the price and the C.O.D. arrangement, what

14  happened next?

15  A    We just agreed to go -- go ahead and send it, and

16  eventually I received two boxes containing fish meat.

17  Q    And that was when?  Do you recall when you received those

18  boxes?

19  A    I believe it was January 4th of 2010.

20       MR. COOPER:  What I'd like to do is put a couple of

21  exhibits in front of you here.  They're going to be numbered

22  nine -- what is ten?

23       THE SPECIAL AGENT:  (Indiscernible - away from

24  microphone.)

25       MR. COOPER:  Okay.  Nine, ten, eleven, and 11-A, B,

1  C, D, D, E, F, G, and H.  Do we have a copy of these?

2                    (Pause - side conversation)

3  BY MR. COOPER:

4  Q    All right.  You should have in front of you now nine, ten

5  and 10-A, and eleven and 11-A through H, which are receipts

6  are nine, two boxes are ten and 10-A, and eleven through 11-A

7  through H are photographs.  Do you have all those?

8  A    I'm missing ten.

9  Q    Ten would be the boxes, so --

10  A    Oh, the boxes, yeah.

11  Q    -- ten and 10-A should be -- do you see the two boxes

12  there next to you?

13  A    Mm-hmm (affirmative).

14              MR. COOPER:  Okay.

15                    (Pause - side conversation)

16  BY MR. COOPER:

17  Q    What is nine, Mr. Solis?  You should have that there.

18  A    Correct.  Number nine is part of the receipts that I

19  received from the Postal Service when I essentially paid the

20  -- the employees there -- I paid the C.O.D. for the -- these

21  packages here.

22  Q    And were these the register receipts then that the post

23  office prints for each box?

24  A    Yes.

25  Q    And so how much did you have to pay to receive these two

1  boxes?

2  A    I'd have to add everything up, but it came out to about

3  thirteen hundred doll -- almost maybe fourteen hundred

4  dollars.

5  Q    Okay.  And so you had it broken down like one strip for

6  each box?

7  A    Correct.

8  Q    So, it's two -- two receipt strips here in -- in Exhibit

9  Number 9?

10 A    Yes.

11 Q    What's the date that this transaction took place?

12 A    January 4th, 2010.

13 Q    And what's the post office?

14 A    Nogales, Arizona.

15 Q    And what -- what does it say is the nature of the

16 transaction?

17 A    It says mail pick-up, C.O.D. payment, and it gives the

18 amount --

19 Q    All right.

20 A    -- for the -- for one is six hundred and eighty-five

21 dollars and seventy-five cents [$685.75].

22 Q    Plus the money order fee plus -- and that was a total of

23 six eighty-seven twenty-five [$685.75], right?

24 A    Correct.

25 Q    And then the other one next to it is the same post

1   office, same date?

2   A    That's correct.

3   Q    Six ninety-four sixty-five [$694.65]?

4   A    That's correct.

5   Q    And does this reflect the time that you picked up the

6   Exhibits 10 and 10-A that you have beside you there?

7   A    Yes, it does.

8        MR. COOPER:  I'd offer number nine in evidence, Your

9   Honor.

10       THE COURT:  Any objection?

11       MR. CURTNER:  May we approach?

12       THE COURT:  All right.

13   (At side bar)

14       (Side bar completely indiscernible)

15   (End side bar)

16       THE COURT:  Okay.  We'll -- we'll accept that

17   exhibit as -- got to clean it up, get the extra notes off it.

18   That was nine.  Nine will be accepted once we get --

19       (Government's Exhibit 9 admitted)

20       MR. COOPER:  We'll have to -- we'll -- after the

21   break, we'll --

22       THE COURT:  Yeah, that's fine.

23       MR. COOPER:  -- take care of that.

24   BY MR. COOPER:

25   Q    All right.  So, then the boxes themselves, would you take

1  a look at those boxes and see if the -- if the photographs

2  eleven and 11-A through H are photographs of these two boxes.

3                          (Pause)

4  A    They are.

5  Q    Okay.  And who took these photographs?

6  A    I took them.

7  Q    And when and where did you take them?

8  A    I -- I took them to our -- our evidence room and I -- I

9  went and photographed them on my truck bed before I brought

10  them into the actual warehouse itself where we keep our

11  evidence.

