UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:11-cr-00003-RRB |
| | ) | |
| Plaintiff, | ) | Fairbanks, Alaska |
| | ) | Thursday, January 26, 2012 |
| vs. | ) | 8:40 o'clock a.m. |
| | ) | |
| WILLIS SCOTT MAXON, | ) | **TRIAL BY JURY – DAY 2** |
| | ) | |
| Defendant. | ) | |

VOLUME II
**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE RALPH R. BEISTLINE
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:            STEPHEN COOPER, ESQ.
                             Assistant U.S. Attorney
                             U.S. Attorney's Office
                             101 12th Avenue, Room 310
                             Fairbanks, Alaska   99701
                             (907) 456-0245

For the Defendant:           F. RICHARD CURTNER, ESQ.
                             Federal Public Defender Agency
                             601 West 5th Avenue, Suite 800
                             Anchorage, Alaska   99501
                             (907) 646-3400

Court Recorder:              JODY EVANS
                             U.S. District Court
                             101 12th Avenue, Room 332
                             Fairbanks, Alaska   99701
                             (907) 451-5792

🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹🌹
**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota 58501-3472*
*(701) 255-1054 ❧ nodak@centurylink.net*

```
 1    Transcription Service:        NODAK ROSE TRANSCRIPTS
                                    721 North 19th Street
 2                                  Bismarck, North Dakota  58501
                                    (701) 255-1054
 3
      Proceedings recorded by electronic sound recording.
 4    Transcript produced by transcription service.
```

1    FAIRBANKS, ALASKA - THURSDAY, JANUARY 26, 2012

2         (Call to Order of the Court at 8:40 a.m.)

3         (All parties present; defendant present)

4         (Jury not present)

5              THE CLERK:  All rise.  His Honor the Court, the

6    United States District Court for the District of Alaska is now

7    in session, the Honorable Ralph R. Beistline presiding.

8    Please be seated.

9              THE COURT:  Are we ready?

10             MR. CURTNER:  Yes, Judge.

11             THE COURT:  All right.  Get the witness in the

12   stand, bring the jury in, and we'll get going.

13             THE CLERK:  Threw me off, Jan answering your phone

14   back there.

15             THE COURT:  I was on the other phone.  I couldn't do

16   two things because this one is ringing, I'm talking on this

17   one.

18                            (Pause)

19        (Jury in at 8:41 a.m.)

20             THE COURT:  Well, good morning, ladies and

21   gentlemen.  How you doing?  Doing well?  You look good.  All

22   right.  We're going to pick up right where we left off, same

23   witness.  Sir, you're still under oath.  We won't swear you in

24   again, and we'll just continue with direct.  Mr. Cooper.

25   **FRANCISCO SOLIS, JR., GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

1        MR. COOPER:  Thank you, Your Honor.

2              **DIRECT EXAMINATION CONTINUED**

3    BY MR. COOPER:

4    Q     Morning, Mr. Solis.

5    A     Good morning.

6    Q     We left off, I believe, yesterday having discussed the

7    two boxes, 10-A -- ten and 10-A, relating to the ones you

8    received in January 2010, is that correct?

9    A     That's correct.

10   Q     And you had just told us about a couple more phone calls

11   you'd made leaving messages for Mr. Maxon relating to your

12   desire to purchase more fish in the coming season, is that

13   right?

14   A     That's correct.

15   Q     All right.  What I'd like to do is to focus on when the

16   next time was that you had an opportunity and did speak to Mr.

17   Maxon on this subject?

18   A     Okay.

19   Q     Do you recall the next -- I think you had two phone calls

20   that we ended with yesterday, one March the 8th and one May

21   the 13th in which you had left messages for Mr. Maxon, is that

22   right?

23   A     That's correct.

24   Q     Okay.  Were you able to get a-hold of him again after

25   that and actually speak with him on the subject of purchase of

1  more fish?

2  A    Yes, that's true.

3  Q    And would that have been in July of 2010?

4  A    That's correct.  Another audio that we selected.

5  Q    All right.  So, that -- to be specific -- I'll just get

6  the right one here.  Are we talking about one that begins July

7  23rd?

8  A    Yes.

9  Q    Okay.  What happened on that occasion?  Tell us briefly.

10 A    What I -- what I did is I got a-hold of him and -- and I

11 discussed with him the fact that he knew already that I was

12 interested in purchasing more fish from him and, you know, he

13 indicated he wanted to send some more fish to me and, you know

14 that I was ready for -- to do so and that -- we discussed like

15 a -- a -- a large shipment, perhaps of -- of fish that he was

16 -- indicated that he had available.  So, we discussed a price,

17 and -- and then he indicated he had some more Yukon King

18 salmon strips that were ready to send and, you know, we kind

19 of made arrangements to get -- to purchase some of those.

20 Q    All right.  And in that conversation, did you speak with

21 his wife or just with him?

22 A    I -- I -- I think it could have been briefly beforehand,

23 I may have spoken with -- with her.

24 Q    Do you recall what -- did that happen more than once or

25 just on one occasion, or do you remember?

1   A    It was -- speaking with his wife, maybe perhaps a couple

2   of times.

3   Q    Did you ever discuss with her the terms of the bargain or

4   the sale or purchase that you were attempting to make?

5   A    No, we did not discuss bargaining or prices or anything

6   of the sort.

7   Q    Did you talk with her at any great length at all?

8   A    No, not too much at all.  There were just brief moments

9   when he passed the phone to her or she answered the call and

10  it was just maybe a few seconds.

11  Q    Okay.  So nothing -- you didn't actually reach any

12  agreement with her.

13  A    That is correct.

14  Q    Okay.  Or even tell her what product and how many pounds

15  and all of that sort of thing that you were looking for.

16  A    Correct.  We didn't discuss that.

17  Q    Okay.  All right.  So, I think you've already mentioned

18  the fact before in your testimony, haven't you, that there was

19  a transcript made of this telephone call that we're going to

20  be listening to now?

21  A    Yes.

22  Q    And that you're satisfied with the quality of that

23  transcript.  I think we went over that before, didn't we?

24  A    Yes, I am satisfied.

25            MR. COOPER:  Okay.  Your Honor, I'd like to have the

1   -- actually, I'd like to offer in evidence the call which is

2   July the 23rd.  It's on that same exhibit that all the calls

3   were on, I think it's eight -- Exhibit 8, and have that played

4   at this time.  The transcripts are in the possession of the

5   defense.  I had it copied for the Court and the Clerk --

6           THE COURT:  Very well.

7           MR. COOPER:  -- and it's set for the jury.

8               (Pause - side conversation)

9           MR. COOPER:  I'm sorry, that's true.  I keep

10  forgetting the sequence.  I think we -- I assume we're on the

11  same sequence as yesterday that --

12          THE COURT:  Yes.

13          MR. COOPER:  -- we're to play the tape first --

14          THE COURT:  Right.

15          MR. COOPER:  -- without the jury reviewing the

16  transcript, then we'll play it with the --

17          THE COURT:  Right.

18          MR. CURTNER:  Your Honor, since I've had an

19  opportunity now to read the transcripts and listen to the

20  tapes last night --

21          THE COURT:  Okay.

22          MR. CURTNER:  -- we can just do this once.

23          THE COURT:  Okay.  All right.

24          MR. COOPER:  Very well.

25          THE COURT:  I -- I thought that might be the case,

1  but -- now you can --

2              MR. COOPER:  Sorry, I missed a step there.

3         (Exhibit 8 continuation played for the jury)

4                          (Pause)

5              MR. COOPER:  All right.  Now, there was a mention --

6              THE COURT:  Just before you do that, I didn't read

7  my instruction.  Remember what it is?  What you hear is the

8  evidence, what you read is not.  Okay.

9              MR. COOPER:  Thank you, Your Honor.

10  BY MR. COOPER:

11  Q    So, what we just heard, it just ended up with some

12  comment about vice versa.  What was he talking about there?

13  A    Vice versa was perhaps -- prior conversation I indicated

14  I imported items from Mexico, and he indicated that he was

15  looking for other commodities that were available from the

16  oceans down in Mexico.  So, by vice versa, I -- I interpreted

17  myself was that, you know, either I trade or we sell -- I sell

18  him commodities from that particular area.

19  Q    I see.  Okay.  All right.  So, was there more

20  communication to -- to solidify exactly the deal for this next

21  shipment besides what we just heard on this short transcript?

22  A    Correct.  Yeah, we --

23  Q    And what was -- when did that occur?

24  A    The 28th of July of 2010.

25  Q    Twenty-eighth.  In other words, five days later, you had

1  another phone conversation with him?

2  A    One more phone conversation, yes.

3        MR. COOPER:  Okay.  And so again, I would like to

4  play that portion and we'll have the transcripts to the Court

5  and to the jury on that.

6        THE COURT:  Okay.  Is this -- what number is this?

7        MR. COOPER:  This is going to be eight -- we'll have

8  it marked for identification as 8-F.  The one we just played a

9  minute ago was 8-E.

10             (Pause - side conversation)

11        THE COURT:  Okay.  I'm going to do it one last time,

12  okay?

13        You're about to hear a recording that has been

14  received in evidence.  The transcript of the recording is

15  being provided to help you identify speakers and help you

16  decide what the speakers say.  Remember that the recording is

17  the evidence, not the transcript.  If you hear something

18  different from what appears in the transcript, what you heard

19  is controlling.  Listen carefully.  The transcript will not be

20  available during your deliberations.  Thank you.

21        MR. COOPER:  Thank you, Your Honor.

22     (Exhibit 8 continuation played for the jury)

23  BY MR. COOPER:

24  Q    That's the end of that conversation, right?

25  A    Correct.

1   Q    Was this the same deal as before?

2   A    It -- it -- it was the same deal.

3   Q    So, in other words, what -- say again what the terms

4   were.

5   A    The terms were to buy fifty pounds of King salmon smoked

6   strips from him, and the same deal as before was he was going

7   to send it C.O.D. through the U.S. Postal Service.

8   Q    And the price was to be the same?

9   A    About the same, yes.

10  Q    How -- how much?

11  A    Roughly twelve hundred and fifty dollars.

12  Q    All right.  Plus -- plus C.O.D. and shipping and all?

13  A    Correct.

14       MR. COOPER:  Okay.  Pick up the transcripts then

15  that are there.

16                          (Pause)

17  BY MR. COOPER:

18  Q    All right.  So, did you subsequently receive that

19  shipment?

20  A    I did, yes.

21  Q    And do you recall approximately when that came in?

22  A    I believe it was August the 23rd of 2010.

23       MR. COOPER:  All right.  What I'd like to do is hand

24  you exhibits that relate to that, and these would be Exhibits

25  12 and a series of 14 through -- 14-A through -- through 14-I,

1    and the boxes themselves are 13-A and 13-B, I think it is.

2                              (Pause)

3    And I've just handed copies of the exhibits to the defense.

4    BY MR. COOPER:

5    Q    All right.  Do you see those exhibits before you now, Mr.

6    Solis?

7    A    Yes.

8    Q    And referring to number twelve, what is number twelve?

9    A    Number twelve are the -- a -- a copy of two receipts that

10   I received for the two boxes that I picked up at the post

11   office in Rio Rico, Arizona, which is just a few miles north

12   of Nogales.

13   Q    All right.  And that's the address you asked him to send

14   it to?

15   A    Correct.  A P.O. box.

16   Q    Okay.  And the date on this is what?

17   A    The date on it is August 23rd, 2010.

18   Q    So, there's one printed strip for one box and one for the

19   other box, is that the way it goes?

20   A    That's correct.

21   Q    And what was the amount you paid on the first box shown

22   on this receipt?

23   A    The total was six hundred seventy-three dollars and sixty

24   cents [$673.60].

25   Q    And the total on the other one?

1   A    It's the same exact amount.

2   Q    Same?  Okay.  All right.  Does this show that it relates

3   to C.O.D. and a -- a C.O.D. money order or C.O.D. label number

4   on each of these?

5   A    Correct.

6   Q    Would you make a comparison between the number on each of

7   these two boxes indicated on Exhibit 12 with the boxes that

8   you have beside you as exhibits -- what are they?  Thirteen --

9   13-A and 13-B?  Oh, is it thirteen and 13-A?  Whatever they're

10  marked, do you see the exhibit stickers on the boxes?

11  A    Okay.  This box here is labeled 13-A.  Has a number of

12  M464451878, and the receipt on the left-hand side of this copy

13  is the same number, M464451878.

14  Q    All right.  So, those two go together.  And the other --

15  does the other match up?

16  A    The one labeled thirteen has a number of M464905940, and

17  on the -- the copy of the receipt on the right-hand side has

18  the same number, M464905 -- 905940.

19          MR. COOPER:  All right.  Your Honor, I'd offer

20  twelve and -- what's the exhibit number on the second box, the

21  one you just told us about?

22          THE WITNESS:  It's thirteen.

23          MR. COOPER:  Thirteen?

24          THE WITNESS:  Thirteen.

25          MR. COOPER:  So, offer twelve and thirteen and 13-A.

1          MR. CURTNER:  No objection.

2          THE COURT:  They will be received.

3       (Government's Exhibits 12, 13, and 13-A admitted)

4          MR. COOPER:  And would you show us the picture of

5  twelve on the screen, if you have that?

6          THE SPECIAL AGENT:  (Indiscernible - away from

7  microphone.)

8          MR. COOPER:  Oh, okay.

9                   (Pause - side conversation)

10  BY MR. COOPER:

11  Q    So, it's a little small there, but I'm pointing out where

12  it says label number.  Is that where you read the number for

13  the -- for the 13-A box?

14  A    Yes, that's correct.

15  Q    And then is this where you read the number on the other

16  column for the thirteen -- number thirteen box?

17  A    Yes, that's correct.

18  Q    Okay.  And these are both Rio Rico post office in

19  Arizona, is that right?

20  A    Yes, that's correct.

21  Q    And August 23rd, the date on both of them?

22  A    Correct.

23  Q    All right.  Now, did you take some photographs of the

24  box?

25  A    I did.

1   Q    And do you have a series of fourteen and 14-A through I,

2   it looks like -- A through I with you there?

3   A    Yes.

4   Q    What's the -- do these actually -- are these -- who took

5   these photographs, first of all?

6   A    I -- I took the photographs.

7   Q    And when and where did you take them?

8   A    On the same day.  I took them similarly at our evidence

9   location in -- in Nogales, Arizona.

10  Q    And at -- at your office?

11  A    At the warehouse where we keep our evidence.

12  Q    Okay.  And are these a fair reproduction or depiction of

13  the subject matter of the photographs as you took them on that

14  day?

15  A    They are good representations.

16  Q    They show the condition of the box and the contents and

17  the labeling as you saw it that day?

18  A    Yes.

19  Q    About how long after you received the boxes did you take

20  these pictures?

21  A    Pretty quickly.  I -- I took them straight to the -- from

22  the post office back to the warehouse.

23          MR. COOPER:  All right.  Your Honor, I'd therefore

24  offer fourteen and 14-A through I.

25          MR. CURTNER:  No objection.

1           MR. COOPER:  And perhaps we --

2           THE COURT:  They will be received.

3       (Government's Exhibits 14 and 14-A through 14-I admitted)

4           MR. COOPER:  Thank you, Your Honor.  Can we show

5   these on the screen?  This would be fourteen, I believe.

6   BY MR. COOPER:

7   Q    What does fourteen show?

8   A    It shows a box that I just -- I put a -- a marker on

9   there just indicating it was the first box I was taking a

10  photograph of.

11  Q    And it's addressed to you at Rio Rico at a P.O. box?

12  A    Correct.

13  Q    And what's the return address on there say?

14  A    A P.O. box in Nenana, P.O. Box 21, zip code 99760.

15  Q    And does it have a name there?

16  A    Yes, Vangie Maxon.

17  Q    She the one you made the deal with?

18  A    No, no, it was --

19          MR. COOPER:  All right.  And look at the next photo,

20  which is number 14-A.  Is that the same thing only not quite

21  as -- I think we've got -- I don't know if they're reversed or

22  not, but what's on the screen now looks to me like what's

23  marked here as fourteen.

24          THE SPECIAL AGENT:  That's correct.

25          MR. COOPER:  Okay.  So, 14-A, is that -- see if you

1   can move that over a little bit.

2              THE SPECIAL AGENT:  That's how the picture is.

3              MR. COOPER:  That's how it came out?  Okay.  Well,

4   you're -- you're photographing -- if you can hold that up,

5   we'll just see -- okay.

6   BY MR. COOPER:

7   Q    That's the whole side of the box with the label on it

8   showing the complete label, is that right?

9   A    Correct.

10  Q    And that's the same -- that's the same box, right?

11  A    It's the same box.

12  Q    Okay.  And 14-B appeared to be the one that was on the

13  screen just a minute ago.  That's a partial -- I think that

14  may be focusing in on the -- on the postage validation

15  sticker --

16  A    Correct.

17  Q    -- you know, the automated postage stamp thing?

18  A    Yes, sir.

19  Q    Can you make out on your photograph there where it says

20  it was mailed?

21  A    I can, I can read it.  It says that U.S. postage was paid

22  in Fairbanks, Alaska, on August 14th.

23  Q    And the zip code was?

24  A    Uh --

25  Q    Right below Fairbanks.

1    A    Yeah.  I can't quite make it out.

2    Q    The copy I've got you can read it.

3    A    99709?

4    Q    Yeah, that's what it looks like.  Okay.  And then 14-C.

5    Tell us what 14-C is.

6    A    14-C is a -- a -- just -- I opened the box and -- and

7    took a photograph of the contents.

8    Q    Now, there's a -- there's a yellow sticker that has a big

9    number one printed on it that's sitting on -- it's been in the

10   previous photos, too, and it's sitting on this bag of salmon

11   strips.  Who put that number there?

12   A    I did.

13   Q    And why did you put that there?

14   A    It -- it's the same number that represents the same box,

15   so I just --

16   Q    So, it's box number one?

17   A    Box number one.

18   Q    Okay.  And 14-D is what?

19   A    It's also the same box.  I just pulled some of the

20   packaged fish strips out just to kind of get a better

21   photographic description of them or -- or a view.

22   Q    All right.  14-E is what?

23   A    14-E would be the next box.

24   Q    And that's got the same Vangie Maxon and return address

25   and your address on there?

1    A    That's correct.

2    Q    So, this is a different kind of writing or printing on

3    here, isn't it?

4    A    Yes, it's another set.

5    Q    Okay.  And then 14-F is what, a close-up of the label on

6    that box -- the second box?

7    A    It's just another close-up of that same box, the second

8    box.

9    Q    All right.  And 14-G is the postage sticker, correct?

10   A    Correct.

11   Q    Does that appear to be the same post office and date as

12   the other one?

13   A    Absolutely.

14   Q    Okay.  14-H?  What is 14-H?

15   A    14-H also, once again, is where I opened the box just to

16   get a -- a representation of the contents.

17   Q    All right.  And 14-I?

18   A    Same as the -- with the first box.  I pulled some of the

19   product out just to get a -- a better view of it.

20              MR. COOPER:  Okay.  Very good.

21                        (Pause)

22              MR. COOPER:  I believe that's all the questions I

23   have for the witness, Your Honor.

24              THE COURT:  All right.  Cross-examination?

25                     **CROSS-EXAMINATION**

 1  BY MR. CURTNER:

 2  Q    Agent Solis, I was just interested -- you talked about

 3  the first phone call you made to Mr. Maxon.  That was only

 4  recorded with your conversation?

 5  A    That's correct.

 6  Q    Why was that?

 7  A    I -- I misplaced the phone jack and put it on the wrong

 8  side of the device where it would -- it should have recorded.

 9  I put it on the -- on the headset side.

10  Q    Okay.  It was just an accident on your part?

11  A    Correct.

12  Q    Now, then the next day you called Mr. Maxon and you

13  remember him referring to she -- in your transcript, there's a

14  third party in part of the discussion.  Do you remember that?

15  A    Correct, yes.

16  Q    And who was that?

17  A    I -- I didn't know at the time.  I -- I -- I --

18  Q    Do you know now?

19  A    I -- I -- I'm assuming it's his wife.

20  Q    Okay.  And you've talked to his wife whose name is

21  Vangie, right?

22  A    Correct, yes.

23  Q    You talked to her a number of times?

24  A    No, not -- not a number of times.  Maybe twice.

25  Q    Maybe twice altogether?

1    A    Mm-hmm (affirmative).

2    Q    And did you ever record those conversations?

3    A    I believe they were.

4    Q    You think -- okay, all the times you talked to her on the

5    phone were recorded.

6    A    I believe so.

7    Q    You recorded every conversation that you had with either

8    Mr. or Mrs. Maxon.

9    A    Yeah, I tried to, yes, I did.

10   Q    And -- and you -- and you gave all those recordings of

11   those conversations to the defense in this case -- to Mr.

12   Cooper then to the defense in discovery, is that correct?

13   A    I believe so, yes.

14   Q    Now, I under -- in these conversations that are broken up

15   -- some of these transcripts and the recordings we hear here

16   are just parts of the whole conversation, is that correct?

17   A    For a portion of them, yes.

18   Q    And so who made those decisions to edit like some parts

19   of these?  Was that your decision?

20   A    No, other agents assisting the case agent, I believe so.

21   Q    Well, let's talk a little bit about the boxes you

22   received on January 4th of 2010, is that correct?

23   A    Yes.

24   Q    And do you have any idea -- now, those boxes have

25   markings on them, twenty-five pound Kings.  Do you have any

1   idea who wrote that on there?

2   A    I -- I do not know specifically who wrote --

3   Q    You -- you can't tell when they were written --

4   A    No, I don't.

5   Q    -- can you?

6   A    I can't.

7   Q    That was -- that was a used box, wasn't it?

8   A    It appeared to be.

9   Q    Okay.  It looked like it had been used a number of times?

10  A    I -- I couldn't tell.

11  Q    And so you can't tell if that was written on there prior

12  to even 2009?

13  A    No, I -- I couldn't tell.

14  Q    Now, that box also had a label on it -- a label on that

15  box that said keta salmon, right?

16  A    I believe so.

17  Q    You saw that.

18  A    Mm-hmm (affirmative).

19  Q    Do you know what that means?

20  A    Is that Chum salmon?

21  Q    Yes.

22  A    Okay.

23  Q    Okay.  So, those boxes had a label that said basically

24  the Gwich'in name for Chum salmon.

25  A    Mm-hmm (affirmative).

1   Q    And you also showed us pictures of the fish that were

2   inside.  There were no labels on those whatsoever, right?

3   A    On the inside?  I didn't notice any, no.

4   Q    Pardon me?

5   A    I did not notice any inside the box.

6   Q    You would have noticed if there was a label saying King

7   salmon on it, wouldn't you?

8   A    I believe I would have, yes.

9   Q    And there was no labels on any of the fish inside.

10  A    Inside the box, I did not see a label.

11  Q    Now, all these phone calls that we've heard are you

12  calling the Maxons, is that correct?

13  A    Correct.

14  Q    And in fact, you left messages on March the 8th for Mr.

15  Maxon?

16  A    Yes.

17  Q    And do you know if he even got that message?

18  A    No.  We didn't specifically discuss that when I finally

19  talked to him, no.

20  Q    So, you don't even know if he got the message, and he

21  never called you back.

22  A    Correct.

23  Q    And again, on May 15th, this is two months later.

24  A    Mm-hmm (affirmative).

25  Q    You call him again, you leave a message, you don't know

1    if he got it, and he never called you back, is that right?

2    A    I believe so, yes.

3    Q    Now, your job in this big operation, your mission in

4    calling Mr. Maxon was to get Yukon Kings sent down to Arizona,

5    is that correct?

6    A    Yes, that -- that was one of the concerns.

7    Q    Well, that was what you were supposed to do.  You were

8    supposed to get, hopefully, somebody to send you -- sell you

9    Yukon King salmon.

10   A    Correct.

11   Q    That was the whole operation, that was the purpose of it.

12   A    That was one of the objectives, yes.

13   Q    And your particular focus was on Scott Maxon, is that

14   right?

15   A    That's correct.

16   Q    That's who you were talking to trying to get Yukon Kings

17   sent down to Arizona.

18   A    Correct.

19   Q    And that's the one you kept calling.

20   A    He's the only person I called.

21   Q    Now, some of the parts of the conversations we didn't

22   hear when you were talking to Mr. Maxon, the vice versa?

23   A    Mm-hmm (affirmative).

24   Q    Remember those conversations?

25   A    Yes.

1   Q    And you were going to -- those were conversations about

2   you were supposed to send tuna up to Alaska, is that right?

3   A    We never hammered anything down.

4   Q    Okay.  You didn't make a specific deal for tuna, but did

5   you talk to Mr. Maxon about his wife likes tuna?

6   A    He mentioned it.  I didn't bring it up.

7   Q    Did you mention to him that you could get tuna and send

8   it up to Alaska?

9   A    I told him I'd look into it.

10  Q    Okay.  Did you tell him that they had -- didn't you talk

11  about the shrimp that you could get from the Gulf of Mexico?

12  A    Not the Gulf of Mexico, the Gulf of California.

13  Q    Oh, the Gulf of California.  Okay.  And you could send

14  shrimp up to Alaska as well.

15  A    He asked me questions regarding that and I answered them

16  to the best of my knowledge.  I --

17  Q    Didn't you lead him on thinking that, hey, you could send

18  him tuna, you could send him shrimp?

19  A    The way we called it is that he asked me questions about

20  it and I would indicate how big I thought they were and how

21  much I thought they were worth as far as poundage, but I don't

22  think I --

23  Q    What -- leading him to believe that you could send him

24  some tuna and some shrimp, right?

25  A    Well, fortuitively (ph) we probably were going to talk

1  about perhaps, you know, I could provide fish to him.

2  Q    Okay.  So, he might have been biting at that bait, but

3  you weren't going to sell him any tuna.  You were lying about

4  that, right?

5  A    Well, we didn't discuss any hard plans in order for me to

6  get -- obtain that for him.

7  Q    Or shrimp.

8  A    Or shrimp.

9  Q    Now, the second shipment of boxes we've been looking at,

10 there's no labels anywhere on that box that says anything

11 about Kings or the species of salmon, is that right?

12 A    That's correct.

13 Q    And again, the fish inside both of those boxes, there

14 were no labels whatsoever on those fish.

15 A    You're correct, yes.

16              MR. CURTNER:  Thank you.  That's all I have.

17              THE COURT:  Redirect?

18              MR. COOPER:  Just briefly, Your Honor.

19                      **REDIRECT EXAMINATION**

20 BY MR. COOPER:

21 Q    Did Mr. Maxon ever call you in this series of phone

22 calls?

23 A    In these series of phone calls that we've outlined today

24 -- or yesterday and today, I don't think so, they were mainly

25 from me.

1   Q    Didn't he have -- didn't he have one where he tried to

2   leave -- where he left a mess -- I don't recall, but if you

3   do, that's a --

4            THE COURT:  Okay.  Everybody's talking quieter and

5   quieter and quieter.  Pretty soon -- I don't know if the jury

6   has heard the last exchange.

7            MR. COOPER:  Okay.

8            THE COURT:  So, everybody talk louder, okay?

9            MR. COOPER:  Very well.

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Please.

12  A    As far as I know, he -- he left a message one time, but I

13  -- I don't think we selected that to -- to be heard here with

14  the -- with the jury.

15  BY MR. COOPER:

16  Q    No, regardless of whether we played it or not, I just

17  wondered if he had called you at some time.

18  A    Correct.  He indicated -- there was one message that I

19  received from him.

20  Q    Okay.

21  A    And actually, there may be another one indicating if he

22  wanted me to -- if he wanted to -- if I wanted him to ship it

23  while I was gone on a trip, the second shipment.  So, there

24  may have been a couple of them.

25  Q    Couple of times he called you.

1    A    Correct.  And -- and other times when I did speak with

2    him, he said that he had been calling me and I hadn't been

3    answering my phone.

4    Q    He told you that?

5    A    Correct.

6              MR. COOPER:  Okay.  That's all I have, Your Honor.

7              THE COURT:  Recross.

8              MR. CURTNER:  No, Your Honor.  Is that loud enough?

9              THE COURT:  All right.  Thank -- thank you, sir.

10   You're free to go, excused.  Next witness?

11             MR. COOPER:  Be Eric Marek.

12             THE COURT:  Okay.

13                       (Pause)

14             THE COURT:  And just -- if you'll remain standing

15   just for a second, my Clerk will swear you in and we'll be

16   ready to go.

17             THE CLERK:  Please raise your right hand.

18        **ERIC MAREK, GOVERNMENT'S WITNESS, SWORN**

19             THE CLERK:  Okay.  Please be seated.  For the

20   record, can you please state and spell your full name?

21             THE WITNESS:  Yes.  Eric William Marek, M-A-R-E-K.

22             THE CLERK:  Can you spell your first name, please?

23             THE WITNESS:  Eric, E-R-I-C.

24             THE CLERK:  Thank you.

25             THE COURT:  Mr. Cooper.

1              MR. COOPER:  Thank you, Your Honor.

2                    **DIRECT EXAMINATION**

3    BY MR. COOPER:

4    Q    Mr. Marek, what is your occupation, please?

5    A    I'm a Special Agent with the United States Fish and

6    Wildlife Service here in Fairbanks.

7    Q    Very well.  And were you employed in that capacity during

8    the summer of 2010?

9    A    Yes, I was.

10   Q    During that time, did you have occasion to make contact

11   with a person you see in the courtroom here today?

12   A    Yes, sir.  I did.

13   Q    And who was that?

14   A    That was Willis Scott Maxon.

15   Q    Where's he located?

16   A    He's sitting over toward -- to your left --

17   Q    Okay.

18   A    -- at the end of the table.

19              MR. COOPER:  The record should show the defendant's

20   been identified, Your Honor.

21              THE COURT:  So noted.

22   BY MR. COOPER:

23   Q    And so where was it that you made contact with Mr. Maxon?

24   A    It was at the Carlson Center here in Fairbanks during the

25   World Eskimo Indian Olympics.

1  Q    Okay.  And do you recall was that on or about the 24th of

2  -- you tell me the date.  It was in July of 2010?

3  A    Yes, yes, sir.  That was on July 24th, 2010.

4  Q    Twenty-fourth?

5  A    Twenty-fourth, yes.

6  Q    Okay.  And what was the occasion for your being there?

7  A    I went to the Carlson Center on request of the case agent

8  for a case that Fish and Wildlife Service was working to

9  contact Mr. Maxon at the Carlson Center, if he was there

10  selling fish.

11  Q    All right.  And so, did you have a recording device with

12  you when you made that contact?

13  A    Yes, I did, a Olympus recording device.

14  Q    And was that -- was that something you'd carry in your

15  pocket?

16  A    As -- as a law enforcement officer, if we're going to

17  make a contact and we have the proper authority, we will

18  record conversations at times, and so it's a -- another tool

19  that we do use.

20  Q    So, was -- was it a pocket-size sort of thing?

21  A    Yeah, it's a mini-recorder about inch -- inch and a

22  quarter wide by three inches long, about three-eighths of an

23  inch thick, and fit in your pocket.

24  Q    Okay.  So -- so what happened?  You went up to the --

25  where were -- where was he located?

1  A    In -- in the -- I guess basically where the hockey arena

2  would be in the Carlson Center, on the floor there was a arts

3  and crafts portion of the show and so there were different

4  vendors, and so walking along -- around the arts and craft

5  area, I did recognize a table where they were selling fish,

6  and began speaking with the two individuals at that table.

7  Q    And who were those two individuals?

8  A    It was Willis Scott Maxon and Evangeline Reyes Maxon.

9  Q    Okay.  Now, were there other people selling fish, or was

10 his the only place where they were selling fish there?

11 A    I believe he was the only one -- that's the only one I

12 recall that was selling fish, and it's the only individuals

13 that I contacted that day regarding fish.

14 Q    And did -- did you tell us what the event was that was

15 taking place?

16 A    It was the World Eskimo Indian Olympics.

17 Q    Okay.  So, did you make -- did you make then a recording

18 of the contact that you had?

19 A    Yes, I did.

20 Q    And have you listened to that recording since then?

21 A    Yes, I have, sir.

22 Q    Is it a fair reproduction of the transactions that you --

23 A    Absolutely.

24 Q    -- you recorded that day?

25 A    Yes, sir.

1   Q    And have you made a transcript of what you hear on the

2   tape?

3   A    Yes, I have done that.

4   Q    And have -- was that transcript a record of what's on the

5   tape?

6   A    Yes, it is.

7   Q    Does it have anything that you added because you know it

8   happened even though it's not on the tape?

