UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:11-cr-00003-RRB |
| | ) | |
| Plaintiff, | ) | Fairbanks, Alaska |
| | ) | Friday, January 27, 2012 |
| vs. | ) | 8:40 o'clock a.m. |
| | ) | |
| WILLIS SCOTT MAXON, | ) | **TRIAL BY JURY – DAY 3/VERDICT** |
| | ) | |
| Defendant. | ) | |
| | ) | |

VOLUME III
**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE RALPH R. BEISTLINE
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          STEPHEN COOPER, ESQ.
                            Assistant U.S. Attorney
                            U.S. Attorney's Office
                            101 12th Avenue, Room 310
                            Fairbanks, Alaska   99701
                            (907) 456-0245

For the Defendant:          F. RICHARD CURTNER, ESQ.
                            Federal Public Defender Agency
                            601 West 5th Avenue, Suite 800
                            Anchorage, Alaska   99501
                            (907) 646-3400

Court Recorder:             JODY EVANS
                            U.S. District Court
                            101 12th Avenue, Room 332
                            Fairbanks, Alaska   99701
                            (907) 451-5792

**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58721*
*(701) 255-1054  ❧  nodak@centurylink.net*

```
1   Transcription Service:        NODAK ROSE TRANSCRIPTS
                                  721 North 19th Street
2                                 Bismarck, North Dakota  58501
                                  (701) 255-1054
3
    Proceedings recorded by electronic sound recording.
4   Transcript produced by transcription service.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    FAIRBANKS, ALASKA - FRIDAY, JANUARY 27, 2012

2         (Call to Order of the Court at 8:40 a.m.)

3         (All parties present; defendant present)

4         (Jury not present)

5             THE CLERK:  All rise.  His Honor the Court, the

6   United States District Court for the District of Alaska is now

7   in session, the Honorable Ralph R. Beistline presiding.

8   Please be seated.

9             THE COURT:  Mr. Curtner.

10            MR. CURTNER:  Morning, Your Honor.

11            THE COURT:  Hi.

12            MR. CURTNER:  The defense rests.

13                        DEFENSE RESTS

14            THE COURT:  Okay.  Mr. Cooper?

15            MR. COOPER:  Yes, Your Honor.  We have a rebuttal

16  witness --

17            THE COURT:  Okay.

18            MR. COOPER:  -- and he's ready to go.  I think he's

19  here in the courtroom.

20            UNIDENTIFIED SPEAKER:  (Indiscernible - away from

21  microphone.)

22            MR. COOPER:  He's just outside the courtroom door.

23            THE COURT:  Okay.  We'll bring the jury in.  Should

24  I just tell them that you rest or --

25            MR. CURTNER:  (No audible reply.)

1            (Pause - side conversation)

2        (Jury in at 8:41 a.m.)

3            THE COURT:  Well, good morning, ladies and

4    gentlemen.  How are you doing?  Isn't this -- did we hit forty

5    below yet?  Getting close.  It's nice to be able to try a case

6    and know it's forty below outside.  You feel like Alaskans.

7            Okay.  Well, here's what's happened.  The defense

8    has rested, so they're through with their evidence.  Now we

9    turn back to the Government, and they have one more witness.

10   Mr. Cooper.  Yes?

11           MR. COOPER:  Be just about a minute, I'm told,

12   before the witness --

13           THE COURT:  Okay.  So, we have --

14           MR. COOPER:  He -- he was out in the hall, but he

15   had to go to the restroom.

16           THE COURT:  Okay.  So, that's the -- that's the

17   plan.  Any questions so far?  Not about the case, about life.

18   We're trying to kill a minute.  Is this the witness?  No?

19   Okay.

20           MR. COOPER:  No, not yet.

21           THE COURT:  Okay.  Well, we can go off the record

22   then.

23       (Off record, at 8:42:09 a.m.)

24       (On record, at 8:42:59 a.m.)

25           THE CLERK:  -- record.

1       THE COURT:  And Mr. Cooper, you can call your next

2  -- your first witness in rebuttal.

3       MR. COOPER:  Yes, Your Honor.  I'd like to call

4  Frank Solis.  If you'd please come forward.

5       THE COURT:  Okay.  Good morning, sir.  If you'll

6  stand -- remain standing, the Clerk will swear you in.

7       THE CLERK:  Please raise your right hand.

8  **FRANCISCO SOLIS, JR., GOVERNMENT'S REBUTTAL WITNESS, SWORN**

9       THE CLERK:  Okay.  Please be seated.  For the

10 record, can you please state your full name?

11      THE WITNESS:  Francisco Solis, Junior.

12      THE CLERK:  Thank you.

13      THE COURT:  All right.  Mr. Cooper.

14                    **DIRECT EXAMINATION**

15 BY MR. COOPER:

16 Q    Mr. Solis, now you've testified previously in the case,

17 correct?

18 A    Correct.

19 Q    And you testified to your telephonic contact with Mr.

20 Maxon and the two agreements you reached with him regarding

21 sales, one for -- each of them for fifty pounds of King salmon

22 strips, one in December 2009 and the other in July or August

23 2010, correct?

24 A    That's correct.

25 Q    Did you deal with -- that is, reach an agreement with

1    Mrs. Maxon, his wife -- Evangeline or Vangie Maxon?

2    A    I -- I -- I never made any kind of agreement with Mrs.

3    Maxon whatsoever.  Most of my deals that were made were with

4    Scott Maxon.

5    Q    So, you did actually talk to her at some time?

6    A    I did speak with her a couple of times when she picked up

7    the phone or the phone was passed to her.

8    Q    All right.  And tell us what the first occasion was in

9    which that happened.

10   A    The first occasion was in 2010, May 25th I believe, and I

11   had been speaking with Scott Maxon prior to that, and he asked

12   -- he passed the phone to -- to his wife so she could explain

13   to me about the -- the fish that was going to be provided to

14   me.  And -- and then so -- and this, by the way, was a

15   recorded telephone conversation.  And, you know, she mentioned

16   that the -- the fish that was provided to me was kind of left

17   over fish, it was kind of dry, and that I was going to like

18   the fish that -- that was going to be provided to me this time

19   because it was, of course, fresher.  And -- and then she --

20   she asked me what kind of fish I was -- I was interested in --

21   in getting, and I said King salmon, and she just pretty much

22   absorbed all that and said, oh, okay, all right, fine.  Then

23   she asked -- you know, wondered what processing would -- I was

24   interested in, and then I asked, you know, well, what do you

25   mean, and she said, well, do you want fresh filets and so

1    forth, and I said, oh, yeah, of course.  And then she said,

2    well, uh, well, you're going to have to talk to Scott about

3    that, and she handed the phone right back to him.  And so that

4    pretty much was the gist of it.

5    Q    All right.  Now, was that the first time you'd actually

6    spoken to her?

7    A    That was the first time I spoke to her directly.

8    Q    And the date of that again was what?

9    A    May 25th, 2010.

10   Q    And you didn't speak to her in December 2009 before you

11   made that first purchase of fifty pounds?

12   A    I did not.

13   Q    At all.

14   A    At all.

15   Q    I mean, she never even picked up the phone and passed it

16   on to Scott or anything like that.

17   A    No.

18   Q    Okay.  So, this is the very first time, May 25th, 2010.

19   A    The very first time.

20   Q    Do you have a tape recording of that?

21   A    There is a tape recording of that, that I think we're

22   prepared to play.

23            MR. COOPER:  Very well, Your Honor.  I'd like to do

24   that.  We'd like to play the portion that has Mrs. Maxon on

25   it.  It's -- probably just take a couple of minutes.  We have

1   it on a disk which is marked forty, and I have a copy for the

2   defense.  And I also have a transcript of that, and we should

3   mark it -- I think that's already been marked 40-A for May the

4   25th.  Thank you.  I have a copy for the Court and copies for

5   the jury.

6              THE COURT:  Okay.  So, has -- do you want to play --

7   Mr. Curtner heard the -- seen the transcript before this

8   moment?

9              MR. CURTNER:  Nope.

10             THE COURT:  So, we'll do the same process then.

11                 (Pause - side conversation)

12             THE COURT:  So, what are we doing now?

13             MR. COOPER:  I think he's going to tell us whether

14  there's an objection.

15             MR. CURTNER:  Well, I have to -- I haven't heard

16  this tape.

17             THE COURT:  He wants -- he wants to hear the tape.

18             MR. COOPER:  Oh, okay.  Fine.  I'll just lay a brief

19  foundation for that.

20             THE COURT:  Okay.

21  BY MR. COOPER:

22  Q    Have you listened to the recording that -- that we're

23  about to hear, Mr. Solis?

24  A    I have.

25  Q    Is it an accurate reproduction of the conversation that

1  you're telling us about today?

2  A    It is.

3  Q    And have you also done a transcript of this portion of

4  the recording that has Mrs. Maxon on it?

5  A    I have.

6  Q    And is that transcript an accurate reproduction of the

7  sounds that are on the tape -- on -- on the CD?

8  A    It is.

9         MR. COOPER:  Very well.  I'd offer forty, Your

10  Honor, in evidence and 40-A, the transcript thereof.

11         THE COURT:  Okay.  Well, we'll take the tape first

12  -- play the tape so that Mr. Curtner can compare his

13  transcript with what's on it, and then we'll go from there.

14       (Government's Exhibit 40 admitted)

15         MR. COOPER:  Thank you, Your Honor.  We'll play that

16  portion of forty.

17       (Exhibit 40 portion played for the jury)

18         THE COURT:  Okay.  Any objection?  Did you find any

19  -- any concerns about the transcript?

20         MR. CURTNER:  No, no.

21         THE COURT:  Okay.  You can distribute the transcript

22  and I'm going to read -- because we haven't read this for

23  awhile, I'm going to read this instruction:

24         You're about to hear a recording that has been

25  received in evidence.  The transcript of the recording is

1    being provided to help you identify speakers and help you

2    decide what the speakers say.  Remember that the recording is

3    the evidence, not the transcript.  If you hear anything

4    different from what appears in the transcript, what you heard

5    is controlling.  Listen carefully.  The transcript will not be

6    available during your deliberations.

7            Okay.  Mr. Cooper, if you can distribute that

8    transcript.

9            MR. COOPER:  Yes, Your Honor.

10                         (Pause)

11        (Exhibit 40 portion re-played for the jury)

12                         (Pause)

13   BY MR. COOPER:

14   Q    Very well.  Now, that's the one you've just testified to

15   about on the May 25th contact?

16   A    That's correct.

17   Q    All right.  Now, was there another later time when you

18   actually spoke with Mrs. Maxon -- Evangeline Maxon --

19   A    Yes, there was a --

20   Q    -- the wife of --

21   A    -- one more occasion.

22   Q    And do you recall when that was?

23   A    I believe the date was July 23rd of 2010.

24   Q    And what happened on that occasion?

25   A    On that occasion, I -- I -- I telephoned expecting to

1   talk to Scott Maxon, for him to pick up the phone and it --

2   Mrs. Maxon picked up the phone and I spoke to her just very

3   briefly, for about twenty seconds or so, and then she just

4   passed the phone to -- to Scott.  But she mentioned they were,

5   you know, kind of busy doing the -- the fish and the -- and

6   the store at the same time.  And then that was pretty much the

7   gist of it.

8   Q    Very well.  And then have you listened to the tape

9   recording of that conversation?

10  A    I have.

11  Q    And is it an accurate reproduction of the conversation

12  you just told us about now?