12  Q    Very well.  They accurately reflect the condition the

13  boxes were in at the time you picked them up?

14  A    They do.

15            MR. COOPER:  I'd offer eleven and 11-A through H.

16            THE COURT:  Any objection?

17            MR. CURTNER:  No objection.

18            THE COURT:  They'll be received without objection.

19      (Government's Exhibits 11, 11-A through 11-H admitted)

20  BY MR. COOPER:

21  Q    Now, take a look at the front of the box which would

22  probably be ten -- box -- box number ten, the actual box

23  itself.  Could you hold the front of that up so we can see it?

24            MR. COOPER:  Oh, we'll need the lights up.  Thanks.

25  We'll need the lights up for a moment here and then we'll look

1  at the pictures next.

2  BY MR. COOPER:

3  Q    That's -- that's ten or is it 10-A?  Which is that?

4  A    10-A.

5  Q    That's 10-A.  If you'd take ten, pick that up first for

6  me and box -- that should be the other box.

7  A    Okay.

8  Q    Okay.  Now, turn it up -- rotate it ninety degrees

9  clockwise to me.  That -- that's right.  Now, you see

10  something written up on the top there in black marker pen?

11  A    Yes.  It says twenty-five pound, Kings, Class A.

12  Q    Was that on there like that when you received that?

13  A    Yes.

14  Q    Okay.  And then now look at the photographs of that box.

15  It should be 11-C.

16  A    Yes.

17  Q    You see the same marking on the box -- photograph in that

18  -- on the box in that photograph?

19  A    I do.

20  Q    All right.  So, that's the way it was when you saw it.

21  A    Yes.

22  Q    Okay.  Now, look at the other box, which is -- should be

23  10-A, and look on the front of it and do you see where on the

24  -- on the right side, the address and C.O.D. label are upside

25  down the way you're holding it there, is that correct?

1    A    That's correct.

2    Q    But if you look on the upper right-hand corner when

3    you're holding it in that position, do you see some black

4    marker pen writing?

5    A    Yes.

6    Q    Does it look like the other black marker pen writing that

7    was on ten?

8    A    It does.

9    Q    What does it say on this one?

10   A    Twenty-five pound, Kings.

11   Q    Okay.  Now, look in your picture, which should be picture

12   number eleven.

13   A    Mm-hmm (affirmative).

14   Q    And can you see a portion of that same marking on that --

15   on there, but not the whole marking?  Do you see it?

16   A    Yes.

17   Q    What's covering up part of the marking in the photograph

18   of number eleven?

19          MR. COOPER:  Could you put eleven on the screen?

20   A    What's blocking it is a -- a label perhaps from the

21   Postal Service.

22   BY MR. COOPER:

23   Q    Okay.  And can you see the twenty-five part of the black

24   marker writing under the edge of that postal label that was

25   put on there?

1    A    Correct, a portion of it.

2    Q    Okay.  That's a bar code type label?

3    A    Yes.

4    Q    Okay.  So, when you received the box, it was as pictured

5    in eleven?

6    A    Yes.

7             MR. COOPER:  Very well.  Your Honor -- well, let me

8    ask you another question here, Mr. Solis.

9    BY MR. COOPER:

10   Q    With regard to these pictures, can you tell by the C.O.D.

11   labels that are on the pictures and on the boxes themselves

12   that the numbers -- the C.O.D. label numbers are the same as

13   the boxes themselves have, 10-A and -- and ten?

14   A    That's correct.  They do match.

15   Q    And do they match with the C.O.D. numbers that are on the

16   receipts -- the sales receipts that are in Exhibit 9.  If you

17   could just check that.  If they're recorded on there.  I think

18   they should be, but -- yeah, I see they are.  It says label

19   number --

20   A    Yes.

21   Q    -- part-way down from the top.

22   A    They do match.

23   Q    Okay.  So, the one on the left matches which box?

24   A    The one on the left matches, I believe, ten.

25   Q    Ten?

1   A    Which is M463652011.

2   Q    All right.  So, the one on the right then matches --

3   A    Oh, the right.

4   Q    Does it match 10-A?

5   A    It's --

6   Q    Let's make sure.

7   A    -- M6 -- M463652013.  It's the same number on the box.

8          MR. COOPER:  Very well.  Then, Your Honor, I'd offer

9   the boxes ten and 10-A in evidence.