9   A    There are some things that were not audio that are not it

10  that are represented in the transcript; example, gestures.

11  Q    So, but I mean words, sounds.  You don't have anybody

12  saying anything that's not on the tape.

13  A    Uh --

14  Q    You haven't added words, have you?

15  A    No, sir.  No, sir.

16  Q    Okay.

17  A    I've just -- just the representation of what you could

18  hear.

19  Q    So, in other words, you're indicating that somebody might

20  have been pointing to something --

21  A    That is correct.

22  Q    -- and you added that because it's not audible, but you

23  know it happened at the time they said such a thing?

24  A    That's correct.

25  Q    Are the words that are in this transcript the words that

1    anyone can hear on the tape?

2    A    Yes, they are.

3            MR. COOPER:  All right.  Your Honor, I'd offer

4    fifteen, which is the CD that has the recording on it and also

5    produce for the Court and the jury the transcript of that tape

6    recording.

7            THE COURT:  Did you get a chance to look --

8            MR. CURTNER:  Yes, we can listen to this once.

9            THE COURT:  Okay.  And the same admonition -- I'll

10   raise the blue book in the air.  Everybody knows what that

11   means.  What you hear is the evidence.

12       (Government's Exhibit 15 admitted)

13           MR. COOPER:  And here -- I'm handing the Court two

14   copies, one for the Clerk, one for the Court, and the --

15           THE COURT:  Okay.

16           MR. COOPER:  -- jury is receiving a copy.

17                          (Pause)

18           MR. COOPER:  This transcript, the -- the CD that

19   this is a transcript of is Exhibit 15, and so the transcript

20   would be 15-A.

21       (Exhibit 15 played for the jury)

22                          (Pause)

23           MR. COOPER:  Your Honor, I'd like to hand Exhibits

24   16 through 18 to the witness.

25           THE COURT:  Okay.

1           (Pause)

2       THE WITNESS:  Thank you.

3           (Pause)

4   BY MR. COOPER:

5   Q    All right.  Now, Mr. Marek, I'd like to ask you one or

6   two questions about this.  You bought some salmon at that

7   occasion that we heard on the tape, is that correct?

8   A    That is correct.

9   Q    What -- what did you buy?

10  A    Purchased two bags of salmon strips.

11  Q    And which -- they were talking about a lot of different

12  kinds of salmon.  Which kind were the kind that -- that you

13  bought?  What did they say those were?

14  A    I believe when I -- when I purchased those, that they

15  were either red salmon or King salmon.

16  Q    Okay.  Did they mention -- well, they did mention all

17  kinds of other salmon, but did they mention any other kind of

18  salmon that they had there besides the reds and Kings?

19  A    No, they did not.

20  Q    And did you ask if they had Kings?

21  A    That is correct, I did.

22  Q    And you got a different answer from -- from the two of

23  them, is that right?

24  A    That is correct.

25  Q    What answer did you get from which person?

1    A    From Willis Scott Maxon, I did get a yes, that they had

2    King salmon, and then from Evangeline Reyes Maxon, she said

3    that they did not have King salmon, sometimes they did, but

4    not at the occasion.

5    Q    And that was right at the same time the two were -- one

6    came right after the other?

7    A    That is correct.

8    Q    Okay.  Do you have some exhibits in front of you there,

9    six -- that are marked sixteen, seventeen, and eighteen?

10   A    Yes, sir.  I do.

11   Q    And just tell us what is number sixteen?

12   A    That is a fish strip that I purchased on the 24th of

13   July, 2010.

14   Q    And does that accurately depict the salmon strips that

15   you purchased?

16   A    Yes, it does.

17   Q    Were they bagged like this in the picture or were they

18   bagged differently?

19   A    They were bagged -- they were bagged in groups, so each

20   bag had a certain number of strips in it.

21   Q    How many bags were there?

22   A    There were two bags total.

23   Q    Okay.  So, we have like half a dozen or so bags here, so

24   it's different, right?

25   A    That is correct.

1  Q    Was this just the way you divided it up for evidence

2  purposes or how --

3  A    That is correct.

4  Q    So, this was taken later, not at the time that you made

5  the purchase.

6  A    That's correct, the photo.

7  Q    All right.  But you know these to be the salmon that you

8  bought.

9  A    Yes, I do.

10          MR. COOPER:  I'd like to offer sixteen in evidence.

11          MR. CURTNER:  No objection.

12          THE COURT:  It'll be received.

13      (Government's Exhibit 16 admitted)

14  BY MR. COOPER:

15  Q    And what is seventeen and what is eighteen?

16  A    Seventeen is a Wells Fargo check number three hundred and

17  ninety-five that I paid the Maxons for the -- sixty dollars

18  for the two packs -- two packs of fish strips.  And that's a

19  digital representation of the check that you can get on-line

20  through the Wells Fargo account.  And then eighteen is the

21  original duplicate check from my checkbook and a photocopy of

22  the duplicate check from the checkbook.

23  Q    Okay.  And the -- this is the check you gave to Mrs.

24  Maxon that day --

25  A    That is correct.

1    Q    -- for the fish that are in number sixteen?

2    A    That is correct, the sixty dollars.

3         MR. COOPER:  Okay.  I'd like to offer seventeen and

4    eighteen, Your Honor.

5         MR. CURTNER:  No objection.

6         THE COURT:  They'll be received.

7    (Government's Exhibits 17 and 18 admitted)

8    BY MR. COOPER:

9    Q    Now, you've got this -- this (indiscernible) one -- oh,

10   seventeen and eighteen relate to one and the same check,

11   correct?

12   A    Yes, that is correct.

13   Q    Okay.  So, it's made out to Frontier Pizza?  Do you know

14   what that is -- what -- what entity that is?

15   A    I was told by Mrs. Maxon that that was their business,

16   their pizza place.

17        MR. COOPER:  Okay.  All right.  I believe that's all

18   -- yeah, we should show those pictures on the overhead, that's

19   true.  Oh, okay.

20             (Pause - side conversation)

21   BY MR. COOPER:

22   Q    Yeah, we're putting on the overhead projector here a

23   picture of sixteen.  Is that the same as the one you have as

24   sixteen?

25   A    Yes, sir.  It is.

1    Q    All right.  And seventeen, is that the photocopy of the

2    check you wrote?

3    A    Yes, that's the digital copy.  Yes, sir.

4    Q    All right.  By the way, I see you got a -- you've got a

5    different name on there.  Is that mainly used for this

6    operation?

7    A    That is correct.  (Indiscernible.)

8    Q    Okay.  And eighteen, is that the same as your eighteen,

9    meaning the photocopy of the carbon copy and also an actual

10   picture of the carbon copy?

11   A    Yes, sir.  It is.

12   Q    Very well.  So, sixty dollars for the two, thirty dollars

13   a bag, right?

14   A    That is correct.

15   Q    What was the weight that these were represented to be to

16   you?

17   A    It was just a little under two pounds, I believe, when it

18   was weighed.

19            MR. COOPER:  Okay.  That's all the questions I have,

20   Your Honor.

21            THE COURT:  Cross-examination.

22                        **CROSS-EXAMINATION**

23   BY MR. CURTNER:

24   Q    Agent Marek, you weren't -- you just didn't happen upon

25   the Maxons there at the Olympics, did you?

1   A     No, sir.

2   Q     You were directed to go there as part of the Operation

3   Yukon Kings?

4   A     Yes, sir.

5   Q     And you were directed to make contact with Scott Maxon.

6   A     Yes, sir.

7   Q     And in fact, you had intended to buy Yukon Kings and you

8   had these like phony checks made up, too?

9   A     Uh --

10  Q     You're not Eric Marshall, right?

11  A     No, sir.

12  Q     You don't live in New Jersey.

13  A     No, sir.

14  Q     And that was a fictitious check that you made up for this

15  sting operation?

16  A     It's just a tool we use.  Yes, sir.

17  Q     Now, this transcript, that transcript was prepared

18  January 21st, 2012?

19  A     Yes, sir.

20  Q     This week -- last week.

21  A     Yes, sir.

22  Q     That was like eighteen months after this happened?

23  A     Yes, sir.

24  Q     Okay.  And then in this transcript, you -- did you edit

25  it?

1    A    Did I -- yes, sir.

2    Q    Okay.  And you added your own commentary?

3    A    No, not my own commentary.

4    Q    Like when you're saying pointing at fish, is that your

5    commentary?

6    A    Yes, I put that in there as a gesture.

7    Q    And if you say in there in brackets somebody was

8    interrupted, that's your commentary, right?

9    A    Yes, sir.

10   Q    And if you put in, in brackets somebody was speaking over

11   somebody else, that's your commentary, right?

12   A    Yes, sir.

13   Q    And you did this all -- like eighteen minutes -- eighteen

14   months later, trying to remember what happened that day?

15   A    I did that from an audio recording.

16   Q    Okay.  Now, this conversation at the Carlson Center, you

17   start off -- that we hear on this tape is how much for the

18   fish, is that right?

19   A    That is correct.

20   Q    That's how you start, and who answers that?

21   A    That question was answered by Ms. Maxon -- Mrs. Maxon.

22   Q    Yeah.  Do you know her as Vangie Maxon?

23   A    Vangie, yes.

24   Q    Okay.  So, Vangie Maxon -- you asked how much for the

25   fish and Vangie answered, right?

1   A    That is correct.

2   Q    And she told you the amount?

3   A    Thirty dollars.

4   Q    And then you went -- did you direct yourself to Mr. Maxon

5   to say how are you?

6   A    That is correct.

7   Q    And got him in the conversation, right?

8   A    Correct.

9   Q    And then most of the conversation though is with Mrs.

10  Maxon, is that correct?

11                          (Pause)

12  She's telling you about we don't have any Kings.

13  A    That's correct, she said that.

14  Q    She's telling you that -- she's actually telling you that

15  the Kings are too oily?

16  A    That is correct.

17  Q    So, she's not encouraging you to buy Kings at all, is

18  she?

19  A    Right, she's encouraging me to buy reds.

20  Q    She's talking about this guy was going to send up tuna

21  and big shrimp.  Do you remember that part of the

22  conversation?

23  A    Yes, sir.

24  Q    Okay.  So, the -- the fish that you did buy, they weren't

25  designated as a particular type of salmon, they were salmon

1   strips, right?

2   A    That is correct.

3   Q    You -- were they in clear packages so you could see them?

4   A    Yes.

5   Q    There were no labels on them, correct?

6   A    No.

7           MR. CURTNER:  Okay.  I think that's all I have.

8   Thank you.

9           THE COURT:  Redirect?

10          MR. COOPER:  Yes.  (Indiscernible - paper rustling)

11  clear one thing up.

12                  **REDIRECT EXAMINATION**

13  BY MR. COOPER:

14  Q    I believe you testified that they told you that they had

15  reds and Kings there, correct?

16  A    That is correct.

17  Q    And so is that a designation of what kind of fish you

18  were purchasing?

19  A    I would believe as a consumer that, yes, that's what I

20  would have been purchasing.  I was told I was buying either

21  reds or Kings.

22          MR. COOPER:  All right.  That's all I have, Your

23  Honor.

24          THE COURT:  Recross?

25          MR. CURTNER:  No, thank you.

1          THE COURT:  Thank you, sir.  You're excused.

2          THE WITNESS:  Thank you, sir.

3          THE COURT:  What's the Government's witness

4     situation now?

5          MR. COOPER:  Be James Neely.

6          THE COURT:  Okay.

7               (Pause - side conversation)

8          THE COURT:  Okay, sir.  If you can just make your

9     way toward the front here.  And then just remain standing for

10    a second and my Clerk will swear you in.

11         THE CLERK:  Please raise your right hand.

12    **JAMES NEELY, GOVERNMENT'S WITNESS, SWORN**

13         THE CLERK:  Okay.  Please be seated.  For the

14    record, can you please state and spell your full name?

15         THE WITNESS:  Yes, ma'am.  James Byron Neely.

16    Common spelling James, middle name B-Y-R-O-N, last name

17    N-E-E-L-Y.

18         THE CLERK:  Thank you.

19         THE COURT:  Mr. Cooper.

20                    **DIRECT EXAMINATION**

21    BY MR. COOPER:

22    Q    Morning, Mr. Neely.

23    A    Good morning, Mr. Cooper.

24    Q    What is your occupation, please?

25    A    I'm employed with the United States Fish and Wildlife

1    Service.  I'm the Zone Officer for the Division of Refuge Law

2    Enforcement, oversee Division of Refuge Law Enforcement's law

3    enforcement operations in the northern half of Alaska on our

4    federal lands.

5    Q    All right.  And in that capacity, did you participate in

6    October 2010 in a search of the Maxon residence over in the

7    Nenana area?

8    A    Yes, sir.  I did.

9    Q    And in connection with that search, did you and anyone

10   else have occasion to interview Mr. Maxon?

11   A    Yes, sir.  I did.

12   Q    Was he advised of his rights and waived those rights and

13   willingly spoke to you?

14   A    Yes, sir.  He was, in his residence.

15   Q    And who was present at that interview?

16   A    Primarily myself and -- and a -- a Special Agent Karras

17   conducted the interview with Mr. Maxon.

18   Q    So, just the three of you or was there --

19   A    Yes, that's -- that's correct.

20   Q    Nobody else.  Okay.  And how many times have you spoken

21   with Mr. Maxon?  Was that the only one time there?

22   A    No.  Interview-wise, probably on three occasions --

23   specific interviews I recall were three occasions.  First was

24   on the 14th at his residence; the following day, the 15th, at

25   the Alaska State Troopers; and one other time with the --

1  Agent Rippeto who spoke with him as well about another issue.

2  Q    Okay.  Well, on this matter that we have today, it was

3  just those three times; the day of the search which was the

4  14th of October, the next day, the 15th -- was it also at his

5  residence?

6  A    No.  The 15th was at the Alaska State Troopers office.

7  Q    And the -- was there a later one you mentioned, the third

8  one?

9  A    Yes.  Some -- and -- but does have necessarily relevance

10  to this case, sir.

11  Q    Oh, okay.  So, just the two then.

12  A    Right.

13  Q    Okay.  All right.  So, did he tell you anything about

14  this salmon strip selling enterprise that he had?

15  A    Yes.  We -- we had lengthy discussions about -- about the

16  business.

17  Q    And did he indicate to you what his role was in that

18  business?

19  A    Yes, he did.  Throughout our conversations, there were a

20  significant number of contradictions.  And early on in the

21  conversation, Mr. Maxon had told us that -- he very much

22  minimized his involvement.  He said I don't sell fish, she

23  sells fish, I don't --

24  Q    She -- she -- who's she?

25  A    She would be his wife, Mrs. Maxon -- Mrs. Vangie Maxon.

1  Q    He -- he made it clear that he was referring to her?

2  A    Yes, he did, sir.

3  Q    Okay.  Go ahead.

4  A    Said he doesn't sell fish, that she sells fish, he

5  doesn't -- he doesn't buy fish, he talked about he doesn't

6  process fish, that's something that she does.  He -- he

7  referred to his involvement as only being the transporter.  He

8  explained that -- that his wife, again Vangie, did not have a

9  driver's license, and so his role was -- he was just the

10  transporter.

11  Q    Did he indicate who labeled the fish or addressed them?

12  A    He -- he talked about that he doesn't mark his fish, he

13  doesn't label them, and that if there's any labeling done,

14  that she -- she indeed did that labeling.

15  Q    Mm-hmm (affirmative).

16  A    Again, meaning Mrs. Maxon.

17  Q    Does he talk about buying fish?

18  A    He did later talk about buying fish.  At that -- early

19  on, he said that he -- he did not buy fish.

20  Q    Doesn't buy fish.  Okay.  What is -- so, what are the

21  things that later came up that were in conflict with this --

22  that you just described that he said?

23  A    Kind of take them one by one here, I guess.  Concerning

24  selling fish, Mr. Maxon talked about -- at length about his

25  taking fish to the Alaska Federation of Natives Convention and

1  standing out front as he described it and giving his sales

2  pitch, get them while they're hot.  He talked about, you know,

3  having a lot of interaction with people.  He described his

4  experience there as a break from the normal routine.  He

5  talked about going down on a weekend and having fun selling

6  fish.

7  Q    And did he say anything else about how long he'd been

8  doing this or how --

9  A    Yes.

10  Q    -- he picked up on it?

11  A    Yeah.  He said about -- about twenty-four years, as I

12  recall, that he talked about being involved in -- in -- in the

13  business or selling fish.  He talked about another occasion

14  where he was involved in selling fish to a person from out of

15  state, Mr. Lopez --

16  Q    What did he -- what did he say to you about this

17  transaction with Mr. Lopez?  At first, what did -- what was

18  his statements regarding that?

19  A    And I -- I believe we -- we brought that up initially to

20  him.  Again, it was some knowledge and again involved in the

21  search warrant and prior to conducting that search warrant

22  when I knew we were doing interviews, we had been briefed with

23  a pre-search warrant investigatory package.  And so we -- we

24  asked him -- when he -- when he denied having made any sale --

25  initially he said he'd -- he'd not made any sales out of

1    state.  When he denied that and I asked him the question was

2    he familiar with Mr. Lopez and -- and -- and he then admitted

3    that he was, but he said that he didn't have anything to do

4    with that, that that was his wife's involvement.

5    Q    Did he say he did --

6    A    His only --

7    Q    Did he say who spoke to Mr. Lopez about the deal?

8    A    He -- he said that she did.  Initially -- again there

9    was --

10   Q    Did he say he didn't?

11   A    -- you know, there was numerous contradictions about

12   this, sir.

13   Q    Did he say that he did or didn't speak to Mr. Lopez?

14   A    He said that he did -- at -- at -- during the -- during

15   the interview --

16   Q    No, at first what did he say?

17   A    At first he -- no.  I'm sorry.  At first, he said he

18   didn't, that this --

19   Q    He said he didn't.

20   A    He did not.

21   Q    Didn't what?

22        MR. CURTNER:  Your Honor, this -- can we have the

23   witness just testify?

24        MR. COOPER:  Okay.  I just want --

25        THE COURT:  Yeah, I'm getting -- just one --

1          MR. COOPER:  Go ahead.

2          THE COURT:  -- one person speak at a time.

3          THE WITNESS:  All right.  I'm sorry.

4    A    Initially, he said that he did not have any involvement

5    with Mr. Lopez, his wife spoke to Mrs. -- or his wife, Vangie,

6    spoke to Mr. Lopez --

7    BY MR. COOPER:

8    Q    Very well.

9    A    -- that she conducted any business with Mr. Lopez over

10   the telephone, he said that he had overheard the conversation

11   appar -- and -- and he -- he used the word speaker, so I'm

12   presuming that that was a speaker on the telephone, and that

13   -- but -- but all he did was transport fish.  He knew that

14   there was -- had been fish sold to Mr. Lopez and all he did --

15   he minimized his involvement saying all he did was transport

16   the fish boxes to the post office.

17   Q    All right.  And you were going to mention something that

18   he later said that conflicted with that.

19   A    Yes.  Yes, sir.  Later, he did admit to having spoken

20   with Mr. Lopez, having done so over the telephone.  He talked

21   about having -- he talked about having talked to Mr. Lopez

22   quite a bit was -- was how he put it.  He talked about having

23   at least two conversations with Mr. Lopez.  One time in

24   particular, as I recall, he said that his wife had answered

25   the phone, they spoke a short period of time, then handed him

1  the phone, and he continued the conversation.

2  Q    Did he ever retract his statement that it was his wife

3  who made the deal or agreement with Mr. Lopez?

4  A    He -- he went back and forth on this a number of times,

5  but he left us with the impression that he was -- or he left

6  us with the -- again, the impression that he was very much

7  involved, he knew the amount of product, he portrayed the

8  amount of product that he was selling, smoked salmon, fifty

9  pounds, he described that at least twice as I recall, saying

10 -- one time he -- he described it as fifty pounds of smoked

11 salmon at -- at I believe twenty-five dollars a pound, another

12 time he described it as fifty pounds and used the terminology

13 twenty-five and twenty-five.  Not sure just exactly what that

14 -- what that meant, if it meant twenty-five pounds of one

15 thing and another.

16     We discussed what type of fish these were.  I know I --

17 we -- he was asked if they were Chum salmon.  At one point he

18 said yes -- or immediately following that question, he said

19 yes or yeah, as I recall was his response.  We asked if they

20 were labeled as King salmon, and he -- his response was no,

21 couldn't be because they were Kings and Chums both.

22 Q    So, he -- he didn't believe they were labeled as Kings?

23 A    Correct.

24 Q    Okay.

25 A    He -- he believed that they were Kings and Chums both.

1    Q    Did he indicate what he -- what representations he made

2    regarding the kind of salmon involved?

3    A    Again, conflicts, but primarily he -- he stuck to the

4    story that he never -- he never sells as Kings only -- as King

5    salmon only because they're mixed, his -- his product is mixed

6    and he explained that as saying they're -- Kings and Chums?

7    And again he said, no, it's Kings, Chums, and silvers.

8    Q    Did he say what he tells the customer or what he told the

9    customer on any occasion when it was asked what are these?

10   A    He did say that -- we asked -- or we asked him if it was

11   Chum -- or we asked him if he had told Mr. Lopez if it was

12   Chum salmon, and he said yeah.

13   Q    And does he say what his -- did he say what his practice

14   was with regard to anybody that wants to know what the fish

15   are?  Does he or does he not tell them --

16   A    He told -- he -- he -- he told us that he tells them that

17   it's mixed, that he never tells people it's just Kings is what

18   he told us.

19   Q    All right.  Now, with regard to the -- there -- there

20   were a couple of large tubs or totes of -- of raw salmon

21   sitting out in the yard, is that right, at this location?

22   A    That's correct.

23   Q    Several hundred pounds of those, right?

24   A    I believe that's correct.

25   Q    And were those -- did he tell you anything about how he

1   had acquired those?

2   A    Yes, he did.  Said he had occasion to purchase from a --

3   to purchase salmon -- Chum salmon -- from a Greg -- Greg

4   Taylor.  There was some confusion whether it was Craig Taylor

5   or Greg Taylor, but -- but we -- we were able to decided it

6   was a Greg Taylor and then later a Curtis Erhart who was

7   introduced to him, I understand, through Greg Taylor, and that

8   he had --

9   Q    It was from those two then are we talking about that he

10  bought those several hundred pounds of raw salmon?

11  A    Yes.  He said that he bought two hundred and fifty fish

12  on one occasion and a hundred and fifty fish on another

13  occasion.

14  Q    One --

15  A    And again from -- from Mr. Taylor and/or Mr. Erhart.

16  Q    Okay.  And did he say what he paid for those?

17  A    Yes, a doll -- a dollar a fish as I recall.

18  Q    Did he say how he paid for them?

19  A    Cash.

20  Q    And --

21  A    And I believe he said that -- I believe he said that he

22  paid -- paid for the first fish, but I believe he said he had

23  never concluded the financial payment on the second fish, as I

24  -- as I recall.  That's --

25  Q    All right.  And did he indicate to you how or why it was

1  that these people came to him to sell fish to him?

2  A    He said that everyone in Alaska knows that he sells

3  smoked salmon and that's how Mr. Taylor knew how to get in

4  touch with him.

5  Q    And did he go on to explain how it was that he got into

6  that business of selling salmon?

7  A    Yes, he did.  Again, there was some conflict in that

8  testimony.  Early on, he talked about his wife having taken

9  over the business from her father -- or early on he said -- I

10 apologize.  Early on he said that.  Later on, he said when --

11 in I believe it was around this portion of the conversation --

12 we had a lot of conversation, but he talked about that when

13 everyone knows that -- everyone in Alaska knows that he sells

14 smoked salmon, he talks about that he had taken over the

15 business from his father-in-law who he named as Herman the

16 German, and that -- and I believe he also referred him -- to

17 him as Reinhardt on occasion, and that who -- and I believe he

18 said that he -- that gentleman had been in the business for

19 about thirty-five years.

20 Q    And he took it over from him.

21 A    Yes, sir.

22 Q    All right.  And did he say anything about whether he was

23 legally permitted or authorized to make the purchase of fish

24 from Mr. Taylor and Mr. Erhart?

25 A    He was questioned whether he had a business license --

1  any business license, commercial buyers license, any of that,

2  and he said, no, he had no business license to -- to conduct

3  that business -- to legally purchase that business.  He went

4  on and said there were no fish tickets involved in -- in the

5  sale of those fish -- the transfer of those fish to him --

6  Q    Did he indicate whether he had a permit to buy fish that

7  way from the fishermen?

8  A    He said he had no permit, he had not business permits, he

9  had no licensure whatsoever.

10 Q    Regarding the fish from Mr. Taylor and Mr. Erhart, were

11 these individuals commercial fishermen?

12 A    He -- he stated to us that they were commercial

13 fishermen.

14 Q    And did he indicate whether he had a permit to buy fish

15 from commercial fishermen?

16 A    He said he did not have a permit.

17 Q    I see.  Did you ask him about having sent salmon out of

18 state and about his prior statements of having sent thousands

19 of pounds out of state?

20 A    Yes, we did.  We talked about -- again, what -- he was

21 asked what -- what kind of past sales he's made out of state.

22 Initially -- initially, he had told us he didn't make any

23 sales, then he retracted that and said, well, besides the

24 Lopez sale, that he hadn't made any sales, but he again

25 changed that and said that he was familiar with one -- I don't

1    know what the word exactly was, I don't think he used

2    transaction, but his -- I believe what he said was his wife

3    had sent fish to California, and I recall 'cause he says -- he

4    said at the time something about she told me right to my face,

5    right to my face that she sent fish to California, and he

6    acted very surprised about that.

7    Q    So, did he admit or deny that he sent thousands of pounds

8    of fish out to the -- somewhere out of Alaska?

9    A    He didn't -- he never admitted that he had done that, no,

10   he did not.

11   Q    Did he deny that he had done that?

12   A    He did not say -- he denied it, yes.

13   Q    All right.  Was the subject -- excuse me a second here.

14                        (Pause)

15   Was the subject brought up that -- that somebody during the

16   search had found one King salmon on the premises and I think

17   one red salmon?

18   A    When -- during the time that we were there, I did see a

19   -- there was a large -- fairly large King salmon was on a

20   white chest freezer on the porch -- as you walk into the

21   Maxons' home, there was an enclosed porch area.  On the left-

22   hand side walking in, there was a -- a chest freezer.  I

23   remember seeing a -- a large salmon, a King salmon sitting on

24   top of that chest freezer.  Inside his home, there -- as you

25   walk into the kitchen area, on the left-hand side, there was a

1    counter top there and on that counter top there was -- not

2    sure if it was one or two, but I remember seeing it -- there

3    was a -- a pan so deep and it had cut up salmon in it, looked

4    to me to be red salmon, and I know I had asked -- spoke with

5    his daughter Venessa early about it and she had told -- she

6    told me that that was salmon she was preparing for canning.

7    It was in a brine bath -- in a clear liquid -- in a brine

8    bath --

9    Q    Okay.  So, the short answer is you did find a King and

10   you did find a red.

11   A    Yes.

12   Q    Okay.  And did that subject come up when you were

13   speaking with Mr. Maxon?

14   A    Yes, it did.

15   Q    And did he indicate what the King and the red were there

16   for and whether they had anything to do with his selling

17   salmon?

18   A    Yes, he said they were for their personal use, and -- and

19   he said that his daughter was being married, and I -- I don't

20   recall just when it was, but it seemed like it was just in a

21   few days, and those were to be used at the wedding.

22   Q    And who had brought those?  Where did they come from?

23   A    I believe his -- Venessa had told me that they had

24   brought them -- her and her husband-to-be, fiance, whatever,

25   had brought them with them.  I believe they told us they were

1   from Bristol Bay area or had harvested those fish in the

2   Bristol Bay area.

3   Q    And did he say whether they had anything to do with this

4   fish operation?

5   A    He said they did not have anything to do with his fish

6   operation.  They were -- there were for personal use.

7   Q    Did he give you any indication why there would be a need

8   to bring in a King salmon and a red salmon when he had a lot

9   of salmon at the premises there?

10  A    He made the statement to us that he does not eat Chum.

11          MR. COOPER:  That's all the questions I have, Your

12  Honor.

13          THE COURT:  Cross-examination?

14                  **CROSS-EXAMINATION**

15  BY MR. CURTNER:

16  Q    Agent Neely, this conversation you had with Mr. Maxon,

17  that was at his home?

18  A    Again, I spoke with him at his home and then also at the

19  Alaska State Troopers on the 15th.

20  Q    The first conversation was at his home?

21  A    Yes, sir.

22  Q    And that's when you were executing a search warrant?

23  A    I was part of the search warrant team, yes.

24  Q    How big was the search warrant team?

25  A    How large in total?

1   Q    How many people?  How many agents?

2   A    I want to think somewhere between six and eight.  If you

3   can give me a second, I can probably recall all the names.

4   Q    Okay.

5   A    Okay.  Trooper -- or Trooper Sergeant Scott Quist was

6   there, there was Agent Karras was there --

7   Q    Okay.

8   A    -- Agent Mann was there --

9   Q    Mm-hmm (affirmative).

10  A    -- obviously myself, Agent Whisler was there, Officer

11  Bartlett works for Refuges was part of that search warrant

12  team, and I believe I did make mention Agent Karras who was --

13  who was with me primarily during the -- was with me during the

14  interviews.

15  Q    Okay.

16  A    That's my recollection (indiscernible) --

17  Q    Could have been more?

18  A    Yeah, there may be -- there may be additional that I'm

19  just not recalling.

20  Q    Now, before you do a search warrant like that at a home,

21  do you have a debriefing?  Do you all get together and discuss

22  how you're going to do that?

23  A    Yes, sir.

24  Q    And do you usually go and -- how was everybody dressed?

25  Are you all armed when you do that?

1    A    At the briefing, sir, or at the search warrant?

2    Q    No, at the search warrant, excuse me.

3    A    At the search warrant, yes, we are.

4    Q    Okay.  So, everybody's armed and do they wear uniforms or

5    plain clothes or both?

6    A    Plain clothes and uniform both.

7    Q    And is that a fairly intimidating process for a bunch of

8    federal and state agents to come to somebody's home with a

9    search warrant, do you think?

10   A    You're asking for my opinion if it's --

11   Q    Yes.

12   A    -- intimidating?

13   Q    What do you think?

14   A    I think that it was surprising.

15   Q    Okay.  I mean, would you be intimidated if six or eight

16   officers came to your home with a federal search warrant?

17   A    I --

18   Q    Or let's say the ordinary person.

19   A    -- I don't know if I understand what you mean by

20   intimidating.

21   Q    Well --

22   A    Fear -- fearful?  Surprised?

23   Q    It makes you anxious.

24   A    Yes, I think -- I think that's accurate.

25   Q    Thank you.  Now -- so, when you first started talking

1  during this process to Mr. Maxon and you were asking about

2  selling smoked salmon processed fish, he right off told you

3  that this was his wife's business primarily, didn't he?

4  A    Yes, I believe that is right.

5  Q    And that she was carrying on this business after her

6  father had done it for many years.

7  A    That's correct.

8  Q    And her father's name again was -- was he known as Herman

9  the --

10 A    He referred to him by a couple of names as I recall,

11 Herman the German --

12 Q    Mm-hmm (affirmative).

13 A    -- and Reinhart or Reinhardt --

14 Q    And he'd --

15 A    -- Reinhardt.

16 Q    And he had been doing this fish processing for many, many

17 years?

18 A    I believe he told me thirty-five years.

19 Q    Okay.  And now, Mr. Maxon also said I don't process fish,

20 I don't have time for that, right?

21 A    Yes, he did.  He told us he didn't -- didn't process

22 fish, he -- that this isn't what he did, he didn't have time

23 for that.

24 Q    Well -- and he didn't have time for it --

25 A    Yes.

1   Q    -- because he was running a restaurant, right?

2   A    He said he didn't have time for it.  I don't -- I don't

3   recall why he said that, but he didn't have time for it.

4   Q    So, the restaurant he was running is like one family

5   business and that he's in charge of and this fish processing

6   is a family business that his wife primarily does, correct?

7   Is that your understanding?

8   A    I don't -- I didn't discuss with him the arrangements of

9   his other business.

10  Q    Now -- so, you had a chance to look at all the fish that

11  was hanging there and all the fish that was on the property?

12  A    No, sir.  I did not have a chance to look at all of it.

13  I -- I was -- my -- my portion of the warrant process was to

14  interview Mr. -- primarily Mr. Maxon and --

15  Q    Okay.  Did you --

16  A    -- I did have -- I did have occasion to see some of that,

17  I helped load trucks at the end, that sort of thing, but I did

18  not see -- see every fish on the residence and where it was

19  when it was discovered.