13  A    It is.

14  Q    And have you also transcribed that small portion where

15  you actually spoke to her on the 23rd of July 2010?

16  A    I have.

17  Q    And is that transcript an accurate representation of the

18  words that are actually on the recording that you described?

19  A    It is.

20       MR. COOPER:  Your Honor, I'd offer then that portion

21  of forty also and the transcript 40-B that goes along with

22  that, soon as the defense has a copy of that.  It's a one-page

23  transcript.

24       THE COURT:  You want to do the same procedure?

25       MR. CURTNER:  Yes.

1          THE COURT:  Okay.

2          MR. COOPER:  You can play that.

3      (Exhibit 40 portion played for the jury)

4   BY MR. COOPER:

5   Q    Is that the end of it?

6   A    That's the end of it.

7   Q    Okay.  Then after -- as soon as this ended, what happened

8   next?

9   A    After that, I spoke to Scott and he just -- I was just

10  touching base with him once again just to see if he could --

11  you know, we could continue with another deal and so he could

12  provide some more King salmon to me, and --

13  Q    Very well.

14  A    -- and --

15         MR. COOPER:  So, I'd like to provide the transcript

16  to the jury on that, Your Honor.

17         THE COURT:  Okay.  Same admon -- same admonition, as

18  I lift the book in the air.

19         MR. COOPER:  We only have one, is that it?

20             (Pause - side conversation)

21         THE CLERK:  Right.  And those are only for

22  identification, they're not being admitted.

23         MR. COOPER:  Okay.

24             (Pause - side conversation)

25      (Exhibit 40 portion re-played for the jury)

1                              (Pause)

2    BY MR. COOPER:

3    Q    Now, aside from these that we just heard, Mr. Solis, is

4    there any other occasion where your conversation with Mr.

5    Maxon led you to believe that his wife was with him at that

6    time while you were speaking to Mr. Maxon?

7    A    Yes.  One of the earlier calls in the year prior.

8            THE COURT:  Okay.  You're talking light again.

9    A    One of the previous calls in December of 2009.

10   BY MR. COOPER:

11   Q    And can you identify which call we're speaking of?

12   A    It's the -- the date it occurred was December 9th, 2009,

13   and I believe it's the -- this is the one in which -- the

14   first call really that we referred to when I first spoke

15   yesterday or the day before that.  It's the first audio that

16   we listened to.

17   Q    So, that would be December the 9th, 2009 --

18   A    Correct.

19           MR. COOPER:  -- correct?  Your Honor, I would like

20   to play just those portions that -- of that 2009 tape in which

21   it's evident that the defendant is speaking to his wife.

22           THE COURT:  It's already been played though, is that

23   right?

24           MR. COOPER:  It has.

25           THE COURT:  So, we don't need the transcript or --

1           MR. COOPER:  I think it would be very useful to have

2      that so there's no question of what was said.

3           THE COURT:  Okay.  All right.

4           MR. COOPER:  It's a very short portion.  There's

5      about a page altogether or less than that actually; portion of

6      a page worth.

7           THE COURT:  Okay.  Very well.  Distribute it and the

8      same admonition would apply.

9                (Pause - side conversation)

10          MR. COOPER:  We'll be playing a portion of what has

11     been marked for identification as 3-A [sic] --

12          THE COURT:  Okay.

13          MR. COOPER:  -- and it is the tape -- Exhibit 3

14     [sic], I believe it is, is the tape, and that's December 9th,

15     2009.  That'll be just a portion of the -- it'll be the first

16     page and then it will pick up again in the middle of page four

17     to the lower part of page five.  Those will be the portions

18     that we'll be playing.  Starting at the beginning of the first

19     page to the bottom of the first page, and starting in the

20     middle of the fourth page to the lower part of the fifth page.

21        (Exhibit 8 portion played for the jury)

22          THE SPECIAL AGENT:  We're about to reach that point

23     now, sir.

24          MR. COOPER:  Okay.  So, we're --

25          THE SPECIAL AGENT:  (Indiscernible -- voice too

1   low.)

2           MR. COOPER:  We're at the top of page four now, are

3   we?

4           THE SPECIAL AGENT:  Yes.

5           MR. COOPER:  All right.  Very good.

6           THE SPECIAL AGENT:  (Indiscernible -- voice too

7   low.)

8           MR. COOPER:  Thanks.  So start the --

9        (Exhibit 8 portion played for the jury)

10          MR. COOPER:  Very well.  Now, these -- wait just a

11  second here.

12                          (Pause)

13  BY MR. COOPER:

14  Q    Are these the only times -- the ones that we heard on

15  this transcript and the previous two today, the only times

16  that you ever either spoke to or heard Mrs. Maxon's voice on

17  the telephone?

18  A    The -- the main ones.  There may have been other times

19  where I've -- when I heard somebody in the background that

20  could have been her --

21  Q    And --

22  A    -- that really sounded similar to that same voice.

23  Q    Did you ever have any kind of a -- an agreement with her

24  that she was going to send you Chum salmon --

25  A    No.  No, no Chum.

1   Q     -- or any salmon at all that she was going to send you?

2   An agreement with her.

3   A     No agreements were made with her.

4         MR. COOPER:  That's all the questions I have, Your

5   Honor.

6         THE COURT:  Cross-examination?

7                    **CROSS-EXAMINATION**

8   BY MR. CURTNER:

9   Q   So, Agent Solis, is it your testimony that you recorded

10  every phone call you made to Alaska to either Scott or Vangie

11  Maxon during this investigation that's been recorded?

12  A     That is my testimony.

13  Q     Okay.  And all those recorded conversations have been

14  turned over to Mr. Cooper and to the defense, is that correct?

15  A     They have.

16  Q     That's your testimony?  Okay.  Well, let's talk a little

17  bit about this first conversation we heard today from -- from

18  May 25th.  And just listening to that conversation, you and

19  her are talking about her sending fish to you, right?

20  A     She's talking about the fish that she was going to

21  prepare.

22  Q     And you don't think that's any kind of a deal or part of

23  the deal?

24  A     No.

25  Q     That's not part of the deal.

1  A    No.

2  Q    Her preparing fish to send to you is not part of --

3  A    Part of the deal, I would imagine, is -- is discussing

4  how much you're going to pay, how much you're going to

5  receive, and none of that was discussed with her at all.

6  Q    But preparing the fish and sending it to you, isn't that

7  -- can't you just agree that's part of the deal?

8  A    It -- it's just discussing the fish I'm going to get.

9  Q    Okay.  All right.  Now -- and during that conversation,

10  she keeps saying fish, fish, fish, fish, fish.  She never says

11  Kings, does she?

12  A    That's correct, yes.

13  Q    And in fact, you're the only one, as usual, that mentions

14  Kings, and she says, well, uh, hmm, do you have -- would you

15  like some kippered King or some other kind?  And you say --

16          MR. COOPER:  Your Honor, that's a misstatement of

17  the evidence.

18  BY MR. CURTNER:

19  Q    She said do you want some fish -- it's in the transcript

20  -- any -- some other kind, and you say yeah.

21  A    That's correct.

22  Q    And after that, she keeps talking about fish, frozen

23  ones, but she never says -- uses the word Kings ever, right?

24  A    That's correct.

25  Q    Now -- so, the other conversation we had was from July

1  23rd, and then you called the Maxons again on July 28th, do

2  you recall that?

3  A    Correct, yeah.

4  Q    And you got a checking account at that time -- a checking

5  account number, didn't you?

6  A    Oh, that's right, yes.

7  Q    And whose checking account was that?

8  A    That was the Maxons from what I understood.

9  Q    Vangie Maxon's checking account?

10 A    I don't recall exactly whose it was.

11 Q    And that was part of the deal, wasn't it?

12 A    Right, to -- fortuitively to make payment to that

13 account.

14 Q    And at one point, you also told the Maxons of a change of

15 address?

16 A    Correct.

17 Q    Your -- your address -- you had a different address

18 during that time?

19 A    Right.  I wanted to use the P.O. box the second time.

20 Q    Okay.  And then that information was passed on to Scott

21 Maxon or Vangie Maxon?

22 A    I do not recall.

23          MR. CURTNER:  That's all I have.  Thank you.

24          THE COURT:  Re -- redirect?

25               **REDIRECT EXAMINATION**

1  BY MR. COOPER:

2  Q    Just to clarify what you were asked, how did the subject

3  of King salmon come up when you spoke to Mrs. Maxon on the

4  25th of May?

5  A    She asked me directly what kind of fish was I looking

6  for, and I said King salmon.  Since she asked me, I told her

7  what I wanted.

8  Q    And what was her response?

9  A    She said okay, all right.

10          MR. COOPER:  All right.  Thank you.  That's all I

11  have, Your Honor.

12          THE COURT:  Recross?

13          MR. CURTNER:  No.

14          THE COURT:  Thank you, sir.  You're excused.

15  Government have anything else?

16          MR. COOPER:  No, Your Honor.

17          THE COURT:  Mr. Curtner, anything else?

18          MR. CURTNER:  No.

19          THE COURT:  Okay.  So, we're done.  Now, we take a

20  break to let the parties get their notes together and some

21  back and do closing arguments.  So, we'll tell -- what do you

22  need to get -- get things pulled together for closing

23  arguments?

24          MR. CURTNER:  Fifteen minutes.

25          THE COURT:  Fifteen minutes.  Take a fifteen-minute

1    recess.

2                              (Pause)

3        (Jury out at 9:16 a.m.)

4            THE COURT:  So, counsel, do you want to argue from

5    the podium?  Do you want to -- we have a little -- we have a

6    little podium we can bring out here if you want in the --

7            MR. CURTNER:  I don't need it.

8            MR. COOPER:  Not necessary.

9            THE COURT:  Okay.  So, you're kidding.  You don't

10   want that little movable podium that the (indiscernible)

11   always --

12           MR. COOPER:  Well, it'd be nice to have something to

13   put the evidence on, but --

14           THE COURT:  Okay.  Is there a little podium -- just

15   a little free-standing thing --

16           THE CLERK:  It's right in there.

17           THE COURT:  Can we -- can you maybe just let -- show

18   that to them and if they want to use it, it's available to

19   them?  Okay.  There it is if you want it, either one of you.

20           MR. COOPER:  Oh --

21           THE COURT:  Is that what -- you don't want that?

22           MR. COOPER:  I could put a couple of papers on it.

23           THE COURT:  I don't care if you use it or not, I'm

24   just telling you about it.

25           MR. COOPER:  I can -- yeah, I can -- I could use it,

1    but --

2            THE COURT:  Get a table if you want a table for the

3    evidence.

4            MR. COOPER:  Is there a table?

5            THE COURT:  I don't know, but the last trial I did,

6    I had tables all over the place, so that's not my job.

7            MR. COOPER:  Okay.  I'll make use of that.

8            THE CLERK:  Off record.

9        (Recess at 9:17 a.m., until 9:42 a.m.)

10        (Jury not present)

11            THE CLERK:  All rise.  His Honor the Court, the

12    United States District Court for the District of Alaska is

13    again in session, the Honorable Ralph R. Beistline presiding.

14    Please be seated.

15            THE COURT:  Okay.  Ready to go, Mr. Cooper?

16            MR. COOPER:  Yes, Your Honor.

17            THE COURT:  Good.  Let's bring the jury in and we'll

18    get started.

19                            (Pause)

20        (Jury in at 9:42 a.m.)