10         THE COURT:  Any objection?

11         MR. CURTNER:  (Indiscernible - simultaneous

12  speakers.)

13         THE COURT:  They'll be received without objection.

14    (Government's Exhibits 10 and 10-A admitted)

15  BY MR. COOPER:

16  Q    And then if you'll look then at picture number 11-G and

17  11-H.  If you would look at those, Mr. Solis, and tell us what

18  they are.

19  A    Those pictures are the -- the contents of the -- of one

20  of the boxes, I believe.

21  Q    Contents of one of them.

22  A    Or perhaps both.

23  Q    11-G would be contents of one of the boxes, right?

24  A    Yeah, I think just one of the boxes.

25  Q    And what's 11-H?

1    A    It's more of a close-up.

2    Q    Would this be the other box or -- the same box, I guess,

3    isn't it?

4    A    Yes.

5    Q    Looks like the same one?

6    A    Mm-hmm (affirmative).

7            MR. COOPER:  Okay.  Can we put those -- do you have

8    11-G and H on the screen then, or one at a time?

9            THE SPECIAL AGENT:  This is G.

10            MR. COOPER:  That's G?  All right.  Then H.  That's

11    H, is that it?  Very good.  All right.

12    BY MR. COOPER:

13    Q    Then -- so after you received those, did you have any

14    further contact with Mr. Maxon?

15    A    It was awhile back.  A few months went by and I -- I

16    called and left a message on his phone.

17    Q    And when was that?

18    A    March 8th of 2010.

19    Q    And March 8th of 2010.  What happened in that phone call?

20    A    He didn't pick up the phone, so I just left a message,

21    and I just -- I called to let him know that pretty much -- I

22    was successful in reselling the items and I was interested in

23    -- in obtaining some more Yukon King salmon strips.  Around

24    the time when he -- he mentioned that the Yukon Kings would be

25    running.

1    Q    Now, that was on -- wait a second now.  Are you

2    describing the March 8th phone call or the next one after it?

3    A    No, I'm describing the March 8th phone call.

4    Q    Okay.  So, when -- all right.  You said that something --

5    that he had indicated the Kings would be running when?

6    A    Well, whenever they would be running, I'd be interested

7    in purchasing some more when the King salmon would be

8    available.

9    Q    So, you're referring to the time in the past when he had

10   told you that there was a time when they'd be running again in

11   the future?

12   A    Correct.  And then I may have gotten more specific with

13   him further in conversations later on about specific times --

14   Q    Okay.

15   A    -- when they would run.

16   Q    Sure.  All right.  And then -- so, you weren't able to do

17   more than leave a message on March 8th, is that right?

18   A    That's correct, just a message.

19   Q    And what happened then on the next -- did you try again

20   some time later?

21   A    I did one more time to follow up.  The first time, like I

22   said, I just mentioned that I was successful, and -- and then

23   the next time I called him was May the 13th, 2010, just --

24   just to say that I was still interested in obtaining more King

25   salmon -- smoked meat -- smoked meat from -- from him and just

1   wanted to, you know, (indiscernible) looked forward to

2   purchasing more from him.

3   Q     All right.  And that was another message then, May 13th?

4   A     Correct.

5   Q     And then what was the next contact after that?

6   A     On July the 23rd was a contact that I was able to speak

7   with him directly.

8          MR. COOPER:  All right.  So, what I'd like to do

9   next, Your Honor, is to play the next two in order which are

10  the one's on which messages were left on the phone.

11         THE COURT:  Okay.  And I think that once you -- I

12  think we need to stop for the day as soon as you're done with

13  that.

14         MR. COOPER:  All right.  Very well, Your Honor.  So,

15  these will be very short, ones where he left a message.

16         THE COURT:  Right.

17         MR. COOPER:  One is March 8th and one is May 13th.

18         THE COURT:  Okay.

19         MR. COOPER:  And they would be transcripts 8-C and

20  8-D, but we'll play it first without the transcript, those two

21  recordings of March 8th and May 13th, and then with the

22  transcript.