20  Q    So, you helped load trucks of what?

21  A    Boxes of salmon and bags of salmon at the end of the

22  warrant when we were finished with our portion with Mr. Maxon

23  at the time.  When we were concluding, I stepped out and -- as

24  I recall, Officer Bartlett and I and maybe a couple others had

25  loaded at the very -- very end.

1   Q    Okay.  How many -- how many bags?

2   A    I -- I can't tell you, sir, how many there were.  There

3   were quite a number.

4   Q    Quite a few bags of fish?  You just took all the fish?

5   A    Sir?

6   Q    You took all the fish that was there?

7   A    Again, I -- that wasn't my role in the search warrant.  I

8   didn't -- I didn't make the seizures.  I -- I did -- I

9   conducted the interviews.

10  Q    Now, when you started talking -- when you talked to Mr.

11  Maxon about sending some salmon to Mr. Lopez, and when you

12  asked him if it was Chum salmon, he answered yeah, is that

13  correct?

14  A    That's correct, sir.

15  Q    Yes.  He told you yes.  And when --

16  A    I took it as an affirmative answer, yes.

17  Q    And when asked if it was labeled as King, he said, well,

18  it can't be because it's mixed, right?

19  A    That's essentially correct, yes.

20  Q    And he explained to you that his wife, when she packages

21  fish, she processes different kind of salmon, whatever's

22  available; reds, Kings if they're available, silvers if

23  they're available, Chum if they're available.  She processes

24  that in the bags that she sells can be a mix of different

25  types of species.

1    A    I don't recall that he went through any explanation of

2    how all that processing is you just explained and -- and her

3    exact role in that.  I do recall that he said that -- that

4    indeed that he doesn't sell a single species, that he sells

5    mixed salmon, and it's Chum -- King and Chum and then he

6    repeated King, Chum, and silver, as I recall.

7    Q    Right.  So, I mean, did you understand that -- I mean,

8    that if you processed a bunch of fish, there can be different

9    fish in the strip just as the way she did it?

10   A    What I understood was that he said that he was an expert

11   essentially in identifying smoked salmon and that he could

12   look at any bag and tell you what was in it -- that his wife

13   had put in it.  That's what I recall.

14   Q    No, what I asked you, sir --

15   A    Mm-hmm (affirmative).

16   Q    -- is that her -- her business, her process, her ordinary

17   practice is to put a bunch of salmon strips together and they

18   could be anything, and they're not labeled, right?

19   A    He said that he did not label the fish.  He said that she

20   labels the fish.

21            MR. CURTNER:  Okay.  That's all I have.  Thank you.

22            THE COURT:  Let's see, are we done?  Did we -- did

23   you do your redirect?

24            MR. COOPER:  Just a little, Your Honor, yes.

25            THE COURT:  Okay.

1                          **REDIRECT EXAMINATION**

2    BY MR. COOPER:

3    Q    You mentioned that he said that he -- Mr. Maxon said that

4    he didn't process fish and he had no time for that?  Did he

5    tell you something about that he didn't have time because he

6    wanted to -- he was trying to complete processing some fish

7    and didn't -- wasn't able to finish it?  What was that?

8    A    He talked to us about having had some medical problems.

9    Specifically -- and this was actually -- this was at the State

10   Troopers on the 15th, he said that he was upset about -- well,

11   at that point, he said he was upset about losing the fish that

12   we had taken in the totes, but that -- that was because they

13   were personal.  There were some Kings in there that were -- he

14   was hoping to use for family food.

15   Q    Now -- okay.  So, let me focus the question.  The

16   question is with regard to the two large tubs of several

17   hundred raw fish --

18   A    I understand, I understand, I'm sorry.

19   Q    -- that were out there, did he make some statement about

20   -- that related to his processing of these fish?

21   A    Yes, I'm sorry, I misunderstood the question.  He said

22   that he was unable to finish those fish because of his medical

23   condition and he described that medical condition.  I think he

24   told us about it two times.  One time he had sixteen pins in

25   his leg and prostate surge -- and recent prostate surgery that

1   he was recovering from, and one time he said he had eighteen

2   pins in his leg.  But he was unable to finish them up because

3   of that.  That's what he told us.

4              MR. COOPER:  Okay.  That's all I have, Your Honor.

5              THE COURT:  Recross?

6              MR. CURTNER:  Just one question, Your Honor.

7                        **RECROSS-EXAMINATION**

8   BY MR. CURTNER:

9   Q    So, the sixteen or eighteen pins, those were from an

10  automobile accident he had just recently experienced, is that

11  correct?

12  A    I believe he said he was in an automobile accident, but I

13  don't know -- I don't know how recent it was, sir.

14             MR. CURTNER:  Okay.  Thank you.

15             THE COURT:  All right.  We'll take a recess, fifteen

16  minutes or so.  And thank you very much, sir.  We're done.

17  And we'll be ready with the Government's next witness.

18             MR. COOPER:  Yes, Your Honor.

19                             (Pause)

20       (Jury out at 10:17 a.m.)

21             THE COURT:  I have jury instructions, very much,

22  very much draft and I know you're going to say, well, we

23  haven't even decided yet.  I don't know what you're going to

24  do, but --

25             UNIDENTIFIED SPEAKER:  (Indiscernible - away from

1  microphone.)

2          THE COURT:  Sure, but this is just something to

3  start with.

4          UNIDENTIFIED SPEAKER:  That's great then.

5          THE COURT:  And maybe, Jody, can you just check with

6  the juror to see if -- one of the jurors had a question about

7  an IED appointment this afternoon.  Remember that?

8          THE CLERK:  Oh, right.  Her -- with her kid.

9          THE COURT:  See if she took care of that.  Just --

10          THE CLERK:  I sure will.

11          THE COURT:  -- as a courtesy.

12          THE CLERK:  Yes.

13          THE COURT:  So, if she did -- if she needs to make a

14  phone call or anything, we can accommodate that.

15          THE CLERK:  Certainly.

16          THE COURT:  Okay.  Okay.  Counsel, did you hear what

17  I just said to Jody?  I asked her to check with that juror to

18  make sure she got the appointment changed for her -- this

19  afternoon and let her use the phone to do that.  No

20  objections?

21          MR. COOPER:  No objection.

22          MR. CURTNER:  No objection.

23          THE COURT:  I think that was that juror --

24          THE CLERK:  We'll go off record.

25      (Recess at 10:18 a.m., until 10:38 a.m.)

1      (Jury not present)

2            THE CLERK:  All rise.  His Honor the Court, the

3   United States District Court for the District of Alaska is

4   again in session, the Honorable Ralph R. Beistline presiding.

5   Please be seated.

6            THE COURT:  Okay.  What do you want to do about the

7   juror's note?

8            MR. COOPER:  Well, we need to at least find out if

9   that's going to affect his ability to be a fair juror and

10  impartial regarding this case.

11           THE COURT:  Okay.  You want to do it right now?

12           MR. COOPER:  I'd -- I'd say we should.

13           THE COURT:  Okay.  Can we bring in just juror number

14  seven?  And he is the gentleman in the blue sweatshirt -- I

15  can't remember what he wore today.

16           MR. CURTNER:  Red today, I think.

17           THE COURT:  Red today?  Okay.  Does that help you?

18  It's either red or blue.

19           THE CLERK:  (States first name of Juror No. 7.)

20           THE COURT:  Huh?

21           THE CLERK:  (States name of Juror No. 7.)

22           THE COURT:  Oh, yeah, Mr. (states last name of Juror

23  No. 7).  That's another way of doing it.  And did counsel --

24  I'll -- I'll do it.

25                          (Pause)

1          (Juror No. 7 entered the courtroom)

2               THE COURT:  Yes, sir.  We got -- we got your note.

3     Did you write this note?

4               JUROR NO. 7:  Yes.

5               THE COURT:  Would this affect your ability to be a

6     fair juror or not?

7               JUROR NO. 7:  No.  I just -- my kid -- my son

8     (indiscernible - away from microphone).

9               THE COURT:  Who, your friends?

10               THE CLERK:  Can I get you in front of that

11     microphone?

12               THE COURT:  Okay.  Now, let me -- my son and his

13     friends.  Whenever you use his, then I don't know who you're

14     talking about.

15               JUROR NO. 7:  This Tim McGyver (ph) --

16               THE COURT:  Okay.

17               JUROR NO. 7:  -- is my neighbor --

18               THE COURT:  Okay.

19               JUROR NO. 7:  -- and his kids and my kid are

20     Facebook friends --

21               THE COURT:  Okay.

22               JUROR NO. 7:  -- and I just know later on when

23     they're going to talk, I don't want nobody to come back later

24     and say, hey, they might have known each other.  So, that's

25     why I --

1    THE COURT:  Okay.  But you don't know Mr. Maxon.

2    JUROR NO. 7:  Never met him --

3    THE COURT:  Okay.

4    JUROR NO. 7:  -- at all.

5    THE COURT:  And the fact that your kids might know

6  some -- have you --

7    JUROR NO. 7:  Well, I know Tim McGyver who said that

8  he's helped out a guy with his pizza parlor, and I am friends

9  with Tim McGyver.

10    THE COURT:  Anything --

11    JUROR NO. 7:  But he's moved to Montana now, so --

12    THE COURT:  He's not even in Alaska?

13    JUROR NO. 7:  Yeah, he moved this summer, but he's

14  coming back this summer.

15    THE COURT:  Anything about that affect your ability

16  to be a fair juror in this case?

17    JUROR NO. 7:  No, it does not.

18    THE COURT:  Great, thanks.

19    JUROR NO. 7:  I just wanted you to be aware that

20  there could be --

21    THE COURT:  I -- that's -- that's what your job is.

22  Good work.  All right, thanks.

23    JUROR NO. 7:  Thank you.

24    THE COURT:  Okay.

25    (Juror No. 7 leaves the courtroom)

1          THE COURT:  Okay.  That satisfy the Government?

2          MR. COOPER:  Yes, Your Honor.

3          THE COURT:  Does that satisfy the defense?

4          MR. CURTNER:  Yes, Judge.

5          THE COURT:  If either of you have any lingering

6    thoughts about it, let me know and we'll consider making him

7    an alternate, but right now it seems so -- so extenuated that

8    it's probably not even an issue.  Okay?

9          MR. COOPER:  Thank you, Your Honor.

10          THE COURT:  All right.  You have another witness?

11          MR. COOPER:  Yes, I do.  Be Matthew Karras.

12          THE COURT:  Okay.  Let's bring the jury in then.

13                         (Pause)

14      (Jury in at 10:41 a.m.)

15          THE COURT:  Also give you a chance to get your

16    jackets if you need it.  Do you need jackets?  It's a little

17    cool in here, so if you --

18          UNKNOWN JUROR:  (Indiscernible - away from

19    microphone.)

20          THE COURT:  You're fine?

21          UNKNOWN JUROR:  (Indiscernible - away from

22    microphone.)

23          THE COURT:  Well, all right.  If you're not, just

24    raise your hand and go get your coat.

25          UNKNOWN JUROR:  (Indiscernible - away from

1  microphone.)

2          THE COURT:  Okay.  Just one second, we're getting

3  coats for people.

4                      (Pause)

5          THE COURT:  Okay.  Mr. Cooper, your next witness is?

6          MR. COOPER:  Matthew Karras.

7          THE COURT:  Okay.  And sir, my Clerk will swear you

8  in, in a second here.

9          THE CLERK:  Please raise your right hand.

10         **MATTHEW KARRAS, GOVERNMENT'S WITNESS, SWORN**

11         THE CLERK:  Okay.  Please be seated.  For the

12  record, can you please state and spell your full name?

13         THE WITNESS:  Matthew J. Karras, K-A-R-R-A-S.

14         THE COURT:  Mr. Cooper?

15                  **DIRECT EXAMINATION**

16  BY MR. COOPER:

17  Q    Mr. Karras, what's your occupation, please?

18  A    I'm a Special Agent with the U.S. Fish and Wildlife

19  Service, currently stationed in Rosemont, Illinois.

20  Q    And during the fall of 2010 -- October 2010 -- did you

21  have occasion to participate in a search that took place here

22  in Alaska regarding Mr. Maxon?

23  A    Yes, I did.

24  Q    And did you speak with Mr. Maxon?

25  A    Yes, I did.

1   Q     And was that in the company of Zone Officer James

2   Neely --

3   A     Yes.

4   Q     -- at Mr. Maxon's residence October the 14th or 15th --

5   October the 14th, I think, 2010?

6   A     Yes, I did.

7   Q     And just for the record, would you indicate if you see

8   Mr. Maxon in the courtroom today?

9   A     Yes.  He's seated at the table wearing the white shirt.

10           MR. COOPER:  I'd like the record to show the

11   defendant's been identified, Your Honor.

12           THE COURT:  Yes, the -- so noted.

13   BY MR. COOPER:

14   Q     Now, we don't necessarily need to reiterate everything

15   regarding the conversation that you had when Mr. Neely was

16   there, we've heard from him, but was there a time during that

17   interview when Mr. Neely left the room or wasn't present and

18   you were still speaking with Mr. Maxon?

19   A     Correct.  There was a time when Refuge Officer Neely did

20   need to leave us for a second to address another issue that

21   was being brought up during the search warrant.

22   Q     And during his absence, was the portion you're going to

23   tell us about also on tape recording as the previous and

24   subsequent parts were?

25   A     Yes, it was.  I was recording.

1  Q    And have you heard the recording?

2  A    Yes, I have.

3  Q    Is it an accurate reproduction of your contact with the

4  defendant, Mr. Maxon?

5  A    Yes, it is.

6  Q    With regard to that, did you ask Mr. Maxon about his past

7  purchases of salmon and offering those as Yukon King salmon to

8  other -- to buyers?

9  A    Correct.  I'd asked him about where he had gotten fish,

10 where he'd purchased them before.  The conversation turned

11 then to the King salmon, and Mr. Maxon stated that he has

12 purchased fish from the rivers before --

13 Q    From the river where?

14 A    -- and then he mentioned the Tanana River, and that the

15 fish in the Tanana River were called Yukon Kings because they

16 had come up from the Yukon River and, therefore, they were

17 (indiscernible) -- if I can, I've got some notes here.

18 Q    If you have -- if you can tell us what his words were,

19 that would be best.

20 A    Correct.  His exact words were:

21        "Every King that you get here is a Yukon King.  It

22        just swims up the river.  It all came out of the

23        Yukon, so if you call that false advertisement, I

24        guess I got to tell you.  This fish was down in the

25        Yukon before it came here."

1   Q    All right.  Then right after that, did he go on and tell

2   you what quality of King salmon he has known to be available

3   in the river there?

4   A    Yes, he did.

5   Q    That -- meaning the Tanana River in the Nenana area.

6   A    Correct.

7   Q    What did he tell you about whether you can get Kings in

8   that area?

9   A    His quote was:

10            "I got little Kings, you know, but they're already

11            red and ready to fall apart.  They're not even --

12            they're not going to make it any further up river."

13            MR. COOPER:  All right.  That's all I have, Your

14   Honor.

15            THE COURT:  Cross?

16                    **CROSS-EXAMINATION**

17   BY MR. CURTNER:

18   Q    Okay.  Just so I'm clear, you're not saying that Mr.

19   Maxon ever made admissions about selling subsistence fish, did

20   you -- do you?

21   A    No, he --

22   Q    No.

23   A    -- did not.

24            MR. CURTNER:  Okay.  I just wanted to make sure

25   that's -- thank you.

1          THE COURT:  Anything else?

2          MR. COOPER:  No, Your Honor.

3          THE COURT:  Thank you, sir.  You're excused.

4     Government's next witness.

5          MR. COOPER:  Yes.  I'd like to call Virgil

6     Umphenour.

7          THE COURT:  Okay.

8                         (Pause)

9          THE COURT:  All right.  Good morning, sir.  We've

10    got -- just come right on up here and we'll let the -- once

11    you get here, just remain standing for a second, my Clerk will

12    swear you in.

13         THE CLERK:  Please raise your right hand.

14    **VIRGIL UMPHENOUR, GOVERNMENT'S WITNESS, SWORN**

15         THE CLERK:  Okay.  Please be seated.  For the

16    record, can you please state and spell your full name?

17         THE WITNESS:  My name is Virgil Lee Umphenour.

18    V-I-R-G-I-L  L-E-E  U-M-P-H-E-N-O-U-R.

19         THE CLERK:  Thank you.

20         THE COURT:  All right.  Mr. Cooper.

21         MR. COOPER:  Thank you, Your Honor.

22                    **DIRECT EXAMINATION**

23    BY MR. COOPER:

24    Q    Mr. Umphenour, what is your occupation, please?

25    A    I own Interior Alaska Fish Processors in -- here in

1  Fairbanks.  We're a full-line processor.  We buy fish from the

2  fishermen in the summer and butcher the fish, freeze them, and

3  we thaw them out throughout the year and smoke them.  And I

4  also buy fish from other processors in western Alaska.

5  Q    All right.  And so do you know -- do you -- do you have

6  knowledge of what the market prices are and were in the years

7  2009 and '10 in interior Alaska for smoked salmon strips of

8  different breeds of salmon?

9  A    Yes, I do.

10 Q    And is that by experience through your own business that

11 you've just described?

12 A    We make a variety of salmon strips in our business and

13 sell them, both wholesale and retail.

14 Q    All right.  So, does that include making and selling Chum

15 salmon strips?

16 A    Yes, it does.

17 Q    Does that include making and selling King salmon strips?

18 A    Yes.  However, due to the depressed King salmon

19 population and no commercial King salmon fishery in the Yukon

20 River, the only other place I can get King salmon currently --

21 they had one opening in the Kuskokwim River this year, so I

22 was able to buy two thousand pounds and that was it for the

23 year, other than buying hatchery fish, which I refuse to do.

24          MR. COOPER:  Excuse me.

25          THE COURT:  Okay.  Other than buying hatchery fish

1  which he refuses to do I think is what he just said.  But

2  could you pull that mic just a little closer, please?

3          MR. COOPER:  Good.  Okay.

4  BY MR. COOPER:

5  Q    So, for awhile fish -- your only source this year, was

6  it, was the Kuskokwim --

7  A    That's --

8  Q    -- fishery?

9  A    That's correct.  The only wild King salmon that were able

10 to be sold this year from western Alaska were from the

11 Kuskokwim, and that was only one opening.

12 Q    All right.  So, in the years 2009 and '10, what was the

13 going price that you were getting for Chum salmon smoked

14 strips and smoked King salmon strips?

15 A    For Chum -- I didn't do any King salmon strips in 2009

16 because we had no King salmon fishery on the Yukon River,

17 commercial that is, but for Chum salmon strips, I sold them

18 between -- depending on the flavor, between ten and sixteen

19 dollars a pound.

20 Q    That's for Chum.  All right.

21 A    That's for Chum.

22 Q    Ten to sixteen per pound.  Okay.  And then did -- was

23 there a time in 2010 when you were able to sell King salmon

24 strips?

25 A    Right.  We haven't been able to sell King salmon strips

1  now for either five or six years because we've had no

2  commercial King salmon fishery on the Yukon River.

3  Q    And so you mentioned picking up some Kings this year, was

4  it, from Bethel?

5  A    Right.  I did get Kings from Bethel this year, but I make

6  other products out of them instead of the strips because

7  there's too much loss in making the strips.  You lose seventy

8  percent of the weight from the headed and gutted weight when

9  you make strips.

10 Q    All right.  Do you have experience from any other

11 connection or from an earlier year as to what the market price

12 for King salmon strips was?

13 A    It would have been around thirty dollars a pound if

14 they're the Native smoked style, which are actually illegal to

15 do according to Food and Drug Administration regulations.

16 Q    All right.  And --

17 A    It's illegal to sell them.

18 Q    Sorry?

19 A    It's illegal to sell them to the public due to Food and

20 Drug Administration requirements.  No salmon can be cold

21 smoked more than eighteen hours.

22 Q    I see.  Well, then if there is -- is there another way of

23 processing them that if they were -- that if that -- the legal

24 process were used, what would the price be on those?

25 A    It would have been, if I was selling those kind of fish,

1    around thirty dollars a pound because you lose so much of the

2    weight --

3    Q    I see.

4    A    -- when you process them.

5              MR. COOPER:  That's all the questions I have, Your

6    Honor.

7              THE COURT:  Thank you.  Cross-examination?

8              MR. CURTNER:  We have no questions.

9              THE COURT:  All right.  Thank you, sir.  You're --

10   you're excused.  Have a good day.  Government's next witness?

11             MR. COOPER:  Call Dave -- David Rippeto.

12             THE COURT:  Okay.  She'll swear you in.

13             THE CLERK:  Please raise your right hand.

14             **DAVID RIPPETO, GOVERNMENT'S WITNESS, SWORN**

15             THE CLERK:  Please be seated.  And for the record,

16   can you please state and spell your full name?

17             THE WITNESS:  David Prosser Rippeto.  It's the

18   common spelling David, Prosser is P-R-O-S-S-E-R, Rippeto is

19   R-I-P-P-E-T-O.

20             THE CLERK:  Thank you.

21             THE COURT:  All right.  Mr. Cooper.

22             MR. COOPER:  Thank you, Your Honor.

23                        **DIRECT EXAMINATION**

24   BY MR. COOPER:

25   Q    Mr. Rippeto, what is your occupation, please?

1   A    I'm a Special Agent with the United States Fish and

2   Wildlife Service.

3   Q    And were you assigned to this particular case involving

4   Mr. Maxon and others for the last year or two?

5   A    Yes, I was.

6         MR. COOPER:  In that connection, I want to ask you

7   about certain evidence that has come forward that relates to

8   the case, and this does involve the stipulation the parties

9   have.

10        THE COURT:  Okay.

11        MR. COOPER:  The admissibility of some postal

12  records and of postal -- a series of photos --

13        THE COURT:  Is that the -- is that the stipulation

14  you've already read or is this another one?

15        MR. COOPER:  That's the same stipulation that was

16  previously read.

17        THE COURT:  Okay.  Well, you can refer to it.

18  That's fine.

19        MR. COOPER:  So, I just wanted to alert the Court

20  that that's the basis for the authentication of some of the

21  things that --

22        THE COURT:  Okay.  Very well.

23        MR. COOPER:  -- Mr. Rippeto will bring forward.

24  BY MR. COOPER:

25  Q    Did you have contact -- in trying to trace the mailing of

1   the boxes that went from Alaska down to Mr. Solis posing as Ed

2   Lopez in Arizona, did you have occasion to contact postal

3   authorities in order to obtain evidence of who it was that

4   mailed these boxes?

5   A    Yes, I did.

6   Q    And who was the person you contacted to get that

7   information?

8   A    I contacted postal -- U.S. Postal Service Inspector Matt

9   Hoffman who was stationed in Anchorage, Alaska, at the time.

10  Q    And did Matt Hoffman -- was he able to make an

11  identification between evidence that the post office possessed

12  and this particular pair of boxes that first went to Mr. Solis

13  in December of 2009?

14  A    He was able to identify the -- I think what you're asking

15  was the source of the documents, the shipping locations, and

16  the specific times and credit or debit card information

17  associated with that shipment.

18  Q    All right.  And first of all, did he have a surveillance

19  video or series of still shots in a camera -- surveillance

20  camera from the post office for the mailing -- actual mailing

21  of the two boxes in December 2009?

22  A    Yes, he did.  He was able to obtain a post serve --

23  postal service video camera, the standard -- or a tape from

24  the standard surveillance camera at the Anchorage main post

25  office, and he provided me with a series of four short clips.

1   He was able to narrow the time frame down by looking at the

2   C.O.D. labels and receipts and he reviewed the tape and

3   removed that section from the standard post office tape.

4   Q    All right.  And he was able to connect that tape with the

5   particular mailing in this case of these two boxes?

6   A    Yes.

7   Q    And that was done by a series of what, postal numbers and

8   identifiers?

9   A    They have postal identifiers, they have time stamps on

10  the receipts.  I'm not an expert in the -- how they match

11  everything up, the postal inspector is, but they're able to

12  match everything up and have the receipts and the C.O.D.

13  documents correspond with the surveillance tape.

14        MR. COOPER:  Very well.  What I'd like to do, Your

15  Honor, is I'd like to offer the -- the video, which is a --

16  it's on -- on a particular disk I have here marked as Exhibit

17  21 that's been described by the witness.  We have an

18  authentication stipulation regarding it.

19        THE COURT:  Okay.

20        MR. COOPER:  So, I'd like to offer that and play

21  that, and then have the witness explain the documents that

22  relate to that in Exhibit 22 which I'll provide to the witness

23  here.

24        THE COURT:  Sounds good to me.  Any objection?

25        MR. CURTNER:  No, Your Honor.

1        THE COURT:  All right.  Go ahead.

2        (Government's Exhibit 21 admitted)

3        MR. COOPER:  I have cop -- I have copies here for

4    Mr. Curtner.

5                            (Pause)

6    BY MR. COOPER:

7    Q    So, I've handed you twenty-two and twenty-three, and I'll

8    have you explain that in a moment, but first I'd like to show

9    the series of photographs the post office -- and before we

10   start that, let me ask you about this video of twenty-one, Mr.

11   Rippeto.  Is this -- where -- where is this physically located

12   that this video was taken?

13   A    The Anchorage main post office at the airport in

14   Anchorage.

15   Q    And the date of it was what?

16   A    I can't -- I don't remember the exact date --

17   Q    If you look at --

18   A    -- without have -- without referring to the documents.

19   Q    If you look at the exhibits you have in front of you, I

20   think you'll see the date of mailing on the C.O.D. label.

21   A    It shows Anchorage, Alaska, and --

22   Q    The left-hand side.

23   A    The left-hand side.

24   Q    Upper.

25   A    Oh, the receipt.  12/28/2009 -- December 28th, 2009.

1   Q    At the Anchorage airport main post office?

2   A    Yes.

3   Q    Very well.  And did this -- was this tape one of those

4   that's routinely run there by the post office all the time?

5   A    It's routine.  It's run all the time --

6   Q    Okay.

7   A    -- according to Inspector Hoffman.

8   Q    And what we're going to see is the portion that relates

9   to the mailing of these two boxes which are not -- now our

10  Exhibits 10 and 10-A.

11  A    Correct.

12       MR. COOPER:  All right.  We'd like to do that, Your

13  Honor.

14       (Exhibit 21 played for the jury)

15  BY MR. COOPER:

16  Q    While that's running, I'd like to ask you, did he explain

17  to you what we're seeing as far as the movement is concerned?

18  Oh, wait, it's a series of stills it looks like.

19  A    That's right.  It's not just a continuous -- like you're

20  used to seeing in a movie camera, it's a series of stills.

21  Q    It was every second or two?

22  A    It looks like there's one taken just about every second

23  according to the clock running on top of the screen shot.

24       MR. COOPER:  Okay.

25       (Exhibit 21 continues playing for the jury)

1            MR. COOPER:  Thank you.

2    BY MR. COOPER:

3    Q    Now, Mr. Rippeto, I'd like to draw your attention --

4    well, take a look at number twenty-three -- Exhibit 23.  Do

5    you have that in front of you?

6    A    Yes, I do.

7    Q    Is that a still shot of one of these screens that we've

8    looked at a minute ago here?

9    A    Yes, that is.

10   Q    Okay.  And that -- that was actually made from this video

11   twenty-one that we just saw?

12   A    Yes, that was made from this by myself and Agent Whisler.

13           MR. COOPER:  For convenience, Your Honor, I'd like

14   to offer twenty-three because we want to refer to some things

15   shown in the picture.

16           MR. CURTNER:  No objection.

17           THE COURT:  It'll be received.

18       (Government's Exhibit 23 admitted)

19           MR. COOPER:  If we could show that -- there it is.

20   BY MR. COOPER:

21   Q    And it's a still shot.  There was -- there was -- as you

22   can see in the video and on this picture, there's one place

23   where Mr. Maxon takes out his wallet, and then he has in his

24   hand a gold card, and at one point he hands the card to the

25   clerk and later the clerk hands the card back to him, and then

1    Mr. Maxon is seen to be signing on one of these -- something

2    in front of him on the counter there.  Did Mr. Hoffman, the

3    postal inspector, provide you any documents that show how this

4    mailing -- this C.O.D. mailing of these two boxes was handled

5    -- was paid for?

6    A    Yes.

7    Q    Do you have those documents with you?

8    A    I do.

9    Q    And do you have specifically exhibits -- Exhibit Number

10   22 in front of you there?

11   A    Yes, I do.

12   Q    Is twenty-two a copy of the documents that Mr. Hoffman

13   gave you relating to what I just asked you?

14   A    Yes.

15   Q    And do these appear to have C.O.D. mailing label numbers

16   on the two labels -- C.O.D. labels that are identical with the

17   mailing labels -- numbers on the C.O.D. labels on our Exhibits

18   10 and 10-A, the two boxes?

19   A    I don't remember those numbers on the boxes off the top

20   of my head --

21   Q    I think we should take --

22   A    -- but I can certainly compare them.

23            MR. COOPER:  I think we should do that, provide the

24   boxes to him.  It's ten and 10-A.

25                              (Pause)

1  BY MR. COOPER:

2  Q    Should be on the C.O.D. label on the front.

3  A    Exhibit -- Exhibit 10 has the label -- the C.O.D. label,

4  the number directly under the bar code, it's M463652011.  That

5  is the same as the C.O.D. label on the top half of the first

6  page of Exhibit 22.

7  Q    All right.

8  A    Exhibit 10-A has the C.O.D. label under the bar code

9  M463652013.  That is the same as the C.O.D. on the bottom half

10 of the first page of Exhibit 22.

11            MR. COOPER:  I'd offer Exhibit 22 in evidence, Your

12 Honor.

13            MR. CURTNER:  No objection.

14            THE COURT:  Be received.

15       (Government's Exhibit 22 admitted)

16            MR. COOPER:  Very well.

17 BY MR. COOPER:

18 Q    So -- and does this -- does the next page of Exhibit 22

19 contain the -- the register tape or whatever you call it that

20 runs for the transaction of the mailing of these two parcels?

21 A    Yes, it does.

22 Q    Does it -- does it also have label numbers that

23 correspond to the ones you just read that are on the C.O.D.

24 labels?

25 A    Yes, it does.  It --

1    Q    Does --

2    A    -- the top label number is M -- the top on the register

3    tape in sequence from top to bottom is M463652013.

4    Q    And that's the same as the bottom one on --

5    A    Same as the bottom one on the page -- previous page.

6    Q    -- on the previous page and it's the same as Exhibit 10-A

7    box.

8    A    Correct.

9    Q    Okay.  And the other one, does that match the ten --

10   number ten box?

11   A    Yes.  It's M463652011.

12   Q    And does that tape -- register tape show where it was

13   mailed to -- these two boxes were mailed to?

14   A    The register tape indicates the box was mailed to

15   Nogales, Arizona.

16   Q    All right.  C.O.D.?

17   A    C.O.D., correct.

18   Q    And paid by what kind of card?

19   A    Paid by debit card.

20   Q    Total amount that was paid with the postage on these two,

21   is that correct?

22   A    I believe that's what it indicates, yes.

23   Q    And what was the total amount?

24   A    One hundred and thirty-eight dollars.

25   Q    All right.  And then is there a -- another page after the

1   end of the cash register tape there to Exhibit 22 that

2   indicates these charges corresponding to what's on the front

3   of this document totaling a hundred and thirty-eight dollars

4   on the debit card?

5   A    Yes.

6   Q    And does the fourth page -- the next page -- the final

7   page anyway of this Exhibit 22, a document that shows actually

8   a bank account number for that card, calling it a DB card

9   type, in other words debit, with a charge amount of a hundred

10  and thirty-eight dollars for the date in question on this

11  case?

12  A    Yes, it does.  The last four numbers on the account

13  number of 2304, which also correspond with the last four

14  digits on the register's tape -- tape receipt 2304.

15  Q    Right.

16  A    It was -- the first part of it was redacted for --

17  Q    Right.

18  A    -- purposes.

19  Q    That's the debit card account number.  All right.  Very

20  well.  So, in other words, this -- these documents, they show

21  the method of payment for this as being what?

22  A    A debit card and --

23  Q    Okay.

24  A    -- Inspector Hoffman advised me with their -- their

25  methods, they were able to -- to determine it was a Wells

1   Fargo debit card.

2   Q    Debit card.

3   A    The account was linked to Wells Fargo Bank.

4   Q    All right.  Okay.  And now with regard to the second pair

5   of boxes, the ones that went from Mr. Maxon to Ed Lopez in

6   August of 2010, we don't have a video for that, I take it, is

7   that correct?