21            THE COURT:  Okay.  We're going to hear first from

22    Mr. Cooper, then from Mr. Curtner, then Mr. Cooper will get a

23    brief response, and then we'll be done, okay?  Mr. Cooper.

24                    **GOVERNMENT'S CLOSING ARGUMENT**

25            MR. COOPER:  Thank you, Your Honor.  May it please

3-22

1  the Court and counsel.

2          Morning, ladies and gentlemen.  I'd like to

3  summarize for you the evidence and proof that establish the

4  charges in this case.  There are two counts in the Indictment

5  for false identification of fish worth more than three hundred

6  and fifty dollars sent in interstate commerce, and, of course,

7  knowingly.

8          And knowingly is not another -- fourth element.

9  Knowingly is part of the first element, and so you will be so

10  instructed by the Court.  It belongs in there.  Of course,

11  nobody ever alleges in this case that Mr. Maxon acted by

12  mistake.  It may be a theory that the defense would wish to

13  argue, but that's not what the evidence shows and it's not

14  what the charge is.  The charge is, of course, that it was a

15  knowing act, that it was not a mistake, and that's the way it

16  is generally in the criminal law.

17          The criminal law does not impose a penalty on

18  anybody for something that was a pure mistake, at least at

19  this level, and it's certainly not in this case.  There are

20  situations where that may be so, but -- in smaller cases, but

21  that's not our concern here.  It's definitely required that

22  the defendant knew that he was misrepresenting what he

23  misrepresented, and that it had to do with fish worth more

24  than three hundred and fifty dollars that were intended to be

25  shipped across state lines, and in fact were.

1      Now, the fact that other -- another person may have

2  been involved in this is something that's taken care of by

3  another instruction that the Court will give you, and that's

4  an instruction which deals with what's called in the law

5  aiding and abetting.

6      If two people act together in the commission of a

7  crime, then the law says that both of them have to share the

8  same knowledge and intent with regard to each of the elements.

9  And if the person -- for example, if Mr. Maxon is considered

10  as only having helped his wife do this -- this is just a

11  theory now, I don't believe this to be the way the evidence --

12  we don't necessarily contend this is the way the evidence

13  lines up, but if it were contended that he was only helping

14  his wife, it would be necessary to show that Mr. Maxon

15  understood the facts, knew the falsification, intended to

16  speak what he spoke that was false, to participate in the

17  false identification -- intended that that should be done and

18  knew that it was untrue, and also conducted the activity in

19  relation to an interstate sale of fish worth three hundred and

20  fifty dollars or more on each occasion.

21      So, in other words, the person aiding and abetting

22  is on the same footing as the person who supposedly committed

23  the crime -- the principal committing the crime.  So, under

24  the law, it doesn't matter whether the principal, the one who

25  mainly acts and is helped by the other, is Mr. Maxon or is his

1    wife.  It could be either way around and it wouldn't make any

2    difference as long as they both shared the full responsibility

3    on each of the elements of the offense.  So, the question for

4    the jury to decide is whether Mr. Maxon knew that he was

5    falsifying the identity of the fish that he sold, and there

6    are a number of ways that you can tell this.

7           First of all, we have the tape recordings -- we have

8    tape-recorded conversations of both sales.  Now, you don't

9    always have tape recordings, and even when you have tape

10   recordings, you still have to get inside a person's mind to

11   know what they knew, but you can tell what a person knew by

12   what they say and what they do, and the tape recordings go a

13   long way to establishing that.

14          The tape recordings show that Mr. Maxon is the one

15   who dealt personally with the man, Mr. Solis, posing as Ed

16   Lopez, on both of these sales -- (clearing throat) excuse me

17   -- and that Mr. Maxon was the one who represented that he was

18   selling Yukon King smoked strips in both instances.  That's on

19   tape.

20          The rest of it is did Mr. Maxon know that it was

21   only Chum salmon that went in the box and that made it down to

22   Arizona?  Did he know?  We heard testimony of what Mr. Maxon

23   said, and Mr. Maxon said that he always mixed the species and

24   he had Kings, silvers, and Chums -- or at least Kings and

25   Chums in any batch of salmon that he sold, and he claimed that

3-25

he never told anybody that it was just King salmon.

Well, we know that to be an untrue statement because he didn't say to Mr. Lopez on any of the phone conversations at any time anything about Chum salmon being in these boxes that were going to be shipped.  It was King salmon.  It was fifty pounds of King salmon strips, fifty pounds of King salmon strips in two twenty-five-pound boxes.  That's what he agreed to sell.  That's what he tape recorded as having agreed to sell.  That was the bargain.  It wasn't for a partial load of Kings and partial of Chum.

And if it had been partial, would it be right for him to be on the phone saying that it's King salmon strips I'm selling you fifty pounds for twelve hundred and fifty dollars?  Which is thirty dollars -- or twenty-five dollars a pound is what it comes out to.  Would it be true for him to say that if in fact, as his statement shows, he thought he was really selling him half or partial Kings and partial Chums?

That in itself, if it were so, if it were fifty-fifty Chums and Kings in the box, which he said was his normal practice to mix the two -- and he got on the phone and he said what you heard on the tape.  I'll sell you fifty pounds of King salmon for twenty-five dollars a pound, twelve hundred and fifty dollars total.  If you do the math, it comes out to that, fifty dollars times -- fifty pounds times twelve -- twenty-five dollars is twelve hundred and fifty dollars.  If

1    he said that, that also would be a misrepresentation.  It

2    would be a false identification of the fish because he was

3    claiming that he was selling fifty pounds of King salmon when

4    he later says, oh, I thought I was selling half Chum salmon or

5    part Chum salmon and part King salmon.

6            But even that isn't really the truth.  He knew he

7    wasn't selling any King salmon and it was all Chum.  That's

8    what the evidence shows.  His wife and his daughter, his

9    witnesses, both testified that the only smoked strips they had

10   were what they got from the cannery, and all they ever got

11   from the cannery was Chum salmon.

12           Although the best corroboration sources for that

13   fact is these exhibits, twenty-five through thirty-six.  This

14   is a combination of documents that were seized from the search

15   of Mr. Maxon's house and two documents that he brought and

16   handed to the investigators and two or three at the end that

17   came from the canneries themselves.

18           Every one of these documents shows that from 2007,

19   when Mrs. Maxon said that business started -- 2007 she said --

20   and these receipts and invoices go back to 2007, 2008, nine,

21   and ten.  Every one of these purchases is for Chum salmon and

22   nothing but Chum salmon.  In fact, it's all made out to Mr.

23   Maxon.  He's the purchaser.  He was trying to put it off on

24   his wife; I don't buy fish, I don't sell fish, I don't process

25   fish, I don't deal with fish, I just transport her stuff, she

1    does the business.  He's the customer on all these, Scott

2    Maxon.

3            And on a couple of them in the more recent time like

4    2010, you'll see that the consignee or the person being billed

5    as Frontier Pizza, attention Vangie or Scott.  He's thinking a

6    little bit ahead now, saying -- using the wife's name in

7    there, too.  But his name is on every one of these and those

8    are -- those are only the last few that say Frontier Peacha --

9    Pizza, Vangie or Scott.  The rest all say Scott Maxon.

10           And if a person wants to take the time and add it

11   all up, you can -- you can add up the numbers.  We had

12   testimony that it was over sixteen thousand pounds, all Chum

13   salmon, sold to Mr. Scott Maxon from 2007 through 2010.  He

14   wasn't buying anything but Chums.  His daughter said the same,

15   his wife said the same, we were getting Chum salmon from the

16   canneries, we weren't making the smoked strips out of anything

17   else but the Chum salmon from the canneries.

18           Sure.  There were these pictures.  In the last part

19   of the testimony, there's Exhibits 38 and 38-A through K,

20   pictures of the other kinds of fish that were lying around at

21   the house, some of them lying outdoors like this on a -- on a

22   pallet in the snow with some lying on the stairway, the steps

23   leading up to the porch all snowed on, but these were

24   principally in these two tubs or totes, this one and this one.

25           Kind of rough looking, but these are -- these are

1  not the fish that were involved in their selling of smoked

2  strips.  They said they only sold the smoked -- as smoked

3  strips the salmon that they bought from the canneries.  The

4  testimony regarding these two totes was that he had bought

5  these from a couple of Fairbanks-area fishermen that got them

6  fishing in the river in that area, but they were Chum, too.

7  There were two Cohos found amongst the samples that were taken

8  from these two totes, but Chums and Cohos, no Kings.

9       Now, the defendant's wife was an interesting witness

10  and -- first of all, you need to determine the materiality and

11  usefulness of the testimony you get from any witness, and then

12  you need to determine, of course, its credibility.  Now, Mrs.

13  Maxon clearly was a person who was trying to help her husband,

14  and she was trying to be a good witness, but she was also not

15  -- clearly not truthful in a couple of areas.

16       Mrs. Maxon had a -- a good thing going, you might

17  say.  She was -- not everybody's fortunate enough to have a

18  situation like she had in the middle of her physical medical

19  difficulties, to have a mother who was that supportive and

20  available and provided her funds, she said, to get her started

21  in an activity that would give her something to do and

22  something useful, maybe even profitable to do.  And she harked

23  back to her old experience at fish camp and she was going to

24  process fish.

25       This is a good thing, and to have somebody help

1  finance it for you is a good thing, and you can see -- if you

2  do the rest of the number work on those Exhibits 25 through

3  36, you'll see that they spent twenty-four thousand dollars

4  plus on these sixteen thousand dollar -- pounds of fish 2007

5  through 2010.  So, somebody was helping (indiscernible) either

6  they're making something or her mother's help was enabling

7  this, a good thing.

8          And her husband, the defendant in this case, turned

9  it all sour by the falsification that he engaged in, and she

10 knew it and she testified to that.  She was not willing to

11 testify against him, but she had to acknowledge as she was on

12 tape saying that sometimes it made me mad because he would say

13 these things that we just didn't have.  He said we had a

14 cannery; we didn't have that.  And he said that he could

15 produce this or that or King salmon, we didn't have it.  Where

16 am I going to get King salmon from?  Where am I going to get

17 this fish that he's saying we have?  I can't get it.  We don't

18 have it.

19         And Virgil Umphenour got on the stand and he said

20 the same thing.  I'm in the business, I do this legally, there

21 was no Yukon King salmon available for five years practically,

22 I think is what he said, because of the poor runs and because

23 the subsistence needs coming first, and you couldn't buy it

24 commercially, and he wasn't making any strips during that

25 time.  And he found some in the Kuskokwim River last year, and

1    -- but he didn't use them for strips because it's too

2    wasteful, there's quite a loss of weight in smoking it down to

3    smoked strips.  So, he had all that information and he knew

4    that it was not possible to be selling smoked King salmon

5    strips from the Yukon River that the defendant was

6    representing repeatedly on tape.

7            Now, that's the significance of the evidence of what

8    happened in October at the AFN Convention in 2009 when Rory

9    Stark and Andie Sears were the -- were the witnesses, that the

10   defendant said he was selling Yukon Kings and -- and Copper

11   River Kings.  You're not going to be able to sell Yukon Kings

12   legally; you're not going to have them available commercially

13   to sell like that in years when the river was closed to that

14   kind of fishing.

15           And his -- the only explanation through his wife

16   was, well, there were people in other tables that were near

17   where we were selling and they were from Dillingham and

18   Chignik and other places in Southwest Alaska where it wasn't

19   closed to fishing, and they were getting King salmon and they

20   could have some King salmon, too, and that's what my husband

21   was referring to when he stood at the table and he said King

22   salmon, Yukon King salmon.  Well, that would have been a

23   misrepresentation at least there that it was Yukon King or

24   Copper River King it if came from Dillingham or Chignik out in

25   the southwest.