23      (Exhibit 8 continuation played for the jury)

24         MR. COOPER:  We offer the same ones with the

25  transcript passed out, Your Honor, 8-C and D.

1        THE COURT:  Very well.

2                (Pause - side conversation)

3        MR. COOPER:  Your Honor, I understand that there was

4  -- the jury hasn't yet heard the second call that was re --

5  that was transcribed with the transcript in hand.

6        THE COURT:  Okay.

7        MR. COOPER:  And so, I need to hand that one to the

8  jury also.  We should play that and these next two in series.

9        THE COURT:  Okay.  I don't know what you said.  It's

10  getting too late.

11        MR. COOPER:  So -- so, I'll -- I'll pass out the

12  transcript for the second December 9th call which I

13  understand --

14        THE COURT:  The second message?

15        MR. COOPER:  It's the second transcribed one, yes.

16  It's actually the third call that -- there were two on

17  December 9th --

18        THE COURT:  Okay.

19        MR. COOPER:  -- and they heard the first one with

20  the transcript in hand, the heard the second one, but not with

21  the transcript in hand --

22        THE COURT:  Okay.

23        MR. COOPER:  -- and so what I'd like to do is play

24  that one first and then the two that I just passed out

25  following that.

1          THE COURT:  Okay.  You follow that -- you follow

2   what he just said?

3          MR. CURTNER:  We're going to give a transcript and

4   listen to a call from December 9th again?  Because I thought

5   we heard all the --

6          THE COURT:  I thought we heard them all.

7          MR. CURTNER:  Yeah, twice.

8          THE COURT:  I think you're --

9          MR. COOPER:  Well --

10          THE COURT:  We didn't?  Okay.  The jury knows more

11   than I do.

12          MR. COOPER:  It's what I've been told.

13          MR. CURTNER:  Okay.

14          THE COURT:  Okay.  So, the ones you have in your

15   hand, just kind of put them down, hand you another transcript

16   and -- and I don't want you to be looking at the wrong

17   transcript for the wrong phone -- that'll really confuse you.

18                  (Pause - side conversation)

19      (Exhibit 8 continuation played for the jury)

20          MR. COOPER:  Now, we switch to the calls of March

21   8th followed by May 13th.

22      (Exhibit 8 continuation played for the jury)

23          THE COURT:  Okay.  Is that it?

24          MR. COOPER:  That's it for today, Your Honor.

25          THE COURT:  Okay.  We'll resume tomorrow -- can --

1   is -- if we start tomorrow at 8:30, is that too early for you?

2   The sooner we get started, the sooner we get -- there's a

3   remote change we'll get done tomorrow.  That's why -- and

4   it'll probably go into Friday, but possibly tomorrow, so let's

5   start at 8:30.  Let me -- let me read this cautionary

6   instruction again.

7            Remember until the trial is over, do not discuss

8   this case with anyone, including your fellow jurors, members

9   of your family, people involved in the trial, or anyone else,

10  and do not allow others to discuss the case with you.  This

11  includes discussing the case in Internet chat rooms or through

12  -- in the blogs, in the bulletin boards, e-mails or text

13  messaging.  Anyone tries to communicate with you about the

14  case, please let me know about it immediately.  Do not read,

15  watch or listen to any news reports or other accounts about

16  the trial or anyone associated with it, including any on-line

17  information.  Do not do any research such as consulting

18  dictionaries, searching the Internet, or using other reference

19  materials, and do not make any investigation about the case on

20  your own.

21           Finally, keep an open mind until all the evidence

22  has been presented and you have heard the arguments of

23  counsel, my instructions on the law, and the views of your

24  fellow jurors.  If you need to speak with me about anything,

25  simply give a signed note to the bailiff to give to me.

1         How's that?  So, you can just put your notes --

2    notes on the chair, you go out to the little room, they'll

3    haul you down to the big room, have a great evening.

4                        (Pause)

5        (Jury out at 5:04 p.m.)

6            THE COURT:  Okay.  Can you be here tomorrow morning

7    at 8:30 sharp?