8   A    That's correct.

9   Q    Do we have any other documentation that connects those

10  two boxes with Mr. Maxon?

11  A    We have copies of C.O.D. receipts or C.O. --

12          MR. COOPER:  Okay.  I'd like to --

13  A    -- C.O.D. labels.

14          MR. COOPER:  -- I'd like to hand the witness Exhibit

15  24.

16                       (Pause)

17  BY MR. COOPER:

18  Q    Do you have twenty-four in front of you now, Mr. Rippeto?

19  A    I do.  I have Exhibit 24.

20  Q    Is twenty-four a pair of C.O.D. label receipts -- carbon

21  copies, I guess, of C.O.D. labels?

22  A    Yes, it is.

23  Q    And is there a -- is there a date on these?

24  A    The date is -- let's see.

25  Q    Postmark?

1    A    August -- August 4, 2010.  I can read it on the bottom

2    one in the exhibit.  The top one, the ink is blurred out --

3    Q    Okay.

4    A    -- and it shows the postmark from Fairbanks, Alaska.

5    Q    What I'd like you to do is compare the C.O.D. label

6    numbers on twenty-four that I've just given you with the

7    C.O.D. label numbers on these two boxes that are in evidence

8    now as thirteen and 13-A.

9    A    I'll look at 13-A first since it's -- also corresponds to

10   the top document in the exhibit.  The C.O.D. label, the number

11   under the bar code on Exhibit 13 is M464905940, which

12   corresponds to the bar code directly on the top receipt in

13   Exhibit 24.

14   Q    All right.

15   A    It matches exactly.  And Exhibit 13-A, the C.O.D. number

16   is same number under the bar code, is M464451878, which is the

17   same as the C.O.D. identifying number on the bottom receipt in

18   Exhibit 24.

19   Q    And are these labels in Exhibit 24 addressed the same way

20   as the labels on the boxes thirteen and 13-A being to Ed Lopez

21   in Rio Rico, Arizona?

22   A    Yes, that's correct.

23   Q    From Vangie Maxon in Nenana, Alaska?

24   A    From Vangie Maxon in Nenana, Alaska, correct.

25   Q    And where did you find these two C.O.D. labels in Exhibit

1    24?

2    A    I did not find them personally.  They were recovered by

3    officers on the search warrant on October 14th, 2010, at the

4    Maxon residence in a motor home parked on the property.

5              MR. COOPER:  Offer twenty-four in evidence, Your

6    Honor.

7              MR. CURTNER:  No objection.

8              THE COURT:  It'll be received.

9         (Government's Exhibit 24 admitted)

10   BY MR. COOPER:

11   Q    Was there some other documents found on the premises in

12   that search that related to purchases of Chum salmon?

13   A    Yes.

14   Q    Both purchases of Chum salmon.

15   A    Yes.

16             MR. COOPER:  What I'd like to do is to show you

17   Exhibits 25 through 36, and I'll have a copy for you in just a

18   moment.  I'd like to hand these to the witness, Your Honor.

19             THE COURT:  All right.

20                       (Pause)

21             THE WITNESS:  Thank you.

22                       (Pause)

23   BY MR. COOPER:

24   Q    First of all, what is Exhibit 25?

25   A    Exhibit 25 is a bill of lading from Snug Harbor Seafoods.

1  Q    And it shows a shipment going to somebody in this case?

2  A    Snug Harbor Seafoods in Kenai is the seller, and it shows

3  that this shipment was to Scott Maxon, slash, Soprano's.

4  Looks like a phone number of 333, dash, 0033.

5  Q    And where did you find this?

6  A    This was found in -- I did not find it, officers in the

7  search warrant found it in the dining room on October 14th,

8  2010.

9  Q    At Mr. Maxon's residence?

10  A    At Mr. Maxon's residence.

11          MR. COOPER:  Offer this in evidence, Your Honor?

12          MR. CURTNER:  No objection.

13          THE COURT:  It'll be received.

14     (Government's Exhibit 25 admitted)

15  BY MR. COOPER:

16  Q    And what does it show was being -- it's a straight bill

17  of lading, is that correct?

18  A    Yes.

19  Q    For a shipment of what?

20  A    One tote of H and G Chum salmon, net one thousand one

21  hundred and thirty-six pounds.

22  Q    One thousand one hundred and thirty-six pounds.  Okay.

23  And this is a shipping document, correct?

24  A    I believe it's a shipping document, yes.

25  Q    Right.

1  A    Bill of lading.

2  Q    Okay.  And then do you see another document from Snug

3  Harbor -- did you -- did your -- did the search team seize

4  another document from -- in this search relating to Snug

5  Harbor sending to S. Maxon with a Nenana phone number

6  something relating to Chum salmon?

7  A    Are you referring to Exhibit 26?

8  Q    That would be Exhibit 26, correct.

9  A    I have Exhibit 26, yes --

10  Q    And --

11  A    -- and it appears to be -- says Movers, Inc. and Seafood

12  Logistics Company, and it's from -- it shows it's from Snug

13  Harbor Seafoods to -- and part of the name is washed out or

14  smudged, but I -- looks to be an S and then the first half of

15  the M in Maxon is washing out, but it says -- it appears to be

16  the last name of Maxon with a phone number eight three two

17  one, the next character is unidentifiable, then it looks like

18  zero three, in Alaska.

19  Q    All right.  And where was this found?

20  A    This was found in the dining room --

21  Q    All right.

22  A    -- on the October 14th, 2010, search warrant of the Maxon

23  residence.

24           MR. COOPER:  Offer twenty-six, Your Honor.

25           MR. CURTNER:  No objection.

1      THE COURT:  It'll be received.

2      (Government's Exhibit 26 admitted)

3  BY MR. COOPER:

4  Q    And that's the document on the screen now?

5  A    Yes.

6  Q    And do you have twenty-seven there?

7  A    I do.

8  Q    And where was twenty-seven found?

9  A    Twenty-seven was also found in the dining room during the

10 service of the search warrant on October 14th, 2010, at the

11 Maxon residence.

12 Q    And is that an Alaska Air Cargo waybill for shipment of a

13 thousand fifty-four pounds of frozen fish to --

14 A    Yes.

15 Q    -- from Prime Select Seafoods of Cordova to Frontier

16 Pizza, Vangie or Scott, at Fairbanks?

17 A    Yes.

18 Q    And the date on that on the bottom appears to be August

19 3rd, 2010, is that correct?

20 A    Yes.

21 Q    And -- I'd like to offer -- where was this found?

22 A    This was found in the dining room --

23 Q    Dining room also.

24 A    -- during the search warrant service.

25      MR. COOPER:  I'd like to offer twenty-seven, Your

1  Honor.

2          MR. CURTNER:  No objection.

3          THE COURT:  It'll be received.  So, the jury

4  understands, every time an exhibit is received, that means it

5  goes back to you and you have it physically in the jury room.

6          (Government's Exhibit 27 admitted)

7  BY MR. COOPER:

8  Q    And on the screen now, is this twenty-seven that you just

9  described for us, is that right?

10 A    Yes.

11 Q    And showing the thousand fifty-four pounds frozen fish

12 tote.  Did you also later acquire a document that shows what

13 kind of fish this thousand and fifty-four pounds was in August

14 of 2010?  We don't have to take that document out of order

15 now, but did you later find one or obtain one that --

16 A    Yes.

17 Q    -- shows what kind of fish it was?

18 A    Yes.

19 Q    All right.  Well, we'll come back to that at the time.

20 By the way, what are -- what's the date on Exhibit 25 from the

21 eleven hundred and thirty-six pounds of Chum salmon from Snug

22 Harbor to Scott Maxon?  What's the date on that?

23 A    Looks like -- I think --

24 Q    Right at the top.

25 A    Right at the top.  I'm trying to decide if it's a -- I

1  think it's a 7/12/2008.

2  Q    2008?  All right.

3  A    Yes.

4  Q    And what's the one on twenty -- Exhibit 26?  Is there a

5  date --

6  A    7/22/2007.

7  Q    And that's for three totes of Chum?

8  A    Yes.

9  Q    And then this one you just showed us was for a thousand

10  fifty-four pounds of frozen fish?

11  A    The date on that is August 3rd, 2010.

12  Q    August 3rd, 2010.  And Exhibit 28, do you have that

13  there?

14  A    Yes.

15  Q    And that's -- tell us, first of all, was this found in

16  the search at Maxon's residence --

17  A    This was --

18  Q    -- on the 14th of October --

19  A    Yes.

20  Q    -- 2010?

21  A    Yes.

22  Q    And where was it located?

23  A    What we identified as bedroom three.

24  Q    And is this a Copper River Seafoods bill to Scott of

25  Soprano's?

1  A    That's correct.  It's an invoice number 018409.

2         MR. COOPER:  All right.  I'd like to offer twenty-

3  eight, Your Honor.

4         MR. CURTNER:  No objection.

5         THE COURT:  It'll be received.

6     (Government's Exhibit 28 admitted)

7  BY MR. COOPER:

8  Q    And does twenty-eight show what it was for and what price

9  was paid and how?

10  A    Shows the invoice was for two thousand four hundred

11  pounds of frozen Chum, number one, H and G --

12  Q    Do you know what H and G stands for, the trade --

13  A    Headed and gutted.

14  Q    Headed and gutted?  Okay.  And --

15  A    The price was one fifty -- it says price each one fifty,

16  which is price per pound, and the amount is three thousand six

17  hundred dollars.

18  Q    And do you have a date when this transaction occurred at

19  the top?

20  A    The date on the invoice is September 9th, 2008.

21  Q    And how was it paid?  Right below the date, or does it --

22  A    Cash.  Well, it says customer cash.

23  Q    Cash customer.  Okay.  All right.  So, do you have

24  twenty-nine there in front of you?  Is -- is twenty-nine also

25  a document found in the search of October 14th, 2010, at Mr.

1  Maxon's house?

2  A    Yes.

3  Q    And where was that found?

4  A    That was found also in bedroom number three.

5  Q    Does it relate to a fish transaction?

6  A    It's also an invoice from Copper River Seafoods, Invoice

7  018121.

8       MR. COOPER:  Your Honor, I'd offer twenty-nine in

9  evidence.

10      MR. CURTNER:  No objection.

11      THE COURT:  It'll be received.

12      (Government's Exhibit 29 admitted)

13 BY MR. COOPER:

14 Q    And does that indicate what kind of product and price and

15 method of payment --

16 A    The invoice is --

17 Q    -- and date?

18 A    -- to Scott of Soprano's.  It also indicates at the top

19 the customer is cash.  The quantity is two thousand twenty-

20 eight pounds of frozen Chum, number one, H and G, which is

21 headed and gutted, one fifty per pound, for a total amount of

22 three thousand forty-two dollars, and it says paid cash --

23 there's written in pen on the bottom of the invoice, "Paid

24 cash 8/23/08," and it looks like some initials underneath the

25 date.

1  Q    Very well.  Do you have number thirty there?

2  A    Yes.

3  Q    And what is thirty and where did you find it?  Was this

4  also in the search of October 14th, 2010?

5  A    Yes, and it was found in bedroom three as well.

6  Q    And is this a Snug Harbor Seafoods invoice?

7  A    It is.

8        MR. COOPER:  I move thirty into evidence, Your

9  Honor.

10       MR. CURTNER:  No objection.

11       THE COURT:  It'll be received.

12       (Government's Exhibit 30 admitted)

13  BY MR. COOPER:

14  Q    What product does that relate to and price and date and

15  customer?

16  A    It's from Snug Harbor Seafoods in Kenai, Alaska, Invoice

17  Number 17611, the date is July 28th, 2008.  It says billed to

18  Scott Maxon, P.O. Box 21, Nenana, Alaska, and it says it is

19  four hundred and eighty-seven net pounds of fresh-packed Chum

20  salmon at a price or a rate of one point oh five, which would

21  be one point or five -- one dollar and five cents per pound,

22  for a total amount of five hundred and eleven dollars and

23  thirty-five cents.

24  Q    Very well.  And then do you have Exhibit 31 there?

25  A    I do.

1  Q    And does this appear to relate to the same transaction?

2  A    It's a Movers, Inc. bill of lading, number 483793, and --

3  Q    When and where was this found?

4  A    This was found during the search warrant at the Maxon

5  residence, October 14th, 2010, also in bedroom number three.

6         MR. COOPER:  I'd move this into evidence, Your

7  Honor.

8         MR. CURTNER:  No objection.

9         THE COURT:  It's received.

10     (Government's Exhibit 31 admitted)

11  BY MR. COOPER:

12  Q    Who is the customer that it's directed to?

13  A    Scott Maxon with Soprano's in parentheses, NOA, which

14  means notify on arrival, and a --

15  Q    And --

16  A    -- Alaska phone number.

17  Q    What product and price -- or weight rather do we show on

18  this?

19  A    It says one tote frozen Chum salmon, weight four hundred

20  and eighty-seven pounds, which appears to relate to the

21  Exhibit Number 30.  It says four hundred and eighty-seven

22  pounds of fresh-packed Chum salmon.  They're the same date.

23  Q    And the same seller?  Snug Harbor?

24  A    The same -- same seller, Snug Harbor, the same person to

25  deliver to as to bill to, Snug Harbor says bill to Scott

1    Maxon.  Exhibit 31 says to, which means deliver to or ship

2    to --

3    Q    Scott Maxon?

4    A    Yes.

5    Q    Did the consignee, that is the person to whom this was

6    directed, have a place to sign at the bottom and is there a

7    signature showing?

8    A    There is a signature and a printed name with the date and

9    a time.

10   Q    What's the printed name and the signature?

11   A    The printed name is Scott Maxon, which appears to match

12   the signature Scott Maxon on the left.

13   Q    And the date is what?

14   A    July 29th, 2008, at 2:40 p.m. -- 1440 hours.

15   Q    Now, looking at number -- Exhibit Number 32, what is

16   thirty-two?  It's an airway bill from Alaska Airlines, isn't

17   it?

18   A    Correct.

19   Q    And was this found in the search of Mr. Maxon's house at

20   -- on October 14th, 2010?

21   A    No, it was not.

22   Q    Where did you obtain this?

23   A    Scott Maxon delivered this to me in person at the U.S.

24   Fish and Wildlife Service office in Fairbanks, Alaska, on

25   October 20th, 2010.

1          MR. COOPER:  And -- all right.  I'd offer thirty-two

2    in evidence, Your Honor.

3          MR. CURTNER:  No objection.

4          THE COURT:  It'll be received.

5       (Government's Exhibit 32 admitted)

6    BY MR. COOPER:

7    Q    What does this Alaska Airlines -- Air Cargo waybill show

8    was the product delivered and the weight and the date and to

9    whom?

10   A    It's Prime Select and it shows the shipper was Prime

11   Select Seafoods, the consignee name and address --

12   Q    Wait.  Prime Select is located where?

13   A    Cordova, Alaska.

14   Q    Go ahead.  Consignee is who?

15   A    Frontier Pizza on Old Richardson Highway in Fairbanks.

16   Q    All right.  And the date was?

17   A    The date is July 11th, 2010.

18   Q    All right.  And what's the product and the weight?

19   A    The product is two pieces -- number of piece -- means two

20   items, for a total weight -- combined weight of two thousand

21   one hundred and eight pounds of frozen salmon.

22   Q    Doesn't say what kind of salmon, does it?

23   A    It does not.

24   Q    Okay.  So, that's like -- that's like Exhibit 27 where it

25   was an Alaska Air Cargo bill that said frozen fish tote, but

1   not saying what kind of fish, right?

2   A     That's correct.

3   Q     All right.  So, keep that in mind and come back to -- to

4   determine if we could have other documents that connect up in

5   a moment with what kind of fish are described -- involved in

6   those two air bills.  What is number thirty-three?

7   A     Number thirty-three is a second Alaska Airline -- Air

8   Cargo waybill that Max -- Mr. Maxon delivered to me at the

9   same time as the previous document.

10          MR. COOPER:  Offer thirty-three in evidence, Your

11  Honor.

12          THE COURT:  It'll be received without objection.

13      (Government's Exhibit 33 admitted)

14          MR. CURTNER:  No objection, right.

15  BY MR. COOPER:

16  Q     And does this show who was the shipper and who was the

17  consignee and what the product and weight were?

18  A     Shows the shipper was Prime Select Seafoods from Cordova,

19  the consignee was Frontier Pizza, it says HFP which is hold

20  for pickup in shipping terms to Vangie or Scott.  It says it's

21  one piece, one thousand fifty-four pounds frozen -- frozen

22  fish tote, and the date is August 3rd, 2010.

23  Q     All right.  Now, if you put thirty-three and twenty-seven

24  beside each other, they look like the same document, aren't --

25  are they?

1    A    Let me get twenty-seven out.

2    Q    Apart from the additional handwriting that was put on

3    twenty-seven.

4    A    They're the same -- they have the same waybill number at

5    the top --

6    Q    Same waybill number?

7    A    -- the Alaska Airlines waybill which is 02729061384.

8    There's some handwriting on Exhibit 27 on the front.  The

9    handwriting on the back of Exhibit 33 is my note of when I

10   received it.

11   Q    But otherwise these are -- these are the same waybill.

12   A    Yes.

13   Q    All right.  And once again, now we need to find out what

14   kind of frozen fish those were.  Those shipments being July

15   11th, 2010 and August 3rd, 2010, correct?

16   A    Correct.

17   Q    All right.  Did you obtain documents from somewhere

18   showing what they were?  Is that the next -- yeah --

19   A    Yes.

20   Q    -- that's the next exhibit that comes up, isn't it?

21   Number thirty-four?

22   A    Yes.

23   Q    Do you have thirty-four there?

24   A    I do.

25   Q    And what is thirty-four?

1  A     Thirty-four is an invoice from Prime Select Seafoods in

2  Cordova.

3  Q     And does that have a date on it?

4  A     It does.  July 11th, 2010.

5  Q     Is that the same date as -- as the date of the Alaska

6  Airlines waybill in Exhibit 32?

7  A     Yes.

8  Q     And is the -- what is the product that's being covered by

9  this invoice from Prime Select on July 11th, 2010?

10  A     It shows it's two thousand pounds of Chum -- it says

11  frozen number one, bright, H and G Chum, four slash sixes, and

12  six slash nines.  It says Alaska Air waybill 29061572 with an

13  ETA of July 12th, 2010.  It says the price each is two dollars

14  and sixty-five cents for a total amount of five thousand three

15  hundred dollars.

16  Q     All right.  Now, does that waybill on this Prime Select

17  Seafoods correspond to the air waybill number on Exhibit 32?

18  A     Yes.

19  Q     And on --

20  A     It only -- well, let me clarify --

21  Q     Only on thirty --

22  A     -- it only has the last eight numbers --

23  Q     Right.

24  A     -- of it on here.

25  Q     The last eight are the same though, correct?

1  A    Correct.

2  Q    And -- very well.  Where did you get thirty-four?

3  A    Thirty-four we -- we being the U.S. Fish and Wildlife

4  Service agents in Fairbanks requested the documents from Prime

5  Select Seafoods.

6  Q    So, that Prime Select Seafoods gave this to us.

7  A    They sent an electronic copy of this invoice to us.

8  Q    All right.  And is there a second page to this also?

9  A    Yes.

10  Q    And is that -- what's on the second page for the

11  transaction described there?  What is it?

12  A    It's another invoice, number 11792, from Prime Select

13  Seafoods in Cordova.  It says billed to Frontier Peacha (ph)

14  -- Pizza, attention Vangie or Scott in Fairbanks, Alaska.

15  Q    What's --

16  A    The date on it says -- paid is August 3rd, 2010.

17  Q    And what's the product and weight?

18  A    One thousand headed and gutted Chum salmon, in

19  parentheses, darks.  Alaska Air waybill 29061384 with an ETA

20  of August 5th, 2010.

21  Q    And price?

22  A    Price, one -- one ninety-five each or one thousand -- and

23  a total of one thousand nine hundred and fifty dollars.

24  Q    So, a thousand pounds of chum for nineteen hundred and

25  fifty dollars on July -- on August 3rd, 2010.

1  A    Yes.

2  Q    Is that the same waybill number as Alaska Air Cargo bill

3  in Exhibit 27, a copy of which Mr. Maxon gave you as exhibit

4  -- which is Exhibit 33?

5  A    Yes.

6  Q    So, the thousand and fifty-four pound tote frozen fish in

7  those Air Cargo bills then would be this thousand pounds of

8  Chum in -- that he purchased from Prime Select Seafoods --

9  A    Yes.

10         MR. COOPER:  -- in thirty-four.  Move thirty-four

11  into evidence, Your Honor.

12         MR. CURTNER:  No objection.

13         THE COURT:  Hearing no objection, it will be

14  received.

15      (Government's Exhibit 34 admitted)

16  BY MR. COOPER:

17  Q    Do you have thirty-five in front of you there?

18  A    I do.

19  Q    And is thirty-five something you obtained from Copper

20  River Seafoods?

21  A    Fish and Wildlife agents in Fairbanks requested

22  electronic copies of invoices from Copper River Seafoods.

23  Q    And what does this relate to?

24  A    This is a -- invoice number 018121.  It says bill to and

25  ship to Scott of Soprano's, and it's from Copper River

1   Seafoods with a business address in Anchorage.

2        MR. COOPER:  All right.  Move twenty-eight into

3   evidence -- or excuse me, thirty-five into evidence.

4        THE COURT:  Be received without objection.

5        (Government's Exhibit 35 admitted)

6   BY MR. COOPER:

7   Q    And does this consist of more than one invoice for the

8   sale of some kind of fish products?

9   A    There's three invoices.  The first was the number I gave

10  before, the second is 018409, the first is 023326.

11  Q    And does this correspond -- does the first one relate to

12  two thousand and twenty-eight pounds of frozen Chum, H and G

13  for thirty-six hundred dollars in September 2008?

14  A    The --

15  Q    On the front page of thirty-five.

16  A    The front page of thirty-five is two thousand twenty-

17  eight pounds --

18  Q    That's what I -- that's right.

19  A    Right.

20  Q    Okay.

21  A    Of frozen Chum, number one, H and G, one dollar and fifty

22  cents each --

23  Q    Right.

24  A    -- three thousand forty-two dollars.

25  Q    Three thousand -- oh.  Sorry, yeah.  Let's see here.

1   Yeah, that's correct.  And is that apparently the same --

2   actually it has to be the same document that we have already

3   as Exhibit 29 that was found in the search at Mr. Maxon's

4   house?

5   A    It looks --

6   Q    The same invoice number, the same transaction, same

7   amount?

8   A    Yes.

9   Q    Same date?

10  A    Except for the one -- Exhibit Number 29, the ship to box

11  is blank, although it still has the bill -- bill to Scott at

12  Soprano's.  The same invoice number and --

13  Q    Oh, I see.

14  A    -- date, yes.

15  Q    Right.  Sure.  Okay.  Same transaction anyway.

16  A    Yes.

17  Q    And the next -- the second page of Exhibit 35, is that in

18  fact the same transaction as Exhibit 28 that we have in

19  evidence as having been found at Mr. Maxon's house?  It's a

20  two thousand four hundred pound frozen Chum, H and G, sale for

21  thirty-six hundred dollars to Scott of Soprano's?

22  A    Yes, it is.

23  Q    What is Soprano's anyway?

24  A    My understanding is Soprano's was or is -- I believe was

25  -- a pizza restaurant or Italian restaurant that Mr. Maxon had

1    an ownership interest in.  I don't know if he owned it

2    directly or if it was a partnership or what the operation was,

3    but he had business involvement with it.

4    Q    Very well.  And then the third page of Exhibit 35 is

5    what?  It's another Copper River Seafoods invoice, correct?

6    A    Correct.

7    Q    For what date?

8    A    The date is July 30th, 2009.

9    Q    And did we -- we didn't have -- we hadn't seized or

10   previously seen this one until they provided it to us, is that

11   correct?

12   A    That is correct.

13   Q    And so what was the purchase from Copper River Seafoods,

14   July 30th, 2009, that this shows?

15   A    It was two thousand pounds -- it says C-H-U-F -- well,

16   fresh Chum which can be seen under the description -- H and G,

17   which is headed and gutted, number one, oh slash R, and I

18   don't know what that means.  The price was one ninety for a

19   total of three thousand eight hundred dollars.

20   Q    Very well.  And finally the last page of the exhibit,

21   does that appear to be just a summary of the previous ones?

22   A    Yes, that just looks -- it's -- that was supplied by

23   Copper River Seafoods.  It's their account -- probably their

24   accounting system invoice tracking or payment tracking system.

25   Q    All right.  And then thirty-six, do you have thirty-six

1    in front of you there?

2    A    Yes.

3    Q    Is thirty-six a series of documents that was provided to

4    Fish and Wildlife by Snug Harbor Seafoods recently in

5    connection with their sales to Scott Maxon?

6    A    Yes.

7            MR. COOPER:  And -- Your Honor, I'd offer thirty-six

8    in evidence.

9            THE COURT:  Hearing no objection, it'll be received.

10        (Government's Exhibit 36 admitted)

11   BY MR. COOPER:

12   Q    Could you tell us what thirty-six is with regard to the

13   date and the transaction and the per -- person billed to?

14   A    Exhibit 36 is, let's see, one, two -- six pages, the

15   first four of which are individual invoices from Snug Harbor

16   Seafoods.  The first one, Invoice 17121, dated July 8th, 2007,

17   was to Scott Maxon in Nenana, Alaska, is two thousand one

18   hundred and twenty-seven pounds of headed and gutted, H and G,

19   Chum salmon, at ninety-five cents each, total amount of two

20   thousand dollars -- two thousand twenty dollars sixty-five

21   cents, and at the P.O. number it says Scott, and then along

22   the top of the receipt it says the F.O.B. -- it says via Snug

23   Harbor F.O.B. Movers and a B slash L 6356.

24   Q    Where were you reading that from?

25   A    Top of right here, right above the description.

1    Q    Oh.  Okay.  All right.  So -- and the total amount was

2    two thousand twenty dollars sixty-five cents, correct, for two

3    thousand one hundred and twenty-seven pounds of Chum?

4    A    Yes.

5    Q    Okay.  And the second page was another Snug Harbor bill

6    -- I'm sorry, the first one was to Scott Maxon with a P.O. box

7    in Nenana, is that correct?

8    A    Correct.

9    Q    The second one is also July, but July 20th, 2007, is that

10   correct?

11   A    Correct.  July 20th, 2007, to Scott Maxon in Nenana.

12   Q    For how much quantity, what -- and what product?

13   A    Three thousand one hundred and eighteen net pounds of

14   Chum salmon with a price of ninety-five cents each, for a

15   total of two thousand nine hundred and sixty-two dollars and

16   ten cents.

17   Q    And the third page is another Snug Harbor bill to whom

18   and the date?

19   A    The date is July 12, 2008, to Scott Maxon, Nenana,

20   Alaska, one thousand one hundred and thirty-six net pounds of

21   frozen Chum salmon at a price of one oh five, and -- for a

22   total amount of one thousand one hundred ninety-two dollars

23   and eighty cents.

24   Q    And the fourth -- actually, the fourth page of this

25   exhibit is --

1    A    I guess I counted wrong.  Four --

2    Q    -- a Snug Harbor invoice --

3    A    It's a Snug Harbor invoice, has paid stamped on it, dated

4    July 28th, 2008, Scott Maxon from Snug Harbor, four hundred

5    and eighty-seven net pounds fresh-packed chum salmon, price of

6    one oh five per pack -- per pound, for a total of five hundred

7    and eleven dollars and thirty-five cents.

8    Q    And does that -- does that appear to be the same

9    transaction that we already have in as Exhibit 30 being a

10   document that you found in the search of Mr. Maxon's residence

11   on the 14th of July -- of October --

12   A    Yeah.

13   Q    -- 2010?

14   A    Yes, it's the same document with the exception of the one

15   we received from the company is stamped paid.

16   Q    Very well.  And then the next page of Exhibit 35 [sic] is

17   -- being the last page, is that just what, a summary of --

18   next to the last page, it's a summary --

19   A    It says -- right.  It says Snug Harbor Seafoods Customer

20   Quick Report.

21   Q    Is that kind of a recounting of the previously --

22   A    That's what it appears to be.

23   Q    -- provided invoices?

24   A    It says Scott Maxon, then it says invoice payment,

25   invoice payment, invoice payment, invoice payment, so a series

1  of what looks like four invoices numbered individually, with a

2  payment date.

3  Q    And then the last page, is that another one that says

4  Scott Maxon on it --

5  A    The last page --

6  Q    -- from Snug Harbor?

7  A    -- says it's a -- says Snug Harbor Seafoods Customer

8  Quick Report for Scott Maxon, and it has amounts received.  It

9  looks like -- I'm not sure what their accounting system is,

10  but it looks like there was two thousand dollars -- two

11  thousand twenty dollars sixty-five cents, two thousand ninety

12  -- two thousand nine hundred sixty-two ten --

13  Q    Okay.

14  A    -- one thousand one hundred ninety-two eighty, and five

15  hundred and eleven thirty-five.

16  Q    And it has Scott Maxon's name on it?

17  A    Has Scott Maxon's name on it.

18  Q    All right.  That was Exhibit Number --

19  A    Thirty-six.

20  Q    -- 36.  And do you have there Exhibit 37?

21                    (Pause - side conversation)

22  A    I don't have thirty-seven.

23            MR. COOPER:  You don't?  Okay.  Let me --

24                    (Pause - side conversation)

25  BY MR. COOPER:

1  Q    Do you have thirty-seven there now, Mr. Rippeto?

2  A    I do.

3  Q    And what is thirty-seven?

4  A    Thirty-seven is a summary of forensic laboratory results

5  that I wrote from lab reports received by me.

6  Q    All right.  So, rather than reading the scientists'

7  complicated lab report, you summarized all of them together on

8  this document --

9  A    Yes.

10  Q    -- two-page document?

11  A    Yes.

12        MR. COOPER:  Your Honor, I'd like to have the agent

13  tell us the contents of this.  I -- I think we should offer it

14  in evidence at this time, and I think it comes in under our

15  stipulation to the results of the lab testing that took place

16  in the case.

17        THE COURT:  Okay.  So, what you're saying is now you

18  have a summary that summarizes the information in the previous

19  stipulation, is that right?

20        MR. COOPER:  It -- it sum -- yes, that's cor -- it

21  details the information that's in the stipulation.  It

22  summarizes the information that's in the lab reports that are

23  the subject of the stip -- the reports themselves aren't the

24  subject of the stipulation, but the results are --

25        THE COURT:  Okay.

1    MR. COOPER:  -- and so this summarizes the results

2  out of the lab reports.

3    THE COURT:  Any objection, Mr. Curtner?

4    MR. CURTNER:  No, Your Honor.

5    THE COURT:  Okay.  So, what number is it?

6    MR. COOPER:  It'd be thirty-seven.

7    THE COURT:  Okay.  It can be received without

8  objection.

9    (Government's Exhibit 37 admitted)

10  BY MR. COOPER:

11  Q    So, tell us what thirty-seven says, this being a summary

12  of all the results that the laboratory reached regarding your

13  samples, is that correct?

14  A    Yes, it is.

15  Q    And these samples were ones that -- that the

16  investigative team collected from where?

17  A    Throughout the investigation.  The samples are detailed

18  on here.  I -- I -- would you like me to go through each one?

19  Q    Just summarize it.  It was from --

20  A    They were from --

21  Q    -- from the purchases that were --

22  A    -- fishes --

23  Q    -- made from Mr. Maxon and from the search of his house?

24  A    Fish acquired, purchased, or seized during the

25  investigation of Mr. Maxon.

1  Q    Very well.  Okay.  Tell us what we have here for --

2  A    Okay.

3  Q    -- the summary.

4  A    I'm just going to read the summaries since --

5  Q    Go ahead.

6  A    It says, "The summary of forensic laboratory results."

7  It says:

8         "The forty-six random samples of fish collected

9         during the investigation of this case were submitted

10        to the U.S. Fish and Wildlife Service National

11        Forensics" -- excuse me -- "National Fish and

12        Wildlife Forensics Laboratory located in Ashland,

13        Oregon, for scientific analysis in order to identify

14        the species.  Qualified scientists at the laboratory

15        conducted DNA testing of the forty-six samples.

16         "Forty-four of the forty-six randomly collected

17        samples were identified as Chum salmon, scientific

18        name Oncorhynchus keta, and two of the samples,

19        which are number six and seven listed below, were

20        identified as Coho salmon, which is Oncorhynchus

21        kisutch, scientific name, and they're described as

22        follows numerically."