But still, what he provided in the bag of collars wasn't King salmon although he said it was. It was Chum salmon by scientific analysis, and there's no dispute about that. And what Justin Lindell, who came along as the third witness, purchased, a two-pound bag of -- of smoked strips as being represented as Yukon King salmon, Exhibit 7, it was tested and found to be Chum salmon.

Now, if he was -- if the defendant was selling for a group, let's say, and it included people from Dillingham and Chignik and other places in the southwest that maybe could get King salmon, that isn't what he was selling to Justin Lindell and that isn't what he provided to Rory Stark. He provided Chum salmon to those people.

So, what becomes of the theory that he was helping sell his neighbors' honest-to-goodness King salmon fish from out in Bristol Bay? A Bristol Bay King is not a Yukon King if the Yukon is closed, and neither is a Bristol Bay King salmon Chum when it ends up in a bag, as these did, being handed off by Mr. Maxon.

So, the point is he did at the AFN Convention in 2009 the same thing that he did when he dealt with Mr. Lopez. He said Yukon King salmon, get them while it's hot. Yukon -- Saint Mary's Yukon Kings. And you test it, it's Chum salmon. Do you think he knew it was Chum? Why, of course, because the only thing they were making into strips at his place was Chum

1  salmon, by his one witness' testimony.

2  Now, you see the purpose of evidence which is not

3  right on the charge itself, and you'll have a jury instruction

4  from the Court about this, the 2009 October events were -- are

5  not charged in the Indictment because there's something

6  separate from what the charges are in the Indictment, but they

7  tend to prove -- they're not separate in fact, but they're

8  separate in law because they don't -- they aren't charged as

9  an offense, but they tend to prove the offense because it

10 shows the defendant's knowledge that he's selling the wrong

11 product, and that's the issue in the charges that he is

12 facing.

13 Selling to Lopez those two times is misidentifying

14 the product that he's selling, and that's the same thing that

15 he did, he misidentified the product that he provided in the

16 bag of King salmon collars to Rory Stark and in the bag of

17 alleged smoked King salmon strips to Justin Lindell.  He was

18 doing the same thing, and when a person does the same thing on

19 another occasion and it's shown that he did the same thing on

20 another occasion, it's offered not to show he's a bad guy, not

21 to show that because he did something wrong once, he's likely

22 to do it again, no, but to show that the thing that he did

23 before that showed that he knew he was doing the wrong thing

24 shows that he had the same kind of knowledge in his mind when

25 he acted with regard to Mr. Lopez in selling him the salmon.

He knew that -- in selling Chum salmon and calling it King, he knew he was making a false statement. That's what the evi -- that's what that evidence relates to and that's why it's in the case.

And that's the same thing that happened in the middle of July. Between the December-January sale to Lopez and the August sale to Lopez, in July of 2010, he sells a bag of red salmon -- he and his wife together. This time his wife actually handled the transaction, but they're both there and both talking about it and representing what it was, being either red or King salmon, to Eric Marek, who was posing as Eric Marshall and making that purchase, and that was tape recorded. And that's this little set of exhibits. The photograph being Exhibit 16 of what he purchased on that occasion in July.

But it was the same thing as saying that the fish is red or King when it's not, it's Chum. Well, what's the difference? We know from Virgil Umphenour that financially, there's a significant difference. And we know from Rory Stark who looked up the -- the -- the statistics that Alaska Department of Fish and Game puts on its website, the statistics of what salmon are actually selling for. From the fisherman out of his boat to the first processor, they have a price. There's a fish ticket, they record all that data, and there's a price known, and the ratio of value between Chum and

1    King is five to one or better.

2            See, that was -- Rory Stark did the mathematics on

3    that, but the data are right there in this Exhibit 4.  And you

4    can see for all the areas in Alaska, that there's quite a

5    difference between the value of a Chum and the value of a

6    King.  And when you smoke it, the smoking process itself, you

7    know, is the same pretty much process for any fish you want to

8    put in the smokehouse, but it's still going to cost you that

9    smoking process.

10           So, that tends to bring the ratio down to make it a

11   little closer.  When you get a smoked product, the ratio is

12   three to one, if you remember what Virgil Umphenour said.  He

13   said Kings would go -- if you could get them, but you couldn't

14   get them the last five years legally commercially -- they

15   would be about thirty dollars a pound.  Interesting.  That's

16   the price that Mr. Maxon was using in his sales -- in his

17   sales pitch quite often was thirty dollars a pound, but that

18   the Chums were from ten to sixteen dollars a pound smoked.

19   And that's Mr. Umphenour's business and he -- that's the

20   prices he gets for those.

21           So, now you see the motivation for saying it's Kings

22   because a person would be willing to pay the King price.  They

23   pay the top dollar to get the top product, and he's getting a

24   cheap substitute, and -- and, of course, it -- it probably

25   could skew the -- the data if we don't know -- if nobody ever

1  knew for sure what was being sold, but it was sold as King

2  salmon.  If anyone kept track of the sales, it would give them

3  a false notion of how much King salmon there was around.

4          That's what started the investigation, people

5  standing around saying they had all this King salmon to sell,

6  Maxon's got -- standing there with boxes stacked up all around

7  him forming a counter and platform in front of him and selling

8  these as King salmon.  Wow.  In a year, like Mr. Umphenour

9  said, when you couldn't get King salmon from the Yukon as

10  these were represented in large part to be.  Something has to

11  be done to account for where the -- whether these really are,

12  A, King salmon and, B, King salmon from the Yukon because if

13  they are, we have a big problem; they're probably not legally

14  commercially-caught fish, and that's the reason for the whole

15  investigation.

16          Well, whether or not they were is an explanation of

17  how this got started, but it's not an explanation of the

18  actual case we have before us today.  The case today is

19  falsification of the identity of fish for interstate commerce,

20  and that establishes as the element -- with what we've looked

21  at today, we can --

22                              (Pause)

23  -- we can finish the chart now, you see.  Knowingly is part of

24  the first element.  It's not a mistake, something knowingly

25  done.  Yes.  For all the reasons stated, it was knowing.  Mr.

1 Maxon knew exactly what he was misrepresenting when he

2 misrepresented the contents of these boxes, and he can't

3 cheaply put it off on his wife and say, oh, she did all of

4 that, which he tried to do.

5      He said I never spoke to Lopez.  Well, if he had

6 known at the time he made that statement that we had a tape

7 recording of him speaking to Lopez all the time for quite

8 awhile, for a few months there, what would his story have

9 been?  But you know you can't believe that.  You know that the

10 reason he said that is because he knew he was telling -- he

11 knew he had misrepresented the situation to Mr. Lopez, and so

12 he said, no, I didn't even talk to him.  And all of that is a

13 fact -- part of the factors that add up to say, yes, indeed,

14 he knew he was falsifying what he was selling.

15      And his wife said, well, yeah, he exaggerates.  He

16 does that in order to sell.  He says you -- sometimes you have

17 to say these things in order to make it happen.  She even said

18 that.  So, it's no secret what we're dealing with in this

19 case.

20      All three of these elements have been established

21 beyond a reasonable doubt, and I think that if you look at the

22 evidence, that you'll find that it does satisfy the -- the

23 requirements in order to establish the defendant's guilt on

24 counts one and two of the Indictment.  Thank you.

25      THE COURT:  Thank you.  Mr. Curtner.

**DEFENDANT'S CLOSING ARGUMENT**

MR. CURTNER:  Good morning.  I hope you understand what I mean when I say by-catch.  I hope that makes sense to you.  I can't help but see it that way.  I see this huge fishing operation, agents from Arizona, Illinois, New Jersey or wherever coming up here for a giant takedown on Operation Yukon Kings; fifty or sixty agents.  And the results, the by-catch, who do they charge?  Scott Maxon, for fifty pounds of smoked salmon, the most expensive smoked salmon in the world, if you -- if you include all the expense of this investigation.

Now, what really happened in this case?  What's the -- what's the entire picture here?  I think you can see, first of all, that this operation was going to focus on the AFN Conventions, to the people out in the cold on the sidewalks, trying to sell their home-processed smoked fish like we have -- like they have for years and generations here.  That's where they're going to target first, and they're going to focus on Scott Maxon because he happens to be the guy front and center, up front, and they're -- that's the first person they go to.

So, they go to Scott out on the counter and as we've learned -- as they didn't know, but as we learned, there's these fish from all different types of people, from -- who are selling their fish at the table, taking turns 'cause they

1    trust each other because they're a group of friends and

2    family, and they are out there and some of them are from

3    Nenana and they have their smoked strips, their smoked fish,

4    that's what they're selling.  There's no sign that said smoked

5    Yukon Kings, smoked King salmon.  There's no brochures,

6    there's no ads in the paper selling King salmon.  It's

7    Vangie's smoked fish that she and her family have been doing

8    for generations.

9         And there's people from other parts of the state,

10   there's people from Chignik, there's people from different

11   places, there's -- there's some friends from Saint Mary's who

12   may have some King salmon from last year's catch that are

13   selling there.

14        And so they come up to Scott and there's all of this

15   salmon and somebody says do you have any Kings?  And they say,

16   yeah, well, there's Kings from Saint Mary's.  He's not saying

17   he is selling Vangie's fish as Kings from Saint Mary's, but

18   that's what they want to believe because as you can tell,

19   their whole focus is we've got to get some subsistence Yukon

20   Kings, somebody selling it, okay?  So, they're going to focus

21   and they're going to target Scott Maxon.

22        Now, the reality is that Vangie Maxon and her family

23   have been doing this for a long time, back when her father

24   could fish on the Yukon and there were plenty of Yukon Kings,

25   that's what they processed.  And then, you know, she came --

1  she became -- her father died, she became sick with cancer,

2  she didn't do it for awhile, and then when she was doing it,

3  it's kind of a therapy for her to go ahead and continue this

4  family tradition of smoking fish, that's when she would smoke

5  what's available.

6          And when there wasn't -- these people didn't go out

7  and get subsistence fish so they could sell it, that wasn't

8  their business.  She was just smoking fish, whatever she could

9  -- and you could see, she bought Chum if that was what was

10  available, and she made smoked fish that people liked.

11          And -- and it was smoked salmon, and you've got to

12  remember Vangie was not hustling Yukon Kings.  She was selling

13  her smoked fish.  And nowhere do you see her advertising or

14  saying I have Yukon Kings, nobody has them, you can get them

15  from here.  No.

16          So, then they set up -- they have the focus, they

17  have the target, and they're going to do the big sting.

18  They're going to have Mr. Solis call -- make these phone calls

19  and set up this big sting to get these -- what they think,

20  what they're focused on, what they can get their mind on,

21  Yukon King subsistence fish.  That's what they want.

22          So, he keeps calling, he keeps calling.  You know,

23  Vangie -- you can see -- you saw her.  She's not that

24  outgoing, she's nervous, she's not the kind of person with the

25  gift of gab on the phone, she lets her husband order fish for

1   her.  They're a family, they've been married twenty-five

2   years, and -- but it -- Mr. Lopez keeps calling and even

3   though Vangie, I think in some of these tapes, said we don't

4   have any Kings, he is only focused on Kings, and he keeps

5   saying Kings, and they're saying we'll send you smoked fish.

6   Vangie sends smoked fish.

7         And she sent the smoked fish.  It was her credit

8   card that shipped it, it was her bank account that the money

9   came to, she was even in this conversation saying I make the

10   fish, would you like other fish?  And, you know, Mr. Solis --

11   he's so closed-minded on this, I can't even ask him today was

12   she part of the deal?  He wouldn't even admit that.  No, it's

13   all Scott, it's all Scott.  No.  You know, I made the deal

14   with him.