8            UNIDENTIFIED SPEAKER:  Yes, sir.

9            THE COURT:  Eight -- 8:25?

10           UNIDENTIFIED SPEAKER:  You bet.

11           THE COURT:  Okay.  You're excused until then.

12   Counsel have anything more for this evening?

13           MR. COOPER:  Not from us, Your Honor.

14           THE COURT:  Mr. Curtner?

15           MR. CURTNER:  We're good.

16           THE COURT:  Okay.  I'll have the -- probably have

17   the jury instructions ready after the first break tomorrow.

18   I've got them pretty well here, but my secretary won't be here

19   until tomorrow morning.

20           MR. COOPER:  I did submit another supplemental

21   during the lunch hour today.

22           THE COURT:  Okay.  I didn't get it yet, but --

23           MR. COOPER:  It's out of the Ninth Circuit book.

24           THE COURT:  Well, that's what I used.  What does it

25   say?  I mean what's --

1          MR. COOPER:  It's just the aiding and abetting

2    instruction.

3          THE COURT:  Oh, the aiding and abetting instruction.

4          MR. COOPER:  Right.  Which applies whether or not

5    it's charged.  It cites the -- it's on pages eighty-two and

6    eighty-three, I think.

7          THE COURT:  Eighty-two and eighty-three.  Okay.

8    I'll look at that.

9          MR. COOPER:  Yeah, it should be 5.1 -- 5.14 or

10   something of that -- page eighty-two or eighty-three, I think.

11         THE COURT:  I got it.  Page eighty-two.  I've got

12   it.

13         MR. COOPER:  Yeah, that's it.

14         THE COURT:  Okay.  Thank you.

15         MR. COOPER:  Thank you, Your Honor.

16         THE CLERK:  All rise.  This Court stands in recess

17   until 8:30 tomorrow.

18       (Proceedings concluded at 5:06 p.m.)

19

20

21

22

23

24

25

# INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **WITNESSES FOR THE GOVERNMENT:** | | | | | |
| Rory Stark | 1-147 | 1-174 | | | |
| Andrea Sears | 1-183 | 1-188 | | | |
| Justin Lindell | 1-193 | 1-202 | | | |
| Francisco Solis, Jr. | 1-207 | | | | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| **GOVERNMENT:** | | | |
| 1 | Video/audio recording | | 1-165 |
| 1-A | Transcript of Exhibit 1 | 1-191 | |
| 2 | Photograph | | 1-167 |
| 3 | Handwritten note by Maxon | | 1-167 |
| 4 | ADFG 2009 commercial fish values | | 1-171 |
| 5 | ADFG 2010 commercial fish values | | 1-171 |
| 6 | Audio recording | | 1-197 |
| 6-A | Transcript of Exhibit 6 | 1-197 | |
| 7 | Photograph | | 1-201 |
| 8 | Audio recording | | 1-217 |
| 8-A | Transcript of Exhibit 8, call 1 | 1-215 | |
| 8-B | Transcript of Exhibit 8, call 2 | 1-215 | |
| 8-C | Transcript of Exhibit 8, call 3 | 1-215 | |
| 8-D | Transcript of Exhibit 8, call 4 | 1-215 | |
| 8-E | Transcript of Exhibit 8, call 5 | 1-215 | |
| 8-F | Transcript of Exhibit 8, call 6 | 1-215 | |
| 9 | 1/4/10 C.O.D. purchase receipts | | 1-221 |
| 10 | Fish box | | 1-226 |
| 10-A | Fish box | | 1-226 |
| 11 | Photograph | | 1-222 |
| 11-A | Photograph | | 1-222 |
| 11-B | Photograph | | 1-222 |
| 11-C | Photograph | | 1-222 |
| 11-D | Photograph | | 1-222 |
| 11-E | Photograph | | 1-222 |

**INDEX**

EXHIBITS:                                    Marked   Received

GOVERNMENT:

11-F   Photograph                                      1-222
11-G   Photograph                                      1-222
11-H   Photograph                                      1-222


                                                         Page

GOVERNMENT'S OPENING STATEMENT:  Mr. Cooper            1-126

DEFENDANT'S OPENING STATEMENT:  Mr. Curtner           1-141

1

**CERTIFICATE**

2

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

3

4

5

   /s/ D. Kathleen Stegmiller           11/04/2012
D. Kathleen Stegmiller, Transcriber          Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25