23  You want me to go through each one?

24  Q    Yes, and tell us where these came from.

25  A    Okay.  Number one on the list above is a random sample of

1  the smoked salmon collars that Special Agent Rory Stark and

2  Andie Sears obtained from Scott Maxon on October 23, 2009, at

3  AFN in Anchorage.

4  Q    And that relates to Exhibit 2, which is a photograph of

5  the salmon collars obtained on that occasion, is that correct?

6  A    Right.  I don't have those copies up here with me.

7            MR. COOPER:  Then I guess -- do you have another

8  stack of --

9            THE COURT:  Before we get started, would this be a

10  good time to take our lunch break?

11            MR. COOPER:  Yeah, I think it would, Your Honor.

12  That would be fine.

13            THE COURT:  Okay.  See you at 1:15.  Stand in recess

14  until 1:15.

15            THE WITNESS:  Can I leave this one up here, thirty-

16  seven?

17            MR. COOPER:  Yeah.

18                      (Pause)

19     (Jury out at 12:02 p.m.)

20            THE COURT:  Did you call Jennifer?  Okay.  How long

21  are we going to be doing this?

22            MR. COOPER:  We're almost at the end.  I think

23  actually --

24            THE COURT:  Well, I didn't know.  I see a list with

25  no end to the --

1                    MR. COOPER:  Right.

2                    THE COURT:  -- bottom of it.

3                    MR. COOPER:  Correct, right.  I think that --

4     actually, that this summary -- isn't this the last of our --

5                    THE WITNESS:  That's the last exhibit.

6                    THE SPECIAL AGENT:  Except for the photos of the --

7                    MR. COOPER:  Yeah.

8                    THE WITNESS:  Well, it's got photos to show.

9                    MR. COOPER:  There are photos --

10                   THE COURT:  So, you've got another half an hour,

11    forty-five minutes?

12                   MR. COOPER:  Probably that or a little less.

13                   THE COURT:  Okay.  And then --

14                   MR. COOPER:  It's just the photographs illustrating

15    each of these items is all.

16                   THE COURT:  Is this your last witness?

17                   MR. COOPER:  Yeah.

18                   THE COURT:  Okay.  So, we need to be thinking about

19    -- you're going to rest at about two o'clock.

20                   MR. COOPER:  Probably so.

21                   THE COURT:  And then the -- so the ball then moves

22    to your side of the court and you have to decide what you're

23    going to do.  I don't care what you do, I just am curious if

24    we're going to be closing today or not.

25                   MR. CURTNER:  I doubt it.  I think we're going to

1  have witnesses today and finish the testimony, but I don't

2  think we'll -- I don't know if we'll get to closing.  I -- we

3  -- I'm anticipating three witnesses.

4          THE COURT:  Okay.  Well, let me just see here.  Just

5  look at my schedule because I have a couple of sentencings

6  tomorrow morning.  How about the jury instructions?  You get a

7  chance to look at those?

8          MR. CURTNER:  No.

9          THE COURT:  Do you want to look at those over the

10  lunch hour just briefly while you're eating your salmon and --

11  and --

12          MR. CURTNER:  Sal-mon.

13          THE COURT:  Okay.  And we can discuss those maybe

14  and we'll be back at 1:15, okay?

15          MR. CURTNER:  Okay.

16          THE COURT:  All right.  Thanks.

17          MR. COOPER:  Thank you.

18          THE CLERK:  All rise.  This Court stands in recess

19  until 1:15.

20      (Recess at 12:04 p.m., until 1:22 p.m.)

21      (Jury not present)

22          THE CLERK:  All rise.  His Honor the Court, the

23  United States District Court for the District of Alaska is

24  again in session, the Honorable Ralph R. Beistline presiding.

25  Please be seated.

1          THE COURT:  Okay.  Are we ready?

2          MR. COOPER:  Yes, Your Honor.

3          THE COURT:  All right.  Let's bring in the jury.

4                          (Pause)

5      (Jury in at 1:23 p.m.)

6          THE COURT:  Okay.  Welcome back.  We'll pick right

7   up where we left off.  Defendant -- I mean, the witness is

8   still under oath.  We won't -- we won't re-swear him in.  Mr.

9   Cooper?

10      **DAVID RIPPETO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

11          MR. COOPER:  Thank you, Your Honor.

12                  **DIRECT EXAMINATION CONTINUED**

13   BY MR. COOPER:

14   Q    Mr. Rippeto, I think you were about to -- you had just

15   read the introductory paragraph of the summary of forensic

16   laboratory results, right?

17   A    Yes.

18   Q    And now you were going to tell us where the random

19   samples were located, forty -- forty-six of -- in number

20   altogether and forty-four were Chum and two were Coho.

21   A    Correct.

22   Q    Okay.  Now, starting with number one here, just go

23   through there and tell us what they are, and if it relates to

24   an exhibit that's been introduced, give us a number, and we'll

25   put that exhibit up on the screen so the jury can see it.

1  A    Okay.  The first one, number one up there, was a sample

2  of the salmon collars obtained by Special Agents Stark and

3  Sears, and it's shown in Exhibit 2, that was a picture of it.

4  Q    It's a bag of salmon collars?

5  A    Correct.  And they're identified as Chums.  Number two is

6  samples -- well, the bags themselves were sent to the

7  forensics lab.  It's Exhibit 7 that was previously introduced;

8  salmon purchased by Investigator Lindell in October '09 at the

9  Alaska Federation of Natives.  Number three is --

10  Q    You're -- so, we're assuming that all of these -- samples

11  taken from all of these that you're mentioning so far were

12  identified as Chum salmon unless you --

13  A    Yes, that's correct.

14  Q    -- unless you tell us which one was the exception or

15  which two were the exception.

16  A    Right.  And I'll get to the exceptions.

17  Q    Okay.

18  A    Those were -- number one and two were identified as

19  Chums.  Number three was the first shipment that Agent Solis

20  acting as Ed Lopez testified earlier to he received in

21  Arizona.

22  Q    And that's Exhibit 11-G --

23  A    G and H.

24  Q    -- and H?  Okay.

25  A    All right.  Samples from those were identified as Chum

1   salmon.

2   Q    All right.

3   A    Number four is -- there was three samples removed from

4   each box of the second shipment of salmon reserved -- received

5   by Agent Solis in Arizona on -- in August of 2010.

6   Q    That relates to --

7   A    And that's 14-B and I are pictures of those -- of those

8   exhibits.

9   Q    Okay.

10  A    And the next one we have Exhibit 16, which is random

11  samples of smoked salmon purchased by Agent Marek at the

12  Alaska Federation of Natives in 2010.  It's exhib -- yeah,

13  Exhibit 16, that one.

14  Q    All right.

15  A    That was eight samples.  Number -- well, now you're under

16  your new exhibits.

17  Q    All right.

18  A    Number six is a sample of raw salmon seized from the blue

19  fish tote outside of the Maxon residence during the October

20  14th, 2010, search warrant.

21  Q    All right.  And do you have photographs of those fish

22  totes and the salmon contained in them?

23  A    I do.

24  Q    And would they be thirty-eight and 38-A?

25  A    Yes.

1   Q    Do you recognize those photographs?

2   A    I recognize those photographs.

3                    (Pause - side conversation)

4             MR. CURTNER:  Thank you.

5   BY MR. COOPER:

6   Q    Before we actually get into these, I want to ask you --

7   you've been through this whole series of thirty-eight --

8   Exhibit 38 photographs and determined that these are an

9   accurate representation of the things stated -- shown in them

10  -- depicted in them?

11  A    Yes.

12  Q    Now, you didn't take these photographs, did you?

13  A    No, I didn't take these photographs.

14  Q    Okay.

15  A    Well, some of the earlier photographs I did take --

16  Q    Right.

17  A    -- the previously introduced exhibits.

18  Q    But in the -- in the thirty-eight series that we're going

19  to be addressing now --

20  A    No.

21  Q    -- you -- okay.  That was done by the search team on the

22  14th of October at the Maxon residence?

23  A    Yes.

24             MR. COOPER:  All right.  And I believe we have a

25  stipulation to the authenticity of these, Your Honor, and so

1    I'd offer them in evidence and ask that --

2              THE COURT:  Very well.  There -- is that right?

3              MR. CURTNER:  No objection.

4         (Government's Exhibits 38, 38-A through 38-K admitted)

5              MR. COOPER:  So --

6    A    So, we're on number six.  One sample of raw salmon seized

7    from the blue fish (indiscernible) outside -- tote outside the

8    Maxon residence that was identified as Coho salmon.

9    BY MR. COOPER:

10   Q    All right.  Now, if you would put up photo 38-A.  You're

11   looking at thirty-eight now on the screen, is that right?

12   A    Yes.

13   Q    And now that's 38-A?

14   A    Yes.

15   Q    There's -- there appears to be a blue tote in the

16   background and a lighter colored one in the foreground with

17   some more fish in it.  Which -- are either of these ones that

18   you're talking about in this --

19   A    The darker blue one was the one in number six.

20   Q    Okay.  And there was one sample that turned out to be a

21   Coho salmon in that tote?

22   A     In the darker blue fish tote on the screen.

23   Q    All right.  And go ahead, what's the next one?

24   A    Number seven is a sample of raw salmon seized from the

25   light-blue fish tote outside the Maxon residence during the

1  search warrant on October 14th, 2010.  That one was also

2  identified as Coho salmon.

3  Q    All right.

4  A    Let's see.  Number eight was a sample -- that's 38-B --

5  Exhibit 38-B, which is one sample of raw salmon removed from

6  the loose fish laying around the yard as -- and on the steps

7  at the Maxon residence during the war -- on October 14th,

8  2010.

9  Q    Now, we're looking at some snow-covered objects in the

10 foreground that appear to be on a -- on a wooden pallet of

11 some kind, and then also some on the steps, is that correct?

12 A    Yes.

13 Q    And are those the fish you're talking about?

14 A    Yes.

15 Q    All right.  So, one sample was taken from that and was

16 that a -- what kind of sample did that turn out to be?

17 A    Chum salmon.

18 Q    All right.

19 A    Multiple samples were taken; one was submitted.  The same

20 with the previous.  We submitted one --

21 Q    Sure.

22 A    Okay.  To be clear on that.

23 Q    Go ahead.

24 A    Nine -- (clearing throat) excuse me -- is a random sample

25 of the smoked salmon from the gray fish tote shown in Exhibit

1  38-C.

2  Q     All right.

3  A     The gray fish tote was at the Maxon residence during the

4  search warrant.

5  Q     So, now we're --

6  A     And that --

7  Q     -- all of these from now on are going to be the Chum

8  salmon because the only two Cohos were already mentioned, is

9  that right?

10  A     Correct.

11  Q     All right.  So, go ahead.

12  A     So, number nine was Chum salmon.  Number ten is a sample

13  seized from a bag of salmon strips located in a storage area

14  there in the Maxon residence, and it's depicted in the

15  photograph in Exhibit 38-D as in Delta, and that was Chum

16  salmon.

17  Q     Very well.

18  A     (Clearing throat) excuse me.  Number eleven is a -- one

19  random sample of raw salmon seized at the -- what was labeled

20  as the fish processing room at the Maxon residence during the

21  warrant, and that was determined to be Chum salmon as well.

22  Q     That's the photo on the screen as --

23  A     That's the photo on the screen, Exhibit 38-E as in Echo.

24  Q     Okay.  Go ahead.

25  A     Number twelve is a sample of the salmon seized from the

1  fish processing room -- the smoked salmon seized from the fish

2  processing room at the Maxon residence during the warrant.

3  Exhibit 38-F is a depiction of that.

4  Q    All right.

5  A    And that was Chum salmon as well.  Number thirteen, three

6  samples of smoked salmon seized from the freezer -- freezer

7  number four.  There was four freezers present and they were

8  labeled one through four.  Three samples from freezer four

9  during the search warrant were identified as Chums, and it's

10  38-G as in Golf is the exhibit.

11  Q    All right.

12  A    And that's shown on the screen.  Three samples of smoked

13  salmon from the freezer number two during the search warrant

14  at the Maxon residence, it's 38-H, that's the same as is on

15  the screen.  Those were Chum salmon.  Fifteen, three samples

16  of smoked salmon from -- seized from the smokehouse at the

17  Maxon residence during the search warrant in 2010, Exhibit

18  38-I, and that's the same picture as is on the screen.

19  Sixteen, three random samples of smoked salmon from freezer

20  number three at the Maxon residence, it's 38-J -- Exhibit

21  38-J, which is on the screen.  We don't have a picture of the

22  freezer open there, it's -- but that is freezer three.

23  Q    All right.

24  A    And seventeen, three samples of smoked salmon from

25  freezer number one at the Maxon residence during the search

1  warrant, Exhibit 38-K, and that's the picture on the screen --

2  Q    Very well.

3  A    -- and those were identified as Chum salmon as well.

4  Q    Very well.  Now, going back to the invoices that you

5  summarized for us just before lunch?

6  A    Yes.

7  Q    Do you -- do you have a total of the amount of fish or

8  amount of dollars that are represented by these -- just these

9  invoices that we have that show fish consigned to or sold to

10 Scott Maxon?

11 A    I didn't add up the money.  I know the total fish weight

12 is over sixteen thousand pounds of Chum salmon.

13 Q    All right.  And that's for the period 2007 through 10?

14 A    Yes, that's the invoices we requested from the companies

15 was '07 through '10.

16        MR. COOPER:  Very well.  I believe that's all the

17 questions I have of Mr. Rippeto at this time, Your Honor.

18        THE COURT:  Okay.  Cross-examination.

19                    **CROSS-EXAMINATION**

20 BY MR. CURTNER:

21 Q    Agent Rippeto, you're the head of this Operation Yukon

22 King project, is that right?

23 A    I'm the what we call the case agent, the lead agent.

24 Q    The lead agent on that.  Okay.

25 A    Mm-hmm (affirmative).

1  Q    And let's go to the -- the post office video and the

2  boxes that were shipped in the -- December 2009.  The label

3  that's on those boxes that were shipped, those that has the

4  sender as being Vangie Maxon, is that correct?

5  A    I'd have to look.  I think that's correct.

6  Q    Can I show you --

7  A    All the exhibits are over there.

8                      (Pause)

9  Those are from the second shipment?  That box?  Exhibit 13?

10 Q    (Indiscernible - away from microphone.)

11 A    Does that say ten or thirteen?

12 Q    (Indiscernible - away from microphone.)

13 A    Yeah.

14                     (Pause)

15 Thank you.  That's Exhibit 10-A?

16 Q    Yes, that's -- you're looking at the box that's been

17 identified as Exhibit 10-A.  And there's -- there's like two

18 -- two labels on the top, is that correct, from the sender?

19 A    There are.  There's a C.O.D. to post office C.O.D. label,

20 then there's a stick-on label, a Priority Mail label.

21 Q    And in both of those cases, what's the name of the

22 sender?

23 A    Both of them -- well, one of them it's Evangeline R.

24 Maxon, and the other is Evangeline Maxon.

25 Q    Okay.  And in the video from the post office -- and you

1    have receipts of a credit card that was used, right, for this

2    transaction --

3    A     Yes.

4    Q     -- to send this?  And the transaction -- that debit card

5    ended in 2304, those numbers?

6    A     That's correct.

7    Q     And whose debit card is that?

8    A     I don't remember if it's a joint account or if it's an

9    account held solely by Mr. Maxon.  I don't remember.  I saw on

10   the video him remove it from a wallet.

11   Q     Okay.  Would it be -- you would be surprised if it's

12   Vangie Maxon's credit card and hers alone on the card?

13   A     That's possible.  I don't remember.

14   Q     Well, you got the credit card information and the

15   receipts from the credit -- from the bank company, didn't you?

16   A     I got the information from the postal inspector who

17   provided me that information and documented it in a report.  I

18   don't remember the name, if it was held jointly or held just

19   by Vangie.

20   Q     Okay.

21   A     I'm just being honest.

22   Q     Okay.  Thank you.  And the receipt -- in that video, we

23   see the receipt at the end of the transaction going to Vangie,

24   right?

25   A     She puts it in what looked like a plastic bag, correct.

1   Q    Okay.  And then the second set of boxes, can I show you

2   that, please?

3   A    Sure.

4                        (Pause)

5   Q    Now, that's identified as Exhibit 13-A.

6   A    That's what I see, yes.

7   Q    And that was a second -- one of the second set of boxes

8   that went to Ed Lopez.

9   A    Yes.

10  Q    And so what's the name on the sender on -- on that one?

11  A    Well, there's the handwritten label, the piece of paper

12  -- the notebook paper torn off, and that's Vangie Maxon, and

13  on the post office C.O.D. label is also Vangie Maxon.

14                       (Pause)

15  Q    Okay.  And you went through a series of invoices that

16  were taken from the Maxons' home --

17  A    Yes.

18  Q    -- for purchasing fish, and a couple of invoices actually

19  Scott Maxon brought to you, is that right?

20  A    He brought me Alaska Airlines waybills, not fish company

21  invoices.

22  Q    Okay.  He brought you some evidence that he had purchased

23  fish.

24  A    He brought me -- well, that's evidence of a shipment of

25  fish.

1   Q    Okay.  And why did he bring that to you?

2   A    I believe he brought that to show me that they were

3   commercially-acquired fish.

4   Q    Because you were accusing him of having subsistence-

5   caught fish.

6   A    I was not accusing him of anything at that time.  We were

7   investigating the sale of subsistence fish.

8   Q    And he told you they -- he doesn't sell subsistence fish,

9   and he brought those to you to show you that he has commercial

10  fish -- his wife has commercial fish, is that right?

11  A    I didn't interview him in reference to his subsistence

12  fish sales.  Officer Neely and Agent Karras interviewed him

13  relative to that, but he did bring me receipts on that day --

14  or not receipts, waybills.

15  Q    Now, in your reports in this investigation, the -- the

16  laws that you felt might be violated by Mr. Maxon, one was

17  Alaska regulations about buying or selling subsistence-taken

18  fish, is that correct?

19  A    That's correct.

20  Q    And Mr. -- you did not charge Mr. Maxon -- you had no

21  evidence at all that he was selling or buying subsistence

22  fish, is that correct?

23  A    We did not charge that.

24  Q    And you did not charge him -- you also were looking at

25  any kind of violation of the Federal Code of Regulations as

1  far as buying or selling subsistence fish to or by a business.

2  A    We did not charge that either, correct.

3  Q    Right.  And you ended up charging him with these boxes as

4  being mislabeled.

5  A    An interstate shipment of the Lacey Act involving what

6  Mr. Cooper spoke about in his opening remarks, falsely

7  identified or falsely count (ph) in interstate commerce with a

8  market value of greater than three fifty.

9  Q    Knowingly.

10 A    Knowingly, correct.

11         MR. CURTNER:  All right.  That's all.

12         THE COURT:  Redirect?

13         MR. COOPER:  No -- wait a -- there is one thing.  I

14 would like the witness to have a look at the boxes that are

15 ten and 10-A.  If we could have those shown to him.

16                         (Pause)

17                 **REDIRECT EXAMINATION**

18 BY MR. COOPER:

19 Q    Are those the two boxes, Mr. Rippeto, that have the

20 twenty-five pounds Kings written on them with a black marker?

21 A    Exhibit 10 here has twenty-five pounds, Kings, Class A,

22 written here.

23 Q    Yes.

24 A    10-A has twenty-five pounds, Kings, written there.

25 Q    All right.  And would you look at the end of each box and

1   see if there's some previous label from Copper River Seafoods?

2   A    Exhibit 10 has a worn label on this end with some --

3   looks like Magic Marker lines through the middle of it.

4   Q    Through what?

5   A    Through -- I'm not sure if that's -- that looks like an

6   address.  It says -- it says Copper River Seafoods -- at least

7   I can see the Copper River part of it right there.

8   Q    Okay.  And is -- is that the one that says wild keta

9   salmon?

10  A    This label says to Scott Maxey, spelled M-A-X-E-Y, wild

11  keta salmon, batch number one, oh slash R, H and G, and it's

12  got a date on it of 7/30/09, and it says fifty pounds.

13  Q    And did you -- now that -- (clearing throat) excuse me.

14  Does that appear to have an address associated with the Copper

15  River Seafoods or an address anywhere on there?

16  A    If you look in the blue through the black line, you can

17  see Anchorage on it.

18  Q    So, it's kind of crossed out or partially so with this

19  black marker?

20  A    Correct.

21  Q    Did you see anywhere else in the other documents that

22  we've reviewed today the name Scott Maxey as a purchaser of

23  anything from Copper River Seafoods?

24  A    The only documents I saw were Scott Maxon, not Maxey.

25  Q    Okay.  Take a look at Exhibit 35.  Do you have thirty-

1  five there?

2  A    Yeah, let me find that.  Okay.  I've got thirty-five.

3  Q    Would you turn to the third page of Exhibit 35?

4  A    Okay.  Yep.  I didn't see the spelling there earlier.

5  Okay.

6  Q    What does it say, bill to and ship to?

7  A    Scott Maxey, spelled M-A-X-E-Y.

8  Q    Okay.  Is that -- you haven't seen that anywhere else,

9  have you?

10  A    On the end of this box --

11  Q    Look at the --

12  A    -- on Exhibit 10.

13  Q    Aside from being on that box, is it on the other box,

14  too, that's --

15  A    It is on the other box on Exhibit 10-A as well.

16  Q    Just that pair of boxes and just this invoice?

17  A    Yep -- yes.

18  Q    And you read a date off the end of that box of 7/30/2009,

19  is that correct?

20  A    Yes, I did.

21  Q    And is that the date of the invoice on the third page of

22  Exhibit 35?

23  A    Yes, it is.

24  Q    Is it fair to say this box and its origin is associated

25  with this particular sale to Mr. Maxon on July 30th, 2009, by

1  Copper River Seafoods?

2  A     Yes.

3  Q     And what was it that was shipped in this box -- or these

4  boxes or at least in these boxes plus something else at that

5  time?

6  A     Each one of these boxes is labeled containing fifty

7  pounds of wild keta salmon, headed and gutted.

8  Q     And if you look at the Copper River Seafoods invoice for

9  July 30th, 2009, what was the total sale on that particular

10 bill?

11 A     Two thousand pounds of headed and gutted fresh Chums for

12 a total of thirty-eight hundred dollars.

13 Q     Is it your understanding that wild keta or keeta (ph)

14 salmon is Chum?

15 A     Yes.  Keta is the species name and the scientific name.

16 The scientific name is composed of two parts, a genus that's

17 capitalized and the species which is the second word.  Keta is

18 the second word in the scientific name.

19 Q     For?

20 A     Chum salmon.

21         MR. COOPER:  Very well.  Thank you.  That's all I

22 have.

23         THE COURT:  Anything else?

24                    **RECROSS-EXAMINATION**

25 BY MR. CURTNER:

1  Q    Agent Rippeto, which came first, that label from Copper

2  River Seafoods or that handwriting?  You don't know, do you?

3  A    I don't know.

4  Q    Yes.  So, the handwriting could have come before even

5  that label from July.

6  A    It could have.  They're -- both handwritings in black

7  Magic Marker as well as the lined-out label on the side -- end

8  of the boxes.

9  Q    But you just don't know which came first.

10  A    That's correct.

11          MR. CURTNER:  Thank you.

12          THE COURT:  Thank you, sir.  You can take those down

13  with you.  Any -- any more witnesses, Mr. Cooper?

14                      (Pause)

15          MR. COOPER:  Your Honor, just subject to the

16  correlation with the Clerk as to which exhibits have been

17  admitted, we would be ready to rest.

18                  GOVERNMENT RESTS

19          THE COURT:  Okay.  Mr. Curtner, what's your --

20  what's your desire at this time?

21          MR. CURTNER:  I have some witnesses downstairs.

22  They could be up here in a few minutes.

23          THE COURT:  Okay.  Let's take a ten-minute recess

24  and -- what happened is the Government is done with its case

25  at this point it looks like.  Take a brief recess and we're

1  going to start with hearing from the defense -- defense case,

2  okay?

3                           (Pause)

4      (Jury out at 1:50 p.m.)

5           THE COURT:  Is that sufficient time, ten minutes?

6           MR. CURTNER:  Yeah.

7           THE COURT:  Okay.  I'll come back in ten minutes.

8           THE CLERK:  Off record.

9      (Recess at 1:50 p.m., until 2:02 p.m.)

10      (Jury not present)

11          THE CLERK:  All rise.  His Honor the Court, the

12  United States District Court for the District of Alaska is

13  again in session, the Honorable Ralph R. Beistline presiding.

14  Please be seated.

15          THE COURT:  Are we ready?  You ready?

16          COUNSEL:  (No audible reply.)

17          THE COURT:  Okay.  Let's bring the jury in.

18                           (Pause)

19      (Jury in at 2:02 p.m.)

20          THE COURT:  Okay.  We're all back.  Mr. Curtner,

21  your first witness?

22          MR. CURTNER:  Thank you, Your Honor.  Defense would

23  call Ms. -- Mrs. Evangeline Maxon, please.

24          THE COURT:  Okay.  Ma'am, come forward and get up

25  here by this chair, and then remain standing for a second and

1  we'll swear you in.

2                          (Pause)

3          THE COURT:  And this lady right here is going to

4  swear you in.

5          THE CLERK:  Please raise your right hand.

6          **EVANGELINE MAXON, DEFENDANT'S WITNESS, SWORN**

7          THE CLERK:  Okay.  Please be seated.  For the

8  record, can you please state and spell your full name?

9          THE WITNESS:  My name is Evangeline Maxon.

10 E-V-A-N-G-E-L-I-N-E, middle name R-E-Y-E-S, M-A-X-O-N.

11         THE COURT:  Mr. Curtner.

12         MR. CURTNER:  Thank you, Your Honor.

13                    **DIRECT EXAMINATION**

14 BY MR. CURTNER:

15 Q    Hello, Mrs. Maxon.

16 A    Hi.

17 Q    You nervous?

18 A    Kinda of, yes.

19         MR. CURTNER:  Okay.  You'll be all right.

20         THE COURT:  You will if you -- if you speak as loud

21 as you stated --

22         THE WITNESS:  Yes.

23         THE COURT:  -- your name.

24         THE WITNESS:  Yes.  Okay.  Yeah.

25         MR. CURTNER:  Okay.

1  BY MR. CURTNER:

2  Q    How long have you lived in Alaska, Mrs. Maxon?

3  A    I got here in 1987.

4  Q    1987?  And where did you live before that?

5  A    Over in the Philippines.  I'm originally from the

6  Phillippines.

7  Q    Okay.  What brought you to Alaska in 1987?

8  A    My mom found a (indiscernible - microphone noise) for me

9  and my brothers, and they live in Nenana.

10 Q    Now, so your mother had already been here in Alaska?

11 A    Yes, they're all here.  Five of them.

12 Q    Okay.  But your mother was here before you came here?

13 A    Yes.

14 Q    And --

15 A    And my three brothers.

16 Q    Okay.  What -- when did your mother first come to Alaska?

17 A    1978.

18 Q    And what's her name?

19 A    Gertrude Rupprecht.

20 Q    What was your father's name?

21 A    Reinhardt Rupprecht.

22 Q    Okay.  Did he have -- did he go by another name or was he

23 known --

24 A    Herman the German.  They call him Herman the German.

25 Q    So, what were your parents doing when you moved up here

1   in '87?

2   A    They been doing some smoked salmon strips down the Yukon.

3   Q    Is that how they made their living?

4   A    Yes.

5   Q    Okay.  And who would do -- who would -- they would

6   process the fish?

7   A    Yes.  We do process fish.  We go to the fish camp down --

8   down the Yukon.

9   Q    Now, how old were you when you came up here in 1987?

10  A    Twenty-six.

11  Q    And so you would help your father --

12  A    In the --

13  Q    -- and your mother, too --

14  A    Yes.

15  Q    -- in this -- in this processing?

16  A    Yes, sir.

17  Q    And you learned how to do that then?

18  A    Yes.

19  Q    Have you been doing that pretty much since 1987?

20  A    Yes.

21  Q    And when you've done that, has it basically been with

22  your parents and other family members or --

23  A    Well, I mean all my brothers do.

24  Q    All your brothers do processing fish?

25  A    Go down the fish camp, yes.

1  Q    Where's the fish camp?  I'm sorry.

2  A    It's about thirty-five miles down Tanana.  It's by the

3  Yukon.

4  Q    Okay.  So, could you tell me a little bit about your

5  processing of fish and what you do?

6  A    We -- you mean with my parents?

7  Q    Well, with your -- let's talk about with your parents

8  first because they're passed away now, right?

9  A    Yeah.  Well, we go there in May -- leave at May and we

10  leave there -- we leave about September, all -- all summer

11  we're down the fish camp, and we been doing smoked salmon

12  strips and canning fish.

13  Q    Okay.  So, you did that since you were twenty-six until

14  -- are you still doing that now or --

15  A    Well, not anymore.  For after about two years, I didn't

16  do nothing anymore.

17  Q    Okay.  And then --

18  A    One year, I think.  Sorry.

19  Q    Now, both of your parents have passed away now?

20  A    Yes.  My mom just passed away this January 19.

21  Q    Okay.  And when did your father pass away?

22  A    2004 -- April 19 of 2004.

23  Q    After your father passed away, did you continue to

24  process fish though?

25  A    Well, yes.

1    Q    And what type of fish would you process?

2    A    We been processing Chums and sometimes if we get Kings

3    and then we process silvers --

4    Q    So, you could --

5    A    -- and reds.

6    Q    -- make all different type of salmon?

7    A    We could -- yes.

8    Q    And what type of processed fish would you make?

9    A    What processed fish can they --

10   Q    What kind -- what -- what -- yeah, when you processed

11   this fish, what kind of fish did you have at the end of the --

12   did you have big slabs of smoked salmon, were there salmon

13   strips?

14   A    Yes, it's all salmon strips --

15   Q    So --

16   A    -- and the belly part we smokes it for our own personal

17   use.

18   Q    Okay.  Now, when you were processing the smoked salmon

19   strips, did you sell those, too?

20   A    Yes.

21   Q    Where would you sell those?

22   A    We usually sell them to the AFN which is the Native

23   corporation and the World Eskimo Olympics.

24   Q    Okay.  Did you ever sell these commercially out of

25   stores?

1   A    No, we don't.  We don't sell them commercially.

2   Q    You would just individually yourself --

3   A    Yes.

4   Q    -- sell them.

5   A    In every -- yes.

6   Q    And how --

7   A    And mostly the Natives are the one that's been buying our

8   fish.

9   Q    Okay.

10  A    Well, some Americans, too.

11  Q    I'm sorry?

12  A    Mostly the Natives are buying, but some -- there's some

13  Americans are being -- white males, females.

14  Q    Anybody could buy your fish though --

15  A    Yes.

16  Q    -- but you would just sell themself?  Would you label

17  them?

18  A    No, there is no label.

19  Q    You just package them in plastic?

20  A    They're just all in the plastic bag.

21  Q    Okay.  And some -- and you would process whatever was

22  available if you had -- if somebody would give you some Kings

23  or some reds or some silvers?

24  A    Yes.  We pro -- I process it.

25  Q    Okay.  Now, originally your father used to catch fish for

1  processing?

2  A    Yeah, my father is a commercial fisherman down the Yukon

3  and every year we go down there to fish --

4  Q    Okay.

5  A    -- and we've been getting mostly Kings.

6  Q    And since that time, have you had access to Kings in the

7  last several years?

8  A    Since my dar -- dad passed away you mean?

9  Q    Yes.

10  A    Well, a little bit here and there, but it's not as much

11  as when we could go down the river.

12  Q    Okay.  Now, your -- is your daughter also involved in

13  commercial fishing?

14  A    Yes.  Her and her husband, they go to Chignik with them

15  because her father-in-law have a boat, so they do commercial

16  fishing.

17  Q    What's your daughter's name?

18  A    Venessa Marie.

19  Q    And did Venessa Marie also send you fish?

20  A    Yes.

21  Q    She would send --

22  A    She -- she send me fish, pinks and reds.

23  Q    Okay.  Now, I -- so when did you meet Scott Maxon?

24  A    Well, I met him through his brother, who's the Chief of

25  Police in Nenana.  I -- I babysit for his five kids.

1    Q    And when did you meet Scott?

2    A    1987.

3    Q    1987, soon after you moved here?

4    A    (No audible reply.)

5    Q    Was it soon after you moved here?

6    A    Yes.

7    Q    And then so when did you and Scott get married?

8    A    We got married in 1989.

9    Q    How many children do you have?

10   A    The two of us, two.

11   Q    Okay.  And you have other children?

12   A    Yes.  I have three and he's got two, so we got total

13   seven.