15         So, I think you have to look at this for what it

16   really is, and what this really is, is what Vangie said.

17   We're just a family trying to make a little bit of extra money

18   by smoking fish and fish that we bought, fish that was legal.

19         So, does this whole thing meet the statute that the

20   judge will instruct you on?  First of all, it has to be

21   knowingly.  And, you know, I guess one thing that would have

22   to change -- we're changing in midstream now.  That opening

23   statement was all Scott.  Now, it's Vangie, too.  Now Scott

24   aided Vangie to commit this crime, okay?  And that's what --

25   you know, they want to put her in this and say, well, if Scott

1  didn't commit this crime, he aided and abetted Vangie in

2  committing this crime.  Well, first of all, he didn't know

3  what was in the box.  I mean, it's her fish, she smoked it, he

4  didn't know what was in that box when it was sent, and it was

5  Vangie who was sending it.

6  Let's look at the false I.D.  You know, I mean, Mr.

7  Cooper would like to make this simple and false I.D., that's

8  all you need.  But you have to use your common sense when you

9  interpret the statute.  The judge will give you the law and

10  you're the ones who are going to decide this case.  And think

11  about what it means when we have a federal statute, a federal

12  crime, that precludes knowingly -- knowingly making false

13  records, accounts, labels, identification of fish.

14  Now, if this were a place where we had a whole bunch

15  of fish going out commercially with labels that were wrong --

16  now maybe those samples that we put in, in our exhibits -- I

17  don't know if those -- that's a King or not, I don't know if

18  that's a crime or not.  I bet if they did a DNA on that, they

19  might say that's false labels, but there weren't any labels in

20  this at all.

21  What -- were there records, were there record-

22  keeping records kept that this was King salmon that was being

23  sent out?  Was there any kind of accounts at all?  No.  There

24  was some handwriting on a box that said Kings, but we don't

25  know who did that or where that came from.

1    So, this statute, and use your common sense, is for

2  some kind of commercial enterprise that's mislabeling and

3  keeping false records on the type of fish that's being

4  commercially sold.  It's not for some woman who's making a

5  fish that calls it smoked salmon and, you know, I guess maybe

6  they should have told Francisco or Mr. Lopez or whoever that

7  it was Chum salmon, but I'm sorry, anybody who can't pronounce

8  the word salmon is not going to know what Chum is anyway.  And

9  I just don't think that -- you know, that's his whole focus

10  was to get Yukon King salmon, so they can make their bust and

11  their takedown.

12    Well, I'm sure Francisco or somebody went to

13  Francisco or Ed and said, dude, you know, you didn't score,

14  you didn't get the Yukon King, these are Chum.  I bet he was

15  embarrassed with that, and now he's closed-minded.  Okay, they

16  told me it was King, this is a mislabeling case now.  But --

17  and then if they want to say -- argue that Vangie committed --

18  violated the statute and then Scott was the one who aided and

19  abetted her, they have to show that he and she were -- both

20  knew it was false label -- all these elements have to go -- he

21  has to be guilty of all her elements; he's got to be guilty of

22  aiding and abetting her and knowing it was false and meeting

23  that definition of false labeling and -- and the other

24  elements of that.  So -- I mean, that's even further from the

25  -- from the point.

1    So -- and then what -- what are they using to try to

2  convince you that Vangie's guilty, too?  Her -- yeah, a few

3  snippets of her two-and-a-half-hour interrogation and -- where

4  they're doing the takedown in their home.

5    Now, I'm going to apologize right now if I get a

6  little bit emotional with some of these -- you know, when I

7  question the witnesses and when I talk to you folks, but you

8  can imagine Vangie in her home when let's say nine guys come

9  in with a search warrant and separate everybody and put them

10  in -- and don't let them talk to each other and put you in a

11  room for two and a half hours and question you.  Can you

12  imagine if they did that to you or your family or your

13  friends?  And then they're going to use a snippet or two of

14  that conversation and say she's guilty, too.

15    Well, okay.  I guess they have the right to get a

16  search warrant and do a takedown on our homes, but you are the

17  decider in this case.  You are the one that can decide if this

18  is going to be a conviction -- a federal conviction or not.

19  It's your decision and you have to be convinced beyond a

20  reasonable doubt of that.  Keep that in mind, beyond a

21  reasonable doubt.  That's what you have to be convinced of in

22  order to render a conviction in this case.

23    And that has to be -- that verdict -- before Scott

24  Maxon can be convicted of a federal crime for these facts,

25  that has to be unanimous, which means each and every one of

1    you stands between the Government getting a conviction in this

2    case and Scott Maxon or in the future you or me or anybody

3    else.  You have to be convinced that he is guilty in order --

4    and that is your responsibility, that's what we're counting on

5    you to do, consider all of this case, consider the big

6    picture, and do the right thing.

7            Now, Mr. Cooper, he gets to go last.  I won't have

8    another chance to respond to whatever he says in this last

9    part of this closing argument, but that's because he's got the

10   burden, he's the one that's supposed to convince you beyond a

11   reasonable doubt to convict Scott Maxon.  You have to -- I

12   can't speak again, but you can.  You can think of -- okay, Mr.

13   Cooper said that, but what would Mr. Curtner say to that, or

14   what was really -- you know, I don't -- I don't -- I don't buy

15   that.  He gets to go last, but you know what this case is

16   about, you know your responsibility, and I'm going to ask you

17   to return a not guilty verdict today.  Thank you.

18           THE COURT:  Mr. Cooper?

19                   (Pause)

20          **GOVERNMENT'S REBUTTAL ARGUMENT**

21       MR. COOPER:  Yes, it is of interest how an

22   investigation got started, but that's not the issue for your

23   final decision, it's part of the whole picture.  A jury, like

24   any other individual even trying to figure out what the truth

25   is, sometimes wonders how something got started, and so you've

1    been told how this investigation got started, and that's
2    normal to understand that.  Whether or not there was a large
3    investigation or a small investigation or what part this
4    played in it is only secondary; that's information that helps
5    you understand how the case began.  It doesn't decide the
6    issue, which is whether the defendant falsified knowingly the
7    identification of the fish that he sold to Solis Lopez.

8        Now, the evidence of whether he did that, the fact
9    that he did it, was tape recorded.  It's crystal clear that he
10   sold fish for King salmon and never anything else, never
11   represented it as being anything else, did represent it
12   affirmatively as being King salmon, twelve hundred and fifty
13   dollars worth on each occasion, twenty-five -- excuse me --
14   fifty pounds on each occasion.  That's tape-recorded evidence.

15       And then the knowledge of the falsification is what
16   we've been discussing up until now as well.  And the -- and
17   the defendant's wife was offered as a witness to help maybe
18   suggest that he may not have had knowledge.  I think her --
19   well, clearly, her what we now know to be an untrue account of
20   what happened was that she made the deal entirely herself with
21   Mr. Lopez and that this was a deal for Chum salmon.

22       She was hesitant to say that.  She said he said send
23   me whatever you have.  She said I don't have King.  Send me
24   whatever you have.  And it took two or three times asking, and
25   she finally said, yes, I did tell him it was Chum.  Can you

imagine that? That this -- she -- she claimed that this
actually happened and that it happened in the beginning.

And yet you hear a tape in May, which was five
months after the original deal was made and the package was
sent, in which it was clear that they spoke for the first
time. Hi, my name is Vangie, I'm Scott's wife. Oh, hi. I'm
Eduardo Lopez. She says I -- I -- I heard your message. They
hadn't spoken before. It's clear that was the first phone
call.

The next time when she picked up the phone in July,
she says, oh, hi, is this Ed Lopez? She'd heard his voice
once before. Well, now, that's what she would have said in
May if she had spoken to him before that. No, she says my
name is Vangie, I'm Scott's wife. That was the very first
time they spoke, May 25th, so it's a clear falsification on
her part. Not a good thing, but, you know, we're not here to
condemn her. She was doing what she thought was the best she
could do for her husband who put her in the bad spot that she
was in.

It's not a question of judging character, it's a
question of judging where the truth actually is. We can tell
that she was fabricating to try to make it seem as though he
didn't know that she had put Chums in the box and made a deal
for Chums. He had not any idea. See, that's what that was
offered for, and it's completely out the window. He knew very

1    well -- he knew just as well then as he did when he was

2    standing at the AFN Convention saying King salmon, Yukon King

3    from Saint Mary's and handing them a bag of supposed -- that

4    -- supposedly that product that turns out to be Chum salmon in

5    fact.

6         She was doing the same thing with regard to the post

7    office event.  You know, she had a credit card -- this is an

8    interesting thing.  I don't know how it happened.  She had a

9    credit card that had her name only on it and has the -- the

10   same number that the postal documents show was the debit card

11   that was used for the transaction that's photographed here on

12   December the 28th, 2009, but as you all remember from the --

13   from the video and from this photo which is Exhibit 23,

14   there's the defendant, Scott Maxon, standing there holding the

15   credit card which is not silver like hers was, it's gold in

16   color, and he's holding his wallet in his right hand, and you

17   can see that he took it out of his wallet and he handed it to

18   the clerk and the clerk handed it back to him.  Clearly not

19   what she said happened.

20        Well, now, somebody could say, well, that was an

21   innocent mis-recollection.  Maybe it was, but it was in favor

22   of saying I was the one doing the transaction, not Scott, you

23   see.  It may have been a mistake on her part, but it was a

24   mistake in favor of trying to exonerate him, and it's one that

25   doesn't work.

1    In fact, the other way.  He handled the financial

2  transaction at that point, and he's leaning all over these

3  boxes at the time which are right-side up, see by the arrows

4  on them?  And he knew what was written on the front.  Has his

5  hands right on practically the writing that says twenty-five

6  pounds Kings, Class A.  You can see that over in the corner

7  there, barely make out that that's what it is.

8    And if you look at these boxes, these are the two

9  from -- from December, ten and 10-A, there's twenty-five

10 pounds, Kings, Class A.  Who would have written that on there?

11 This box has a label on the end of it which is a stick-on

12 label with a bar code and everything like an established

13 business would do, and you can see that this same kind of

14 black marker was used to cross out the -- the company that had

15 sent this -- put this label on here whose name is on there,

16 Copper -- you can make it out, Copper River Seafoods,

17 Anchorage, Alaska, and it says Scott Maxey, wild keta salmon,

18 fresh, number one, oh slant R, H and G.  And that's the same

19 description that's on the -- the invoice from this company,

20 Copper River Seafoods, to Scott Maxey, in July 2010.

21    So, he'd only had this box -- and it was fifty

22 pounds -- it says right on it fifty pounds of this type of

23 salmon.  So, when it had fresh fish in, it had fifty pounds in

24 it.  Now somebody took a black marker and they did two things,

25 they crossed out this Copper River Seafoods, Anchorage,

1  Alaska, and wrote twenty-five pound, Kings, Class A.  Now, who

2  in the world would have done that?

3         This is an example of a label that is false, but as

4  you were -- had explained to you during the argument just now,

5  there are different ways of committing this offense, and the

6  judge will tell you in his instructions a false label or a

7  false record or a false account or a false identification is

8  -- and as you can see, a record or a label would tend to be

9  something that's written, but an account and an identification

10  may be written, it may not be.

11        The identification was false, and in this case was

12  clearly verbal and we have it tape recorded, but the label is

13  added on.  If you don't -- if you don't know who wrote that,

14  it doesn't matter because Scott Maxon falsely identified and

15  knowingly falsely identified the contents in the deal he made

16  before he sent this.