14   Q    Now, what type of work does Scott do?

15   A    Well, when I first met him, he works at the hardware off

16   -- as a hardware officer in Cordova.

17   Q    Okay.  And then since then, what other type of jobs has

18   he had?

19   A    And then we came back here.  He also fishes now in

20   Cordova before, and then he works at the school as a custodial

21   and when we came to Fairbanks, he works at Hub Foods and

22   Lorell (ph) Aerospace.

23   Q    Okay.

24   A    And we been doing processing -- some loggings for Mike

25   Holz (ph).  We have big different sidings we paint.

1   Q    Okay.  And what other business -- what type of business

2   is he -- is he in now?

3   A    We have a little restaurant, the Co-Op Diner.

4   Q    Okay.  So, has he been -- has he had restaurants before?

5   A    Yes.  Down in Anchorage -- it's Soprano's in Anchorage.

6   Q    Okay.  What restaurants has he had in Fairbanks or

7   Nenana?

8   A    Oh, that was the -- also a pizza place, the one in

9   Nenana.

10  Q    What was the name of that?

11  A    Oh, I forget the -- I can't remember -- Gold Pan Pizza.

12  Q    Okay.

13  A    Gold Pan Pizza.

14  Q    Did he own that?  Did he run it?

15  A    Yes.  Yes, we owned it -- well, it both in my name and

16  his, the license.

17  Q    Well, who -- who actually ran it do you think?

18  A    (No audible reply.)

19  Q    Who ran the restaurant?

20  A    Well, I did and sometime -- oh, the Scott's the one doing

21  all the dough because he's good at that --

22  Q    Okay.

23  A    -- and making the pizza, and I just be at the register.

24  Q    Okay.  So, you worked together in the restaurants?

25  A    Yes.

1  Q     Now -- and did you make extra income with your fish

2  processing?

3  A     Well, a little bit, but not that much.

4  Q     You make a little bit of money for the family?

5  A     Yes.  Well, see, since I can't -- my cancer, I didn't --

6  2006, I can't do anymore work, so my mom decided to give us

7  some money to buy fish so I can just do something just to keep

8  myself busy to keep my mind.

9  Q     Okay.  So, you -- you developed cancer in nine -- 2006?

10 A     Yes, I have breast cancer.

11 Q     And that --

12 A     They removed both of my --

13 Q     So, that meant that you couldn't work at the restaurant

14 anymore?

15 A     Well, I just been helping a little bit here and there,

16 and then when I don't feel good, I sleep.

17 Q     Okay.  So, how did that affect your ability to process

18 fish?  Did you still process fish after that?

19 A     Well, I do a little bit at a time when I feel good, but

20 -- and it's not -- I just -- 'cause I took twenty-four kinds

21 of pills.

22 Q     Does Scott help you in the processing of fish?

23 A     Well, yeah, in getting some wood, but not in cutting or

24 anything.

25 Q     Why is that?

1  A    Because he doesn't know how to cut fish.  I mean, me and

2  my son -- because when we get fish from the cannery, it's

3  already all headed and gutted, and all I do is filet and strip

4  them --

5  Q    Okay.

6  A    -- and my handicap son help me do the rest of the work.

7  Q    Okay.  And Scott doesn't participate in that very much?

8  A    No.  And -- and at the same time, he was staying at the

9  Frontier Pizza doing the pizza at that time, too.

10  Q    Now, maybe you could tell us a little bit about when you

11  sell fish at, let's say, an AFN Convention.  How does that

12  work?  Do you have like a stand or a table or how -- tell me

13  about that.

14  A    We actually buy tables.

15  Q    You buy a table.

16  A    Yes.

17  Q    Okay.  So, you have to like purchase a table to -- in

18  order to be a vendor at the --

19  A    Yes.

20  Q    All right.  And then do you do that with other people?

21  A    Yes.  Well, in AFN -- because there's a group of us

22  that's been doing that, all of our fish are all together, and

23  then sometimes they get cold, so they -- I'll watch their fish

24  or somebody get cold and then I'll -- we take turns watching

25  all the fish.

1    Q    Okay.  So, how many people are involved in this?

2    A    There's actually -- there's people from Chignik, there's

3    people from Dillingham, I think Saint Mary's -- there's about

4    five, six vendors in there.

5    Q    And they -- and they would be with you at one table?

6    A    Yeah.  Where all -- all the things are all out.

7    Q    And would all the vendors be there all the time or would

8    you sort of watch each other's --

9    A    Oh, we watch each other's and then I give them the money

10   when their fish get sold.

11   Q    Okay.  Do you know what the other vendors -- what their

12   -- what type of fish they're selling?

13   A    Well, they got -- they have Kings.  It's just like on --

14   on Chignik they have reds, and Saint Mary's they got Kings,

15   and they got some dry fish, and then from Dillingham they

16   always have Kings and reds, and us, we got Chums.

17   Q    Okay.  Now, when -- say I came to you at that table and I

18   asked you what was here at that table?  Would you tell me that

19   there might be some Kings here and some reds here --

20   A    Yes.

21   Q    -- depending on who might else -- might be there?

22   A    Yes.  Yes.  I would tell you that there is.

23   Q    Okay.  Now, do you -- when you sell your fish, is it

24   labeled?

25   A    No.

1    Q    Is it -- do you sell it as a particular type of salmon,

2    or do you sell it as smoked salmon?

3    A    We just part -- just smoked salmon strips.

4    Q    Okay.

5    A    Because when people approach us, they said can I buy

6    strips?  And the only thing I answer, you want a hard smoke or

7    a cold -- or a soft one or this kind, whatever the one in the

8    jar, pickled or smoked.

9    Q    Now, we discussed this before.  I -- and I was asking you

10   questions from that.  Did you happen to go to the store and

11   buy something similar to what you were selling?

12   A    Yes.

13   Q    Did you bring those down with you?

14   A    Yes, I did.

15   Q    Can I see those?

16   A    This is from Walmart.

17              MR. CURTNER:  We need a (indiscernible - away from

18   microphone).

19                            (Pause)

20   BY MR. CURTNER:

21   Q    Okay.  Mrs. Maxon, I've given you a couple of items that

22   have been now marked as Defense Exhibit A and B.  I'd ask you

23   to look at Defense Exhibit B.  It's got a blue sticker that

24   says B on it.

25              (Defendant's Exhibits A and B marked for identification)

1   A   Yeah.

2   Q   What is that?

3   A   Well, it says wild -- it's just salmon jerky.

4   Q   It says wild salmon jerky?

5   A   Yes.

6   Q   Okay.  Can you -- is that similar to the product that you

7   might make?

8   A   Yes.

9   Q   And could you tell what type of salmon that is?

10  A   No.

11  Q   Does it say what type it is?

12  A   No, it didn't say what kind -- what -- what kind.

13  Q   Can you identify it?  King, red --

14  A   No.

15  Q   -- Chum, silver.

16  A   Just that Kings is often --

17  Q   Now -- okay, that's A -- B.  What is Defense Exhibit A?

18  A   Well, it says on Exhibit A that this is King salmon --

19  Q   Okay.

20  A   -- but in the back it would say wild salmon and in the

21  indigents (ph), it didn't say that it's Kings.

22  Q   Okay.  Do you think that's a King salmon?

23  A   I can't tell because King salmon are a thick fish and I

24  don't know what this -- unless you -- I don't know.

25  Q   Is it -- you bought those yourself, right?

1    A    Yes, I did.  There's a lot --

2    Q    And where did you buy them?

3    A    Walmart.

4    Q    And how much was the one that's labeled as wild salmon.

5    A    They're probably almost two -- three dollars maybe

6    apiece.

7    Q    Okay.  Were they the same price?

8    A    Yes.

9         MR. CURTNER:  I'd like to move to admit ex --

10   Defense Exhibits A and B, Your Honor.

11        MR. COOPER:  No objection, Your Honor.

12        THE COURT:  They'll be received.

13        (Defendant's Exhibits A and B admitted)

14   BY MR. CURTNER:

15   Q    So, Mrs. Maxon, when you are at a convention or someplace

16   in the public where you have a table and you're selling some

17   of your smoked salmon, does Scott help you sometimes with

18   that?

19   A    My son?

20   Q    No, Scott.  I'm sorry, your husband Scott.

21   A    Oh, yeah, Scott -- Scott's over there --

22   Q    And --

23   A    -- because he has to drive me there to Anchorage.

24   Q    Okay.  If it's in Anchorage, he has to drive you there?

25   A    Yeah, to AFN, yes.

1  Q    All right.  And then if it's here in Fairbanks or if

2  you're at the Carlson Center, is he sometimes with you there,

3  too?

4  A    Well, sometimes, but when I'm over at the World Eskimo

5  Olympics, he stayed at the pizza place.  Me and my son --

6  handicapped son is the one that's been selling at the Eskimo

7  Olympics.

8  Q    All right.  So, he's not really involved in your

9  businesses, but he does help out occasionally.

10  A    He does help me out because of my --

11  Q    Now, do you sometimes -- well, let me ask you this.  Did

12  you -- do you know a person named Ed Lopez?

13  A    Yes.

14  Q    How do you know that person or that name?

15  A    Well, he was the one that's been calling us every time --

16  Q    He's called you before --

17  A    -- and asking for fish.

18  Q    Okay.  Have you ever met him?

19  A    No.

20  Q    He would just call you on the phone?

21  A    Yes.  He called on the phone.  He left message at first

22  and it -- I told Scott to talk to the guy.

23  Q    Okay.  Now, why would you ask Scott to talk to the guy?

24  A    'Cause sometimes I can't talk too good on -- over the

25  phone when it comes to talking.  I always let my husband talk.

1   Q    Okay.  So, did you talk to this Ed Lopez about sending

2   fish to him in Arizona?

3   A    Yes, I -- I talked to him.  When Scott wasn't there, he

4   asked me about the fish and I -- I think I -- I kind of

5   mentioned to him that we don't have any Kings.

6   Q    Okay.

7   A    And he said just send anything, whatever you have.

8   Q    And then did you just tell him you would send him some

9   fish?

10  A    Yeah.  Anything --

11  Q    And what did you say --

12  A    -- what we have, it means dry fish, Chums.

13  Q    Okay.  You told him you would send him smoked fish then.

14  A    Yeah, smoked fish, yes.

15  Q    But you didn't tell him you were sending him smoked

16  Kings.

17  A    No.  Kings never even brought up.

18  Q    Okay.  Let me show you a box, okay?

19  A    Okay.

20                         (Pause)

21  Q    And that's been marked as the Government's Exhibit 10.

22  Do you recognize that?

23  A    Yes.

24  Q    All right.  What is that?

25  A    Oh, sorry.  This is my writing right here.  I'm the one

1  that sent it.

2  Q    Okay.  You sent that box.

3  A    Yes, I sent this box.

4  Q    To?

5  A    To Eduardo Lopez at Nogales, Arizona.

6  Q    Do you remember when you mailed that box?

7  A    I think it was December --

8  Q    Okay.

9  A    -- or novem -- yeah, I can't remember.

10  Q    And what was in that box when you mailed it?

11  A    Salmon strips.

12  Q    What type of salmon were in the salmon strips?

13  A    Chums.

14  Q    Okay.  And you knew that those were Chums that you were

15  sending.

16  A    Yes.

17  Q    And that's what Mr. Lopez had agreed to?

18  A    Yes.

19  Q    Okay.  Now, you see -- if you look on that box, you see

20  some like a felt-tip marker that says something about Kings on

21  it, on the top?

22  A    Yes, I see that.

23  Q    What is that?

24  A    It says twenty-five pound Kings, Class A.

25  Q    Did you put that on there?

1  A    No, I didn't.  Because first of all, we never put any

2  classification on the fish whether it's dried up, whether it's

3  -- we never classify any fish.

4  Q    Okay.  So, you wouldn't have written --

5  A    No.

6  Q    -- Kings on here.

7  A    No.

8  Q    And do you know if Scott wrote Kings on there?

9  A    No, I don't -- because Scott's writing is not like this.

10  No.  And this one, too.  There's some other writing.  This is

11  not my writing.

12                      (Pause)

13  Q    Now -- so, how did you send that box -- now, there --

14  there were actually two boxes together like that?

15  A    Yes.

16  Q    And you sent those in December 2009?

17  A    I think so.

18  Q    Okay.  When -- where did you send it from?

19  A    From Anchorage.

20  Q    From Anchorage.  From a post office?

21  A    Yeah, I think it's Anchorage post office.

22  Q    Okay.  And who paid to send that package down to Ed

23  Lopez?

24  A    I did.

25  Q    And what did you use to pay for it?

1   A    My -- my debit card.

2   Q    Do you have that debit card with you today?

3   A    Yes.

4   Q    Can I see it?  Do you have it?

5   A    Yes.

6                          (Pause)

7   Q    So, Mrs. Maxon, that's your debit card?

8   A    Yes.

9   Q    Is that the one that you used that day?

10  A    I think so.  This is the one.

11  Q    Okay.  What are the last four digits on that debit card?

12  A    2304.

13  Q    And it's got your name on it?

14  A    Yes.

15  Q    Does it have your husband's name on it?

16  A    No.

17  Q    And you -- it says you've been a customer since when?

18  Can you see that on the front?

19  A    I -- 2008, I think is what it says.

20  Q    Okay.  So, you've had that card since 2008?

21  A    Yes.

22  Q    Okay.  Mrs. Maxon, when you mailed that card to Ed Lopez,

23  did your husband Scott Maxon know what was in -- what type of

24  fish was in the box?

25  A    No.  He can't possibly know that because when he got

1   there, I already got them all in package.

2   Q    You didn't discuss like what type of fish you were

3   sending to him?

4   A    No, because to me smoked fish is smoked fish and just

5   like I told Ed Lopez on the phone, I'll just send whatever I

6   have -- to send whatever I have.

7   Q    Now, did Mr. Lopez also talk to you about sending fish to

8   you?  Tuna or -- or anything that he would send up to you?

9   A    He kind of mentioned about the tuna and shrimp.

10  Q    Okay.

11  A    Yeah, because that's what we -- if we going to have the

12  sending of fish, he's going to be sending tuna and shrimp.

13          MR. CURTNER:  Okay.  Alrighty, I don't think I have

14  any more questions for you, Mrs. Maxon.  Mr. Cooper will have

15  some questions for you.

16          THE WITNESS:  Okay.

17          THE COURT:  Cross-examination.

18          MR. COOPER:  Yes, Your Honor.

19                  (Pause)

20                **CROSS-EXAMINATION**

21  BY MR. COOPER:

22  Q    Hello, Mrs. Maxon.

23  A    Hello.

24  Q    I have a few questions for you.

25  A    Yes, sir.

1   Q   Were you at the house on the 14th of October -- at your

2   house in Nenana last -- it'd be a year ago October 2010 when

3   some officers came by for a search?

4   A   Yes.  Well, actually, we were here in Fairbanks first,

5   and then we -- we got there and they were already there.

6   Q   They were there when you got there.

7   A   Yes.

8   Q   And did you or Scott or both of you at different times

9   talk with the officers when they were there?

10  A   No, they actually -- one of the officer brought me in our

11  bedroom and they took Scott on the other side of the room.

12  Q   I see.  But you did talk to him.

13  A   I talked to --

14  Q   You talked to them --

15  A   -- the officer --

16  Q   -- at that time?

17  A   Yes.

18  Q   Okay.  And they asked you about some of the subjects that

19  you were telling us about today, didn't they, among other

20  things?

21  A   Yes.

22  Q   Okay.  We'll get into that in a minute here, but I've got

23  one or two other things I want to ask you first.  Now,

24  Reinhardt Rupprecht was your stepfather.

25  A   Yes.

1    Q    So, your mother -- you -- she gave her name as Gertrude

2    Rupprecht?

3    A    Yes.

4    Q    And she was your natural mother?

5    A    She's my mother, yes.

6    Q    Yes.  And so she had then married Reinhardt some time,

7    what, in the 1970's or --

8    A    Seventy-nine, '78, yeah.

9    Q    Okay.  And he had a fish camp thirty-five miles down

10   river from Nenana?

11   A    From Tanana.

12   Q    Oh, from Tanana.

13   A    Yes.

14   Q    Not from Nenana.

15   A    No.

16   Q    Okay.  So, this was on the Yukon River --

17   A    Yes.

18   Q    -- downstream from Tanana.

19   A    Yes.

20   Q    Didn't he used to live in Nenana, Reinhardt?

21   A    They still do.

22   Q    Okay.  Well, I mean he died some time ago, didn't he, Mr.

23   Rupprecht?

24   A    Well, living my dad and my mom when they first got here

25   in Nenana.

1   Q    They lived in Nenana at that time?

2   A    Yes.

3   Q    And they had a fish camp near Nenana probably in those

4   days?

5   A    No, they --

6   Q    Oh, they didn't.

7   A    -- didn't have any camp.

8   Q    Okay.  So, this -- the time period that you were at this

9   fish camp on the Yukon would have been from 1987 on through

10  the nineties?

11  A    Yes.  I think we stopped fishing because of the flow was

12  so high, I think we start -- we stop fishing about two

13  thousand something -- about '99 then or 2001, somewhere.

14  Q    Stopped fishing --

15  A    They stopped fishing down the Yukon.

16  Q    And came and lived in Nenana at that time from then on?

17  A    Yes.  Well, they always have a house there they started

18  just buying fish.

19  Q    I see.  Just a moment, please.

20                        (Pause)

21  So -- so, on the -- on the Yukon, the fish that they would

22  catch there were various kinds of salmon, is that correct?

23  A    Yes.

24  Q    Did he fish with a set net or with a fishwheel?

25  A    Well, before I came up, they been using fishwheel, but

1  then when I was (indiscernible) in 1987, we were using net.

2  Q    This would be a net that's set to the beach?

3  A    Set -- yeah, the slough and something, you know, to the

4  bone yard and places like that.

5  Q    Right.  And you would get Kings, silver, Chums, and reds?

6  A    Yes.  We -- actually, I don't know much about reds

7  because at that time, I don't know the difference, but Kings

8  -- I -- I would know the Kings --

9  Q    Sure.

10  A    -- and the big Chums because somebody's been buying all

11  the Kings from my dad when I -- the first year I was working

12  with them.

13  Q    Now, was he a commercial fisherman?

14  A    My dad?  Yes.

15  Q    Yes.  But you're speaking of Reinhardt.

16  A    Reinhardt is.  Yeah, he (indiscernible - too close to

17  microphone) license.

18  Q    Right.  So, all the fish that you've been talking about

19  that you caught at this -- on the Yukon and processed at this

20  fish camp were commercially-caught fish?

21  A    Yes, sir.

22  Q    It would be during commercial open seasons --

23  A    Yes.

24  Q    -- not subsistence-caught fish.

25  A    No -- no subsistence.

1  Q    And these were fish that you said that you sold or your

2  family sold at Native gatherings --

3  A    Yes.

4  Q    -- around the state?  When did you or your husband, Mr.

5  Maxon, start this pizza business in Nenana?

6  A    In nine -- in 2005.  I think that's when my husband

7  started the business, in 2005 in Nenana.

8  Q    Okay.  And you've had several different businesses since

9  that time, haven't you?

10 A    Yeah.  Well, actually before that, we had -- when I -- I

11 think we had a store down here in Fairbanks, too.

12 Q    A store?

13 A    Yeah, we had a store.

14 Q    Did you have a pizza shop here?

15 A    No.  Now we do, but before that.

16 Q    Where was Frontier Pizza?

17 A    Oh, Frontier Pizza, it's over by --

18 Q    Frontier Lodge?

19 A    -- Frontier Lounge.

20 Q    Was it Frontier Lodge?

21 A    Frontier Lounge over by -- what is that place?

22 Q    It's on the Old Rich --

23 A    It's (indiscernible) North Pole.

24 Q    It's on the Old Rich?

25 A    Yeah -- oh, yes, sir.  Yes.

1   Q    So, near -- what is it?  Sunset Strip?

2   A    Yes, that's -- yes.

3   Q    Okay.  Is that still there?

4   A    Huh?

5   Q    Is that business still there?

6   A    The Frontier?

7   Q    Frontier Pizza?

8   A    No.  We moved to Co-Op Diner.

9   Q    Okay.  And so you men -- mentioned that you had a -- a

10  struggle with cancer at one time and --

11  A    In 2006.

12  Q    2006.

13  A    Yeah.  I have breast cancer.  They removed both of them.

14  Q    And so you had to -- I think you indicated you had to

15  slow down and you couldn't work --

16  A    Well, it's because I -- the chemo affected my head and I

17  can't do anything.

18  Q    So, was it since that time that you were in this Frontier

19  Pizza business?

20  A    Yeah.  I been helping whenever they need help, but most

21  of the time I was at the house.

22  Q    And your house is near Nenana, correct?

23  A    Yes.  We live by the highway.

24  Q    Okay.  So, it's actually this side of Nenana towards

25  Fairbanks on the highway a little bit?

1    A    It -- it -- it's on the right side when you coming from

2    here.

3    Q    From Fairbanks.  Be on the right side.

4    A    Yes.

5    Q    But it's almost all the way to Nenana?

6    A    Yes.  About seven, eight miles.

7    Q    Seven or eight --

8    A    Miles.

9    Q    -- miles from Nenana.

10   A    From Nenana.

11   Q    Okay.  Got it.  All right.  So, when was it that your

12   mother, you indicated, had given you some extra money to

13   purchase fish so that you could be processing it like you used

14   to do in the old days?

15   A    Well, actually, 2005 I don't think it happened yet

16   because my dad just passed away --

17   Q    Mm-hmm (affirmative).

18   A    -- and my mom was still living at her house.  It was my

19   brother, Arthur, that -- that got fish from Kenai in 2005.

20   Q    And so, you weren't doing anymore fish processing since

21   year --

22   A    And then after 2006, I -- after I feel a little better,

23   after my chemo -- because I was in Anchorage and I got my

24   chemo and I had my -- I forgot the word, the -- because they

25   did do -- do testing -- chemo and --

1   Q    Blood tests and so on?

2   A    No.  Where they have to burn you or something.

3   Q    Oh, radiation?

4   A    Radiation.

5   Q    Yes.

6   A    After that, I stayed home because I can't even do

7   anything anymore.

8   Q    Okay.  So, what I'm trying to pin -- to establish --

9   A    And --

10  Q    -- is when did you start the --

11  A    I think it's 2007, I think, when I start doing that.

12  Q    -- doing the fish processing --

13  A    Yes.

14  Q    -- and making salmon strips --

15  A    Yes.

16  Q    -- and then you would take these salmon strips to the AFN

17  and places like that --

18  A    Yes.

19  Q    -- to sell.  Now -- now, you've indicated that you were

20  the one that was doing all the processing of these fish and --

21  A    Yes.

22  Q    -- you would -- we've seen photographs -- seen some

23  photographs of them hanging up on -- on racks --

24  A    Yes.

25  Q    -- in the smokehouse and so forth and so on.  All those

1    fish that were hanging up in the smokehouse, that would be at

2    your place there in Nenana?

3    A    Yes, sir.

4    Q    And those -- where did those fish come from?

5    A    They're from the cannery.

6    Q    So, they would be --

7    A    We bought it from the canneries.

8    Q    They would be like from Copper River Seafoods and --

9    A    Yeah, Copper River Seafoods.

10   Q    -- Prime Select and some --

11   A    Snug Harbor.  I know there's a lot of canneries that

12   we've been getting fish from.

13   Q    Prime Select, does that ring a bell?

14   A    From Prime Select was the last one.

15   Q    The last one.

16   A    The one that they took.  They're all from the Prime

17   Select.

18   Q    Before that, it would be Copper River and Snug Harbor?

19   A    Snug Harbor and then one from Kenai.

20   Q    Snug Harbor is in Kenai, isn't it?

21   A    Yeah, it is.

22   Q    So, that would be that one.

23   A    It's also in Kenai.

24   Q    All right.  So -- so, from 2007 onwards is about when you

25   were doing that, buying those fish from -- from those

1  canneries and processing them; you would convert them into

2  strips then you smoked them --

3  A    Yes.

4  Q    -- and then wrapped them in plastic bags so --

5  A    Plastic bag, individual bag with no label --

6  Q    Right.

7  A    -- it just was -- it's small salmon strips.

8  Q    Right.  And they weren't vacuum-packed bags, were they --

9  A    No.

10 Q    -- like this product from Walmart, were they?

11 A    No.

12 Q    They were just loose in there, correct?

13 A    They were loose.

14 Q    And in fact, they still had the skin on one side of them,

15 right?

16 A    Yes.  Because that's how the Native way wants it.

17 Q    Sure.  But I believe you testified that your husband

18 didn't help you in the -- in the processing or cutting of

19 those fish into strips, that was the work that you were doing

20 as you were able to do it?

21 A    (No audible reply.)

22 Q    You were -- you were pretty -- you were recovered enough

23 from your cancer treatments that you were able to do the

24 stripping of those fish -- cutting them into strips?

25 A    Well, actually whenever I feel better, I cut probably

1  fifteen, twenty fish --

2  Q     Mm-hmm (affirmative).

3  A     -- and then we freeze them and then when it's already all

4  piled up, we hang them all out at one time in the smokehouse.

5  Q     All right.  So -- but what I was asking is I think you

6  testified, and I want to make sure that I got it right, that

7  -- that your husband Scott helps you in some ways, but not in

8  cutting the fish into strips --

9  A     Yeah -- well, he --

10  Q     -- but in some other ways.

11  A     Yes.  He -- actually, he gets the wood.

12  Q     Okay.

13  A     The one that we use for --

14  Q     For the smoking.

15  A     -- for smoking.

16  Q     Right.  And do you remember telling the agents that spoke

17  to you on the 14th of October something a little different

18  from this, about who cut the fish?

19  A     Uh-huh (affirmative).

20  Q     Do you recall that situation?

21  A     Yes.  They ask me -- they ask me actually a lot of

22  questions.  They ask me if -- what does Scott do?  I said

23  Scott don't do anything with the fish.  He get me some wood.

24  And then they ask me if my husband have a different account.

25  They ask me my husband has been doing business behind me, I

1  said no.  They been asking me a lot of questions.

2  Q    Mm-hmm (affirmative).  Did you tell them that -- did they

3  ask you whether you're the one who cut the fish?  Did they ask

4  you about that?

5  A    Yes.  And I did say that I was the one cutting the fish.

6  Q    Isn't it correct that you told them when they said but

7  you cut the fish --

8  A    Uh-huh (affirmative).

9  Q    -- no, Scott also cuts some fish?

10  A    No, no, no, no.  That's not the way it was.  They ask me

11  -- I -- I -- I said I cut the fish not unless Scott cut

12  because they were insisting that Scott was cutting fish, and I

13  said I don't know nothing (indiscernible) unless he's cutting

14  his own fish.  That's what I said.  I didn't say that Scott

15  cut the fish.

16  Q    Well, did you tell them, "No, Scott also cuts some fish.

17  When I'm lying down, Scott also cuts some fish."

18  A    Oh.  No, I didn't say that.

19  Q    And you said, "When I don't feel good, Scott cuts some

20  fish, too."

21  A    Maybe they had -- I don't know what --

22  Q    "I can't say that it's just me cutting the fish."

23  A    He's cleaning -- oh, well, maybe cleaning or -- because

24  after I get done laying down, they clean everything there, but

25  not cutting fish because Scott can't even strip.

1   Q    So, you're saying now that he didn't do that because he

2   didn't know how to do it?

3   A    No.  I told him that he can't do -- because I just --

4   it's a double job every time he tried, and going to end up

5   doing it again, so I told Scott you might as well not touch

6   the fish because he just ruined the fish when he start

7   cutting.

8   Q    Uh --

9   A    So, he don't cut the fish.

10  Q    Okay.  So, your testimony -- I just want to be clear --

11  is that you say you did not tell the agent at that time --

12  A    No.

13  Q    -- when he asked but you're the one that cut the fish or

14  that you cut the fish --

15  A    Must be a --

16  Q    -- "No, Scott also cuts some fish."

17  A    Maybe a misinterpretation of the officer that asked me

18  because I said that --

19  Q    Mm-hmm (affirmative).

20  A    -- Scott don't cut fish.

21                      (Pause)

22  Sometimes he hang fish when it's on the pole, but cutting, no.

23  Q    Now, do you recall when it was you spoke to the person

24  who said he was Eduardo Lopez in Arizona?

25  A    Mm-hmm (affirmative).

1   Q     You mentioned that you mailed these two boxes that you

2   looked at here.

3   A     Mm-hmm (affirmative).

4   Q     You identified that -- you recognize those boxes that are

5   set --

6   A     Yes.

7   Q     You put at least the labels anyway on them.  You

8   recognize those as labels you filled out.

9   A     Yes.  I did the labeling, yes.

10  Q     Mm-hmm (affirmative).  The address labels.

11  A     Yes, and the address.

12  Q     And so, you remember mailing those boxes.

13  A     Yes.

14  Q     And you went to the post office --

15  A     Post office.

16  Q     -- in Anchorage.

17  A     Yes.

18  Q     Where -- which post office did you go to in Anchorage?

19  A     I can't remember which -- I don't know if it's Northern

20  Lights or -- or the airport because at that time, my husband

21  was doing a therapy when we were in Anchorage.

22  Q     What therapy for what?

23  A     Because we just got into an accident at that time.

24  Q     Okay.  So, were you alone then when you mailed them or

25  was he helping --

1    A    No, Scott was with us --

2    Q    He was with you.

3    A    -- and my son, too, because my son was the one carrying

4    the boxes when we all went to the post office.

5    Q    And so you went to the post office with your husband --

6    A    Yes.

7    Q    -- but you say you mailed them.  How is -- what do you

8    mean by that?

9    A    We mailed the box to the post office, and we pay for

10   the --

11   Q    Did you once have a previous edition of this card you

12   have in your hand, an earlier one?  When -- when was that card

13   issued to you that you have with you?

14   A    2008.

15   Q    2008?

16   A    Yes.

17   Q    Is that the one that you used on that day in the post

18   office?

19   A    I think so because I don't have anymore cards.

20   Q    Does your husband also or did he have a card also?

21   A    No, my husband don't have a card.

22   Q    And he didn't carry that card in his own wallet, you

23   carried it in yours?

24   A    I always carry it in my wallet except probably for that

25   day because we were there at the post office and I hand it

1    over there.

2    Q    You handed it to whom now?

3    A    I handed it to Scott.

4    Q    Ah-ha.  And why would you do that if you were mailing

5    these?

6    A    Well, does sometimes wife do that, handing the card to

7    their husband when they don't have a card?

8    Q    Well, you were mailing the boxes.  Why would you give

9    your -- why wouldn't you give your card to the clerk at the

10   post office?

11   A    I don't know what I'm thinking, but I just hand him the

12   card because --

13   Q    You -- you --

14   A    -- that was in front --

15   Q    -- remember you did that.

16   A    Huh?

17   Q    Do you remember specifically that you handed him your

18   card?

19   A    Yeah, I think.  I hand him the card -- I don't know if I

20   handed in the car or if I handed -- because we know we're

21   going to pay it.  I can't remember when I hand him this card

22   because I always have the card with me.

23   Q    You can't remember if you handed it to him, so --

24   A    But I know I -- this is the one that we paid for the card

25   -- for the thing, right?

1  Q    But it's not a card that he was carrying, it's a card

2  your carried.

3  A    Yeah, this is my card.

4  Q    No, that isn't my question.  Who had the card?  Did you

5  have the card or did he have the card?

6  A    I have the card.

7  Q    I see.

8  A    And I gave it to him.

9  Q    Uh-huh (affirmative).  Okay.  So, now the reason why you

10 were there was because you had a conversation on the phone

11 with Mr. Lopez -- Eduardo Lopez?

12 A    Yes.

13 Q    And you -- and this conversation would have been sometime

14 in December of 2009.

15 A    Okay.

16 Q    Is that right?

17 A    I think so.

18 Q    Do you have any way of remembering when it was that you

19 mailed these boxes to Eduardo Lopez?

20 A    (No audible reply.)

21 Q    I mean, if we looked at the postal records, would that

22 help you sort out when it was?

23 A    Yeah, please.  I can't --

24 Q    Okay.  Well, if we could save some time, I've got the

25 date memorized.  December the 28th, 2009?

1  A   December 28 when we mailed this out?

2  Q   That's what --

3  A   Okay.

4  Q   If we look on the label on the front, that's what it's

5  going to say, but do you recall that or is that consistent

6  with your memory of when this happened?