17        So, this is an extra element, an extra way of

18  committing the crime, to have it written on there, if he wrote

19  that, but who else in the world would have written it?  It

20  doesn't look like his wife's writing, and her writing is on

21  the addresses on the -- on one of the second boxes -- two

22  boxes, and so it would have been written on there by Copper

23  River Seafoods when they sent fresh Chum just four months --

24  four and a half months before this?  Certainly not.  Would

25  they have used a used box, a company that has its own pre-

1    printed bar-coded label and everything and take an old used

2    box to put this fresh fish in?  That's an unreasonable

3    interpretation of the evidence.  And it just happens to be

4    exactly what Mr. Maxon knew he was sending, twenty-five pounds

5    of King -- King salmon to Mr. Lopez, and the other one says

6    twenty-five pounds Kings in the same area of the box.

7            There's only one person in the world that could have

8    written that, and that's Mr. Maxon.  Both is wife and his

9    daughter say they don't think it looks -- she said she didn't

10   write it and they don't think he did, but nobody else could

11   have.

12           But you don't have to decide that because he already

13   had previous to that falsely identified this fish when he made

14   the deal with Mr. Lopez.  So, again, we have a witness, his

15   wife, who is trying to be helpful, who stepped over the line

16   and said some things that were proven to be untrue, but

17   nevertheless was put in that bad position by a husband that

18   she acknowledges had a way of exaggerating in order to make

19   sales happen and that she would -- it made her mad sometimes

20   because she knew that we just didn't have the product he was

21   saying we had.

22           In fact, on one of those when -- when Eric Marek was

23   making that purchase over at the Carlson Center in July of

24   2010 of the two-pound bags that he was led to believe were red

25   salmon, it turned out to be Chum salmon, he says, well, do you

1    have Kings?  And the tape, as you may recall, says do you guys

2    have Kings, too, or not?  And Maxon -- Scott Maxon says, yeah,

3    and right away his wife is saying at the same time we don't

4    have -- we didn't have any Kings right now.  She was telling

5    the truth and her husband was standing right beside her and

6    heard that and said the opposite.

7            This is what's going on, and he put her in that bad

8    position, and she did her best to try and shield him, as could

9    be expected.  And it's not a bad comment on -- against her

10   that she did it, but it is something the jury should recognize

11   for what it is.  It's not true, it's not reliable, and we're

12   here to find what the truth is.

13           So, you -- you have -- yes, you are to determine the

14   case unanimously and beyond a reasonable doubt.  There is no

15   reasonable doubt left in this case because a reasonable doubt

16   is one that's based on reason and common sense, it's not just

17   a speculative doubt, but one that you say there really is a

18   problem here and here's the reason why.  There's nothing like

19   that whatsoever.  All the questions have been looked at about

20   eight different ways, and that kind of doubt has been

21   eliminated.  You know where the truth is and the truth is that

22   Mr. Maxon knew that he was falsifying, his own wife knew that

23   he was falsifying and said so, and that he did so in order to

24   make sales work, and he did this on two occasions with which

25   he is charged, count one and count two, and which -- which

1  support the finding of guilty of Mr. Maxon on those two

2  counts. Thank you.

3                    **JURY INSTRUCTIONS**

4          THE COURT: All right. Thank you. Well, ladies and

5  gentlemen, I have the jury instructions. I can read those to

6  you now, take about ten to fifteen minutes. Can we go -- just

7  get right into it? Okay. Then we'll pick the alternates and

8  then you'll be able to go deliberate, okay? Let me see. Let

9  me find them.

10         Members of the jury, now that you have heard all of

11 the evidence, it is my duty to instruct you on the law that

12 applies to this case. A copy of these instructions will be

13 available in the jury room for you to consult.

14         There will be many copies, so I have to read it out

15 loud. You're not expected to memorize what I say to you now,

16 but the law requires me to read it, but we'll have many copies

17 of this for you to refer to, okay? So, don't stress about

18 that.

19         It is your duty to weigh and to evaluate all the the

20 evidence received in the case and, in that process, to decide

21 the facts. It is also your duty to apply the law as I give it

22 to you to the facts as you find them, whether you agree with

23 the law or not. You must decide the case solely on the

24 evidence and the law and must not be influenced by any

25 personal likes or dislikes, opinions, prejudices, or sympathy.

You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others. They are all important. Please do not read into these instructions or anything I may say or have said or done as any suggestion as to what the verdict should be. That is a matter entirely up to you.

Sections 3372(d) and 3373(d)(3) in Title 16, United States Code, provide in part that it is unlawful for any person involved in a sale or purchase of fish with a market value greater than three hundred and fifty dollars, which is intended to be transported in interstate commerce, to knowingly -- knowingly to make any false record, account, or label for, or any false identification of, any such fish.

The defendant is charged in the Indictment with two counts of violating Sections 3372 and 3373 of Title 16 of the United States Code. Count one charges that defendant did knowingly make a false identification, record, account, or label of fish on or about January 2nd, 2010. Count two charges that defendant did knowingly make a false identification, record, account, or label of fish on or about January 2, 2010, and continuing up to on or about August 23, 2010.

In order for the defendant to be found guilty of these charges, the Government must prove each of the following

1  elements beyond a reasonable doubt:

2          First, the defendant knowingly made a false record

3  or account concerning, or a false label for, or a false

4  identification of a fish;

5          Second, the fish were intended to be transported in

6  interstate commerce; and

7          Third, the defendant's making of a false record or

8  account concerning, or false labor for -- label -- that says

9  labor, but it should be label -- or false label for, or false

10 identification of fish involved the sale or purchase of the

11 fish without a market value greater than -- with a market

12 value greater than three hundred and fifty dollars.

13         That's why you can read them because sometimes I

14 miss -- I'll read that again:

15         Third, the defendant -- third, the defendant's

16 making of a false record or account concerning, or false label

17 for, or false identification of fish involved the sale or

18 purchase of the fish without a market value greater than three

19 hundred and fifty dollars.

20         A defendant acts knowingly if he is aware of the act

21 and does not act through ignorance, mistake, or accident.  You

22 may consider evidence of the defendant's words, acts, or

23 omissions, along with all the other evidence, in deciding

24 whether the defendant acted knowingly.

25         A separate crime is charged against the defendant in

each count.  You must decide each count separately.  Your

verdict on one count should not control your verdict on any

other count.

A defendant may be found guilty of making a false

identification of fish worth more than three hundred and fifty

dollars that is being sold and shipped interstate, even if the

defendant personally did not commit the act or acts

constituting the crime, but aided and abetted it -- aid --

aided and abetted in its commission.

To prove a defendant guilty of aiding and abetting,

the Government -- Government must prove beyond a reasonable

doubt:

First, a crime of making a false identification of

fish worth more than three hundred and fifty dollars that is

being sold and shipped interstate was committed by someone;

Second, the defendant knowingly and intentionally

aided, counseled, commanded, induced or procured that person

to commit such element of the crime -- each element of the

crime of making a false identification of fish worth more than

fifty -- three hundred and fifty dollars that is being sold

and shipped interstate; and

Third, the defendant acted before the crime was

completed.  It is not enough that defendant merely associated

with the person committing the crime, or unknowingly or

unintentionally did things that were helpful to that person,

1  or was present at the scene of the crime.  The evidence must

2  show beyond a reasonable doubt that the defendant acted with

3  the knowledge and intention of helping that person commit the

4  crime of making a false identification of fish worth more than

5  three hundred and fifty dollars that is being sold and shipped

6  interstate.

7  The Government is not required to prove precisely

8  which defendant actually committed the crime and which

9  defendant aided and abetted.

10  Proof beyond a reasonable doubt is proof that leaves

11  you firmly convinced that the defendant is guilty.  It is not

12  required that the Government prove guilt beyond all possible

13  doubt.

14  A reasonable doubt is a doubt based upon reason and

15  common sense and is not based purely on speculation.  It may

16  arise from a careful and impartial consideration of all the

17  evidence, or from lack of evidence.  If, after a careful and

18  impartial consideration of all the evidence you are not

19  convinced beyond a reasonable doubt that the defendant is

20  guilty, it is your duty to find the defendant not guilty.  On

21  the other hand, if, after a careful and impartial

22  consideration of all the evidence you are convinced beyond a

23  reasonable doubt that the defendant is guilty, it is your duty

24  to find the defendant guilty.

25  A defendant in a criminal case has a constitutional

1  right not to testify.  You may not draw any inference of any

2  kind from the fact that the defendant did not testify.

3       You have heard testimony that the defendant made a

4  statement.  It is for you to decide whether the defendant made

5  the statement and, if so, how much weight to give to it.  In

6  making those decisions, you should consider all of the

7  evidence about the statement, including the circumstances

8  under which the defendant may have made it.

9       You have heard testimony from an undercover agent

10  who was involved in the Government's investigation in this

11  case.  Law enforcement officials may engage in stealth and

12  deception, such as the use of informants and undercover

13  agents, in order to investigate criminal activities.

14  Undercover agents and informants may use false names and

15  appearances and assume the roles of members in criminal

16  organizations.

17       An act is done knowingly if the defendant is aware

18  of the act and does not act through ignorance, mistake, or

19  accident.  The Government is not required to prove that the

20  defendant knew that his acts were unlawful.  You may consider

21  evidence of the defendant's words, acts, or omissions, along

22  with all other evidence, in deciding whether the defendant

23  acted knowingly.

24       The punishment provided by law for this crime is not

25  -- is for the Court to decide.  You may not consider

1    punishment in discern -- deter -- deciding whether the

2    Government has proven its case against the defendant beyond a

3    reasonable doubt.

4         When you begin your deliberations, elect one member

5    of the jury as your foreperson who will preside over the

6    deliberations and speak for you here in court.  You will then

7    discuss the case with your fellow jurors to reach agreement if

8    you can do so.  Your verdict, whether guilty or not guilty,

9    must be unanimous.

10        Each of you must decide the case for yourself, but

11   you should do so only after you consider all the evidence,

12   discussed -- discussed it fully with the other jurors, and

13   listened to the views of your fellow jurors.

14        Do not be afraid to change your opinion if the

15   discussion persuades you that you should, but do -- but do not

16   come to a decision simply because other jurors think it is

17   right.

18        It is important that you attempt to reach a

19   unanimous verdict but, of course, only if each of you can do

20   so after having made your own conscious decision --

21   conscientious decision.  Do not change an honest belief about

22   the weight and effect of the evidence simply to reach a

23   verdict.

24        Verdict forms will be prepare -- have been provided

25   -- prepared for you.  After you have reached unanimous

agreement on a verdict, your foreperson should complete the
verdict form according to your deliberations, sign and date
it, and advise the bailiff that you are ready to return to the
courtroom.

If it becomes necessary during your deliberations to
communicate with me, you may send a note through the bailiff
signed by any one or more of you.  No member of the jury
should ever attempt to communicate with me except by a signed
writing, and I will respond to the jury concerning the case
only in writing or here in open court.  If you send out a
question, I will consult with the lawyers before answering it,
which may take some time.  You may continue your deliberations
while waiting for answer to -- the answer to any question.

Remember that you are not to tell anyone, including
me, how the jury stands numerically or otherwise on any -- on
-- on any question submitted to you, including the question of
-- of the guilt of the defendant until after you have reached
a unanimous verdict or have been discharged.