7  A   Maybe that was the time that we mailed them out.  When it

8  comes to dates, I can't remember much.

9                   (Pause - side conversation)

10  BY MR. COOPER:

11  Q   So, your recollection is what as to the time when you did

12  this?  When was it?

13  A   Maybe what you said, December.

14  Q   2009?

15  A   Yes.

16  Q   And is it your testimony that this was done as a result

17  of a conversation you had with Mr. Lopez on the telephone

18  before you brought those boxes to the post office to mail?

19  A   Yes.

20  Q   And that you put in them Chum salmon.

21  A   Yes.

22  Q   And that you did that yourself.

23  A   Yes.

24  Q   And that you did that because of this conversation with

25  Mr. Lopez which you told him you don't have any Kings, which

1  is what he wanted, right?

2  A    Well, actually he just said smoked salmon strips.  Kings

3  never even brought up yet.

4  Q    Well, I think you've testified that you said --

5  A    But at first --

6  Q    -- we don't have any Kings.  You said you told Lopez you

7  have no Kings.  Isn't that what you said a few minutes --

8  A    Yes.

9  Q    -- ago?

10 A    Yes, I did.

11 Q    And that's because --

12 A    But when we were first start talking, it just smoked

13 salmon strips and then he mentioned about Kings.

14 Q    Right.  So, he brought up Kings --

15 A    Yes.

16 Q    -- and -- and -- and you told him, according to your

17 testimony today if I've got it right --

18 A    Yes, we don't have any Kings.

19 Q    -- we don't have any Kings.

20 A    Yes.

21 Q    And now you say that he said, well, that's all right,

22 send anything you have.

23 A    Yes.

24 Q    I see.  And so did you tell him what you were going to

25 send?

1   A    Yes, it's Chums because that's all I have is dry fish.

2   Q    Fine.  Did you tell him --

3   A    Because when he said any -- just send anything you have,

4   so I packed up some fish.

5   Q    In other words, you --

6   A    Anything whatever I have.

7   Q    Did you tell him what you were going to send?

8   A    I think I mentioned it's Chums.

9   Q    Okay.  All right.  And was your husband around at that

10  time when you had this conversation with him?

11  A    No, my husband was at the pizza place.

12  Q    So, he wasn't even home then.

13  A    No.

14  Q    When -- when this call came in, did Mr. Lopez ask for

15  Scott Maxon?

16  A    Well, he always ask and leave messages for -- he only

17  want to talk to Scott.

18  Q    Oh, was this call that you described now, was this the

19  first phone call that he ever made --

20  A    No.

21  Q    -- to the house?

22  A    No.

23  Q    He'd already previously spoken to your husband Scott?

24  A    Ed Lopez you mean?

25  Q    Yeah.

1   A    I talk to Ed Lopez, yes.

2   Q    No.  Before you talked to him, had he spoken to Scott

3   before that or was this his first call?

4   A    I don't remember.

5   Q    When the call came in --

6   A    Because Ed Lopez calls at the store where Scott is -- Ed

7   Lopez calls on his cell phone and Ed Lopez calls on our home

8   phone in Nenana.

9   Q    So, this -- you knew somehow something about this person,

10  Ed Lopez, already, didn't you, when he called, or was this new

11  to you at the time?

12  A    Well, actually it was Ed Lopez that I got the message

13  from our phone first.  It said there's an Ed Lopez was trying

14  to call -- trying to get some fish, and I told my husband,

15  Scott can you talk to him, please?  Can you call him back?

16  And I think Scott called him back.

17  Q    So, that would have been the first time he had

18  conversation with either one of you was when Scott called him

19  back?

20  A    Yeah.

21  Q    And then so --

22  A    Then he called some numerous times.

23  Q    Hmm.  So, was this very near the beginning of the time

24  that he started to call that you got to talk to him and make

25  this agreement with him?

1   A    I can't remember how many times he called, but all I know

2   is I talked to him and says that we don't have any Kings.

3   Q    All right.  So -- and you told him you were going to send

4   Chums.

5   A    Yeah.  Anything he said, so --

6   Q    All right.  And you didn't write Kings on the box.

7   A    No.  It's not my writing.  If you want me to write --

8   Q    No, I --

9   A    -- I can --

10  Q    It doesn't look like your writing, does it?

11  A    No.

12  Q    I mean, we can see your writing on the label there,

13  correct?

14  A    That's what I was saying.

15  Q    Yeah, right.

16  A    Even that thing in front that says Eduardo Lopez in front

17  is not my writing.

18  Q    Were you aware -- when you speaking to Mr. Lopez or at

19  any time since then, were you aware that your husband had

20  spoken to Mr. Lopez and agreed with him to send him King

21  salmon?

22  A    Not that I know of.  I think --

23  Q    Yes.

24  A    -- the only thing I remember was there -- my husband was

25  saying Kings and I don't know what was that about because we

1  usually get Kings from -- from other fishermen anyway,

2  especially from King Salmon or in Dillingham.  We have this

3  guy, Kono (ph), that we were talking to.  That must be why my

4  husband was telling him that we going to have Kings.

5  Q    Well, did he -- didn't he say where they came from, these

6  Kings?  Didn't he call them Saint Mary's Kings?

7  A    No, I never -- because where we --

8  Q    You never heard him say that?

9  A    No.

10 Q    Were you at the -- with your husband at the October 2009

11 AFN Convention when he was -- he told several different people

12 that he had Saint Mary's and Copper River King salmon for

13 sale?

14 A    Well, see, the thing about it is, sir, all the fish that

15 are all laid out during the AFN is from different areas, and

16 my husband always sells for everybody there, and there's fish

17 from Chignik, fish from Saint Mary's, fish from the Yukon,

18 which is the Holy Cross, and then there's a lot of fish in

19 there -- varieties of fish in the jar and then dry fish and

20 they even have the -- the kippered and they have -- there's a

21 lot of fish people there are selling in there -- right in

22 there with the different places.

23 Q    But you knew that he was selling fish that were -- that

24 he said were King salmon, right?

25 A    Not that I know of because --

1   Q    You didn't know that?

2   A    -- it's a Copper River fish.

3   Q    You didn't know that he was selling fish that he said

4   were King salmon that he told --

5   A    Well, of course if there's some -- if there's Kings in

6   there, then he would say that there's a King.

7   Q    That there's Kings from Saint Mary's?

8   A    Yeah, because it was on -- it was all over the -- the

9   table, that it says -- the other --

10  Q    Where -- where is -- do you know where --

11  A    -- the others a different person.

12  Q    Excuse me.  Do you know where Saint Mary's is?

13  A    Yes.  It's mouth of the Yukon.

14  Q    Right.  And there's no -- there was no commercial fishing

15  in 2009 in that area, was there?

16  A    I don't know because all I know is there's nothing on --

17  by where we at, Tanana.

18  Q    There's no commercial fishing in that area, you mean for

19  Kings.

20  A    Yeah, there isn't.

21  Q    In that year.

22  A    I know that for a fact, down in the Yukon.

23  Q    Right.  And that the Yukon River in the area of Tanana

24  was closed, wasn't it, to commercial fishing in 2009 and '10?

25  A    Okay.  And we never got fish from them.

1  Q    And so if your husband was saying that he had some Saint

2  Mary's Kings for sale --

3  A    Uh-huh (affirmative).

4  Q    -- that couldn't be legal fish, could it?

5  A    Could have been illegal because if -- just like what you

6  said, that it's -- it don't belong to us, it belongs to some

7  vendors.

8  Q    But if you're selling it --

9  A    No.

10  Q    -- and collecting the money for it --

11  A    Oh, we don't get money for that.

12  Q    Yeah, but you're collecting money from somebody for fish

13  that you said may be illegal.

14  A    Well, sir, if somebody would ask you can you sell this

15  for me and, of course -- we just all just like a family in

16  there.  We sell it for everybody.

17  Q    Do you have any recollection of hearing your husband say

18  at that time in the 2009 AFN Convention to people that came to

19  buy fish --

20  A    Uh-huh (affirmative).

21  Q    -- that he had Saint Mary's Kings and Copper River Kings

22  for sale?

23  A    Who said that, my husband?

24  Q    Yeah -- I'm asking if you remember that?

25  A    Well, I must be in the bathroom.  I don't know.

1    Q    You didn't hear it.

2    A    No, I don't think I heard that.

3    Q    And you didn't hear him tell Mr. Lopez that he had Yukon

4    River Kings --

5    A    No.

6    Q    -- that he was selling at --

7    A    It can't -- it can't be because my husband knows that

8    there won't be no Yukon Kings.

9    Q    Isn't it true --

10   A    All the fed -- oh, I'm sorry.

11   Q    Oh, no, please, I don't want you to --

12   A    Okay.  Because I know that the federal government already

13   stops the fishing from the Yukon --

14   Q    Mm-hmm (affirmative).

15   A    -- and that's why we know already that we can't fish down

16   there.

17   Q    But you don't recall hearing him say anything like that,

18   that's my question, do you?

19   A    I don't remember.

20   Q    Promising to provide King salmon to somebody?

21   A    Probably a King salmon, but not from the Yukon.  Because

22   we can get any Kings from any places, but not from the Yukon.

23   Q    Did you talk to the officer or agent on October the 14th,

24   2009 [sic], on the subject of your husband's sales pitch that

25   he uses when he's --

1    A    Yes.  Sometimes my husband talks, you know, when he's

2    selling.

3    Q    What do you mean he talks?

4    A    Well, he says something -- oh, it's rattlesnake, you

5    know, he made a joke.  He always make a joke when he --

6    Q    Was he joking with anybody about selling King salmon?

7    A    Yeah, King salmon, get them while it's hot, get them

8    while it's hot, and we know that the salmon's not hot.  Just

9    to make people laugh.

10   Q    But do you know that it's --

11   A    My husband always just smile and --

12   Q    So, he's smiling when he said he had King salmon when it

13   wasn't King salmon?

14   A    It's just a sales pitch for him.  King sal -- well, just

15   like when he said a lady asked what is that?  And he says it's

16   a rattlesnake.

17   Q    So, in other words --

18   A    You know, it's just a joke.

19   Q    It doesn't -- in other words, you don't think it matters

20   much if he says it's King salmon and it's not really King

21   salmon?

22   A    Well, there are King salmons laying in there.

23   Q    No, but I mean if he sells something that's not and calls

24   it King salmon, you wouldn't think that's too big a deal?

25   A    Well, people knows what they get.

1    Q    Do they?

2    A    Yes.

3    Q    Do you remember talking to the agents on October 14th,

4    2009 [sic], and this was what you said -- you were asked:

5              "Kings cost a lot more to buy, don't they, than

6              Chums?"

7    And you answered "Well" -- it says:

8              "Well, sometimes when it's already smoked.  People

9              don't care, they -- just as long as it's fish, they

10             don't know the difference."

11   A    Yeah, that's what I say, when the fish are smoked, they

12   just ask can I have smoked salmon strips?

13   Q    And --

14   A    They don't even ask if it's Kings or Chums or silvers,

15   they just want the smoked salmon strips --

16   Q    And --

17   A    -- so I actually don't say what kind of species or fish

18   that is because they never ask.

19   Q    And you -- and the officer said, "They don't know the

20   difference."  And you said no, and laughed.

21   A    (Sound.)

22   Q    Is that the way that conversation went?

23   A    Well, I -- I guess that's what I said.

24   Q    Did you tell them that your husband sometimes falsifies

25   the truth --

1    A    Falsified --

2    Q    -- in conducting these sales?

3    A    Falsified the truth?

4    Q    Yes.

5    A    What do you mean?

6    Q    Tells something that's not true.

7    A    No, I didn't say that.  They must have changed that.  I

8    didn't say no falsification of truth.

9    Q    Did you tell them that:

10                "Sometimes my husband brags sometimes."

11   A    Well --

12   Q              "He's a talker.  When he wants to sell something, he

13              always says I'm this and that, and he makes me mad

14              sometimes."

15   A    Yeah, I get mad.  It's true.

16   Q    And --

17   A    When he bragging sometimes, I --

18   Q              "And he says ten thousand this, he doesn't have --

19              even have it on his hands sometimes, he doesn't even

20              have it."

21   A    He just --

22   Q    Did you say that to the officers when --

23   A    Yes, I did.

24   Q    And did they ask you --

25   A    I did say that.

1    Q    -- the officer ask you if your husband embellished things

2    a little bit --

3    A    What?

4    Q    -- and you said, yes, he over-exaggerated.

5    A    I cannot -- when -- when he jokes around, he exaggerates.

6    That's what I meant, not -- not to the way of scamming people.

7    Q    Did he ever say we have a cannery or we have a fishery?

8    A    Well, we were using a -- Steven's cannery about five, six

9    years ago.

10   Q    So, in other words, that would have been true?

11   A    What is?

12   Q    That you had a cannery?

13   A    I didn't say we had a cannery.

14   Q    What did you say about Steven's cannery?

15   A    Oh, when we used to work there at the cannery --

16   Q    Mm-hmm (affirmative).

17   A    -- at the Steven's cannery.

18   Q    Did you tell the officer at that time on October the

19   14th, that your husband Scott said we have a cannery, we have

20   this, but we don't even have it?

21   A    Oh, I didn't men --

22   Q    We don't have it?

23   A    I didn't mention anything about a cannery.  I don't know.

24   I can't remember that.

25   Q    And did -- have you -- did you tell him that sometimes

1  you told your husband why did you say that?  And he answers we

2  just -- so we can sell, you have -- sometimes have to use

3  that?

4  A    Do what?

5  Q       "Sometimes I told him why do you say that?  Oh, we

6          just -- so we can sell.  He says sometimes you have

7          to use that."

8  Is that what your answer was?

9  A    You mean sell fish.  Sells fish.

10  Q    Yes, right.  Is that correct that you said that at the

11  time of that interview?

12  A    I guess I did.  But it's differ -- it's a

13  misunderstanding of what you guys are getting now.

14  Q    Did you tell him with regard to what he told Ed Lopez

15  that you did know what he was telling Lopez, right?  You've

16  told us today --

17  A    Yes.

18  Q    -- that you didn't know that he had promised King salmon

19  to Mr. Lopez.

20  A    That Scott promised Kings?

21  Q    Yes.

22  A    No.

23  Q    Did you tell the officer back then on October the 14th,

24  2009 -- 2010, excuse me -- that you said to your husband:

25          "You can't tell that you have this, that's why that

1           guy Lopez says I'm going to trade prawns if you send

2           filet, how can we send you Kings?  We don't even

3           have Kings.  Where am I going to produce Kings?

4           Where am I going to produce reds?  Where am I going

5           to get those?  We don't have them."

6    Is that what you told the officer?

7    A    I didn't tell that to the officer.  We -- I think he

8    pro --

9    Q    You did or didn't?

10   A    Because we are going to get it somewhere else --

11              MR. CURTNER:  Your Honor?

12   A    -- not --

13              THE COURT:  Yes?

14              MR. CURTNER:  I don't have I think what Mr. --

15   whatever prior statements that Mr. Cooper is referring to in

16   order to follow this.  I'd ask that --

17              THE COURT:  Okay.  How about we do this?  We take a

18   fifteen-minute recess and you get what you need, okay?

19              MR. COOPER:  We -- we do have it on a disk here and

20   I'd like to play it.

21              THE COURT:  Okay.  Well --

22              MR. COOPER:  So --

23              THE COURT:  All right.  Well, I'm just saying it's

24   recess time and the two of you gentlemen can work it out,

25   okay?  Ma'am, we're going to take a fifteen-minute recess.

1          THE WITNESS:  Thank you, sir.

2                          (Pause)

3      (Jury out at 3:09:14 p.m.)

4          THE CLERK:  Off record.

5      (Recess at 3:09:23 p.m., until 3:29 p.m.)

6      (Jury not present)

7          THE CLERK:  All rise.  His Honor the Court, the

8  United States District Court for the District of Alaska is

9  again in session, the Honorable Ralph R. Beistline presiding.

10  Please be seated.

11          THE COURT:  Okay.  Are we ready to keep going?

12          MR. COOPER:  Yes.

13          THE COURT:  All right.  Bring the jury in.

14                  (Pause - side conversation)

15      (Jury in at 3:29 p.m.)

16          THE COURT:  Okay.  We're all back and we're

17  continuing forward.  Whenever you're ready, Mr. Cooper, we'll

18  -- we'll continue forward.

19          MR. COOPER:  Very well.

20                  (Pause - side conversation)

21          MR. COOPER:  Yes.  Your Honor, what I'd like to do

22  is I want to play a recording of the interview -- the prior

23  interview, and we've given a copy of that to Mr. Curtner, and

24  -- with some log notes of the portions that we're interested

25  in at this time.  I'd like to play that portion for the

1   witness, this being her prior interview of October 14th, 2009

2   [sic].

3           THE COURT:  The entire interview or a portion of it

4   or --

5           MR. COOPER:  No, the -- just two portions of it at

6   this time.

7           THE COURT:  And you've provided the transcript to

8   Mr. Curtner, is that right?

9           MR. COOPER:  I've provided the disk --

10          THE COURT:  Okay.

11          MR. COOPER:  -- to Mr. Curtner with log notes of the

12  times for the sections that I'm referring to right now.

13          THE COURT:  Okay.

14          MR. COOPER:  So, this will be the first one.  It'd

15  be starting at log notes 12147 to 12203.

16          THE COURT:  So, you're going to have the witness

17  listen to this and then question her about it, is that right?

18          MR. COOPER:  Yes.  This is --

19          THE COURT:  Okay.

20          MR. COOPER:  -- I can advise the witness this is

21  your interview of October 14th, 2009 [sic], with Special Agent

22  Mann and Sergeant Quist.  Those --

23          THE WITNESS:  Sergeant -- okay.

24                **CROSS-EXAMINATION CONTINUED**

25  BY MR. COOPER:

1   Q    Sergeant Quist of the Alaska State Troopers and Special

2   Agent Mann was -- was the person who asked you the questions

3   in this particular area.  Do you remember Special Agent Mann

4   questioning you?

5   A    Which one is he?

6   Q    He was a Fish and Wildlife agent.

7   A    Is he here?  No.

8   Q    No.

9   A    Okay.

10       (Audio recording portion played for the witness)

11  A    We've got some fish.

12  BY MR. COOPER:

13  Q    That's your voice on there, isn't it?

14  A    Yeah, but is there any more besides that tape?  Did they

15  cut the tape off?

16  Q    Oh, no, there's more.

17  A    Okay.  Because when I said that, it's -- probably Scott's

18  cutting fish, you know, but not the way it's -- put it on that

19  because when they asked me if Scott -- is Scott cutting fish,

20  I said no, not -- not unless he's cutting fish on his own.

21  That's what I thought that I remember.

22  Q    So, you don't -- you don't agree that you said what we

23  just played here?

24  A    Well, it's -- I know it's on the tape, sir, but -- but in

25  my -- when they were interviewing me, I must have said

1  differently, but the way I want to say it is that not unless

2  Scott's cutting fish without me knowing or something like

3  that.

4  Q    Hmm.

5  A    So, I don't know --

6  Q    So, it's not true that -- that Scott would cut fish

7  whenever you wanted to lie down if you -- or if you didn't

8  feel good?

9  A    No, because Scott's at the pizza place.

10       MR. COOPER:  Hmm.  All right.  I'd like to play the

11 next section, starting at 14751 to 15008.

12       (Audio recording portion played for the witness)

13 BY MR. COOPER:

14 Q    That was your voice, too, wasn't it?

15 A    Yes.

16       MR. COOPER:  Now, do we have that (indiscernible -

17 away from microphone).

18            (Pause - side conversation)

19 BY MR. COOPER:

20 Q    You weren't agreeing with what your husband was doing,

21 were you?

22 A    What?

23 Q    You weren't agreeing with what he was doing, what you

24 described on here that's exaggerating and saying things that

25 you didn't have.

1       MR. CURTNER:  Judge, I'd ask Mr. Cooper to clarify.

2   She doesn't agree with what he was doing.  I'm not sure what

3   you're referring to.

4       MR. COOPER:  Sure.

5   BY MR. COOPER:

6   Q    That he was promising to produce Kings and you were

7   saying:

8           "How can we send you Kings?  We don't even have it.

9           Where am I going to produce Kings?  Where am I going

10          to produce reds?  Where am I going to get those?  We

11          don't have it."

12  A    Well, at that point, we don't have any connections yet.

13  That's what I meant.  Because we can actually -- we already

14  have a contact from King Salmon that -- see, that's what my

15  husband knows is that we -- we might be getting some Kings and

16  reds from King Salmon from a -- and Dillingham.  But then when

17  we were talking to that guy, Lopez I guess, and I told him

18  it's -- we don't have any Kings, so I sent him what I get.

19  Q    Were you not disapproving of what your husband was doing

20  when you were speaking to Special Agent Mann in this recording

21  we just heard?

22  A    It's -- it's not that I'm disapproving because what they

23  told me there is that, okay, you just have to say what you say

24  for the truth.  I'm not dis -- I mean, well, in a way I could

25  say that, but -- but they -- all I know is that the

1  investigators that came, they -- they just lied to us.

2  Q    You knew that what your -- what your husband was doing

3  was wrong, didn't you?

4  A    Doing what -- in what way?

5  Q    Promising to produce King salmon for people that you

6  didn't --

7  A    Well, it's not just --

8  Q    Excuse me.  Let me say it.

9  A    Okay.

10  Q    Saying he was producing King salmon for them when he

11  didn't have it and you couldn't get it.

12  A    Oh, we could get it.

13  Q    You didn't think that was right, did you?

14  A    We could get it sometimes when he said it right there and

15  then --

16  Q    That's not my question.

17  A    -- but he don't have it on his hand, I don't like that

18  because he doesn't have it in his hand and he's going to say,

19  oh, I have this, but we still have to look for it.

20  Q    Did you say to the officers at any time during the time

21  that they were there that day that what you did -- what you

22  and your husband had done was not right?

23  A    I can't remember saying that.  I don't know if I said

24  that what my husband doing was wrong.

25          MR. COOPER:  I'd like to play that portion, Your

1   Honor.

2              THE COURT:  All right.  Very well.

3              MR. COOPER:  That's a different tape.

4              MR. CURTNER:  Do I have a copy of that?

5              MR. COOPER:  I think you do.  At least I can tell

6   you where it is.

7              MR. CURTNER:  (Indiscernible - simultaneous

8   speakers) are you referring to?

9              MR. COOPER:  (Indiscernible - away from microphone)

10  it's on the -- file is the -- you've got several labels --

11             MR. CURTNER:  Uh-huh (affirmative).

12             MR. COOPER:  -- of DM numbers.

13             MR. CURTNER:  Yeah, what's the DM number?

14             MR. COOPER:  DM-1 -- 40125 -- 40125.

15             MR. CURTNER:  And what's the date of that interview?

16             MR. COOPER:  It's October 14th, 2009 [sic].

17             MR. CURTNER:  2009 or 2010?

18             MR. COOPER:  Two thousand -- excuse me, 2010.

19  Correction.

20             MR. CURTNER:  (Indiscernible -- voice too low.)

21                       (Pause)

22             MR. COOPER:  Do you have the actual --

23             MR. CURTNER:  No, all I have is this summary

24  (indiscernible - paper rustling) talking about.

25             MR. COOPER:  Okay.  It's at these -- it's at these

1    log numbers, 930 to 934.  It's -- I don't know that it's going

2    to be in the notes.

3            MR. CURTNER:  Well, wouldn't it be in the notes of

4    the interview that you gave us?

5            MR. COOPER:  I don't know if -- no, it's not.

6    (Indiscernible -- voice too low.)

7            MR. CURTNER:  You going to ask her about his

8    interview?

9            MR. COOPER:  No, I'm asking her what she said, but

10   it's on the interview tape.

11           MR. CURTNER:  Oh, his interview.

12           MR. COOPER:  Right.

13           MR. CURTNER:  (Indiscernible -- voice too low.)

14           THE COURT:  Okay.  We find what -- find what we're

15   looking for yet?

16           MR. CURTNER:  No, Your Honor.  We're going back and

17   forth and I just have some summaries.  I have to find --

18           THE COURT:  Okay.  Well, take your time.

19           MR. CURTNER:  Okay.

20                   (Pause - side conversation)

21           THE COURT:  Let's go off the record while we're

22   waiting.

23       (Off record, at 3:43 p.m.)

24       (On record, at 3:47 p.m.)

25           THE COURT:  Okay.  Let's go back on the record.

1  Back on the record.  Okay.

2          MR. CURTNER:  Apparently what we're going to hear is

3  nowhere in this twenty-one-page narrative of this interview,

4  so I guess we should just all listen to it together.

5          THE COURT:  Okay.  All right.  Go ahead.

6          MR. COOPER:  Yes.

7      (Audio recording portion played for the witness)

8  BY MR. COOPER:

9  Q    Was that your voice that we just heard?

10 A    What did I say?

11 Q    Say?

12 A    I didn't hear it.  What --

13 Q    Oh.  Want to hear it again?

14 A    Yes.

15      (Audio recording portion re-played for the witness)

16 A    What did I say?

17 BY MR. COOPER:

18 Q    You said I know what we did was not right, correct?

19 A    In what way?  What's the continuation for the tape?  Is

20 there anymore besides that?

21 Q    There is, but not -- well, you want to hear the rest of

22 the tape or what do you want to do?

23 A    Well, I guess because I don't know why I said that, not

24 in your part.  I guess I said I don't know why we think was

25 not right.

1  Q    Mm-hmm (affirmative).  Well, you didn't explain that.

2  A    Because when I took my pills -- when I went in, they had

3  me take my pills, and I told them that I don't know why you

4  guys are doing this to us because I didn't even know what we

5  did was right, that's what I -- I remember, I recall saying

6  that because I told them that we're only doing little fish for

7  little money and we're not doing anything illegals.  We been

8  buying the fish from the cannery, so I don't see why what

9  we're doing was not right.  That's what -- I think that's --

10 Q    It doesn't say that though, does it?  It says I know what

11 we did was not right.

12 A    So, I must not said it right way because I -- I remember

13 saying things like that because when they were getting all our

14 fish, I told them we're not criminals, we're not drug dealers,

15 we're just trying to make a living.

16          MR. COOPER:  Your Honor, I -- I guess I should mark

17 for identification the portions of the interview of this

18 witness that we played earlier, and that's -- that's on a disk

19 which is numbered thirty-nine.  That would be our Exhibit 39.

20 I'd like to offer that in evidence.

21          (Government's Exhibit 39 marked for identification)

22          THE COURT:  Very -- any objection?

23          MR. CURTNER:  No, Your Honor.  I'm probably going to

24 ask some of those snippets, too, so --

25          THE COURT:  Okay.  Well, then it'll be received.

1        (Government's Exhibit 39 admitted)

2                MR. COOPER:  No further questions.

3                THE COURT:  Okay.  Redirect.

4                MR. CURTNER:  Thank you, Your Honor.  First of all,

5    Your Honor, I took Mrs. Maxon's credit card back and I'd like

6    to admit it into evidence as Defense Exhibit C.

7                THE COURT:  You want to -- the card itself or --

8                MR. CURTNER:  The card, yes.

9                THE COURT:  -- a copy of it?  Do you want to --

10               MR. CURTNER:  I've got the card itself in case the

11   jury wants to examine it.

12               THE COURT:  Okay.  So, I didn't -- G did you say?

13               MR. CURTNER:  C.

14               THE COURT:  C.  Very well.

15       (Defendant's Exhibit C admitted)

16               MR. CURTNER:  Thank you.

17                      **REDIRECT EXAMINATION**

18   BY MR. CURTNER:

19   Q    Mrs. Maxon, first of all, I think we need to clarify a

20   little bit about when Mr. Cooper was asking about Saint Mary's

21   Kings.  Now, as I understand it, when you have a table at a

22   public event like the AFN Convention, you might be selling

23   different types of fish with different people?

24   A    Yes, that's what I said.  Yes, sir.

25   Q    And some of those people that you know that are your

1  friends might be from Saint Mary's, Alaska?

2  A    Yes, Saint Mary's, Alaska.

3  Q    And -- and they -- and they may have King salmon strips.

4  A    Yes.

5  Q    Now, those could be legal, right?  They should be legal.

6  They could have been from 2008, they could have been smoked

7  anytime, there's no way --

8  A    There may be.

9  Q    -- to think that they're illegal, right?

10 A    Yes.

11 Q    You don't think anybody's selling illegal fish right

12 there in front of the AFN Convention.

13 A    No, I don't think so because just like the Chignik fish,

14 they're illegal, and actually somebody walked in there one

15 time and they asked if there's illegal fish.

16 Q    And so there might be somebody who has some -- who are

17 from Saint Mary's that you know who might have some King

18 salmon at your table, and if somebody came up and said are

19 there any Kings, somebody could say here are some Kings --

20 A    Yes.

21 Q    -- right here from Saint Mary's.

22 A    Yes, Saint -- there were some Kings, yes.

23 Q    And that would be a completely honest answer, right?

24 A    Yes, and I -- I said that.

25 Q    Okay.  And that's -- I mean, I'm just being clear.

1    That's how it goes, that's what happens at your table.

2    A    Yes.  Yes, sir.

3    Q    Now, do you remember this time back in October 2010 when

4    all these people came over to your house?  How many agents

5    came over?

6    A    Probably eight to twelve.

7    Q    Okay.  And -- and they wanted to talk to you alone by

8    yourself?

9    A    Well, actually as soon as I walked in, they -- I guess my

10   daughter told them that I'm not in a position to -- because I

11   was shaking when I walked in there and the officer said I can

12   take my pills --

13   Q    Okay.  What --

14   A    -- and I --

15   Q    -- what kind of medications were you taking then?

16   A    I take an Ativan when I -- when they walked me into the

17   bedroom and I have two officers with me.

18   Q    Okay.  So, they interviewed you in your bedroom.

19   A    Yes, they put me --

20   Q    Just you and two officers.

21   A    Yes, they put me in the bedroom.

22   Q    And you took Activan (ph)?

23   A    Ativan.  It's Lorazepam --

24   Q    What does that do?

25   A    -- to calm me down.

1  Q    Okay.  So, you were pretty nervous when all these agents

2  were there?

3  A    Yes, because it's -- they're everywhere.

4  Q    And so you took some medication just to calm down.

5  A    Yes.

6  Q    And was that at the beginning of this interview?

7  A    Yes.

8  Q    Because this interview -- this interrogation took what,

9  two and a half hours?

10 A    Yeah.  I took my pills first before they let me bring

11 into the bedroom.

12 Q    Okay.  And then they continued to question you about two

13 and a half hours.

14 A    Yes.  And they keep asking me and they said that -- this

15 is nothing but just say what -- but you're not in any

16 charges --

17 Q    Okay.

18 A    -- but you're not doing any illegal fish.

19 Q    Okay.  So, in this two-and-a-half-hour interrogation, at

20 first -- you told them within the first thirty-five minutes or

21 so that you had mailed this fish --

22 A    Yes.

23       MR. CURTNER:  -- Chums from Arizona.  Could we

24 listen to that tape starting at thirty -- this first clip you

25 have 3437 to 3522?

1          MR. COOPER:  Where is this?

2          MR. CURTNER:  This is on your --

3          MR. COOPER:  Oh, okay.

4          THE SPECIAL AGENT:  You ready?

5          MR. COOPER:  Your Honor, what -- what is the purpose

6    of this person offering this person's own prior statement?

7          MR. CURTNER:  It's part of -- it's to respond to

8    some of the other statements he's played.  It's the same

9    interview.

10          THE COURT:  Oh, this -- is it -- it's the same

11    interview --

12          MR. CURTNER:  Yes.

13          THE COURT:  -- but not the same --

14          MR. CURTNER:  Same interview, different time --

15    different segments.  He's taken a few pieces, I want to --

16          THE COURT:  Okay.  Go ahead.

17        (Exhibit 39 portion played for the witness)

18    BY MR. CURTNER:

19    Q    Okay.  That was your response then -- or earlier in the

20    beginning of the interview?

21    A    (No audible reply.)

22    Q    And then they asked you about the AFN Convention, that

23    was at about forty-five minutes into the interview.  Do you

24    remember that?

25    A    Yes.

1      MR. CURTNER:  Maybe we could play a short clip, very

2  short, from 4330 to 4400.

3      (Exhibit 39 portion played for the witness)

4  BY MR. CURTNER:

5  Q    Okay.  So, that was your voice.  You were being honest

6  with the agents then, right --

7  A    Yes.

8  Q    -- about what happens at AFN, right?

9  A    Yes.

10      MR. CURTNER:  Okay.  And just one more short clip at

11  5220 to 5240.