On the day you reach your verdict, if you should
agree upon your verdict before 5:00 p.m., you should have your
foreperson date and sign the verdict form unanimously agreed
upon by your members and return it immediately into open court
in the presence of the entire jury, together with any exhibits
and these instructions.

In the event that you do not arrive at a verdict

1    before 5:00 p.m., you may go to your homes or place of abode

2    for the night, but you must return to the jury room to

3    continue your deliberations at 8:30 a.m. the following

4    morning.

5            Now in this case, if you don't reach a verdict

6    today, you'll have the weekend off and you come back and

7    continue deliberations Monday morning.

8            That's it.  Get it?  Okay.  We're getting -- we're

9    going to get -- getting many copies of these made as I speak.

10   The actual verdict forms will be blue-backed, so they'll be --

11   you'll see -- so you can tell them from the other

12   instructions.

13           Now, here's the exciting part.  Do you have the --

14   the roster?

15           THE CLERK:  You ready?

16           THE COURT:  Can you give it a crank of a yank?

17   Counsel, any reason why we cannot proceed with selecting

18   alternates at this time?

19           MR. COOPER:  Not unless there's some juror that

20   needs to, but --

21           THE COURT:  I'll check on that, but other than that?

22           MR. CURTNER:  No, Your Honor.

23           THE COURT:  Anyone here feel that they can't

24   continue?  That they're ill, dying, or eloping or something?

25   You all ready?  Okay.  Let's just give it a crank of a yank,

1  pick out two names.

2                          (Pause - laughter)

3          THE COURT:  What did you do?

4          THE CLERK:  I didn't do anything.

5          THE COURT:  That's what she always says.

6          THE CLERK:  (States name of Juror No. 10).

7          THE COURT:  Okay.  Who's that?  Just raise your

8  hand.  Okay.  All right.  Well, you've still got another

9  Olympics, right?  Keep going, keep going, you're okay.  Next?

10         THE CLERK:  (States name of Juror No. 4).

11         THE COURT:  Okay.  Thank the two of you on each end

12 of the spectrum very much.  Whenever we have two alternates,

13 no one gets sick, but if we try to go with one or maybe --

14 then everybody gets sick.  So, that's -- that's just the way

15 it works.  I don't know what you're going to do.  It's only

16 quarter to eleven.  The meals aren't even going to get here

17 until noon.  So, if you're hungry, you can hang around,

18 otherwise we'll donate it to the cause, okay?  But thank both

19 of you very much and when everyone -- excused now.  You can

20 just grab your things and are free to go.

21         Everyone else can go -- take your notes with you now

22 and we'll bring the exhibits back in a minute and we'll bring

23 the instructions back.

24                          (Pause)

25 Alternates, you can just -- what do you do with their notes?

1          THE CLERK:  I'll take the notebooks.

2          THE COURT:  She'll get your notebooks.  Yeah, and

3    we're going to just -- we just destroy the notes.

4          UNIDENTIFIED SPEAKER:  (Indiscernible - away from

5    microphone.)

6          THE CLERK:  Yep.

7          THE COURT:  Thank you, again, sir.

8                    (Pause - side conversation)

9        (Jury out at 10:50 a.m.)

10          THE COURT:  Okay.  Let's get the exhibits ready to

11   go and counsel should make sure that only the admitted

12   exhibits are -- go to the jury.  I will go get the

13   instructions.  Any -- did I misstate the instructions or

14   misread them?

15          MR. COOPER:  No, that was fine, Your Honor.

16          THE COURT:  Okay.

17          MR. CURTNER:  (Indiscernible.)

18          THE COURT:  Okay.  I'll get -- we'll get at least

19   six maybe as many as twelve copies of the instructions and

20   we'll get the verdict forms, we'll get them all in there.

21   Bailiff needs to make sure we have telephone numbers of

22   counsel and of defendant so that if there's any questions, we

23   can quickly respond to those.  Thank you.

24          THE CLERK:  All rise.  This Court stands in recess

25   until 11:00 a.m.

1   (Recess at 10:51 a.m., until 11:29 a.m.)

2   (Jury not present)

3       THE CLERK:  All rise.  His Honor the Court, the

4   United States District Court for the District of Alaska is

5   again in session, the Honorable Ralph R. Beistline presiding.

6   Please be seated.

7       THE COURT:  Okay.  The -- the jurors need a CD --

8   DVD player -- monitor and/or CD player.  Do you have that, Mr.

9   Cooper?

10      MR. COOPER:  I see it.  Yes, Your Honor.

11      THE COURT:  Do you have the player?

12      MR. COOPER:  Yeah, I believe they have this computer

13      THE COURT:  Can you -- something that we can give

14  the jury so they can play them?

15      MR. COOPER:  I think we probably can.  I'll have to

16  ask.  It's --

17      THE COURT:  Okay.

18      MR. COOPER:  -- on computer here.

19      THE COURT:  No, I mean the -- all these disks that

20  were submitted into evidence, they have them, and they want to

21  put them on something and play them, I presume.

22      MR. COOPER:  Yeah, that's a -- yeah, this -- they --

23  a simple player, that would be the way to go.  I -- I have to

24  ask the people in the office here.  I don't know the answer --

25      THE COURT:  What's your view?

1          MR. CURTNER:  We can give them my laptop, but --

2          THE COURT:  Well, we've got to solve this problem.

3    This happens in every trial.

4          MR. CURTNER:  Oh, really.

5          THE COURT:  Yeah, every trial.  You submit a CD or

6    something into evidence and then we don't know how -- they --

7    then they always ask can we put -- we want to see it, and so

8    we come back in here and we kind of look at each other.  We

9    need to solve this problem.

10          MR. COOPER:  Yes.  If I can call --

11          THE COURT:  Yes, call.

12          MR. COOPER:  -- my office?

13          THE COURT:  Whatever you -- do what --

14          MR. CURTNER:  Did they say they had a problem with

15    my salmon strips or my (indiscernible - simultaneous

16    speakers).

17          THE COURT:  They -- they said they'd like another

18    dozen.

19          THE CLERK:  You just want the office?

20          UNIDENTIFIED SPEAKER:  They need a DVD player?

21          THE COURT:  Mm-hmm (affirmative).  They need

22    something to play these --

23          UNIDENTIFIED SPEAKER:  We have DVD players --

24    there's a television downstairs in the weight room.

25          THE CLERK:  We used to have one -- we do have a DVD

1    player that we use to show the jury --

2           THE COURT:  Well, maybe we'll bring that in.

3           THE CLERK:  I don't know if it'll work the audio

4    though.  I mean, it's just a --

5           UNIDENTIFIED SPEAKER:  It should still play it

6    (indiscernible - away from microphone) picture.  Most DVD's

7    play the --

8           THE CLERK:  Audio tracks?

9           UNIDENTIFIED SPEAKER:  -- (indiscernible - away from

10   microphone).

11          THE COURT:  Well, I'm just in the wrong generation

12   for all this.  I just sit up here -- I just want to get it

13   done.  I don't care how it gets done, and --

14          UNIDENTIFIED SPEAKER:  I cook them dinner.

15          THE COURT:  -- and you could -- if you have a

16   solution, fine, but we've got to get -- and technology is

17   moving so fast --

18       (Indiscernible - simultaneous speakers at this point.)

19          THE CLERK:  Well, the only thing (indiscernible)

20   snips of the audio on the record.  I don't know how that --

21          THE COURT:  Whatever's in the CD is the evidence.

22   They can --

23          THE CLERK:  They can play the whole thing if they

24   want.

25          THE COURT:  Whatever -- they can use the evidence,

1    whatever they want to do with the evidence, but they can't

2    just hold it in their hand, it's got to be put into something.

3              MR. COOPER:  (Indiscernible - talking on telephone.)

4              MR. CURTNER:  Now, what's that -- oh, that's video

5    conference.  That's too --

6              THE CLERK:  Right.

7              MR. CURTNER:  I could run to the store.

8              THE CLERK:  You going to go buy them a laptop to

9    watch?

10                   (Pause - side conversation)

11             MR. CURTNER:  Hey, Judge, you need the -- the Court

12   needs to have, I think, a clean laptop that can be in the jury

13   room that doesn't have anything on it that people can put

14   things in --

15             THE COURT:  Well, there's -- the new jur -- juror

16   system is the -- courtroom one in Anchorage is all set up to

17   deal with everything, but not us.

18             MR. CURTNER:  Well, let's send them to Anchorage.

19             MR. COOPER:  They have a -- they have a laptop

20   computer over at (indiscernible - away from microphone) take

21   about fifteen minutes to get it.

22             THE COURT:  Well, that is unbelievable.

23             MR. COOPER:  That's -- it won't work in just an

24   ordinary player, it has to go to a computer in order to play

25   it and there's a monitor on it, so --

1    THE COURT:  Wouldn't you -- you look like you have a

2  solution.

3    THE CLERK:  Well, we have the -- we have a DVD

4  player that we could take in there.

5    THE COURT:  What would that do?

6    MR. COOPER:  What we should do is try it

7  (indiscernible - simultaneous speakers).

8    MR. CURTNER:  The original note that was crossed out

9  says they want to watch the video of Stark and Sears, and

10  that's just the DVD, so if you give a DVD player, they can

11  watch that right now.  And they don't -- they can't play audio

12  recordings -- it probably should, but they can't

13  (indiscernible).

14    MR. COOPER:  That has a sound track on it

15  (indiscernible - voice too low).

16    MR. CURTNER:  Yeah.  It should play it.

17    MR. COOPER:  Well --

18    THE CLERK:  It should.

19    UNIDENTIFIED SPEAKER:  It should.

20    MR. COOPER:  -- (on the telephone) you say it won't

21  work on an ordinary DVD player --

22    THE COURT:  Well, the --

23    MR. CURTNER:  Judge, do you want to just give them

24  that?

25    MR. COOPER:  -- or not?  Okay.  They need to be

1   played on a computer.  I see.  Well, then that's what we need

2   to do.

3           THE COURT:  Okay.  We'll just have to bring them in,

4   we'll all sit quietly while they re -- while they bring the

5   computer back, then we'll play whatever they tell us to play.

6           MR. COOPER:  Yeah, I would (indiscernible - away

7   from microphone).

8           THE COURT:  Bring -- bring their computer back in

9   here.

10           MR. COOPER:  Thank you.  Be just a few minutes.

11   They're going to go get it and bring it --

12           THE COURT:  Oh, you mean it's not -- what -- what --

13           MR. COOPER:  Oh, it's in the Fish and Wildlife

14   office over on Airport Road.

15           THE COURT:  Well, what have they been playing for

16   the last three days?

17           MR. COOPER:  Well, that's -- you have all kinds of

18   things in it.  We got a kind of a more or less empty computer

19   over at the --

20           THE COURT:  No, my point is we'll sit here, they'll

21   tell us what they want played.

22           MR. COOPER:  Oh, (indiscernible - away from

23   microphone).

24           THE CLERK:  Yeah, go ahead.

25           THE COURT:  They can do both, but I don't want to do

1  -- let's do something.  Like I tell my kids, do something, I

2  don't -- do something.  I don't care what college, go to -- I

3  don't care, just do something.  They all probably rushed out

4  the door across town.

5          MR. COOPER:  (Indiscernible - away from microphone.)

6          THE COURT:  Okay.  I just want --

7          THE CLERK:  Do you want to go off record?

8          THE COURT:  Yes, please.  And do something.

9      (Recess at 11:35 a.m., until 11:45 a.m.)