12      (Exhibit 39 portion played for the witness)

13  BY MR. CURTNER:

14  Q    Okay.  So, you were being honest then, telling them that

15  you sell Chums --

16  A    Yes.

17  Q    -- not Kings.

18  A    Yes.

19  Q    That's what you told the agents.

20  A    Yes.

21  Q    And then this one thing about a statement about Scott

22  sometimes cutting fish, now that was at minute one twenty-one

23  in the interview.  That's after two hours of this interview

24  that you made that statement, is that correct?

25  A    I think so if that's what it --

1   Q    So, Mrs. Maxon, are you telling us the truth today that

2   you -- that you sent Chums down to --

3   A    Yes.

4   Q    -- Ed Lopez --

5   A    Yes, I did.

6   Q    -- that that's what he wanted, that's what you talked

7   about --

8   A    Yes.

9   Q    -- that you didn't tell him it was Kings --

10  A    No.

11  Q    -- and that Scott didn't know what you were mailing down

12  there.

13  A    No.

14            MR. CURTNER:  Thank you.

15            THE COURT:  Recross?

16            MR. COOPER:  No, Your Honor.

17            THE COURT:  All right.  Thank you, ma'am.  You're

18  excused.  Your next witness?

19            MR. CURTNER:  I'm going to call Venessa Shangin,

20  please.

21            THE COURT:  Okay.

22                 (Pause - side conversation)

23            THE COURT:  Come on down.  Have a chair for you

24  right up here.  Right up the front and just get near the chair

25  and then remain standing just for a second and she's going to

1    swear you in, and then we'll go from there.

2              THE CLERK:  Please raise your right hand.

3    **VENESSA SHANGIN, DEFENDANT'S WITNESS, SWORN**

4              THE CLERK:  Okay.  Please be seated.  For the

5    record, can you please state and spell your full name?

6              THE WITNESS:  Venessa Shangin.  V-E-N-E-S-S-A.

7    Shangin, S-H-A-N-G-I-N.

8              THE CLERK:  Thank you.

9              THE COURT:  All right.  Mr. Curtner.

10              MR. CURTNER:  Thank you.

11    **DIRECT EXAMINATION**

12    BY MR. CURTNER:

13    Q    Venessa, how old are you?

14    A    Twenty.

15    Q    And who are your parents?

16    A    Evangeline Maxon and Scott Maxon.

17    Q    Okay.  So, this is your father here --

18    A    Mm-hmm (affirmative).

19    Q    -- and your mother just came out of the courtroom?

20    A    Yeah.

21    Q    Okay.  Are you married?

22    A    I am.

23    Q    And what's your husband do?

24    A    Russell Shangin, Junior.  He's a commercial fisherman.

25    Q    All right.  And do you sometimes fish with him?

1    A    Mm-hmm (affirmative).

2    Q    Could -- could you tell us a little bit about you and

3    your husband's occupation?

4    A    He fishes in Chignik Lagoon, Alaska, it's near the

5    Aleutians, and they commercial fish in the summers for about

6    four months.

7    Q    Now, do you get involved in your mother's fish processing

8    at all?

9    A    When I was younger and with them, I'd help her, you know,

10   hang strips up and everything.  It's a family thing.

11   Q    So, you're familiar with --

12   A    Mm-hmm (affirmative).

13   Q    -- with that?  All right.  Do you -- are you familiar

14   with her selling her salmon strips at different public events?

15   A    Yeah.

16   Q    What do you know about that?

17   A    She just sets up her strips, sells them by the pound.

18   Sometimes we all help out, you know, say she was outside and

19   she gets cold and we go -- she will go inside, get coffee,

20   we'll help her sell.  She usually helps other people sell,

21   too.  Everyone's stuff is kind of just all together.

22   Q    Okay.  When you say everybody's stuff is together, do you

23   have anything that you get from Chignik?

24   A    My husband's family sells pickled fish and everything

25   there, but there's also other people that she knows from other

1    villages, and they also sell stuff at the same table and

2    she'll help them out.

3    Q    What other parts of Alaska do you --

4    A    There's so many parts.  I --

5    Q    Different -- different towns --

6    A    Yeah, different villages, different towns.  They all have

7    smoked fish, they sell a lot of different stuff.

8    Q    Okay.  And they'll all be at the same table?

9    A    Yeah.

10   Q    And your mother -- why does she help out with that?

11   A    She's a nice person.  She just --

12   Q    She likes to help the other people --

13   A    Yeah.

14   Q    -- who do it, too?

15   A    Yeah.

16   Q    Okay.  And is -- sometimes your father Scott, is he there

17   occasionally?

18   A    Mm-hmm (affirmative).  Yeah.  He usually, you know -- we

19   can't carry all of it, so he carries and helps her sell, so

20   she has her moments where she doesn't feel good, and so he'll

21   do a lot of the work for her selling it.

22   Q    Now, what do you know about your mother's being involved

23   in processing fish.  She's done it your whole life?

24   A    Yeah.  My grandma and grandpa, she grew up with them

25   doing it, and then they'd always do it at their house, and

1  then -- yeah, first she got her cancer, she -- it makes her

2  feel better, so she does it, too, so --

3  Q    Maybe you could tell us a little bit about that.  So, she

4  was -- she has -- she was seriously ill from the cancer --

5  A    Mm-hmm (affirmative).

6  Q    -- and the treatment?

7  A    Yeah.  'Cause they -- yeah.

8  Q    And so did she take some time off from -- from smoking

9  fish?

10  A    For her treatments?

11  Q    Yeah.

12  A    Yeah.

13  Q    Then why did she get back into smoking fish then if she

14  was not feeling well?

15  A    It gave her something to take her mind off of it.  She

16  just -- it's what she grew up doing and, you know, it's her

17  parents, so something that she would love, and so she did it

18  to keep her mind off things and just try to focus on that;

19  kept her going instead of laying in bed.

20  Q    And in a sense, was that therapeutic for her then?

21  A    Yeah.

22  Q    Did she ever like label the fish or how did she sell it?

23  A    Smoked fish, buy it by the pound.  It -- it was never

24  labeled, it was just always smoked fish or they called it

25  squaw candy.

1   Q    They call it squaw candy?

2   A    Yeah.

3   Q    Why is that?

4   A    I don't know.  It's -- it's -- I don't know, they just

5   call it squaw candy.  They cut it up in small pieces and --

6   Q    So, it's small strips?

7   A    Yeah.

8   Q    Okay.  And it's usually kind of hard smoked?

9   A    Yeah.

10  Q    Okay.  And now your father Scott, was he involved in that

11  processing business much?

12  A    He would help check on the smokehouse once in awhile, but

13  I wouldn't really say he did strips.

14  Q    Oh, I'm sorry?

15  A    I wouldn't really say he cut it or processed or anything.

16  Q    Why?  Was that -- why wouldn't he?

17  A    (No audible reply.)

18  Q    You can tell us.

19  A    Kind of horrible (indiscernible - laughing).

20  Q    What's that?

21  A    Horrible.

22  Q    Was your mother pretty good at it?

23  A    Yeah, my mom was really good.

24  Q    And -- and your father really wouldn't do it at all?

25  A    Uhn-uh (negative).

1   Q    Now, was he busy running a restaurant at --

2   A    Mm-hmm (affirmative).

3   Q    -- during this time?

4   A    Yeah.

5   Q    Tell us about that.

6   A    Well, they had Frontier Pizza and Co-Op Diner, and my dad

7   really likes to cook and serve people and it's one of their

8   passions.

9   Q    Okay.  So, that's where he spent most of the time is --

10  A    Mm-hmm (affirmative).

11  Q    -- at the restaurant?

12  A    Yeah.

13  Q    Now, I want to show you a couple of boxes.

14                          (Pause)

15  That's been identified as Government's Exhibit 10.  Have you

16  seen that box before?

17  A    They're fishing boxes.

18  Q    Well, that particular box, do you know?

19  A    There's multiple -- I mean, I'm not sure -- like I wasn't

20  there when they mailed it out or anything, but --

21  Q    Did you see boxes like that at your mother's?

22  A    Yeah.

23  Q    Did she have a lot of --

24  A    Yeah, she has lots of --

25  Q    -- fish boxes?

1   A    -- she has -- she collects all her boxes.

2   Q    How many boxes do you think would be around?

3   A    I don't even know.  She just collects them over the years

4   and reuses them.  She doesn't ever let anything go to waste.

5   Q    So, she'll keep them -- she'll get a box, she'll keep it,

6   she'll use it, ship it, she'll --

7   A    Yeah.

8   Q    -- she'll use it over and over?

9   A    Mm-hmm (affirmative).

10  Q    It'll be recycled for one -- one thing (indiscernible -

11  voice too low)?

12  A    Yeah, any -- any box.

13  Q    Pardon me?

14  A    Any box.

15  Q    Okay.  Now, can you look in the top -- do you see

16  something -- markings with a black felt-tip marker on the top?

17  A    Yeah.

18  Q    What does it say?

19  A    Twenty-five pound Kings, Class A.

20  Q    Okay.  Now, do you recognize your mother's handwriting?

21  A    Yeah.

22  Q    Any way that's her handwriting?

23  A    No.

24  Q    Do you recognize your father's handwriting?

25  A    Yeah.

1   Q   Any way that's his handwriting?

2   A   No.

3   Q   Okay.  You're sure of that?

4   A   Yeah.  My mom has (indiscernible - laughing).

5                    (Pause)

6   Q   Okay.  That's been identified and marked as Government's

7   Exhibit 10-A.  Do you -- can you look at the top of that box

8   and see if you see some handwriting on top of that, too?

9   A   Yeah.

10  Q   What does it say?

11  A   Twenty-five pound King.

12  Q   Okay.  And is there any way that's your mother's --

13  A   No.

14  Q   -- writing?  Any way that's your father's handwriting?

15  A   Uhn-uh (negative).

16  Q   And you're positive.

17  A   Yeah.

18                    (Pause)

19  Q   Now, Venessa, do you remember October last year, 2010,

20  then agents came to your mother's home with a search warrant?

21  A   Yeah, very well.

22  Q   Were you there?

23  A   Mm-hmm (affirmative).

24  Q   Can you tell me what happened that day?

25  A   Well, we had just drove there from Anchorage at like two

1  in the morning and we woke up hearing something on the porch

2  that my husband thought was (indiscernible).  He couldn't

3  understand it, so I went over and I opened the door and I just

4  remember a bunch of people coming in.  And I tried to go over

5  to the room to get my husband up and they wouldn't let me go

6  in there.  Asked if I had anyone else in the house, and then

7  they brought me into the kitchen and sat me down on a chair

8  with my husband in the living room, and they wouldn't really

9  let us talk to each other, and they just started asking us

10  where my parents were and I -- I thought they were in bed

11  though 'cause I had just got there from Anchorage and they

12  told me they weren't in the house, could they be anywhere in

13  the house like hiding anywhere, and I said no.  And -- I had

14  -- I had no idea where they were.

15      So, they sat us down and they began asking us if we knew

16  anything about like Arizona and fish and if my mom mailed

17  anything out of state, my dad mails anything out of state, and

18  I was just -- I didn't know what was going on and I asked them

19  what's it about, and they didn't show me any warrants or

20  anything at first, not until they got into telling me my

21  rights -- my <u>Miranda</u> rights and everything, and then they

22  asked if I'd be willing to answer questions, and I said yeah.

23      And then maybe like an hour or so later, they started

24  showing me the warrant and everything, what everything was

25  about, and it was just kind of ridiculous, I think.  I don't

1  know.

2  Q    Well, was your mother there?

3  A    No.  No one was home.

4  Q    Did she end up coming later or --

5  A    Yeah, she came in later.  I had told them that they

6  needed to be nice to her and if she was the one who answered

7  the door when they came in, she probably would have been in

8  the hospital because of her bad health.  And so I instructed

9  them to keep -- to talk to her very nicely and calm.

10 Q    So, what happened when she got there?  Was she nervous?

11 A    Yeah.  She -- at first, she thought it was maybe us and,

12 you know, she was kind of shaky, and she has bad anxiety, so

13 they calmly, you know, escorted her in and talked to her about

14 it.

15 Q    How long did they talk to her, do you know?

16 A    Awhile.  A long time.

17           MR. CURTNER:  Okay.  All right.  That's all the

18 questions I have.  Mr. Cooper may have some --

19           THE WITNESS:  Okay.

20           THE COURT:  All right.  Cross-examination?

21           MR. COOPER:  Thank you, Your Honor.

22                        **CROSS-EXAMINATION**

23 BY MR. COOPER:

24 Q    You were present at the time the officers first came for

25 the search warrant, is that correct?

1   A    Correct.

2   Q    And they asked you some questions and you provided

3   information to them --

4   A    Yeah.

5   Q    -- freely, didn't you?  Did they ask you about salmon

6   being shipped to Arizona?

7   A    They asked me about shipments made out, and afterward

8   they asked if my parents have been mailing any fish out.

9   Q    They asked you about that.

10  A    Mm-hmm (affirmative).

11  Q    And do you know anything about that?

12  A    Uhn-uh (negative).

13  Q    So, you're not aware of whether they were or were not

14  shipping anything out of --

15  A    They normally don't ship anything out.  It's just local

16  customers.

17  Q    Oh, really?  Okay.  Did you subsequently learn that they

18  had shipped salmon out to Arizona?

19  A    Mm-hmm (affirmative).

20  Q    Where did you hear about that?

21  A    Pretty much through all this.

22  Q    Who did you speak to about it?

23  A    Well, my mom and dad afterward and -- 'cause the officers

24  were in there asking questions about it.

25  Q    And did they tell you that they had sent some salmon out

1  to somebody in Arizona?

2  A     Mm-hmm (affirmative).

3  Q     They did or didn't?

4  A     They did.

5  Q     They did.

6  A     Yeah.

7  Q     Did they talk to you about the writing that was on the

8  box?

9  A     My mom doesn't ever write anything on the box besides --

10 Q     Okay.  That's not my question.

11 A     The what?

12 Q     Did they talk to you about the writing on the box?

13 A     Uhn-uh (negative).

14 Q     They didn't.

15 A     No.

16 Q     Have you since had a chance to speak with them about the

17 writing on the box, either your mom or your dad?

18 A     Yeah.

19 Q     And when was that?

20 A     Probably after looking at -- I'm not sure when.  It's

21 after looking at all the pictures.

22 Q     Recently?

23 A     Mm-hmm (affirmative).

24 Q     What did they tell you about the writing on the box?

25 A     They looked at it and -- I had been the one that actually

1  noticed it and I was just like that's -- whose handwriting is

2  that?  And they don't know, it could have been an old box.

3  Q    Sorry?

4  A    They don't know whose handwriting it was 'cause I was --

5  Q    They told you that?

6  A    Yeah, 'cause I had noticed.

7  Q    Mm-hmm (affirmative).  So, your -- your dad told you he

8  didn't know whose handwriting it was?

9  A    Mm-hmm (affirmative).

10  Q    And your mother told you the same.

11  A    Yeah.

12  Q    Is that having some influence on your conclusion that

13  they didn't write it because they said they didn't?

14  A    Yeah.  More because I know their handwriting.

15  Q    Mm-hmm (affirmative).  Now, you spoke with the officers

16  about whether or not either your mother or your father had

17  sold King salmon or red salmon.

18  A    Mm-hmm (affirmative).

19  Q    And isn't it true that you indicated to them that you

20  didn't believe they did?

21  A    Yeah.

22  Q    Now, what was the basis for your belief in that regard?

23  In other words, why did you say --

24  A    Because I had always seen my mom do dog salmon.

25  Q    Because what?

1    A    I had always seen my mom do dog salmon, and I know that

2    she ordered dog salmon --

3    Q    Mm-hmm (affirmative).

4    A    -- and the only time I ever seen her sell Kings or

5    anything is for other people.

6    Q    I see.

7    A    Yeah.

8    Q    So, nothing that they ever had of their own would have

9    been King or red, it would have been dog salmon or Chums --

10   A    Yeah.

11   Q    -- in other words --

12   A    Yeah.  Sorry.

13   Q    Yeah.

14   A    Yeah.

15   Q    I mean, Chum is the fancy word for the marketplace, isn't

16   it?  It's just dog salmon.

17   A    Yeah.  Yeah.  Commercial fishermen, it's dog salmon.

18   Q    Right.  Right.  Okay.  So, that's all you've ever seen

19   them put up and smoke --

20   A    Yeah.

21   Q    -- to be sold to anybody --

22   A    Yeah.

23   Q    -- is the dog salmon that they get from the canneries.

24   A    Mm-hmm (affirmative).

25   Q    Nothing else.

1   A    No.

2            MR. COOPER:  Thank you.  That's all I have.

3            THE COURT:  Redirect?

4            MR. CURTNER:  No, Your Honor.  Thank you.

5            THE COURT:  Thank you, ma'am.  What's -- can you do

6   another one today or not?

7            MR. CURTNER:  No.

8            THE COURT:  We've got forty-five minutes.

9            MR. CURTNER:  I know, but I don't -- we may be able

10  to start tomorrow morning.  There may not be (indiscernible).

11  I have to make a decision.

12           THE COURT:  Huh?

13           MR. CURTNER:  I haven't decided --

14           THE COURT:  Okay.  Okay.  Do you want -- so you want

15  some time to think.

16           MR. CURTNER:  Yes.  I'm getting old, Judge, you

17  know, it takes longer --

18           THE COURT:  You're getting old?  So, is that okay,

19  Mr. Cooper, if we start -- stop a few minutes early today?

20           MR. COOPER:  It would be all right, Your Honor.

21           THE COURT:  All right.  Eight-thirty tomorrow

22  morning?  Okay.  And we're going to be at it, you know, full

23  day tomorrow probably, and the -- the -- if -- if -- I don't

24  know what's going on, as you probably can tell, but if we

25  finish tomorrow, we'll probably -- if there's another witness

1    -- let's say there's another witness, the Government then can

2    decide whether or not it has any more witnesses, and we'll try

3    to do closing arguments in the morning -- late morning maybe.

4    This is all just guesswork.  And then we pick the jury -- I

5    don't know if we'll be picking the jury -- I mean the

6    alternates, so I don't know if we'll do that before lunch or

7    after lunch, it just depends on the timing, and then you begin

8    deliberating -- the remaining twelve begin deliberating.

9         Can counsel give me any more advice than that

10   schedule?  If by chance we finish before lunch, then you have

11   to stay and deliberate through the lunch hour, but the lunch

12   will be provided.  And I just don't know about that and

13   counsel can't help me either.

14        MR. CURTNER:  We'll be done tomorrow for sure.

15        THE COURT:  See, that's not an answer.  Okay.  We'll

16   stand at recess then and we'll use this time to talk about

17   jury instructions.

18        MR. CURTNER:  Yes.

19                     (Pause)

20     (Jury out at 4:18 p.m.)

21        THE COURT:  Okay.  Let's just go through these

22   instructions real quick.

23        MR. COOPER:  They look all right to me, Your Honor.

24        THE COURT:  I have one to add, and maybe I -- I just

25   left it out, It's 3.11:

1          "A separate crime is charged against defendant in

2          each count.  You must decide each count separately.

3          Your verdict on one count should not control your

4          verdict on any other."

5    That's -- that's the pattern 3.11.  Should that be added?

6          MR. COOPER:  I think it's appropriate.  Sure.

7          THE COURT:  Okay.  I'll just add that one.

8          MR. COOPER:  I -- I saw one that I don't know if it

9    really applies, and that's the one about --

10          THE COURT:  Okay.  Well, let's talk about it.

11          MR. COOPER:  -- expert testimony.

12          THE COURT:  Well, I said it may be.  I've already

13   read it, so it's too late.  I said expert testimony may be

14   because I figured in this case that it would be --

15          MR. COOPER:  But I mean --

16          THE COURT:  -- but I guess it's --

17          MR. COOPER:  It doesn't matter that it was already

18   read, but do we -- we don't need it again.

19          THE COURT:  I'm not going to do it again.

20          MR. COOPER:  Okay.

21          THE COURT:  No, I -- I -- the only one I read twice,

22   frankly, is the reasonable doubt one.  I -- that I -- that's

23   the only one I usually read twice.

24          MR. COOPER:  So -- so these are -- these are meant

25   to be instructions at the end of the case, but there's a

1    couple of preliminary ones in there.

2              THE COURT:  What -- what you have there is what I

3    have read already --

4              MR. COOPER:  Okay.

5              THE COURT:  -- and that takes you up through

6    instruction number -- I want -- I'm not going to start reading

7    until we get to instruction number eighteen.

8              MR. COOPER:  Eighteen.

9              THE COURT:  Although there's not numbers on them --

10   well, there's no number on eight -- the one after seventeen.

11   Those are the ones I've already read.  I've read the first

12   seventeen already.  So, if we -- if you turn to the -- the one

13   after seventeen, that's where I would start.

14             MR. COOPER:  Okay.

15             THE COURT:  My secretary hasn't numbered those

16   because she knows we change things, so starting at 3.1, and

17   she'll finalize these, take all the -- the -- the notes off of

18   them, and put them in order, and I would add -- I'm going to

19   add this one about a separate crime is charged against the

20   defendant in each count, and that will follow Government

21   number two, which is if your -- if everybody's -- instruction

22   entitled 3.1.  Am I the only one looking at these?

23             MR. CURTNER:  No.

24             MR. COOPER:  I'm looking at them right now.  3.1 is

25   the one we start with --

1           THE COURT:  Yeah, that's the first thing I'll say.

2           MR. COOPER:  -- and then I've (indiscernible) number

3     one.

4           THE COURT:  Okay.  Then I'll turn the page and I'll

5     get to one called Government number one.

6           MR. COOPER:  And then our number two.

7           THE COURT:  And then your number two, and then I

8     will insert this one called 3.11:

9               "A separate crime is charged against defendant in

10              each count.  You must decide each count separately.

11              Your verdict on one count should not control your

12              verdict on the other count."

13    That will then go in right after Government number two.  Okay?

14          MR. COOPER:  Yes.

15          THE COURT:  And then I get to -- the next one is the

16    aiding and abetting instruction, that's from the pattern --

17    every one of these is from the pattern except for the very

18    last page.  Then I do proof beyond a reasonable doubt a second

19    time, and then, of course, 3.3, we've got to decide, that can

20    go either way, that's what Mr. Curtner's thinking about,

21    right?  We want to go 3.3 or 3.4.  You with me?

22          MR. CURTNER:  Yes.

23          THE COURT:  It says, "A defendant in a criminal

24    case" --

25          MR. COOPER:  Where was the -- I thought aiding and

1  abetting was in here -- oh, I see it.

2          THE COURT:  Oh, it's -- it's -- it's -- aiding and

3  abetting is the -- is the third --

4          MR. COOPER:  I see it in there.

5          THE COURT:  Okay.

6          MR. COOPER:  So, then after 3.11 comes 3.5 and then

7  the defendant will say whether it's 3.4 or --

8          THE COURT:  Right.

9          MR. COOPER:  -- whatever, 3.3 --

10          THE COURT:  We'll know that tomorrow morning.

11  Everybody with me so far?

12          MR. CURTNER:  Yes.

13          MR. COOPER:  Yes.

14          THE COURT:  Now, I'm going to turn the page.

15          MR. COOPER:  Yes.

16          THE COURT:  Now, I'm at 4.1.  Yes or no?

17                        (Pause)

18  I don't care either --

19          MR. COOPER:  I think it's pretty standard, isn't it?

20          THE COURT:  It's a standard pattern one.

21          MR. COOPER:  Yeah.

22          MR. CURTNER:  Looks good.

23          THE COURT:  Okay.  All right.  Then we turn the

24  page, we're at 4.3.  That has no happen -- well, yes, it --

25  yeah, that -- that's -- that may be --

1      MR. COOPER:  That's arguable.  I mean, I think it's

2  all one common scheme and they're inter -- inextricably

3  intertwined, but there were events like the sale in the summer

4  of --

5      THE COURT:  That's what I was thinking of.

6      MR. COOPER:  -- 2010 that was not charged and --

7      THE COURT:  And they can't consider that.

8      MR. COOPER:  Well, they --

9      THE COURT:  Well, they can consider it not as to

10  guilt, as what 4.3 says.  This is the pattern.

11      MR. COOPER:  It -- yes.  I -- I think it's

12  inextricably intertwined, but if -- the alternative is that it

13  would be subject to this --

14      THE COURT:  Do you want me to give it or not?

15  That's all I'm asking.

16      MR. COOPER:  -- instruction.  Well, where's the

17  four --

18      MR. CURTNER:  I think it's misleading, Judge.  I

19  mean, because, you know, it characterizes other acts not

20  charged.  I think it's all part of one --

21      THE COURT:  I've already allowed all the testimony

22  about the preliminary matters --

23      MR. CURTNER:  Right.

24      THE COURT:  -- without objection.

25      MR. CURTNER:  Right.

1          THE COURT:  So, this might be unnecessary.

2          MR. CURTNER:  Exactly.

3          MR. COOPER:  I have no problem with --

4          THE COURT:  Okay.  I'm going to strike 4.3.  Put a

5     big X through my 4.3.  4.10, pattern.

6          MR. CURTNER:  Keep it.

7          MR. COOPER:  It applies.

8          MR. CURTNER:  They had phony checks and all that,

9     yeah.

10          THE COURT:  5.6.  Okay.

11          MR. CURTNER:  Looks good.

12          MR. COOPER:  That's standard, too.

13          THE COURT:  Pattern.  I -- I -- my -- my legal

14    secretary has convinced me -- or my judicial assistant has

15    convinced me to stick with the pattern and don't get in so

16    much trouble, okay?  So, I'm sticking with the pattern.  5.6

17    is pattern.  Turn the page.  7.4, pattern.

18          MR. COOPER:  Right.

19          MR. CURTNER:  We're good.

20          THE COURT:  7.1.

21          MR. CURTNER:  One?

22          THE COURT:  7.1.  When you begin your deliberations.

23          MR. CURTNER:  Oh, that's good.

24          THE COURT:  7.5, verdict forms.

25          MR. CURTNER:  No objection.

1          MR. COOPER:  No objection.

2          THE COURT:  7.6 --

3          MR. COOPER:  No objection.

4          THE COURT:  -- pattern.  Okay.  The very last page

5 is not a pattern, but it's --

6          MR. COOPER:  That's all right.

7          MR. CURTNER:  No objection.

8          THE COURT:  So, I'll have her -- anything that you

9 want to do at this point to supplement them -- I know we can't

10 finalize them because we've got one we're waiting on, but we

11 can get them pretty much in order and we can number them, we

12 just don't know whether we're going to use 3.2 or 3.1, or

13 whatever those numbers were.

14          MR. CURTNER:  Judge, I just have one thing on the

15 aiding and abetting instruction, 5.1.

16          THE COURT:  Yes.

17          MR. CURTNER:  I was looking at the pattern

18 instructions --

19          THE COURT:  Okay.

20          MR. CURTNER:  -- in the Lopez case at the bottom of

21 that where I think it's clear that:

22          "To obtain a conviction for aiding and abetting, the

23          government must prove beyond a reasonable doubt that

24          the defendant knowingly and intentionally aided,

25          counseled, commanded, induced, or procured the

1          principal to commit each element of the crime

2          charged."

3    And I think that language should be added to your instruction.

4          THE COURT:  Where -- where is it?  You're on the --

5          MR. COOPER:  It's already in there.

6          MR. CURTNER:  Is that in there?

7          MR. COOPER:  It's in the -- it's the second element.

8          MR. CURTNER:  Yeah, I see it.  Okay.  Then that's --

9          MR. COOPER:  It's in there.  Yeah.

10          THE COURT:  It's there.

11          MR. CURTNER:  Okay.  Then we're good.

12          THE COURT:  Good.  Okay.  So, the only change

13    tomorrow is going to be that three point whatever.  I keep --

14    3.2 or 3.1 -- or 3.3.  And so we'll -- if the part -- you

15    know, let me know first thing in the morning.  So, the plan is

16    first thing in the morning, it's going to be either -- you're

17    going to either put on another witness or rest.

18          MR. CURTNER:  Yeah, exactly.

19          THE COURT:  Then we're going to turn to you and ask

20    you if you have any rebuttal -- legitimate rebuttal, and then

21    we're going to get ready to jump on closing arguments.

22          MR. COOPER:  Very well.

23          THE COURT:  Okay?

24          MR. COOPER:  Very well.

25          THE COURT:  Okay.  Boy, we're getting done early.  I

1  got more time.  I told my wife not to pick me up until five,

2  so we -- we've got thirty minutes to go --

3              MR. CURTNER:  You talking about the Super Bowl?

4              THE COURT:  Okay.  All right, thanks.  See you

5  tomorrow.

6              THE CLERK:  All rise.  Court stands in recess until

7  Friday at 8:30.

8         (Proceedings concluded at 4:27 p.m.)

**INDEX**

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **WITNESSES FOR THE GOVERNMENT:** | | | | | |
| Francisco Solis, Jr. | 2-4 | 2-18 | 2-25 | | |
| Eric Marek | 2-28 | 2-37 | 2-41 | | |
| James Neely | 2-42 | 2-56 | 2-63 | 2-64 | |
| Michael Karras | 2-70 | 2-73 | | | |
| Virgil Umphenour | 2-74 | | | | |
| David Rippeto | 2-78 | 2-129 | 2-134 | 2-137 | |
| **WITNESSES FOR THE DEFENDANT:** | | | | | |
| Evangeline Maxon | 2-140 | 2-160 | 2-203 | | |
| Venessa Shangin | 2-210 | 2-219 | | | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| **GOVERNMENT:** | | | |
| 12 | 8/23/10 C.O.D. purchase receipts | | 2-13 |
| 13 | Fish box | | 2-13 |
| 13-A | Fish box | | 2-13 |
| 14 | Photograph | | 2-15 |
| 14-A | Photograph | | 2-15 |
| 14-B | Photograph | | 2-15 |
| 14-C | Photograph | | 2-15 |
| 14-D | Photograph | | 2-15 |
| 14-E | Photograph | | 2-15 |
| 14-F | Photograph | | 2-15 |
| 14-G | Photograph | | 2-15 |
| 14-H | Photograph | | 2-15 |
| 14-I | Photograph | | 2-15 |
| 15 | Audio recording | | 2-32 |

1

**INDEX**

2

<u>EXHIBITS</u>:                                                    <u>Marked</u>    <u>Received</u>

3

<u>GOVERNMENT</u>:

4

5      16    Photograph                                                2-35
       17    Copy of check                                             2-36
       18    Copy of duplicate check                                   2-36
6      21    USPS surveillance video                                   2-82
       22    USPS C.O.D. documents                                     2-86
7      23    Screen shot from Exhibit 21                               2-84
       24    Copies of C.O.D. labels                                   2-91
8      25    7/12/08 Snug Harbor Seafoods bill of lading               2-92
       26    7/22/07 Movers, Inc. document                             2-94
9      27    8/3/10 Alaska Air Cargo waybill                           2-95
       28    9/9/08 Copper River Seafoods invoice                      2-97
10     29    8/23/08 Copper River Seafoods invoice                     2-98
       30    7/28/08 Snug Harbor Seafoods invoice                      2-99
11     31    7/29/08 Movers, Inc. bill of lading                       2-100
       32    7/11/10 Alaska Air Cargo waybill                          2-102
12     33    8/3/10 Alaska Air Cargo waybill                           2-103
       34    Prime Select Seafoods invoices                            2-107
13     35    Copper River Seafoods invoices                            2-108
       36    Snug Harbor Seafoods invoices                             2-111
14     37    Lab results summary                                       2-116
       38    Photograph                                                2-125
15     38-A  Photograph                                                2-125
       38-B  Photograph                                                2-125
16     38-C  Photograph                                                2-125
       38-D  Photograph                                                2-125
17     38-E  Photograph                                                2-125
       38-F  Photograph                                                2-125
18     38-G  Photograph                                                2-125
       38-H  Photograph                                                2-125
19     38-I  Photograph                                                2-125
       38-J  Photograph                                                2-125
20     38-K  Photograph                                                2-125
21     39    Audio recording                             2-202         2-203

22     <u>DEFENDANT</u>:

23     A     Salmon jerky                                2-152         2-154
       B     Salmon jerky                                2-152         2-154
24     C     Evangeline Maxon debit card                               2-203

25

1       **CERTIFICATE**

2       I certify that the foregoing is a correct transcript from the
        electronic sound recording of the proceedings in the above-
3       entitled matter.

4

5           /s/ D. Kathleen Stegmiller                    11/13/2012
        D. Kathleen Stegmiller, Transcriber                  Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25