10     (Jury not present)

11         INVESTIGATOR JOHNSON:  -- little bit more tricky to

12 deal with, but the audio you can burn to a CD and then it can

13 play in just any --

14         THE COURT:  We're -- this is 2012 we're in, right?

15         INVESTIGATOR JOHNSON:  Yeah.

16     (Indiscernible - simultaneous speakers)

17         THE COURT:  Okay.  Well --

18         MR. COOPER:  We can copy all the sound tracks.

19         THE COURT:  I'm ready.  See, if Ms. Haden had been

20 doing all of this, we would have never had this problem.

21              (Pause - side conversation)

22         MR. COOPER:  We can also give them a computer -- an

23 empty computer that will work and -- and play it for them.

24         THE COURT:  We don't have an empty computer, do we?

25         MR. COOPER:  Well --

1        UNIDENTIFIED SPEAKER:  One of our agents is --

2        THE COURT:  On the way to get one?

3        UNIDENTIFIED SPEAKER:  -- (indiscernible -

4   simultaneous speakers) laptop from the office in case we want

5   to do that.

6        THE COURT:  So, they would then have an empty

7   computer, they could put these disks in --

8        MR. COOPER:  That's right.

9        THE COURT:  -- and what would it play on?  What

10  would it show up on?

11       MR. COOPER:  All the disks.

12       UNIDENTIFIED SPEAKER:  Well, they'd have to look at

13  it on the screen of the laptop.  This would be a laptop

14  computer.

15       THE COURT:  Oh, it'd be a laptop computer.  I'll ask

16  them if they've got the technic --

17                      (Pause)

18     (Jury in at 11:46 a.m.)

19       THE COURT:  Did your lunch get here yet?

20       THE JURORS:  (Indiscernible - simultaneous

21  speakers).

22       THE COURT:  Okay.  Well, we just wanted you to get

23  the smell of it.  Okay.  This is just brief.  Who's the

24  foreperson by the way?

25       UNKNOWN JUROR:  (Indiscernible - away from

1   microphone.)

2           THE COURT:  Yes.  Here's the deal.  I've got your

3   note and it said recording of -- I think it says Stark and

4   Sears of AFN record -- and then that was crossed out and then

5   "We need a DVD player and monitor and/or CD player."

6   That's --

7           JUROR NO. 5:  We wanted to watch that --

8           THE COURT:  I understand that.  Things are getting

9   complicated because we don't have all the equipment we need.

10  We're rushing over -- what we can do is you tell us what we

11  want and everybody remains perfectly quiet, and we can play it

12  up here while we're waiting.  Someone else is --

13          UNIDENTIFIED SPEAKER:  (Indiscernible - simultaneous

14  speakers).

15          THE COURT:  -- someone else rushing over to try to

16  get a laptop, but then I don't know if you know how to do it.

17  So, can we -- we're trying -- so what would you like us to do?

18          UNKNOWN JUROR:  If you could just play that first --

19  the tape with the audio?

20          THE COURT:  Okay.

21          UNKNOWN JUROR:  That's what we'd really like.

22          THE COURT:  Now, here's the -- here's the -- here's

23  the rules.  No discussion, no deliberations at all while we're

24  here.

25          UNKNOWN JUROR:  Okay.

1    THE COURT:  You tell us what you want us to do and

2 we'll do it.

3    UNKNOWN JUROR:  Okay.

4    THE COURT:  Okay.  And that applies to everyone here

5 as well.  Okay.  So, we need the light -- you know what --

6 you --

7    MR. COOPER:  (Indiscernible - away from microphone.)

8    THE COURT:  Okay.  And if -- there we go.  Can we

9 dim the lights when it comes up?  Okay.

10    (Exhibit 1 played for the jury)

11    THE COURT:  All right.  Do you want to just go back

12 now?  If you need anything, we'll be around, okay?  We -- we

13 have other things going on, but we'll fit you in.

14    UNKNOWN JUROR:  Okay.

15    THE COURT:  Okay.  All right, thanks.  Enjoy your

16 lunch.

17                    (Pause)

18    (Jury out at 11:57 a.m.)

19    THE COURT:  Okay.  So, why don't we keep -- why

20 don't we do two things.  You can go to lunch and you can go

21 get the other computer in case they ask again, and we'll --

22 we'll be flexible.  We don't know what the afternoon has to

23 bring, but it may be we just keep going back and forth,

24 although I've got sentencings all afternoon, but we'll work it

25 out.

1        MR. CURTNER:  We'll do that.

2        THE COURT:  Okay.  Have a good lunch.  Thanks.

3        MR. COOPER:  Thank you.

4        MR. CURTNER:  Thank you.

5        THE CLERK:  Off record.

6    (Recess at 11:57 a.m., until 1:24 p.m.)

7    (Jury not present)

8        THE CLERK:  All rise.  His Honor the Court, the

9    United States District Court for the District of Alaska is

10   again in session, the Honorable Ralph R. Beistline presiding.

11   Please be seated.

12       THE COURT:  Okay.  Thank you.  I've got a note that

13   says that they have a verdict.  I don't see where the note is,

14   but I presume that's right.  Okay.  Any reason why we can't

15   bring the jury in?

16       MR. CURTNER:  No.

17       MR. COOPER:  No, Your Honor.

18       THE COURT:  Okay.  We'll take the verdict.

19            (Pause - side conversation)

20   (Jury in at 1:25 p.m.)

21       THE COURT:  I believe I can have the foreperson just

22   hand the verdict to the -- to the bailiff, and -- I will say

23   this before I even look at the form.  I'll address this to the

24   foreperson.  Did you reach a verdict?

25       THE FOREPERSON:  Yes, we did.

1                              **VERDICT**

2              THE COURT:  Okay.  I'll just read the verdict into

3   the record.  Verdict -- let's see here, verdict number one:

4              "We, the jury, duly empaneled to try the above-

5              entitled matter, do find the defendant, Willis Scott

6              Maxon, guilty of the crime of false identification,

7              in violation of Title 16" -- et cetera.

8   Then verdict number two:

9              "We, the jury duly empaneled to try the above matter

10             do find the defendant, Willis Scott Maxon, guilty of

11             the crime of false identification as set forth in

12             count two."

13  So, you found the defendant guilty of both count one and count

14  two, is that right?

15             THE FOREPERSON:  Yes, sir.

16             THE COURT:  Okay.  I'll have my Clerk poll the jury,

17  and she's just going to ask each of you if this is your true

18  and correct verdict, and just say yes or no.  Okay.  Madam

19  Clerk?

20             THE CLERK:  Juror No. 1, are these your true and

21  correct verdicts?

22             JUROR NO. 1:  Yes.

23             THE CLERK:  Juror No. 2, are these your true and

24  correct verdicts?

25             JUROR NO. 2:  (No audible reply.)

1          THE CLERK:  Juror No. 3, are these your true and

2    correct verdicts?

3          JUROR NO. 3:  Yes.

4          THE CLERK:  Juror No. 5, are these your true and

5    correct verdicts?

6          JUROR NO. 5:  Yes.

7          THE CLERK:  Juror No. 6, are these your true and

8    correct verdicts?

9          JUROR NO. 6:  Yes.

10         THE CLERK:  Juror No. 7, are these your true and

11   correct verdicts?

12         JUROR NO. 7:  Yes.

13         THE CLERK:  Juror No. 8, are these your true and

14   correct verdicts?

15         JUROR NO. 8:  Yes.

16         THE CLERK:  Juror No. 9, are these your true and

17   correct verdicts?

18         JUROR NO. 9:  Yes.

19         THE CLERK:  Juror No. 11, are these your true and

20   correct verdicts?

21         JUROR NO. 11:  Yes.

22         THE CLERK:  Juror No. 12, are these your true and

23   correct verdicts?

24         JUROR NO. 12:  Yes.

25         THE CLERK:  Juror No. 13, are these your true and

1    correct verdicts?

2              JUROR NO. 13:  Yes.

3              THE CLERK:  Juror No. 14, are these your true and

4    correct verdicts?

5              JUROR NO. 14:  Yes.

6              THE CLERK:  Thank you.  So say you one, so say you

7    all.  Your Honor, the jurors have been polled and have all

8    answered in the affirmative.

9              THE COURT:  All right.  Very good.  So, ladies and

10   gentlemen, thank you very much.  Counsel, anything before I

11   excuse the jury?  From the Government?

12             MR. COOPER:  No, Your Honor.

13             MR. CURTNER:  No, Your Honor.

14             THE COURT:  I'm going to be in the back in just a

15   couple minutes to ask -- answer any questions you might have,

16   but we'll stand in recess until that time.  Thank you again

17   very, very much.  I'll do it in person in a minute, okay?  And

18   counsel, if either of you would like to look at the verdict

19   forms -- Jody, if you'll make these available to counsel if

20   they would like to look at those.

21                            (Pause)

22        (Jury dismissed at 1:27 p.m.)

23             THE COURT:  Okay.  Based on the -- on the verdict

24   entered by the jury, I will accept the verdict, enter

25   adjudication of guilt based thereon, and order a presentence

1  report.  The probation officer is right back there.  They'll

2  need to meet with the defendant and with counsel at some

3  reasonable time, and a presentence report will be prepared.

4  It will help me understand what an appropriate sentence might

5  be.  I'll set sentencing for April 6th, 2012, here at nine

6  o'clock in the morning, and bail conditions will remain as

7  currently in effect.  Does the Government have anything else?

8                MR. COOPER:  No, Your Honor.

9                THE COURT:  Mr. Curtner, anything?

10               MR. CURTNER:  No, Your Honor.  Thank you.

11               THE COURT:  Defendant, any questions about this?

12               THE DEFENDANT:  (No audible reply.)

13               THE COURT:  Let me just -- what you're supposed to

14  do is just stay out of trouble between now and sentencing,

15  come in here and do sentencing, and then get on with your

16  life.  That's the -- that's it in a nutshell.  I have no idea

17  what the sentence will be at this point in time.

18               Will parties -- before they leave, we need to get

19  the exhibits back and make sure you get all the exhibits back

20  before -- before you leave.  Okay?

21               MR. COOPER:  April 6th at what time did you --

22               THE COURT:  Nine in the morning.

23               MR. COOPER:  Thank you.

24               THE COURT:  Okay.  Thank you very much.  We'll stand

25  in recess.

1            THE CLERK:  All rise.  This Court stands in a brief

2  recess.

3        (Proceedings concluded at 1:29 p.m.)

1                              **INDEX**

2                                                              Further
                    Direct    Cross    Redirect    Recross    Redirect
3
  REBUTTAL WITNESSES
4   FOR THE GOVERNMENT:

5   Francisco
     Solis, Jr.       3-5       3-16       3-18
6

7   EXHIBITS:                                      Marked    Received

8   GOVERNMENT:

9   40   Audio recording                                      3-9

10

11                                                           Page

12  GOVERNMENT'S CLOSING ARGUMENT:  Mr. Cooper               3-21

13  DEFENDANT'S CLOSING ARGUMENT:  Mr. Curtner               3-37

14  GOVERNMENT'S REBUTTAL ARGUMENT:  Mr. Cooper              3-44

15  JURY INSTRUCTIONS                                        3-52

16  VERDICT                                                  3-74

17

18

19

20

21

22

23

24

25

1
**CERTIFICATE**

2    I certify that the foregoing is a correct transcript from the
    electronic sound recording of the proceedings in the above-
3    entitled matter.

4

5      /s/ D. Kathleen Stegmiller                    11/16/2012
    D. Kathleen Stegmiller, Transcriber                 Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25